UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| Catfish Farmers of America, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Court No. 20-00105 |
| United States, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

1. This action is commenced pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) to contest the U.S. Department of Commerce's ("Commerce") final results of the fifteenth administrative review of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"), published in the *Federal Register* as *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) (fin. results) (hereinafter, "*Final Results*").

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).

## STANDING

3. Plaintiffs, Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and

1

Simmons Farm Raised Catfish, Inc. (collectively, "Catfish Farmers of America, *et al.*") are domestic producers and/or processors of frozen fish fillets (and, in the case of Catfish Farmers of America, a trade association, a majority of whose members manufacture or process the domestic like product), and thus, are interested parties as defined in 19 U.S.C. §§ 1677(9)(C) and (G). The Catfish Farmers of America actively participated in the administrative proceeding that resulted in the contested determination, and thus, are entitled to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS

4. Commerce published its notice of the final results of the administrative review in the *Federal Register* on April 29, 2020. *See Final Results*. On May 13, 2020, Plaintiffs commenced this action by the timely filing of a summons with this Court within the thirty-day statutory time limit specified in 19 U.S.C. § 1516a(a)(2)(A).

5. This complaint is being filed concurrently with the filing of the summons, and thus, is timely within the statutory time limits specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and in accordance with 28 U.S.C. § 2636(c).

## SUMMARY OF FACTS

6. On September 28, 2018, Commerce initiated an administrative review of the antidumping duty order on certain frozen fish fillets from Vietnam. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 50,077, 50,080, 50,081 (Dep't of Commerce Oct. 4, 2018) (notice of initiation). Following the withdrawal of review requests for several companies, Commerce selected NTSF Seafoods Joint Stock Company ("NTSF") as a mandatory respondent.

7. On October 22, 2019, Commerce published its preliminary results of the administrative review. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 84 Fed. Reg. 56,420 (Dep't of Commerce Oct. 22, 2019) (prelim. results) (hereinafter, "*Preliminary Results*"). Despite using Indonesia as the primary surrogate country for valuing the factors of production ("FOP") in six previous segments of the proceeding, and despite the Indonesian data on the record being superior to the Indian data, Commerce selected India and relied primarily on Indian surrogate value data in its *Preliminary Results*. Commerce preliminarily determined a weighted-average dumping margin of $0.00 per kilogram for NTSF for the period of review. *See Preliminary Results* at 56,421.

8. From February 3, 2020 through February 11, 2020, Commerce conducted verification of NTSF in Vietnam. Verification confirmed that various data reported by NTSF were not supported by its normal books and records, that it failed to report accurate FOPs on a CONNUM-specific basis, and that its FOP allocation methodology is distortive.

9. On April 29, 2020, Commerce published the *Final Results*, in which it, *inter alia*, affirmed its selection of India as the primary surrogate country, accepted most of NTSF's reported data, and assigned NTSF a $0.15 per kilogram weighted-average dumping margin. *See Final Results* at 23,757.

COUNT 1

10. Paragraphs 1-9 are hereby incorporated by reference.

11. Commerce's selection of India as the primary surrogate country is not supported by substantial evidence, is inconsistent with prior agency practice, and is otherwise contrary to law. In six previous administrative reviews of this proceeding, Commerce has determined correctly that Indonesia was the appropriate primary surrogate country. Substantial record

evidence continues to justify a finding that Indonesia is more suitable than India as the primary surrogate country. Because Commerce did not select the best primary surrogate country, and for other reasons that can be found in the public and confidential administrative record to be filed with the Court, Commerce's *Final Results* are not supported by substantial evidence and are not in accordance with law.

## COUNT 2

12.  Paragraphs 1-11 are hereby incorporated by reference.

13.  Even if Commerce were correct in selecting India as the primary surrogate country, its reliance on Indian surrogate values for certain FOPs is not supported by substantial evidence and is not in accordance with law because the Indonesian values are superior, and the Indian values are distortive. For example, the Indian values for fingerlings, whole live fish, fish feed, labor, and the Indian financial statements each are not suitable surrogates, while their Indonesian counterparts satisfy Commerce's surrogate value criteria. For these and other reasons that can be found in the public and confidential administrative record to be filed with the Court, Commerce's rejection of the individual Indonesian values in favor of the individual Indian values is not supported by substantial evidence and is not in accordance with law.

## COUNT 3

14.  Paragraphs 1-13 are hereby incorporated by reference.

15.  Commerce's refusal to apply total adverse facts available to NTSF is not supported by substantial evidence, is inconsistent with prior agency practice, and is otherwise contrary to law. Substantial record evidence in this administrative review demonstrates that NTSF's reported FOP data are generally unreliable. Much of NTSF's reported data do not reconcile to its normal books and records, its reported per-unit FOPs are not CONNUM-specific

and are otherwise inaccurate, its U.S. and FOP CONNUMs are inaccurate, its finished goods production volume is unverifiable, and its reported data are otherwise not usable. NTSF's reporting failures prohibited a proper calculation. Commerce's practice in previous segments of the proceeding with similarly faulty data is to apply total adverse facts available. Yet, Commerce continued to rely on most of these data in the *Final Results*.

16. Moreover, NTSF was provided multiple opportunities to submit reliable, CONNUM-specific FOP data and accurate U.S. and FOP CONNUMs, but failed to do so. For these and other reasons that can be found in the public and confidential administrative record to be filed with the Court, Commerce should have rejected NTSF's data and based its margin entirely on AFA.

## COUNT 4

17. Paragraphs 1-16 are hereby incorporated by reference.

18. Even if Commerce's refusal to apply total adverse facts available to NTSF is lawful, its determination not to apply partial adverse facts available to NTSF's unreliable data is not supported by substantial evidence and is not in accordance with law.

19. As noted in Count 3, much of NTSF's reported data are unreliable. In each instance of unreliable reporting, Commerce should have made an adverse adjustment in accordance with 19 U.S.C. §§ 1677e(a) and (b). Thus, for example, Commerce should have adversely adjusted or otherwise restated some of NTSF's factors of production because its reported data were unreliable and unreconcilable. For these and other reasons that can be found in the public and confidential administrative record to be filed with the Court, Commerce's determinations to accept each instance of NTSF's unreliable reporting without making an adverse adjustment is not supported by substantial evidence and is not in accordance with law.

## COUNT 5

20. Paragraphs 1-19 are hereby incorporated by reference.

21. Commerce's determination to grant NTSF certain byproduct offsets is not supported by substantial evidence and is not in accordance with law because NTSF's data could not support such offsets. For this and other reasons that can be found in the public and confidential administrative record to be filed with the Court, Commerce should have denied all of NTSF's claimed byproduct offsets.

## DEMAND FOR JUDGMENT AND RELIEF

22. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, declare that Commerce erred in the *Final Results* as alleged herein, remand this matter to Commerce to reconsider its surrogate country and surrogate value selections, reconsider its refusal to apply a total AFA rate to NTSF or alternatively to reconsider its acceptance of NTSF's unreliable data, and grant Plaintiffs such further relief as the Court may deem appropriate.

Respectfully submitted,

Date: May 13, 2020 /s/ Jonathan M. Zielinski

Jonathan M. Zielinski
James R. Cannon, Jr.
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
202-787-5507
jzielinski@cassidylevy.com

*Counsel to the Catfish Farmers of America, et al.*