# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *ET AL.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Ct. No. 20-00105 |
| v. | ) | |
| | ) | **PUBLIC** |
| UNITED STATES, | ) | **VERSION** |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NTSF SEAFOODS JOINT STOCK COMPANY, | ) | |
| | ) | Business Proprietary |
| Defendant-Intervenor. | ) | Information Removed |
| | ) | from Brackets on Pages iii, |
| | ) | 10, 20, 22-26. |
| | ) | |

## REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S OPPOSITION TO THE CATFISH FARMERS OF AMERICA, *ET AL.*'S MOTION FOR JUDGEMENT UPON THE AGENCY RECORD

Jonathan M. Zielinski
James R. Cannon, Jr.
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 787-5507
F: (202) 567-2301
E-mail:  jzielinski@cassidylevy.com

*Counsel to the Catfish Farmers of America, et al.*

Dated:  May 26, 2021

## Table of Contents

I.   Argument ........................................................................ 2

A.  Neither the Record Nor Commerce's Practice in this Proceeding
    Support the Choice of India as the Primary Surrogate Country ....... 3

1.  Indonesia is Economically Comparable to Vietnam and Should
    Have Been Treated Equally to All Other Countries on the List of
    Potential Surrogate Countries ........................................... 5

2.  India Is Not a Significant Producer of Comparable Merchandise .. 8

3.  Indonesian Data Were the Best Available Information on the
    Record ........................................................................ 14

B.  NTSF Failed to Verify Its Production Inputs ................................. 20

C.  NTSF Failed to Report Product-Specific FOPs for Whole Fish ...... 22

D.  NTSF Overstated the Moisture Content of Its Unsoaked and Soaked
    Fish Fillets, Rendering CONNUM Matching Unreliable .............. 24

II.  Conclusion ........................................................................ 27

Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677b(c)(1) ......................................................................3

19 U.S.C. § 1677b(c)(2)(B) ...............................................................6

19 U.S.C. § 1677b(c)(4) ...............................................................3, 8, 12

Regulations

19 C.F.R. § 351.307(d) ....................................................................21

Court Decisions

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366 (Ct.
Int'l Trade 2012) ..............................................................................15

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d
1256 (Ct. Int'l Trade 2017) .................................................................7

*Anderson v. U.S. Sec'y of Agriculture*, 30 CIT 1742, 462 F. Supp. 2d 1333 (2006)
...........................................................................................5

*ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285 (Ct. Int'l Trade
2018) ........................................................................................21

*Bristol Metals L.P. et al. v. United States,* 703 F. Supp. 2d 1370 (Ct. Int'l Trade
2010) ........................................................................................14

*Catfish Farmers of Am. v. United States*, 2013 Ct. Intl. Trade LEXIS 66, Ct. No.
11-00109, Slip Op. 2013-63 (Ct. Int'l Trade 2013)....................................3

*Dupont Teijin films China Ltd. v. United States*, 7 F. Supp. 3d 1338 (Ct. Int'l Trade
2014) ........................................................................................22

*Godaco Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ...................................................................................26

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .............................................................................................26

*Mukand, Ltd. v. United States*, 767 F.3d 1300 (Fed. Cir. 2014) ............................22

*SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) .......5

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ...............................................................................................24

[
    ] ...................................................................................22

*Trs. in Bankruptcy of N. Am. Rubber Thread Co. v. United States*, 32 CIT 663 F. Supp. 2d 1367 (2008) ...............................................................................6

*Zenith Elecs. Corp. v. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ..................24


Administrative Decisions

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews; 2010–2011*, 78 Fed. Reg. 17,350 (Dep't. Commerce Mar. 21, 2013) ..............................18

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review; 2016–2017*, 84 Fed. Reg. 18,007 (Dep't. Commerce Apr. 29, 2019)  17-18

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 Fed. Reg. 47,771 (Dep't. Commerce Aug. 9, 2010) ...............................................16

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:
Final Affirmative Determination of Sales at Less Than Fair Value and Partial
Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (Dep't.
Commerce July 15, 2008) ......................................................................14

*Certain Oil Country Tubular Goods from the People's Republic of China:  Final
Determination of Sales at Less Than Fair Value, Affirmative Final Determination
of Critical Circumstances and Final Determination of Targeted Dumping*, 75 Fed.
Reg. 20,335 (Dep't of Commerce Apr. 19, 2010) ...................................19

*Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of
Final Results of Antidumping Duty Administrative Review,* 68 Fed. Reg. 19,504
(Dep't. Commerce Apr. 21, 2003) ...........................................................9

*Freshwater Crawfish Tail Meat from the People's Republic of China:  Notice of
Preliminary Results of Antidumping Duty Administrative Review*, 67 Fed. Reg.
63,877 (Dep't. Commerce Oct. 16, 2002) ............................................. 8-9

*Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium
and Alloy Magnesium From the Russian Federation,* 60 Fed. Reg. 16,440 (Dep't.
Commerce Mar. 30, 1995) ......................................................................9

*Notice of Preliminary Determinations of Sales at Less Than Fair Value and
Postponement of Final Determinations:  Pure and Alloy Magnesium From the
Russian Federation*, 59 Fed. Reg. 55,427 (Dep't. Commerce Nov. 7, 1994) ..........9

## GLOSSARY OF CASE-SPECIFIC ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **CFA** | Catfish Farmers of America, *et al*. |
| **CONNUM** | Control Number |
| **FOP** | Factor of production |
| **GNI** | Gross National Income |
| **IDM** | Issues and Decision Memorandum |
| **LTFV** | Less Than Fair Value |
| **NME** | Non-market economy |
| **NTSF** | NTSF Seafoods Joint Stock Company |
| **POR** | Period of review |
| **PRODFORM** | Product form, as reported in response to Commerce's questionnaire.  Appx89648-89649. |
| **PRODSIZE** | Product size, the size/weight band of the fillet, as reported in response to Commerce's questionnaire.  Appx89649-89650. |
| **SV** | Surrogate value |

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *ET AL*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| NTSF SEAFOODS JOINT STOCK COMPANY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

Ct. No. 20-00105

**PUBLIC VERSION**

## REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S OPPOSITION TO THE CATFISH FARMERS OF AMERICA, *ET AL*.'S MOTION FOR JUDGEMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2(d) of the Rules of the United States Court of International Trade, Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "Catfish Farmers of America, *et al*.," "CFA," or "Plaintiffs") hereby submit this reply to the memoranda in opposition to Plaintiffs'

1.

Motion for Judgement upon the Agency Record, filed by Defendant the United States and Defendant-Intervenor NTSF Seafoods Joint Stock Company ("NTSF") in the above-captioned appeal, ECF Doc. No. 43 (Mar. 31, 2021) ("*Def. Br.*"); ECF Doc. No. 44 (Apr. 12, 2021) ("*NTSF Br.*").

## I.  ARGUMENT

The Plaintiffs' opening brief demonstrated that Commerce's selection of India as the primary surrogate country was not supported by substantial evidence and was inconsistent with Commerce's practice because Indonesia is economically comparable to Vietnam and, unlike India, is a significant producer of comparable frozen fish fillets and provides comprehensive high-quality surrogate values data. *See* Memorandum in Support of the Rule 56.2 Motion for Judgement on the Agency Record Filed by Plaintiffs, Catfish Farmers of America, *et al.*, ECF Doc. No. 31-2 (Nov. 6, 2020) ("*CFA Br.*").  The opening brief also demonstrated that NTSF's reported data were not reliable because NTSF was unable to reconcile its reported inputs and outputs, NTSF failed to report its FOP usage data on a product-specific basis (*i.e.*, on a control number (or "CONNUM") specific basis), and NTSF overstated its added soaking water (or moisture content) of its unsoaked and soaked fillets.  The Government and NTSF respond by arguing that Commerce is not bound by its previous reliance on Indonesian data, that India's data are

2.

superior, and that substantial evidence supported Commerce's use of NTSF's

reported production inputs.

The Government and NTSF are mistaken.  As explained below, record

evidence demonstrates that Indonesia continues to be economically comparable to

Vietnam and is a superior surrogate country choice because, unlike India,

Indonesia is a producer of comparable merchandise and otherwise provides higher

quality data to value NTSF's FOPs.  The record also demonstrates that Commerce

unreasonably relied on NTSF's reported FOPs which were inaccurate and not

CONNUM-specific.

A.   Neither the Record Nor Commerce's Practice in this Proceeding
     Support the Choice of India as the Primary Surrogate Country

In calculating dumping margins for producers and exporters in non-market

economy ("NME") countries such as Vietnam, "Commerce is required to use the

'best available information' in the selection of surrogate data, and the surrogate

country should be, to the extent possible, (1) at a level of economic development

comparable to the non-market economy and (2) a significant producer of

comparable merchandise." *Catfish Farmers of Am. v. United States*, 2013 Ct. Intl.

Trade LEXIS 66, *4, Ct. No. 11-00109, Slip Op. 2013-63 (Ct. Int'l Trade 2013);

*see also* 19 U.S.C. §§ 1677b(c)(1)&(4).  Data quality, economic comparability, and

level of production are thus all critical factors in Commerce's surrogate country selection process.  *See, e.g., CFA Br*. at 15-16.

For the seven previous review periods, Commerce selected Indonesia as the primary surrogate country, regardless of whether it was on the official list of economically comparable countries and regardless of whether other countries on that list were also significant producers of comparable merchandise.  It did so because it consistently found that Indonesia was economically comparable to Vietnam (again, regardless of whether Indonesia was on the official surrogate country list) and because it determined that Indonesia's surrogate values were reliable.  We explained in our opening brief why it was unreasonable for Commerce to, for the first time in nearly a decade, refuse to consider Indonesia as a viable surrogate country because it was not on the list and to reject its surrogate values in favor of less reliable data from a country that is not a significant producer of comparable merchandise.

In its response brief, the Government argues that its unbroken string of previous determinations were different because Indonesia was the best choice in those instances but is not here, and because the same Indonesian surrogate values it found reliable in previous reviews were no longer reliable when compared to the Indian data.  The Government's arguments are unreasonably circular and contradict the record and Commerce's practice.  As explained below, Commerce

should have selected Indonesia, not India, as the primary surrogate country because record evidence establishes that Indonesia is (1) economically comparable to Vietnam, (2) unlike India is a significant producer of comparable merchandise, and (3) has higher quality data than India.

1. <u>Indonesia is Economically Comparable to Vietnam and Should Have Been Treated Equally to All Other Countries on the List of Potential Surrogate Countries</u>

In our opening brief, we demonstrated why Commerce's refusal to consider Indonesia as economically comparable to Vietnam because it was not included on Commerce's 2017 surrogate country list was arbitrary.  *See generally CFA Br*. at 19-20 (citing *SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316, (Ct. Int'l Trade 2016) ("'{A}determination is arbitrary when it fails to 'consider an important aspect of the problem,' or 'treat{s} similar situations in dissimilar ways.'") (citing *Anderson v. U.S. Sec'y of Agriculture*, 30 CIT 1742, 1749, 462 F. Supp. 2d 1333, 1339 (2006)).  Specifically, Commerce's conclusion that "Indonesia is not at the same level of economic development of Vietnam" was unreasonable when Commerce had (1) described its country list as "non-exhaustive," (2) considered Indonesia to be economically comparable in seven prior reviews, including in years when Indonesia was not included on the surrogate country list, and (3) failed to provide a reasoned explanation for its departure from

past practice.  *See generally CFA Br.* at 17-21; *see also Trs. in Bankruptcy of N. Am. Rubber Thread Co. v. United States*, 32 CIT 663, 665, 558 F. Supp. 2d 1367, 1370 (2008) ("Generally, an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (quotation, alteration marks, and citation omitted)).

In their response briefs both the Government and NTSF acknowledge Commerce's departure from a long string of prior decisions, but contend that those prior conclusions are irrelevant and sufficiently explained by the finding here that India is a significant producer of comparable merchandise with usable surrogate values.  *Def. Br.* at 20; *NTSF Br.* at 2-3.  This argument misses the point.

The Government and NTSF insist that Indonesia is not "at the same level of economic development of Vietnam" simply because Indonesia is not identified on the six-country list.  *Def Br.* at 20; *NTSF Br.* at 3.  However, the statute does not require the surrogate country to be at the identical or same level of economic development as the NME.  Whether it is "comparable" by definition requires a comparison.  19 U.S.C. § 1677b(c)(2)(B); *see also* Policy Bulletin 04.1, Appx3222-3226.  Whether or not Indonesia is "economically comparable" to Vietnam is a matter of degree.  India, after all, does not have the same per-capita gross national income ("GNI") as the five other countries deemed to be economically comparable.

Commerce provided no discussion of Indonesia's per-capita GNI, or any other *indicia*, justifying its conclusion that Indonesia was no longer "economically comparable" to Vietnam.  *See CFA Br*. at 18-21; *see also* Policy Bulletin 04.1, Appx3223 (noting that Commerce "determines economic comparability on the basis of per capital gross national income, as reported in the most current annual issue of the World Development Report (The World Bank).").  As explained previously, record evidence indicates that Indonesia in 2017 was still "economically comparable" to Vietnam as measured by per-capita GNI.  *See, e.g., CFA Br*. at 18-19 (citing Appx2804).  Under such circumstances, Commerce's conclusion that Indonesia is not economically comparable to Vietnam, and therefore not an appropriate surrogate, is arbitrary and contrary to the law.

This lack of reasoning tied to the record evidence is precisely why this Court has expressed concern regarding Commerce's reliance on a list of potential surrogate countries.  *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1265 (Ct. Int'l Trade 2017) at n.8 ("{T}he opacity and brevity of Commerce's economic comparability analysis makes it difficult for parties to predict what potential surrogate countries may be considered for SV purposes . . . {In response to the court's inquiries} Defendant explained that Commerce . . . uses 'no set formula' for determining when a potential surrogate country will be deemed economically comparable. . . .  The court is troubled that

Commerce's approach to determining economic comparability generally makes it difficult for the court to review the reasonableness of that determination.") (internal citations omitted).

### 2. India Is Not a Significant Producer of Comparable Merchandise

The statute calls for Commerce to select a surrogate that is both "at a level of economic development comparable to" the NME country of origin, and that is a "significant producer{} of comparable merchandise."  19 U.S.C. § 1677b(c)(4). Both factors have equal importance in the statute.  Moreover, in cases involving "unusual or unique" products, such as crawfish with unusual inputs or those that are not produced in many countries, Policy Bulletin 04.1 indicates that Commerce will begin its analysis by assessing whether a potential surrogate produces "comparable merchandise."  Policy Bulletin 04.1, Appx3225.  This same approach is also applicable when the case involves products and inputs that are not widely traded internationally.  *Id.* ("Particular emphasis on 'significant producer of comparable merchandise' is also generally warranted where major inputs are not widely traded internationally. . ."). As explained further below, frozen pangasius fish fillets, as do crawfish, involve "unusual or unique inputs" that are "produced by only a few countries" and are "not widely traded internationally."  *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 67 Fed. Reg.

8.

63,877, 63,884 (Dep't. Commerce Oct. 16, 2002) (prelim. results admin. rev.)

(unchanged in *Final Results*, 68 Fed. Reg. 19,504 (Dep't. Commerce Apr. 21,

2003)); *Pure Magnesium from the Russian Federation*, 59 Fed. Reg. 55,427,

55,430 (Dep't. Commerce Nov. 7, 1994) (prelim. LTFV deter.) (unchanged in

*Final Determination*, 60 Fed. Reg. 16,440 (Dep't. Commerce Mar. 30, 1995)).

Yet, here, Commerce relied almost exclusively on Indonesia's absence from

its self-created list of six economically comparable countries.  Regarding the actual

frozen fish fillets produced in India, there is a significant quality difference

between the "Grade A," unblemished, "export-quality," frozen fish fillets imported

into the United States by NTSF during the POR and the type of "Grade B" frozen

pangasius fish fillets produced in India, which are typically "yellowish in color

and/or trimmed crudely."  *See CFA Br.* at 22-23.  This distinction in quality is well

established in the record.  For example,

- "Generally, all of the swai produced by NTSF is grade A, which
  NTSF regards as export quality. . .{By contrast} Grade B fillets
  might be yellowish in color and/or trimmed crudely."  Appx92976.

- "The premium grade of {pangasius} imported into India, is
  unblemished white.  'People like to see white meat when they cut into
  it.  Whiteness is always associated with good quality.' { } But, where
  look and taste is concerned, Indian {pangasius} is yet to make the

cut.  Its colour is dimmer and the bloodstreams running across the

flesh is visible. For these reasons the price of Indian {pangasius} is

lower" than Vietnamese pangasius."  Appx15662.

- [


]. Appx96677.

The Government does not dispute this clear quality difference.  Instead, it

argues that it is "inappropriate" to consider these factors (*i.e.*, "the grade, color,

and texture of the fish fillet meat") in making a surrogate country selection because

such product characteristics are not part of the scope of the antidumping duty order

or the CONNUM buildup.  *See Def. Br.* at 22.  However, this argument upends the

structure of the statute.

The CONNUM is a product code defined in Commerce's questionnaire that

enables the computer program to match sales of frozen fish fillets in the U.S.

market with normal values in the home market with identical characteristics.  In

this case, the CONNUM assigns numeric codes to species, form, coating, size,

frozen form, preservatives, and net weight.  Appx89648-89651.  Using these

codes, merchandise can be appropriately matched and compared.  For example, the

price of a *pangasius hypophthalmus*, regular fillet, with unbreaded/unmarinated

coating, weighing 5-7 ounces (*etc*.) that is imported into the United States can be compared to the normal value for an identical frozen fish fillet.

The CONNUM does not identify grade, color, or texture because frozen fish fillets imported from Vietnam are uniformly of "export quality" by virtue of the documented registration, testing, and inspection requirements that they must undergo. *See generally* Appx102556-102557. It follows that these characteristics were not needed to describe Vietnamese frozen pangasius fillets. And, over the eight review periods when Commerce was comparing export quality Vietnamese frozen fish fillets to the fish fillets produced in Indonesia, there was no debate that the quality of the Indonesian product (grade, color, and texture) was equal to the quality of the Vietnamese imports. For this reason, differences in grade, color, and texture were not relevant to the CONNUM or the comparison.[1]

To determine whether India is a "significant producer of comparable merchandise," however, Commerce must necessarily evaluate differences in the quality of the frozen pangasius fillets that are documented in the record. The statute does not permit Commerce to ignore differences in the merchandise produced in India (versus Vietnam) simply because grade, color, and texture were

---

[1] For the same reason, such characteristics are not included within the scope of the antidumping order, *i.e.*, any product subject to the order will necessarily be of export quality and should only be considered "comparable" to other export quality fish fillets.

not assigned separate codes in a computer program that was not designed to use India as a surrogate.

The point of the surrogate methodology is to find a market economy producer that most closely resembles the respondent being investigated and the exact product that respondent produces. Pursuant to 19 U.S.C. § 1677b(c)(4), Commerce's task was to find the surrogate country that produces "comparable" fish fillets to those produced by the Vietnamese respondents, not to find any frozen fish fillet that might be produced in a potential surrogate country.

In this instance, the record is clear that subject merchandise, and the Vietnamese facilities that produce it, must satisfy numerous, stringent inspection and safety requirements imposed by both Vietnamese and U.S. authorities. *See* Appx102556-102557. As a result, Vietnamese-produced subject merchandise exported to the United States is necessarily of "export-quality," regardless of whether the factors defining export quality are specifically noted in the CONNUM or the scope of the antidumping duty order. Contrary to the Government's contentions, "export quality" and associated product characteristics are not arbitrary "additional criteria," *Def. Br.* at 22, but rather innate attributes of the subject merchandise produced in Vietnam. As such, Commerce should have considered these factors in its comparability analysis.

12.

The record establishes that only Indonesia, and not India, is a significant producer of merchandise comparable to the "export-quality" frozen fish fillets exported by NTSF during the POR. *See generally CFA Br.* at 21-25. Indeed, record evidence demonstrates that Indonesia exports the second-highest volume of frozen fish fillets in the world, behind only Vietnam. *See CFA Br.* at 22 (citing Appx3203). Undisputed record evidence also establishes that Indonesia is the only country in the world whose product competes with Vietnam in the export market (*i.e.*, is of a comparable "export quality"). *See id.* at 22-23 (citing Appx3203, Appx3231-3232, Appx3337, Appx15526, Appx15032, Appx17739-17747, Appx17603).

By contrast, frozen fish fillets produced in India are widely considered of a low quality and not fit for export. *Id.* Because of its poor quality, most Indian production is consumed domestically which, contrary to NTSF's claims, only means the domestic market consists of non-comparable low-quality fillets and does not make India a significant producer of identical or comparable merchandise. *NTSF Br.* at 3-4.

In sum, India is not a significant producer of merchandise comparable to the "export-quality" subject merchandise produced in Vietnam. The Indian surrogate values for inputs to fish processing thus do not represent the same quality of inputs as those used in Vietnam, and thus do not provide the "best available information"

13.

on the record to value Vietnamese factors of production.  For that, Commerce must look to Indonesian input data.

### 3. <u>Indonesian Data Were the Best Available Information on the Record</u>

In our opening brief, we explained in detail why Indonesian data are superior to Indian data based upon Commerce's five-factor test for establishing data quality, which examines whether the data are (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the POR; (4) representative of a broad market average; and (5) publicly available.  *See generally CFA Br.* at 26-41. *See also, e.g.*, *Bristol Metals L.P. et al. v. United States*, 703 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2010) (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,485 (Dep't. Commerce July 15, 2008) (fin. LTFV deter.), and accompanying IDM, at Comment 10).  The Government acknowledges that data quality is "a critical consideration affecting surrogate country selection," but concludes that "Indian data were superior to Indonesian data because they are from the primary surrogate country."  *Def. Br.* at 24.  *See also NTSF Br.* at 5 (NTSF similarly concludes that Indian surrogate data are superior because Commerce said so).  Such circular logic is unreasonable.

The reason that Commerce compares "data quality" is to determine whether it should select India or Indonesia as the primary surrogate.  Selecting the primary

surrogate country solely on the basis of economic comparability (*i.e.*, presence on the list) ignores the other criteria that bear on the selection of a primary surrogate. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366, 1374-1375 (Ct. Int'l Trade 2012) ("Because none of Commerce's three surrogate country eligibility criteria is preeminent, it follows that relative strengths and weaknesses among potential surrogates must be weighed by evaluating the extent to which the potential surrogates satisfy each of the three criteria.").

When analyzed properly under the law and Commerce's practice, Indonesian data are superior to the Indian data.

> a. *Indonesian Data for Key Inputs Represent a Broad Market Average and Are Species-Specific*

We explained previously why the Indian data for key inputs do not represent a "broad market average," and are therefore inferior to Indonesian sources. *See CFA Br.* at 26-36. In particular, for several key FOPs—including fingerlings, fish feed, and whole fish— Commerce relied upon Indian data from a one-off, private survey of 54 farmers in two districts of a single Indian state that was published in *Fishing Chimes* magazine. *Id*. at 27 (citing Appx13785-13791). Such a limited survey does not represent a "broad market average" because it was sourced from a limited number of participants in a very limited number of locales where the participants are unknown.

The Government counters that the *Fishing Chimes* data constitute a "broad market average" because the state of Andhra Pradesh accounted for "approximately 80 percent of {Indian} pangasius production during the {period of review}." *Def. Br*. at 29.  As an initial matter, this statement has no basis in the factual record, nor even in the article cited by Commerce, which explains that Andhra Pradesh's accounted for only about 60% of Indian pangasius production during 2018.  *CFA Br*. at 28 (citing Appx15534).  Even if data from one of India's 36 states and union territories were considered a "broad" market average, the *Fishing Chimes* data still would not qualify because they only represent two of the state's thirteen districts.  *See generally Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 75 Fed. Reg. 47,771 (Dep't. Commerce Aug. 9, 2010) (fin. results admin. rev.), and accompanying IDM at Comment 1 (Commerce rejecting Indian pricing data for raw shrimp because it was limited to data from a single Indian state).

In contrast to the coverage of the Indian fish feed prices, the Indonesian data are based on actual price lists obtained from a large number of sellers.  Although the sworn affidavits attesting to the price lists are "limited {in} number," *Def. Br.* at 26, each affidavit transmits from 2 to 11 price lists providing a total of 62 data points and no party has contested that the price lists yield broad, representative average prices.  Appx8405-8620.  Indeed, Commerce has relied on similar

16.

Indonesian price lists for years.  Also, in contrast to Indian *Fishing Chimes* data,

the Indonesian data come from identified sources and are corroborated by

nationwide Indonesian government statistics.  *See CFA Br.* at 33-35 (citing

Appx8221-8311, Appx8320-8343, Appx8509-8515, Appx8626-8717, Appx14299-

14363).  Furthermore, even if true, the Government's conclusion that the

Indonesian fish feed values are not a "broad market average" merely places the

Indonesian data on par with the Indian fish feed data for this single prong of

Commerce's analysis.  It does not mean that Indian data are superior.

The Government's arguments that Indonesian fingerling and whole live fish

prices are not species-specific are also unsupported by the record.  *See, e.g., Def.*

*Br*. at 26-27.  As we previously explained, the record contains information from

Indonesian government officials and a *pangasius* industry expert which confirms

that *pangasius hypophthalmus* is the predominant species of *pangasius* cultivated

in Indonesia.  *CFA Br*. at 35 (citing Appx8320-8343).  As a result, virtually all the

production volume and value data for *pangasius* fish collected by the Indonesian

government pertain to that specific species.  *Id*. at 30, 34-35 (citing Appx8221-

8311, Appx8320-8343, Appx8363-8398, Appx8642-8643, Appx14299-14363).

Indeed, Commerce has consistently found these same data to be "sufficiently"

species specific in prior reviews, including the immediately preceding review.  *See*,

*e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 84 Fed.

Reg. 18,007 (Dep't. Commerce Apr. 29, 2019) (fin. results admin. rev.), and

accompanying IDM at Comment 4; *Certain Frozen Fish Fillets from the Socialist*

*Republic of Vietnam*, 78 Fed. Reg. 17,350 (Dep't. Commerce Mar. 21, 2013) (fin.

results admin. rev.), and accompanying IDM at Comment I.C. (p. 25).

### b. Other Factors Also Make Indonesia a Superior Primary Surrogate Country Choice

We further explained in our opening brief that Indonesian data are superior

to Indian data with respect to labor, by-products, and financial ratios. *See*

*generally CFA Br.* at 36-40. *First*, for surrogate wage rates, Commerce relied on

Indian labor rate data from 2006, *more than a decade before the POR*, despite

POR-specific Indonesian wage data being available on the record. *CFA Br.* at 36-

37 (citing Appx8751-8761, Appx10980, Appx16570, Appx16575, Appx102929).

The Government supports its choice like it does all others, by citing its selection of

India as the primary surrogate country. *Def. Br.* at 35 (noting that Commerce

"preferred the Indian data because the data are from the primary surrogate

country"). But again, Indonesia, not India, should have been selected as the

primary surrogate country *because* its data were superior. Commerce's circular

logic does not explain why Commerce chose India as the primary surrogate

country when overall higher quality and complete Indonesian data were available.

*Second*, as the Government concedes, for all but one by-product Commerce had to use Indonesian surrogate values because "the record did not contain Indian surrogate value data to value all by-products." *Def. Br.* at 36.  The entire purpose for Commerce's preference of relying upon a single primary surrogate country is to avoid such mixing of surrogate value sources because it may lead to unreasonable results.  *See CFA Br.* at 37-39.  For example, in this instance, the total value of fish by-products exceeded the total value of whole live fish inputs.  *Id*.  The Government dismisses this concern, noting that Indian data "allowed for the valuation of *most* factors of production." *Def. Br.* at 36.  But this does not explain why Indonesia, whose available data allowed for valuation of *all* factors of production, was not a superior primary surrogate country option than India (other than it was not on Commerce's self-created, non-exhaustive list of potential surrogate countries).

*Finally*, despite its long-standing preference for averaging multiple financial statements, in this review Commerce relied on a single Indian financial statement, rather than two viable Indonesian statements.  *See, e.g., Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg. 20,335 (Dep't. Commerce Apr. 19, 2010) (fin. LTFV deter.), and accompanying IDM at Comment 13.  Here the Government again justifies Commerce's actions by reference to Commerce's preference for using a single surrogate country.  *Def. Br.*

19.

at 38.  Once again, Indonesia should have been the primary surrogate country *because* its data were superior.  Commerce's circular justification does not explain why the existence of multiple financial statements from Indonesia does not make Indonesia, rather than India, a superior primary surrogate country choice.

      B.    <u>NTSF Failed to Verify Its Production Inputs</u>

NTSF did not report verifiable data because it failed to reconcile its reported production inputs with the outputs it claims to have produced.  The whole fish inputs consumed by NTSF weighed nearly [        ] kilograms *less* than the fish fillets [        ] allegedly obtained from those same fish.  *CFA Br*. at 42.  NTSF, and the Government, contend that the discrepancy is explained by water sprayed on the fish during the production process.  *NTSF Br*. at 6; *Def Br*. at 40.  However, during verification NTSF was unable to demonstrate anywhere near the level of weight gain claimed in its production records.  *See generally CFA Br*. at 44-48.  Indeed, in the yield test conducted by Commerce there was only a [   ] percent difference between NTSF's input and post-trimming output weights, [   ] times less than the average difference of [   ] percent in NTSF's production reporting.  *See CFA Br*. at 44 (citing Appx94001, Appx102459, Appx102577).

The Government argues that these discrepancies "do not necessarily undermine the reliability of NTSF's reporting with respect to moisture" as Commerce "was not able to replicate {NTSF's} production process because, for example, it appeared that during verification the fillets may have been patted dry more than in the regular production process." *Def. Br.* at 45.  In other words, the Government contends that NTSF's own failure to follow its normal production procedures during verification justifies its inability to verify its reported production.  This position is unreasonable and undercuts the entire purpose of verification, which is to "verify the accuracy and completeness of {the respondent's} submitted information."  *See ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285, 1303 (Ct. Int'l Trade 2018) (citing 19 C.F.R. § 351.307(d)).

Here, NTSF was unable to reconcile the weights of its inputs and outputs and, through its own failure to follow its normal production process at verification, was unable to demonstrate the validity of its claimed explanation for the discrepancy.  Under such circumstances, Commerce's conclusion that NTSF's figures were accurate is unreasonable and contrary to law.

C.      NTSF Failed to Report Product-Specific FOPs for Whole Fish

NTSF failed to report product-specific FOPs, which "is a fundamental element in the dumping analysis." *See CFA Br*. at 51-52 (citing *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014)).  Specifically, rather than reporting the actual amount of whole fish used to produce subject merchandise, NTSF calculated "standard" usage rates based on allocations across in-scope and out-of-scope merchandise, [                                                              ]. *See CFA Br*. at 53-55 (citing Appx93605-93618, Appx93992-94000, Appx102818, Appx102957).  Such an allocation methodology [

           ]. *See id*. at 54 (citing [

                              ]; *Dupont Teijin films China Ltd. v. United States*, 7 F. Supp. 3d 1338, [           ] (Ct. Int'l Trade 2014)).  Stated another way, NTSF's allocation methodology allowed it to [

                        ] but then [

                              ].  As a result, the whole fish usage rates reported by NTSF were [            ] the typical rates identified in various expert reports on the record based on actual, rather than estimated or allocated production.  *See CFA Br*. at 52 (citing Appx2550, Appx2560, Appx7634, Appx7668, Appx93992-93999, Appx95581-95582).

22.

Neither the Government nor NTSF address this [

] in their response briefs.[2]  Instead, the Government argues that

Plaintiffs did not establish that "NTSF's reporting was not CONNUM-specific in

terms of PRODSIZE (*i.e.*, product size, the weight band of the fillet) and

PRODFORM (product form)."  *Def. Br.* at 48-49.  But, as explained previously,

such a conclusion does not address whether <u>all</u> of NTSF's fish-to-fillet ratios were

[                ] as a result of NTSF's allocations or whether NTSF's methodology

[                                        ].  *See CFA Br.* at 53-54.

Commerce acknowledged that NTSF's reporting was not CONNUM-

specific in terms of PRODSIZE and PRODFORM, but argued that NTSF's

reporting was nonetheless acceptable because CFA was unable to demonstrate any

meaningful cost differences based on size or form.  *Def. Br.* at 48-49.  This

argument is unreasonable and backward.  Fundamentally, NTSF has access to and

control of the product-specific data relevant to differences resulting from product

size and form.  NTSF failed to submit such data, and it is irrational to insist that the

U.S. producers demonstrate the associated cost differences.  Moreover, Commerce

admits that these physical characteristics are "commercially meaningful in the U.S.

marketplace" and "<u>affect costs of production</u>" by virtue of their inclusion in the

---

[2] NTSF chose not to address this issue, and instead "incorporates by
reference {the Government}'s arguments."  *NTSF Br.* at 9.

23.

CONNUM. *Def. Br*. at 48 (emphasis added).  Commerce thus required NTSF to report these physical characteristics on a CONNUM-specific basis.  It is unreasonable to shift the burden to the domestic industry to show that NTSF should have provided a complete response.  *See generally Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("The burden of production {belongs} to the party in possession of the necessary information.") (quoting *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)) (alteration in original).

>    D.    NTSF Overstated the Moisture Content of Its Unsoaked and Soaked
>          Fish Fillets, Rendering CONNUM Matching Unreliable

The moisture content reported for NTSF's unsoaked and soaked fillets [          ] the moisture content that Commerce found during verification as well as the moisture content reported on NTSF's own product labels for frozen fish fillets sold [          ].  *See* CFA Br. at 55-58.  By overstating the moisture content in its unsoaked and soaked fillets, NTSF [          ] the "whole live fish" input found in each frozen fish fillet.  As a result, the products were not correctly matched with appropriate normal values and the resulting antidumping margins were incorrectly calculated.  *See id*. at 57-58.

Both the Government and NTSF argue that results of the verification moisture tests "do not necessarily undermine the reliability of NTSF's reporting"

because:  (a) the tests were not fully representative of NTSF's actual production

due to NTSF's failure to follow its normal production process and (b) the fact that

"third party testing certificates" validate NTSF's reports.  *Def. Br*. at 42-43; *NTSF*

*Br*. at 12-13.  Such arguments are not persuasive and are contrary to record

evidence.  First, verification established that the moisture content reported in

NTSF's questionnaire response was [                    ] than the observed

moisture content during Commerce's verification tests and [            ] the

reported moisture content on NTSF's product labels.  It is not the case that the test

results were [                        ] the reported moisture

content.  Nor is it true that the moisture content on the labels was [

                        ] the reported moisture content.

    Second, it is unreasonable to justify NTSF's failure to verify its reported

moisture content by noting that NTSF failed to follow its normal procedures during

verification.  NTSF itself conducted the trials at verification and had every

incentive and opportunity to duplicate the reported results.  Yet, its failure showed

that the reported data were [                    ] the test results – to NTSF's

[          ] in the antidumping calculation.

    Third, the "third party testing certificates" indicated only that the moisture

content [              ] percent, which says nothing about whether NTSF's

reported figures or Commerce's verification figures [              ].  *CFA Br. at 59*

(citing Appx99249-99254, Appx99511-99516, Appx99575-99580, Appx101946-101951).

Fourth, none of the justifications offered by Commerce or NTSF explain why the [          ] labels match the tested moisture content of the soaked fillets, rather than the moisture content that NTSF reported.  *See CFA Br.* at 56, 59 (citing Appx89805, 89811, 89813, 89828, 89830).

In short, substantial record evidence does not support NTSF's reported moisture content figures, and this Court should therefore hold Commerce's decision to rely on these figures to be unlawful.  Indeed, this Court recently affirmed Commerce's reliance on a total adverse facts available rate in a prior review of this proceeding because the respondent failed to report its net weight (moisture content) physical characteristic on an equal basis to allow for accurate matching by CONNUMs.  *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1357-64 (Ct. Int'l Trade 2020); *see also Godaco Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1354 (Ct. Int'l Trade 2020) ("Because GODACO did not report correctly the net weight information that Commerce had requested, the court concludes that Commerce's reliance on facts otherwise available . . . is supported by substantial evidence.").  Here, the record similarly shows that NTSF's net weight (moisture content) physical characteristic

26.

component reporting is inaccurate, making it impossible to match U.S. CONNUMs and FOP CONNUMs accurately and on an equal basis.

II.   CONCLUSION

For the foregoing reasons, in the event the Court concludes that Plaintiffs' claims have merit, we respectfully request that the Court remand the *Final Results* to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

/s/ Jonathan M. Zielinski

Jonathan M. Zielinski
James R. Cannon, Jr.
Nicole Brunda
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 787-5507
F: (202) 567-2301
Dated:  May 26, 2021                    E-mail:  jzielinski@cassidylevy.com

*Counsel to the Catfish Farmers of America, et al.*

**PUBLIC VERSION**

<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 5,704 words, exclusive of the corporate disclosure statement, table of contents, table of authorities, glossary of case-specific acronyms and abbreviations, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     <u>/s/ Jonathan M. Zielinski</u>
        Jonathan M. Zielinski