A-552-801
Remand
Slip Op 22-38
POR: 08/01/2017 – 07/31/2018
**Public Document**
E&C/OV: JB

*Catfish Farmers of America, et al. v. United States*
**Court No. 20-00105, Slip Op. 22-38 (CIT April 25, 2022)**
**Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) in *Catfish Farmers of America, et al. v. United States*, Court No.

20-00105, Slip Op. 22-38 (CIT April 25, 2022) (*Remand Opinion*).  These final results concern

the *Final Results* in the 15th administrative review of the antidumping duty (AD) order on certain

frozen fish fillets (fish fillets) from the Socialist Republic of Vietnam (Vietnam)[1] covering the

period of review (POR) August 1, 2017, through July 31, 2018.[2]

The Court sustained, in part, and remanded, in part, certain aspects of the *Final Results*.

In particular, the Court remanded for further explanation Commerce's:  (1) selection of the

primary surrogate country and data for valuing factors of production (FOP); (2) analysis of

NTSF Seafoods Joint Stock Company's (NTSF) reporting with respect to the consumption rate

for a main input, *i.e.*, whole live fish; and (3) reliance on NTSF's reported moisture content.  In

---

[1] *See Notice of Antidumping Duty Order:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 FR 23756 (April 29, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

accordance with the *Remand Opinion*, Commerce further explains its findings regarding these issues, as discussed below.

## II.    BACKGROUND

### A.  Commerce's *Final Results*

On October 4, 2018, Commerce initiated the 15th administrative review of the *Order*.[3] Because of the large number of exporters covered by the review, on October 31, 2018, Commerce selected the three largest exporters, in alphabetical order, for individual examination: Bien Dong Seafood Co., Ltd. (Bien Dong); Hung Vuong Group (HVG); and Vinh Hoan Corporation (Vinh Hoan).[4]  Because all review requests for Bien Dong, HVG, and Vinh Hoan were timely withdrawn, on February 4, 2019, Commerce selected NTSF for individual review as a mandatory respondent.[5]

On October 22, 2019, Commerce published the *Preliminary Results*.[6]  In the *Preliminary Results*, Commerce calculated a weighted-average dumping margin for NTSF.[7]  In calculating NTSF's weighted-average dumping margin, Commerce selected India as the primary surrogate country because we found that it:  (1) was at the same level of economic development as Vietnam; (2) was a significant producer of comparable merchandise; and (3) provided the best available information with which to value NTSF's FOPs.[8]

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 FR 50077 (October 4, 2018).
[4] *See* Memorandum, "Selection of Respondents for Individual Review," dated October 31, 2018.
[5] *See* Memorandum, "Selection of Replacement Respondent for Individual Review," dated February 4, 2019.
[6] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018*, 84 FR 56420 (October 22, 2019) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[7] *See Preliminary Results*, 84 FR at 56421; *see also* Memorandum, "15th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results Analysis Memorandum for the NTSF Seafoods Joint Stock Company," dated October 10, 2019.
[8] *See Preliminary Results* PDM at 12.

Between February 3 and 11, 2020, Commerce conducted verification of the questionnaire responses of NTSF.[9]  On April 29, 2020, Commerce published its *Final Results*.[10]

In the *Final Results* Commerce continued to calculate an individual weighted-average dumping margin for NTSF,[11] and continued to select India as the primary surrogate country.[12]  In doing so, Commerce explained its reasoning regarding the three surrogate country selection criteria:  level of economic development; significant producer of comparable merchandise; and data availability and quality.[13]  With regard to level of economic development, Commerce stated:

> {b}ecause Vietnam is an NME {*i.e.*, non-market economy} country, when calculating {normal value (NV)}, section 773(c)(4) of the Tariff Act of 1930{, as amended} (the Act) requires Commerce to value the FOPs, to the extent possible, in a surrogate country that is (a) at a level of economic development comparable to Vietnam, and (b) a significant producer of comparable merchandise.  Section 773(c)(4)(A) of the Act is silent with respect to how Commerce determines that a country is at a level of economic development comparable to the NME country in question.  As such, Commerce's longstanding practice has been to identify those countries that are at a level of economic development similar to Vietnam based on {gross national income (GNI)} data reported in the *World Bank Development Report* provided by the World Bank.  Using 2017 GNI data, Commerce provided parties with a list of potential surrogate countries found to be at Vietnam's level of economic development, including Bolivia, Egypt, Honduras, Nicaragua, Nigeria, and India.
>
> The petitioners note that economic comparability is not always the exclusive starting point for selecting a primary surrogate.  In certain past reviews of this AD order, Commerce has indeed used Indonesia as the primary surrogate country even when it was not on the non-exhaustive list of countries, due to the other countries on that list not being significant producers of comparable merchandise and/or lacking suitable {surrogate value (SV)} data.  Unlike those segments, however, and as discussed in further detail below in the "Significant Producer" and "Data Considerations" subsections of this issue, this is not the case in this administrative review.  Here, record information shows that India, which is on the list of economically comparable surrogate countries, is a significant producer of identical and comparable merchandise.

---

[9] *See* Memorandum, "Verification of the Questionnaire Responses of NTSF Seafoods Joint Stock Company in the 2017-2018 Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam," dated March 13, 2020 (Verification Report).
[10] *See generally Final Results*.
[11] *See Final Results* IDM at Comment 1.
[12] *Id*. at Comment 2.
[13] *Id*.

…

Further, regarding the petitioners' arguments concerning the World Bank's classification of economies, and the relative GNIs of Indonesia and Vietnam in past administrative reviews, we disagree. Commerce has consistently rejected parties' arguments to use the World Bank's reported upper-middle or lower-middle income thresholds or categories for the purposes of determining the level of economic development. The band of countries that Commerce selected in this review, in absolute terms, is a reasonable range of countries given the entire worldwide range of GNIs. Furthermore, in past cases, Commerce has rejected the use of relative measures of GNI comparison.

Thus, for all of the foregoing reasons, we find that Indonesia is not at the same level of economic development as Vietnam. Nonetheless, even if, *arguendo*, we were to find Indonesia to be at the same level of economic development, for the reasons expressed below in the "Data Considerations" subsection, we would still find India to be a superior choice as the primary surrogate country.[14]

In our subsequent discussion of the data from the proposed surrogate countries, Commerce highlighted five major components of NV:  fingerlings; fish feed; whole fish; by-products; and financial ratios.[15]  We explained that, when considering what constitutes the best available information, Commerce considers several criteria, including whether the SV data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question.[16]  We found that the India data met our SV criteria, including the broad market average criterion, with respect to fingerlings, fish feed, and whole live fish.  We found that, although the petitioners argued that the fingerling, fish feed, and whole fish data from the *Fishing Chimes* study we relied upon did not reflect a broad market average because they were based on survey responses from 54 farmers within two of 13 districts

---

[14] *Id*. (internal citations omitted); *see also* Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the Socialist Republic of Vietnam," dated August 2, 2018 (Surrogate Country List).  The petitioners are:  The Catfish Farmers of America and individual U.S. catfish processors; America's Catch, Inc.; Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc.; Consolidated Catfish Companies, LLC d/b/a Country Select Catfish; Delta Pride Catfish, Inc.; Guidry's Catfish, Inc.; Heartland Catfish Company; Magnolia Processing, Inc. d/b/a Pride of the Pond; and, Simmons Farm Raised Catfish, Inc.
[15] *See Final Results* IDM at Comment 2.
[16] *Id*.

of a single state, the data were nonetheless reflective of a broad market average.  We noted that the state in question (Andhra Pradesh) was the largest *pangasius*-producing area of India, accounting for approximately 80 percent of *pangasius* production during the POR.[17]

As noted above, our analysis of the available data covered each of the above-referenced surrogate country criteria.  In addition to these considerations, we also emphasized that the Indian data are superior because they are from the primary surrogate country in the segment pursuant to Commerce's sequential surrogate country selection process.[18]

We also relied on NTSF's reporting with respect to its reported whole-fish-to-fillet yield ratio and its reported moisture content.  Regarding the former, in the *Final Results*, Commerce stated, in part:

> {w}e note that both parties point to reports on the record and proffered their estimations of what the appropriate yield should be.  However, given the above analysis, we find that the small difference between the outputs and inputs could reasonably be accounted for by:  (1) the fact that Commerce's post-trimmed fillets did not sit in chilled water for several hours, as is typical; and (2) the fact that Commerce's yield test did not weigh the by-products in the way NTSF normally weighs them, *i.e.*, after being transported by water to the by-products staging area.

> Finally, in past verifications, we have seen the output weights exceed the input weight by very similar amounts as NTSF's experience here.  As a consequence, we find that NTSF's experience and yield reporting is consistent with our prior findings.[19]

With respect to NTSF's moisture content, we accepted its moisture content reporting in the *Final Results*.[20]

---

[17] *Id*. (citing NTSF's Letter, "Frozen Fish Fillets from Vietnam:  Factual Information Submission," dated September 10, 2019, at Exhibit 2).

[18] *See Final Results* IDM at Comment 2.

[19] *Id*. at Comment 1 (citing Memorandum, "Antidumping Duty Review of Certain Fish Fillets from the Socialist Republic of Vietnam:  Placing Information on the Record," dated October 24, 2019 (October 24, 2019 Memorandum)).

[20] *Id*. (declining to find that information submitted by the parties, or information contained in Commerce's verification report, provided a basis to disregard NTSF's moisture content reporting).

In our *Final Results*, we calculated a weighted-average dumping margin of 0.15 dollars/kilogram for NTSF.[21]  NTSF and the petitioners appealed.

### B.  *Remand Opinion*

On April 25, 2022, the Court issued its *Remand Opinion*[22] and affirmed the *Final Results* with respect to the claims brought by NTSF.  With respect to the claims brought by the petitioners, the *Remand Opinion* addressed whether four main aspects of the *Final Results* were supported by substantial evidence:  (1) Commerce's selection of India as a primary surrogate country for valuing FOPs; (2) NTSF's reporting with respect to the weight of its production inputs and finished outputs, on an aggregate basis; (3) NTSF's FOP reporting; and (4) NTSF's reporting of moisture content.  The Court affirmed Commerce on the second issue and remanded the *Final Results* with respect to the first, third, and fourth issues, in whole or in part.

With respect to the selection of India as the primary surrogate country,[23] the Court directed Commerce to explain:  (1) whether Indonesia is economically comparable to Vietnam using the same World Bank GNI data used to identify India and the five other countries on the Surrogate Country List and whether Commerce improperly focused its analysis on a set of countries at the same level of economic development as Vietnam;[24] (2) whether the Indian FOP data are the best available information as compared to the Indonesian data submitted by the petitioners;[25] (3) why Commerce treated the Indian data as superior to the Indonesian data;[26] (4)

---

[21] *See Final Results*, 85 FR at 23757.  We note that we relied on an application of partial facts available with an adverse inference (AFA) due to NTSF's failure to accurately report farming FOPs.  *See Final Results* IDM at Comment 3.

[22] *See generally Remand Opinion*.

[23] The Court affirmed the *Final Results* with respect to Commerce's decision to find India to be a significant producer of comparable merchandise, selection of by-product SVs, and selection of surrogate financial statements/ratios.  *Id*. at 38, 51, and 52, respectively.

[24] *Id*. at 39-40.

[25] *Id*. at 53.

[26] *Id*. at 41.

Commerce's finding that the Indian SVs for whole fish, fingerlings, and fish feed represented broad market averages that constituted the best available information;[27] and (5) Commerce's decision to use 2006 Indian data to value labor inputs.[28]

With respect to NTSF's FOP reporting,[29] the Court directed Commerce to address contradictory reports and studies on the record regarding NTSF's whole-live-fish-to-fillet ratio, and to consider whether the cost to produce by-products was properly accounted for in Commerce's analysis.[30]  With respect to NTSF's reporting of moisture content,[31] the Court directed Commerce to address the record evidence that supports, and the evidence that contradicts, NTSF's reported moisture content.[32]

### C.  *Draft Results of Redetermination*

Commerce released the Draft Results on July 19, 2022,[33] finding that its selection of India as the primary surrogate country and its reliance on NTSF's reporting with respect to the consumption rate for whole live fish and moisture content, was reasonable.  The petitioners and NTSF submitted comments on the Draft Results on July 26, 2022.[34]

### III.   ANALYSIS

Commerce continues to find that its selection of India as a surrogate country, its use of Indian data to value certain FOPs, and its reliance on NTSF's reporting relating to whole fish

---

[27] *Id*. at 41-48.

[28] *Id*. at 49.

[29] The Court affirmed Commerce's decision with respect to the inclusion of non-U.S.-bound merchandise in NTSF's reported FOPs, and NTSF's reliance on standard usage rates.  *Id*. at 58-59 and 61-62, respectively.

[30] *Id*. at 65-66.

[31] The Court affirmed Commerce's decision with respect to:  (1) Commerce's decision not to apply total AFA to NTSF; and (2) Commerce's verification procedures.  *Id*. at 68 and 68-69, respectively.

[32] *Id*. at 69.

[33] *See* Draft Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Court No. 20-00105, Slip Op. 22-38 (CIT April 25, 2022), dated July 19, 2022 (Draft Results).

[34] *See* Petitioners' Letter, "Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Comments on Draft Results of Redetermination," dated July 26, 2022 (Petitioners Comments); and NTSF's Letter, "Frozen Fish Fillets from Vietnam:  Comments on Draft Remand Results," dated July 26, 2022 (NTSF Comments).

input/output ratios and moisture content, was reasonable.  In accordance with the Court's *Remand Opinion*, we have provided additional discussion of these issues below.

### A.  Selection of India as a Surrogate Country

Section 773(c)(4) of the Act states that Commerce shall, to the extent possible, utilize the prices, or costs, of FOPs in one or more market economy (ME) countries that are "at a level of economic development comparable to that of the nonmarket economy country" and are "significant producers of comparable merchandise."  The Act is silent with respect to how, or on what basis, Commerce may make this determination.  Commerce has, thus, developed a surrogate country selection process that is guided by Policy Bulletin 04.1[35] and subsequent case law.  The basic outline of this sequential approach is as follows:  (1) using per capita GNI information from the World Bank, Commerce identifies a list of countries that are at a comparable, *i.e.*, the "same," level of economic development[36] to the NME country in question; (2) Commerce determines whether the potential surrogate countries are "significant" producers of comparable merchandise; and (3) if there are multiple countries that meet the first two prongs of the analysis, Commerce takes into consideration the quality of data offered by those countries.

Although the Court observed that, in very limited, select determinations, a country may be relied upon as a surrogate country even if it has not met the first two prongs of the analysis,[37] that is not Commerce's normal approach to surrogate country selection.  Rather, Commerce has applied – and the Court and the U.S. Court of Appeals for the Federal Circuit have affirmed – the

---

[35] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 04.1), available on Commerce's website at https://enforcement.trade.gov/policy/bull04-1.html.

[36] As explained below, in identifying countries that are at a "comparable" level of economic development, Commerce generally selects countries that are at the "same" level of economic development.

[37] *See Remand Opinion* at 34.

use of a sequential surrogate country selection process.[38]  Through this approach, Commerce first analyzes which countries meet the level of economic development and significant producer criteria; then, Commerce will rely on the data considerations prong to facilitate the selection of a country where multiple countries have met the first two criteria.[39]

Furthermore, in identifying countries that are at a "comparable" level of economic development to the NME in question, Commerce identifies countries at the "same" level of economic development as the NME in its surrogate country list.  The goal of this process is to present a range of potential surrogate countries that reasonably represent the market values that would be present in the NME if it were an ME for consideration by interested parties and Commerce.  Commerce's identification of a group of countries that are considered to be at the same level of economic development for surrogate country selection purposes within each segment of a proceeding is consistent with the statutory requirement under section 773(c)(4) of the Act to value FOPs using data from ME countries at a comparable level of economic development to the NME at issue, because the same level of economic development between two countries will necessarily also be comparable.

As a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME country unless it is determined that none of the countries are viable options because they:  (1) are not significant producers of comparable merchandise; (2) do

---

[38] *See, e.g.*, *Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1335 (CIT 2014) (*Jiaxing I*), *aff'd*, 822 F.3d 1289, 1293-96, 1298 (Fed. Cir. 2016) (*Jiaxing II*); *Juancheng Kangtai Chemical Co., Ltd. et al., v. United States*, 39 CIT, Slip Op. 15-93, at *8 (CIT August 21, 2015) (*Juancheng Kangtai*) (Commerce may properly narrow a list of countries within a band for purposes of administrative feasibility); and *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1171-75 (CIT 2017) (finding Commerce's sequential surrogate country selection methodology to be lawful).

[39] *See Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301, 1318 (n. 9) (CIT August 5, 2021) ("In general, however, 'the criteria outlined in the section of Policy Bulletin 04.1 captioned 'Data Considerations' were developed to serve as a 'tie-breaker,' if necessary, in Commerce's identification of a surrogate country.'" (citing *Jinan Yipin Corp., Ltd. v. United States*, 800 F. Supp. 2d 1226, n. 7 (CIT 2011))).

not provide sufficient, reliable sources of publicly available SV data; or (3) are not suitable for use because of other factors.[40]  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh level-of-economic-development differences or significant producer considerations.  Thus, Commerce considers countries at the "same" level of economic development to be "comparable."  While other countries may, where necessary, be selected from outside of the range of countries identified by Commerce in its surrogate country list, those countries are not considered to be at the same level of economic development.  The Court has affirmed this practice in *Clearon III,* explaining:

> {e}xamining Commerce's primary country surrogate selection process as a general matter, *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the *same level of economic development* as the home country measured by per capita GNI, and it observed that Commerce will compare data from countries on the surrogate country list with data from a "less comparable country" when it becomes persuaded that none of the listed countries provide the requisite "scope of quality data." … Commerce on second remand concluded from the foregoing that absent adequate showing that the Philippines lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development.  The court is unable to conclude that is an unreasonable interpretation of *Clearon II,* and the results of the second remand comply to that extent with what was ordered.[41]

---

[40] *See, e.g.*, *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013), and accompanying IDM, at Comment 2; *Certain Steel Threaded Rod from the People's Republic of China:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 67332 (November 9, 2012), and accompanying IDM, at Comment 1; and *Certain Steel Wheels from the People's Republic of China:  Notice of Preliminary Determination of Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 76 FR 67703, 67708 (November 2, 2011), unchanged in *Certain Steel Wheels from the People's Republic of China:  Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012).

[41] *See Clearon Corp. v. United States*, Consol. Court No. 13-00073, Slip-Op 2016-110, 40 CIT at 3 (CIT November 23, 2016) (*Clearon III*) (internal citations omitted and emphasis added).

Similarly, in *Jacobi Carbons*, the Court recognized that, "{a}lthough the statute only requires Commerce to seek a surrogate market economy country whose economic development is 'comparable' to the subject nonmarket economy (NME), when possible, the agency selects a surrogate country at the *same* level of economic development as the NME country" and "Commerce considers those countries that occupy a 'relatively narrow *per capita* GNI range that is *centered* on the *per capita* GNI of the NME country' to have attained the same level of economic development."[42]  The Court also recognized the following rationale behind Commerce's selection of countries at the same level of economic development:

> {t}he list is non-exhaustive, and is intended to provide interested parties with a "manageable set of potential surrogate countries" to focus on.  When an interested party proposes an alternative country with a *per capita* GNI within the range of countries on the list, Commerce affords that country the same consideration as others on the list.  When an interested party proposes a country with a *per capita* GNI outside the selected range, Commerce will consider the country only if its data quality and availability, and significant producer status, outweigh its deficient economic comparability, and only when none of the countries at the same level of economic development (*i.e.*, within Commerce's *per capita* GNI range) present viable surrogate country options.[43]

Thus, the Court acknowledged the potential existence of "less comparable" surrogate countries, and affirmed Commerce's preference to rely on countries at the "same" level of economic development, where possible.[44]

---

[42] *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1316 (CIT 2018) (*Jacobi Carbons*) (emphasis in original).

[43] *Id.*, 313 F. Supp. 3d at 1318.

[44] *Id.*, 313 F. Supp. 3d at 1319-22 (holding that Commerce provided a reasoned explanation of how it generated the surrogate country list, including why it considers those countries on the list to be at the same level of economic development as the People's Republic of China); *see also Jiaxing Brother Fastener Co., Ltd. v. United States*, 428 F. Supp. 3d 1364, 1372-73 (CIT 2020) (*Jiaxing Brother*) (explaining that "{a}lthough Commerce found Ukraine, like Thailand, to be 'within the GNI band of countries that are considered to be at the same level of economic development to the {People's Republic of China (China)}' and to be a significant producer of STR, thus satisfying the statutory requirements under section 1677b(c)(4)(A)-(B), Commerce, in comparing data sources from Thailand and the Ukraine reasonably found that data from Thailand were the 'best available information' on the record." (internal citations omitted)); and *Xiping Opeck Food Co., Ltd. v. United States*, 551 F. Supp. 3d 1339, 1348 (n. 18) (CIT 2021) (*Xiping Opeck*) ("Commerce selects a primary surrogate country using a process that tracks the requirements of {section 773(c)(1) and (4) of the Act}").

This approach, affirmed by this Court, has been applied in numerous proceedings.[45]  For

example, in *Nails from China*, Commerce explained:

> Surrogate countries that are not at the same level of economic development as the
> NME country, but still at a level of economic development comparable to the
> NME country, are selected only to the extent that data considerations outweigh
> the difference in levels of economic development.  … Here, because we have
> adequate data from those countries on the list of economically comparable
> countries, we find it reasonable to continue to limit our consideration to countries
> that are on the list.  Therefore, because Mexico and Russia are both countries on
> the Surrogate Country List and both fulfill these selection criteria, there is no need
> to resort to countries that are not at the same level of economic development, such
> as Thailand and Romania.[46]

---

[45] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 68881 (December 17, 2019) (*Activated Carbon Final*), and accompanying IDM, at Comment 1 (explaining that "Malaysia and Romania are both economically comparable to China, as both countries are on the OP List, and are therefore determined, based on per capita GNI, to *be at the same level of economic development* as China." (internal citations omitted and emphasis added)); *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 30, 2020), and accompanying IDM, at Comment 2 (noting that "pursuant to section 773(c)(4)(A) of the Act, both Russia and Brazil are considered to be at *the same level of economic development* as China.  Thus, they are not ranked and are considered equal in terms of economic comparability.") (internal citations omitted and emphasis added); *Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 8821 (February 18, 2020), and accompanying IDM, at "Surrogate Country" (noting that "{w}e selected Romania as the primary surrogate country, pursuant to section 773(c)(4) of the Act and 19 CFR 351.408(c)(2), because it is at *the same level of economic development* as China, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Romanian data for valuing FOPs." (internal citations omitted and emphasis added)); *Forged Steel Fittings from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 53629 (September 28, 2021), and accompanying IDM, at Comment 1 (noting that "consistent with our practice, and section 773(c)(4) of the Act, Commerce identified Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey as countries at *the same level of economic development* as China, based on per capita GNI data from the World Bank's World Development Report.  Therefore, we consider all six countries as having met this economic comparability prong of the {surrogate country} selection criteria.") (internal citations omitted and emphasis added); and *Polyester Textured Yarn from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 58877 (October 25, 2021), and accompanying IDM, at "Surrogate Country" (explaining that "{w}e selected India as the primary surrogate country, pursuant to section 773(c)(4) of the Act and 19 CFR 351.408(c)(2) because it is at *the same level of economic development* as Vietnam, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Indian data for valuing factors of production (FOPs)." (internal citations omitted and emphasis added)).

[46] *See Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 33219 (June 24, 2021) (*Nails from China*), and accompanying IDM, at Comment 1; *see also Certain Quartz Surface Products from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019) (*QSP from China*), and accompanying IDM, at Comment 8 ("Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.").

We further explained in *Nails from China* that "data considerations do not favor selecting a country not on the Surrogate Country List because the record contains factor values from Mexico that are specific to the inputs, are tax- and duty-exclusive, represent a broad market average, and are contemporaneous and useable."[47]  Thus, in view of the usable data from a country at the same level of economic development as the NME in question, consideration of countries at comparable, but not the same, levels of development was unwarranted.  Again, in *Activated Carbon from China*, we explained:

> consistent with its practice and section 773(c)(4) of the Act, Commerce considers Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia to be at the same level of economic development as China.  Commerce treats each of these countries as equally comparable.  Therefore, Commerce considers all six countries identified in the {Surrogate Country List} as having met this prong of the surrogate country selection criteria.  Unless Commerce finds that none of these countries is a significant producer of comparable merchandise, does not provide a reliable source of publicly available surrogate data, or is unsuitable for use for other reasons, or Commerce finds that another equally comparable country is an appropriate surrogate within the GNI range, Commerce will rely on data from one of these countries.  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.  As discussed below, Commerce preliminarily determines that one or more of these six countries are significant producers of comparable merchandise and provide usable SV information, and as such, Commerce will not rely on data from Thailand, whose 2017 GNI do not fall within the range of GNI represented by the countries included on the surrogate country list issued by Commerce.[48]

Commerce has also applied its sequential surrogate country selection process in the context of administrative reviews covering merchandise from Vietnam.  In *OCTG from Vietnam*, Commerce explained:

---

[47] *See Nails from China* IDM at Comment 1.
[48] *See Certain Activated Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 7758 (June 14, 2019) (*Activated Carbon from China*), and accompanying PDM, at "Surrogate Country and Surrogate Value Data" (internal citations omitted), unchanged in *Activated Carbon Final*.

… Commerce identified Bolivia, Egypt, Honduras, India, Morocco, and Nicaragua as countries that are at the same level of economic development as Vietnam, based on per capita GNI.  Accordingly, we preliminarily find that these six countries meet the economic comparability criterion of the surrogate country analysis.

Additionally, the domestic interested parties claimed that Indonesia is at a level of economic development comparable to Vietnam, although Indonesia does not appear on Commerce's list countries that are at the same level of economic development as Vietnam based on per capita 2019 GNI data.  We preliminarily find that Indonesia's gross national income per capita (GNI) of $4,050 reflects that it is not at the same level of economic development as Vietnam.  Specifically, Vietnam's 2019 GNI is $2,540, and the highest GNI of the six countries identified in Commerce's Surrogate Country Letter is Bolivia's GNI of $3,530.

… We preliminarily find that the record contains factor values from India for all of {respondent's} reported FOPs, and that these factor values are specific to the inputs, are tax- and duty-exclusive, represent a broad market average, and are contemporaneous and useable.  Because a country on the surrogate country list contains useable data, in accordance with our practice, we preliminarily find that there is no compelling reason to deviate from the surrogate country list in selecting a surrogate country.[49]

In all the above determinations, Commerce applied its sequential surrogate country selection process (*i.e.*, selecting a surrogate country:  (1) that was at the same level of economic development as the NME in question; (2) was a significant producer of comparable merchandise; and, then (3) had usable SV data) and declined to consider data from countries that were not at the same level of economic development as the NME.

   *1.   Application of Commerce's Sequential Surrogate Country Selection Method*

Commerce's selection of India over Indonesia as the surrogate country in the *Final Results* was consistent with Commerce's prior determinations and the decisions of this Court. Here, Commerce identified India as one of six countries at the same level of economic

---

[49] *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 86 FR 55807 (October 7, 2021) (*OCTG from Vietnam*), and accompanying PDM, at "Surrogate Country," unchanged in *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 21094 (April 11, 2022) (*OCTG from Vietnam Final*).

development as Vietnam, based on *per capita* GNI data.  Moreover, Commerce determined that India was a significant producer of comparable merchandise and that the record contained usable SV data for India.[50]  Thus, this review does not present an instance where "none of the countries on the list are significant producers of comparable merchandise or have suitable sources of surrogate value data."[51]

In contrast, Indonesia was outside the *per capita* GNI range set forth by the countries included in the Surrogate Country List, that Commerce determined were at the same level of economic development as Vietnam.  Like *OCTG from Vietnam*, here, Indonesia's *per capita* GNI during this review is also not within the *per capita* GNI range of the countries included in Commerce's Surrogate Country List.[52]  Vietnam's 2017 *per capita* GNI was $2,170, and the highest *per capita* GNI of the six countries identified in the Surrogate Country List was Bolivia's 2017 *per capita* GNI of $3,130.  Indonesia's 2017 *per capita* GNI was $3,540, which is outside of the range of the *per capita* GNI Commerce considered for countries that had the same level of economic development as Vietnam.[53]

Thus, despite the petitioners' arguments that Indonesia represents a country at a comparable level of economic development as Vietnam, it was not at the *same* level of economic development, and, thus, did not present a scenario where Commerce must "afford{} that country the same consideration as others on the list" of countries at the same level of economic development.[54]  To the extent the Court is concerned that Commerce is being too restrictive and

---

[50] *See Final Results* IDM at Comment 2.  The Court affirmed Commerce's determination that India was a significant producer of comparable merchandise.  *See Remand Opinion* at 38 ("Commerce's finding that India is a 'significant producer of comparable merchandise' is supported by substantial evidence.").
[51] *See Jacobi Carbons*, 313 F. Supp. 3d at 1318 (n. 12).
[52] *See* Surrogate Country List at 1.  *See OCTG from Vietnam* PDM at "Surrogate Country," unchanged in *OCTG from Vietnam Final*.
[53] *See* Surrogate Country List at 1.
[54] *See Jacobi Carbons*, 313 F. Supp. 3d at 1318.

misapplied the statutory standard,[55] we emphasize that this approach – *i.e.*, selecting countries at the *same* level of economic development, where possible – is the approach that Commerce has applied in numerous determination and, as discussed above, has been upheld by this Court.

Moreover, as discussed further below, India offers SV data that meet our surrogate country criteria for data availability and quality. Under these conditions, a discussion of the merits of Indonesia as a potential primary surrogate country or of the availability and quality of the Indonesia SV data is unwarranted.

We note that the Court observes that, "perhaps anticipating that its discussion of Indonesia's economic comparability to Vietnam would not withstand scrutiny—{Commerce} went ahead and compared the Indian data to the Indonesian data."[56] We respectfully submit that this was not the intent of Commerce's analysis.

In the *Final Results*, after concluding that Indonesia was not at the same level of economic development as Vietnam, we explained that, "{n}onetheless, even if, *arguendo*, we were to find Indonesia to be at the same level of economic development, for the reasons expressed below in the 'Data Considerations' subsection, we would still find India to be a superior choice as the primary surrogate country."[57] This statement did not reflect an admission that Commerce's economic development analysis was flawed. Rather, the statement was an explicit acknowledgement that Commerce typically follows a sequential surrogate country selection process. However, although Commerce does not typically analyze data from other countries when a country at the "same" level of economic development offers adequate data, we did so here to address extensive comments on the issue by the parties. Doing so was not required

---

[55] *See Remand Opinion* at 39.
[56] *Id*. at 40.
[57] *See Final Results* IDM at Comment 2.

under Commerce's practice and in no way indicated that Indonesia could be considered at the

same level of economic development as Vietnam or the six countries on the Surrogate Country

List. In fact, in numerous determinations,[58] and in the final results of the subsequent two

administrative reviews in this proceeding, Commerce focused its analysis on the availability and

quality of the Indian data after concluding that India was at the same level of economic

development as Vietnam (and was also a significant producer of comparable merchandise)

because India was, once again, on the Surrogate Country List, while Indonesia was neither on the

Surrogate Country List nor within the range of the *per capita* GNI of the countries which were

on the Surrogate Country List.[59]

The Court also stated that "Commerce – absurdly – found the Indian data superior

because they were from India,"[60] noting Commerce's conclusion that "the Indonesian

information {for surrogate valuation} is not from the primary surrogate country which we have

selected in this case, India."[61] This passage was not intended to suggest any inherent superiority

of the Indian data; rather, it reflects the standard application of Commerce's sequential surrogate

country selection process. Having determined that only one country, *i.e.*, India, was at the same

level of economic development as Vietnam (and was a significant producer of comparable

---

[58] *See, e.g.*, *QSP from China* IDM at Comment 8; and *Nails from China* IDM at Comment 1.
[59] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 FR 36102 (July 8, 2021) (*Fish from Vietnam 18-19*), and accompanying IDM, at Comment 3 ("Thus, and even though parties submitted arguments for and against the use of the Indonesian data, Commerce need not compare whether the Indian or Indonesian data are superior, as Indonesia is not on the surrogate country list and, more importantly, India satisfies the surrogate country and surrogate value criteria, as explained below." (internal citations and quotations omitted)); and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 FR 15912 (March 21, 2022) (*Fish from Vietnam 19-20*), and accompanying IDM, at Comment 10 ("Thus, and even though parties submitted arguments for and against the use of the Indonesian data, Commerce need not compare whether the Indian or Indonesian data are superior, as Indonesia is not on the surrogate country list and, importantly, India satisfies all three surrogate country and SV criteria, as explained below." (internal citations and quotations omitted)).
[60] *See Remand Opinion* at 41.
[61] *Id.*

merchandise, and provides adequate data for this review), Commerce appropriately deemed

Indonesia not eligible to be the primary surrogate country because there were countries that were

at the same level of economic development as Vietnam, and, consequently, it was inappropriate

to consider the Indonesian SV data.  Rather than being circular reasoning, Commerce's statement

that the Indian data were "superior because they were from India" reflects application of a

sequential analysis wherein the Indonesian data already had been eliminated from consideration.

Thus, the statement is only "circular" insofar as Commerce analyzes the "level of economic

development" and "data considerations" steps of the surrogate country selection process *in

tandem with* considering the availability and quality of the SV data, which is not Commerce's

court-affirmed (sequential) practice.

### 2.   *The Indian Data in this Administrative Review - Key Inputs and Labor*

Section 773(c)(1) of the Act further directs that when valuing FOPs for an NME using

surrogate country data, the selected valuation "shall be based on the best available information

regarding the values of such factors in a market economy country or countries considered to be

appropriate by the administering authority."  As explained above, Commerce reasonably

determined that India was an appropriate surrogate country because it was at the same level of

economic development as Vietnam, and was a significant producer of comparable merchandise

during the POR.  When considering what constitutes the best available information, Commerce

considers several criteria, including whether the SV data are contemporaneous, publicly

available, tax and duty exclusive, representative of a broad market average, and specific to the

inputs in question.

In the *Final Results*, Commerce determined that India provided appropriate information

for valuing certain key inputs – including whole live fish, fish feed and fingerlings – in the

*Fishing Chimes* publication,[62] *i.e.*, data that were based on surveys of farmers in Andhra Pradesh.[63] We also relied on Indian data to value labor.[64] In its *Remand Opinion*, the Court directed Commerce to provide additional explanation as to whether the Indian data met certain SV criteria.

First, the Court directed Commerce to consider whether the *Fishing Chimes* data represented a broad market average.[65] In finding this publication to provide data representative of a broad market average, in the *Final Results* we noted that Andhra Pradesh accounted for "approximately 80 percent" of Indian *pangasius* production during the POR.[66] In the *Remand Opinion*, the Court directed Commerce to explain whether this conclusion was warranted in light of the rapid growth of *pangasius* farming in numerous other states outside of Andhra Pradesh.[67] Furthermore, the Court stated:

> {w}hile the government is correct that there is no statutory requirement that a "broad market average" must reflect a particular percentage of a market, and the government is also correct that Andhra Pradesh remained a significant producer of pangasius even after its share of the market decreased, Commerce placed considerable emphasis on the 80-percent figure and did not opine on what market share {Commerce} considers "significant."[68]

---

[62] *See Final Results* IDM at 17-20.

[63] *See* NTSF's Letter, "Factual Information Submission," dated August 27, 2022 (NTSF August 27, 2019 SV Submission), at Exhibits SV-2 and SV-3.

[64] *See Final Results* IDM at Comment 2.

[65] *See Remand Opinion* at 41-45. With respect to the SV data for these three inputs, more generally, Commerce emphasized that Andhra Pradesh, the state from which the whole fish, fingerling, and fish feed survey data were sourced, accounted for "approximately 80 percent" of production during the POR. *Id.* at 45. The Court directed Commerce to address record evidence that contradicts the 80 percent figure and suggests that the data were based on a subset of Andhra Pradesh's production. With respect to the fingerling data, the Court directed Commerce to address record evidence that these data were limited to responses relating to 54 farms in 46 villages in two districts within Andhra Pradesh. *Id.* at 46. With respect to the whole fish data, in addition to addressing record evidence regarding the broad market average finding, the Court remanded Commerce to address how the corroboration of such information is relevant to the analysis. *Id.* at 48. Similarly, with respect to the fish feed data, the Court again directed Commerce to address evidence regarding the broad market average finding and to discuss the relevance of corroborating data. *Id.* at 47.

[66] *See Final Results* IDM at 19.

[67] The Court stated that "Fishing Chimes also states that between 2010 and 2012 pangasius farming 'rapidly expanded to other states, viz., Telangana, Tamil Nadu, Kerala, Maharashtra, Goa, Himachal Pradesh{,} and Rajasthan.' Thus, there is evidence in the record that pangasius is farmed in at least 11 Indian states. *Fishing Chimes* states that the total is 15." *See Remand Opinion* at 43 (internal citations omitted).

[68] *Id.* at 45.

In view of the Court's directive, we provide additional analysis of this issue below.  We continue to find that the *Fishing Chimes* data adequately represent a broad market average.

Regarding whether Andhra Pradesh is a major *pangasius* producing region vis-à-vis other states, Commerce agrees that the study indicates that *pangasius* production does occur in other states, and that *pangasius* production in Andhra Pradesh decreased from 80 percent in 2017 to 58 percent in 2018.[69]  However, there are numerous reasons that data based on the experience observed in Andhra Pradesh, as laid out in *Fishing Chimes,* is the best available information for valuing FOPs.

At the outset, in either year of the POR (2017/2018), the single state of Andhra Pradesh was the majority producer of *pangasius* in India.  Although we do not endorse a particular production percentage threshold to determine if a region reflects a board market average – because the question of whether a region is reflective of the country-wide experience can vary by country, product, and time period – the fact that Andhra Pradesh represents the majority of Indian production across the relevant period is a significant consideration, and is consistent with past practice in other segments of this proceeding[70] and in other proceedings.[71]

---

[69] *Id.*

[70] *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 75 FR 12726 (March 17, 2010), and accompanying IDM, at Comment 1.A ("Petitioners argue that the FAO Report price does not represent as broad a market average as the Fish Pond Report, as the data contained within the FAO Report is based on only one region in Bangladesh as opposed to the Fish Pond Report data that is based on three provinces.  While Petitioners are correct that the FAO Report is not based on multiple provinces, we note that the data in the FAO Report is based on more fish farmers (60) than the Fish Pond Report (34).  Moreover, it is not clear that other provinces in Bangladesh have any meaningful production of Pangas fish.  However, the FAO Report does state why this particular region was selected (*i.e.*, importance of this region in Pangas farming, the availability of hatchery produced fry, availability of ponds, warm climate, cheap and abundant labor.)" (internal citations omitted)).

[71] *See, e.g.*, *Raw Honey from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22184 (April 14, 2022), and accompanying IDM, at Comment 1 ("The five Indian news articles are specific to ingredient raw beekeeper honey, representative of the broad market average because they are from the largest raw honey producing regions of India … .").

Beyond the production percentages associated with Andhra Pradesh, other aspects of the *Fishing Chimes* study specifically address why the research team selected the sample that it did. For instance, the study stated that data relating to *pangasius* farming was limited in these other states prior to 2018.[72]  In addition, the study explicitly states that the "study team focused on Andhra Pradesh as it has major representation in production of *pangasius*."[73]  Thus, the study researchers deemed the region to be representative.

The Court also raised concerns regarding the study's coverage within Andhra Pradesh. Specifically, the Court noted that "{o}ut of the 300 villages that the study covered, 46 of them are in these two districts {covered by the study}," and asked "{i}f most of Andhra Pradesh's fish producers are not in those two districts, how can a study that relies on data from only those two districts represent a broad market average, absent data (which no party has cited) showing that those districts produced far more fish than anywhere else?"[74]  However, the study states:

> {d}ata on Pangasius farming in Andhra Pradesh is obtained by direct collection from farmers through direct field visits.  It is estimated that, at present Pangasius farming is carried out more than 300 villages in West Godavari and Krishna districts surrounding Kolleru lake area.  Information obtained from different sources also indicates that the pangasius farming is majorly producing in these areas.  In West Godavari district major pangasius farming located in villages located in Eluru, Bhimadolu, Akividu, Kalla, Mogaltur, Narsapuram, Lankalakoderu, Bhimavaram, Undi, Veeravsaram, Palakol, Ganapavaram, Pedapadu mandals and in Krishna district Kakikalur, Mandavalli, Nandivada, Gudivada, Kalidindi, Mudinepalli, Machilipatnam, Bantumilli, Kruthivennu, Challapalli areas.  Survey focused mainly on these mandals which are major representatives.  Out of 300 villages study covered 46 villages in these two districts.  … Study interviewed 54 farmers in 46 villages to obtain the general trend.[75]

---

[72] *See* NTSF August 27, 2019 SV Submission at Exhibits SV-2 and SV-3.
[73] *Id.*
[74] *See Remand Opinion* at 43-44.
[75] *See* NTSF August 27, 2019 SV Submission at Exhibits SV-2 and SV-3.

Thus, the study focused on Andhra Pradesh due to its major representation of Indian production of *pangasius*.  From there, the study further narrowed to two districts, West Godavari, and Krishna, because these districts were key *pangasius* farming locations.  In short, the study selected 54 farmers from 46 villages, and the researchers explicitly considered the representativeness of the data in selecting their survey sample.  The number of survey respondents, the method of sample selection, and the proportion of *pangasius* production covered all support Commerce's decision to select the *Fishing Chimes* data.[76]

In addition to its general findings regarding the representativeness of the *Fishing Chimes* source, the Court made several specific observations regarding key inputs.  First, the Court remanded for reconsideration the issue of whether the whole fish data reflected a broad market average considering the study's focus on Andhra Pradesh.  The Court also questioned the relevance of Commerce's statement that the *Fishing Chimes* data were corroborated to an analysis of whether the data represented a broad market average.[77]  With respect to the first concern, for the reasons detailed above, Commerce finds that the prices in *Fishing Chimes* represent a sufficiently broad market average, *i.e.*, farm-gate prices from 54 farmers, in 46

---

[76] *See, e.g.*, *Hangzhou Yingqing Material Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (December 21, 2016) (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because:  (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM, at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks.  Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average."); and *Certain Steel Threaded Rod from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014), and accompanying IDM, at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business:  Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

[77] *See Remand Opinion* at 47-48 ("It is also unclear how 'corroboration' has anything to do with whether data represent a broad market average, as something may be 'corroborated' yet still represent an exceptionally narrow part of the overall market.").

villages, in West Godavari and Krishna districts of Andhra Pradesh that represent the majority of *pangasius* farming in India.  Regarding the Court's concern on Commerce's statement that the *Fishing Chimes* data were corroborated, we agree with the Court that representativeness and corroboration are distinct concepts.  Commerce did not intend to imply that other pricing data corroborated Commerce's finding that the *Fishing Chimes* data represented a broad market average.  Rather, Commerce's observation was intended to emphasize that the other pricing data corroborated the pricing data in *Fishing Chimes*, and, thus, helped to establish the overall reliability and usability of the data.

The Court also remanded for reconsideration Commerce's finding that the fingerling data in *Fishing Chimes* represented a broad market average.  The Court observed that Commerce stated that the data were from commercial nurseries in two locales which supplied fingerlings to 94.5 percent and 96 percent of the *pangasius* farms in 2017 and 2018; however, the Court emphasizes that the record suggests that the underlying data may have been from 54 farmers in 46 villages in two districts within Andhra Pradesh.[78]  Specifically, the Court noted that "the paragraph from which Commerce drew that {fingerling} data also refers to interviews with the farmers and stakeholders about where they obtained their fingerlings, thus suggesting that the supply data referred to the specific subset of farms *Fishing Chimes* surveyed, *i.e.*, 54 farms in 46 villages in two districts within Andhra Pradesh."[79]

For the reasons discussed above concerning the reliability of the *Fishing Chimes* data in general, we find that the fingerling data – based on the pricing experience of the numerous farmers in Andhra Pradesh as the Court posits – are representative of a broad market average.  In the *Final Results*, Commerce stated "{a}s to the broad market average criterion, *Fishing Chimes*

---

[78] *See Remand Opinion* at 45-46.
[79] *Id*. at 45 (internal citations and quotations omitted).

indicates that its fingerling data were from commercial nurseries in two locales, which collectively supplied fingerlings to 94.5 percent and 96 percent of the *pangasius* farms in 2017 and 2018, respectively."[80]  The purpose of this observation was to the highlight that the farmers, *i.e.*, the above-referenced survey respondents, overwhelming sourced their fingerlings from nurseries that were the predominant suppliers in the areas.  Thus, the prices paid for these fingerlings were not the result of atypical transactions or arrangements specific to particular farmers.  Rather, the observed prices resulted from the standard practice[81] for the sample of farmers in question.[82]  Furthermore, because these prices are from Andhra Pradesh, where the majority of *pangasius* farming occurs, we find the survey prices representative of broad market averages for fingerlings.

The Court also remanded for reconsideration Commerce's findings of corroboration on fish feed data in *Fishing Chimes*.[83]  Specifically, the Court noted the petitioners' argument "that Commerce's finding of corroboration is unsupported by substantial evidence because the supplier whose data Commerce cited, Godrej Agrovet, is one of the suppliers named in the *Fishing Chimes* study" and "{i}nvoices from one of the suppliers included in the study do not provide an independent basis for evaluating the quality of that study."[84]  While it does appear that the invoice from Godrej Agrovet may be an invoice from one of the feed brands relied on in the study (*i.e.*, "Godrej"), it is unclear whether it is, in fact, the same fish feed producer.

---

[80] *See Final Results* IDM at Comment 2 (citing NTSF August 27, 2019 SV Submission, at Exhibits SV-2 and SV-3).
[81] *Id*.  The study states that the seed source was recorded as "commercial nursery in major {*sic*} cases," indicating that most farmers sourced from nurseries.
[82] We also note that the section of the report dealing with fingerlings states that "{a}bout 300 to 500 million P. hypophthalmus seed is produced every year *with the bulk of it being sent to Andhra Pradesh* and the rest to Orissa, Tamil Nadu, Maharashtra, Kerala, Karnataka, Bihar, Rajasthan and Uttar Pradesh."  *Id*. (emphasis added).  The fact that the "bulk" of seed is sent to Andhra Pradesh is consistent with our finding above that the state is a leading region for the production of *pangasius* and consumption of the key inputs thereof.
[83] *See Remand Opinion* at 47.
[84] *Id*. at 46 (internal citations omitted).

Considering this ambiguity, Commerce is no longer relying on this invoice.  Regardless, Commerce does not find that any information on the record undermines the *Fishing Chimes* source, and further corroboration of its reliability is unnecessary.  Moreover, and separately, we have relied on this publication in multiple segments of this proceeding,[85] and elsewhere,[86] and have determined that the publication meets Commerce's SV criteria, including representativeness.

Regarding wage rates/labor data, the Court found that Commerce's decision to use 2006 Indian data to value labor inputs lacked an explanation as to why Commerce selected data that was not contemporaneous with the POR and was, thus, not supported by substantial evidence.[87] In the *Final Results*, Commerce used 2006 International Labor Organization (ILO) wage data for India.[88]  The Court found that this decision was unsupported by substantial evidence because "{n}othing in the record explains why {Commerce} found data from 2006—eleven years before the period of review—to be more acceptable than 2017–2018 data."[89]  The Court also stated that Commerce's contention that it relied on Indian data because India was the primary surrogate country was "irrelevant."[90]

At the outset, and as noted above, we relied on our sequential surrogate country selection process to rely on India (an on-list country at the same level of economic development as Vietnam) as a primary surrogate country, rather than Indonesia, *i.e.*, a country at a less

---

[85] *See, e.g.*, *Fish from Vietnam 18-19* IDM at Comment 3; and *Fish from Vietnam 19-20* IDM at Comment 10.
[86] *See, e.g.*, *Third Administrative Review of Frozen Warmwater Shrimp from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 FR 46565 (September 10, 2009) (*Shrimp from China*), and accompanying IDM, at 17 (valuing shrimp larvae using an article published in *Fishing Chimes*).
[87] *Id*. at 49.
[88] *See* Memorandum, "Surrogate Values for the Preliminary Results," dated October 10, 2019 (Surrogate Values Memorandum), at 4, unchanged in *Final Results*; *see also* NTSF's Letter, "Response to Request for Surrogate Value Information," dated February 25, 2019 (NTSF February 25, 2019 Submission), at Exhibit SV-10.
[89] *See Remand Opinion* at 48.
[90] *Id.* at 48-49.

comparable level of economic development.  Thus, the fact that the data are from India *is*

relevant.  Moreover, because the SV data from India regarding valuing labor inputs was usable,

for the reasons explained below, a direct comparison between these data and the 2017-2018 data

(from Indonesia) is unnecessary.

On June 21, 2011, Commerce revised its methodology for valuing the labor input in

NME AD proceedings.[91]  In *Labor Methodologies*, Commerce determined that the best

methodology to value the labor input is to use labor rates from the primary surrogate country.[92]

Here, Commerce selected the 2006 ILO data relating to wage rates in India,[93] the primary

surrogate country.

Although Commerce prefers to value each FOP with contemporaneous SVs, in prior

cases, Commerce has selected a labor value from the primary surrogate country regardless of

there being other values on the record that may have been more contemporaneous to the period

of investigation or POR, when Commerce deemed the non-contemporaneous data more

appropriate for other reasons.[94]  Here, the wage data was specific to India, and although the

values for this FOP contained in the ILO wage data are not themselves contemporaneous with

the POR, Commerce inflated that data to reflect wage rates for the POR.  Moreover, there is

nothing on the record to suggest, nor do parties argue, that the values are anomalous.  For

instance, the Indonesian value for labor is $0.72 per hour on average;[95] the Indian value, after

---

[91] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092 (June 21, 2011) (*Labor Methodologies*) ("Accordingly, {Commerce} finds that using the data on industry-specific wages from the primary surrogate country is the best approach for valuing the labor input in NME antidumping duty proceedings.").

[92] *Id.*; *see also T. T. International v. United States*, 439 F. Supp. 3d 1370, 1382 (CIT 2020).

[93] *See* Surrogate Values Memorandum; *see also* NTSF February 25, 2019 Submission at Exhibit SV-10.

[94] *See, e.g.*, *Certain Iron Mechanical Transfer Drive Components from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 81 FR 75032 (October 28, 2016).

[95] *See* Petitioners' Letter, "CFA's Submission of Proposed Factor Values," dated February 25, 2019, at I-7.  The average price is $0.72/Hr = 9650.5 Indonesia rupiah x 0.000075 (Average Exchange Rate for 2017 from SAS Indonesian Exchange Rate Database).

being inflated, is \$0.84 per hour.[96]  Moreover, we note that the labor FOP comprises a very small portion of NV, *i.e.*, it is not a major input.[97]  Accordingly, given Commerce's preference to use SVs from the primary surrogate country, to the extent possible, we continue to find it appropriate to use the inflated Indian labor SV for this redetermination.

### B.  Ratio of Whole Live Fish to Fillets

Regarding NTSF's reported ratio of whole live fish to fillets, the Court remanded this issue and directed Commerce to address reports on the record that contradicted NTSF's reported yield ratios.[98]  Specifically, the Court stated that Commerce did not address a 2005 report by the Norwegian Institute of Fisheries and Aquaculture Research, known as the *Fiskeriforskning* report,[99] a 2007 "discussion paper" prepared by an employee of Can Tho University in Vietnam,[100] and a 2017 affidavit[101] from an Indonesian professor specializing in *pangasius* fish production and processing in Indonesia.[102]  These studies and reports claim that the number of whole fish necessary to produce one kilogram of fillet is 3.2, 3.2, and 3.1-3.4 kilograms, respectively,[103] whereas NTSF's reporting differed from these figures.

Commerce continues to find that the evidence on the record supports our reliance on NTSF's reporting with respect to its ratio of whole live fish inputs to fillet outputs.  First, we note that, beyond NTSF's own reporting and verification, the record contains information

---

[96] *See* NTSF February 25, 2019 Submission at SV-10.  The average price is \$0.84/Hr = 23.51 Indian rupees x 0.022115 (Average Exchange Rate for 2006 from SAS Indian Exchange Rate Database) x 1.619655083 (Inflator used for the *Final Results*).
[97] *See* Memorandum, "Final Results Analysis Memorandum for NTSF Seafoods Joint Stock Company," dated April 20, 2020, at *e.g.*, SAS Output page 36-37.
[98] *See Remand Opinion* at 66.
[99] *See* Petitioners' Letter, "CFA FOP-Related Factual Information Submission," dated November 21, 2018, at Exhibit FS-AR12-F.
[100] *See* Petitioners' Letter, "CFA's Submission to Clarify Information Contained in NTSF's Section D Questionnaire Response," dated February 11, 2019 (Petitioners February 11, 2019 RFI), at Exhibit 7.
[101] *See* Petitioners' Letter, "CFA's Submission to Clarify Information Contained in NTSF's Supplemental Sections A, C, and D Questionnaire Response," dated August 8, 2019, at Appendix 2.
[102] *See Remand Opinion* at 62-63.
[103] *Id.*

relating to the ratio of whole live fish to fillets in past segments of this proceeding.  Specifically, Commerce placed on the record several verification reports from prior administrative reviews wherein Commerce conducted yield tests.[104]  At these verifications, as with NTSF, we performed several yield tests where we weighed the output products immediately after each processing stage as they were generated.[105]  The information in these reports includes details on the starting whole fish volume and the resultant raw fillet weights that Commerce directly observed.  When Commerce calculates a whole fish to fillet ratio from the information in these verification reports, the figures are consistent with NTSF's reported yield for its subject merchandise. Specifically, NTSF's reported and verified whole fish to fillet ratio is within the range of input/output ratios reported in those prior reviews and, in fact, is closely in line with the experience observed by the average of the previously verified companies.[106]  Finally, we note that *none* of the companies verified in these earlier segments, or NTSF in this segment, had a whole fish to fillet ratio as high as the ratios proposed by the petitioners here.[107]  Thus, contrary to the petitioners' contention, we do not find that NTSF underreported its whole live fish consumption rate given Commerce's experience, previous findings, and the verification of NTSF in this segment.

Regarding the studies and reports the petitioners placed on the record, given that the record contains Commerce's direct findings of NTSF's experience and past verifications, we do not find that the reports and studies have greater probative value.  At a minimum, because Commerce did not directly perform and/or observe the procedures (*e.g.*, the types and levels of

---

[104] *See* October 24, 2019 Memorandum.
[105] *Id.*; *see also* Verification Report at 7.
[106] *Id*.
[107] *Id.*

processing, weighing techniques, *etc*.) relied on in those reports and studies, we find it appropriate to afford these documents less weight.

The Court also indicated that Commerce should address the petitioners' arguments regarding the whole fish input considering the by-product reporting, and also to consider whether the cost to produce by-products was taken into account by the relied upon methodology. Specifically, the Court reasoned that, "{i}f a producer takes an offset for the revenue made from selling the byproducts, then the producer should have to account for the cost of producing the byproducts in the first instance."[108]  Here, Commerce did not subtract the weight of the by-products to get the input FOPs.  Additionally, Commerce's calculation of NTSF's overall dumping margin includes the labor and energy associated with producing the by-products, as this labor and energy was already incorporated into NTSF's reported labor and energy FOPs.[109] Thus, the record does not demonstrate that any information is missing (or double counted) with respect to NTSF's input/output reporting.

### C. Moisture Content

The Court directed Commerce to address certain record evidence proffered by the parties that both contradicted and supported Commerce's conclusion that NTSF did not overreport the moisture content in its finished frozen fish fillets.[110]

The Court stated that evidence potentially supportive of Commerce's decision is information provided by NTSF, including third-party inspection reports, which are consistent with NTSF's reported data.[111]  In particular, as part of onsite verification, Commerce performed

---

[108] *See Remand Opinion* at 65 (n. 23).
[109] *See* NTSF's Letters, "Voluntary Section D Questionnaire Response and Section D Appendix Questionnaire Response," dated December 18, 2018, at D-14 to D-17; "NTSF's Response to the Department's Supplemental Sections A, C, and D Questionnaire," dated July 30, 2019 (NTSF July 30, 2019 SACDQR), at 42-46; *see also* Verification Report at 20-21.
[110] *See Remand Opinion* at 66.
[111] *Id*. at 67 (citing Verification Report at Attachment 1 (page 16) and Verification Exhibit 9).

sales traces where Commerce reviewed documentation relating to NTSFs reported moisture content.  This documentation included third-party (*i.e.*, a firm hired by the unaffiliated customer in the United States) inspection certificates relating to the moisture content of the merchandise underlying the sales in question.[112]  Upon reviewing this evidence, we find that the inspection certificates establish that NTSF's reported moisture did not exceed the stated maximum in the contract.[113]  In addition, Commerce also verified the moisture content of NTSF's products by examining sample test reports for a product coded as a 86 percent moisture product; the product in question was inspected by another third party, and the results show moisture levels of 85.7, 85.8, and 85.9 percent.[114]  Commerce also examined the washing and additive soaking test reports for four invoices, and these test reports were consistent with the moisture amounts reported by NTSF.[115]  In sum, these multiple third-party inspector reports, and verified internal documentation, support NTSF's reported moisture content.

Regarding the record evidence contrary to Commerce's decision, the Court stated that such evidence includes:  (1) the results of verification in this review;[116] (2) NTSF's product labels;[117] and (3) studies and other documentation, including affidavits, in the administrative record.[118]

With respect to the results of verification in this review, the petitioners argue that the testing conducted at verification confirm that NTSF overreported its moisture content.[119]

---

[112] *See* Verification Report at Attachment 1 (page 16) and Verification Exhibit 9.
[113] *Id*.
[114] *Id*. at Verification Exhibit 40.
[115] *Id*. at Attachment 1 (page 18) and Verification Exhibit 44.
[116] *See Remand Opinion* at 66 (citing Petitioners' Letter, "Memorandum in Support of The Rule 56.2 Motion for Judgment on the Agency Record Filed by Plaintiffs, Catfish Farmers of America, *et al.* (Ct. No. 20-00105)," dated November 5, 2020 (Petitioners Confidential Brief), at 56-58).
[117] *Id*. (citing Petitioners Confidential Brief at 56).
[118] *Id*.
[119] *Id*. at 8-9 (citing Petitioners Confidential Brief at 56-58).

However, in the *Final Results*, Commerce explained why the tests results did not undermine

NTSF's reporting:

> {a}t verification, Commerce performed three moisture tests:  Test (1), during Commerce's yield test conducted during the plant tour; Test (2), soaked fillet from inventory; and, Test (3), unsoaked fillet from inventory.  However, we subsequently learned at verification that the first two tests were not done in a manner that fully conforms to NTSF's actual production experience.  Specifically, it appears that the fillets may have been patted dry more than is typical in the regular production process.  Moreover, the product from the Test 1 did not sit in chilled water for hours before freezing, unlike the equivalent procedure when performed during NTSF's normal production process.  Regarding the Test 2, Commerce did not retest this product, as Commerce did in Test 3 when it retested with an unsoaked fillet, due to time constraints.  Given these facts, we do not find that the moisture test results are fully representative of NTSF's actual experience, and thus, do not necessarily undermine the reliability of NTSF's reporting with respect to moisture.[120]

Therefore, as we stated in the *Final Results*, given these facts, we do not find that the moisture

test results are fully representative of NTSF's actual experience; accordingly, they do not

undermine the reliability of NTSF's reporting with respect to moisture.

Regarding the product labels, the petitioners claim that these labels show that NTSF

misreported its NETWGTU variable.[121]  However, the printing templates for these labels are

provided by the customer to NTSF and, thus, the customer decides what information is provided

therein.[122]  Moreover, it is not clear how the customer determined the information on the labels.

For example, although a label may state "contains 30% of a solution of water, *etc*.," Commerce

must know the basis on which that percentage was derived to determine whether the percentage

is presented on the same terms as NTSF's reporting in the underlying review.  For these reasons,

---

[120] *See Final Results* IDM at Comment 1 (citing Verification Report at 8-9 and Attachment 1 at Answer (74)).
[121] *See Remand Opinion* at 8-9 (citing Petitioners Confidential Brief at 56); *see also* NTSF's Letter, "Section C Questionnaire Response and Appendix IV Questionnaire Response," dated December 12, 2018 (NTSF December 12, 2018 CQR), at Appendix C-2; and NTSF July 30, 2019 SACDQR at Exhibit Q-22.
[122] *See* NTSF July 30, 2019 SACDQR at C-22; *see also* Verification Report at Attachment 1 (Answer (51)).

we do not find that these labels undermine NTSF's reporting, as this information is controlled by the customer not by NTSF.

Regarding the studies and other documentation on the record, the petitioners claim that these documents show that NTSF misreported its moisture content.[123]  As in the context of whole fish to fillet ratio discussion above, the petitioners provided studies and documentation that may reflect different procedures and merchandise than those in this review.  As a result, we do not find that the figures contained in these sources are more reliable than the data obtained in this review.  Here, the record contains documentary evidence on moisture tests (including tests performed by independent third parties) on the subject merchandise that NTSF sold to the United States.  Given this, and absent any evidence on the record that the independent third-party moisture tests are flawed, Commerce finds that the petitioners' reports and affidavits are not probative in this instance.  For the reasons stated, we continue to find that the weight of the evidence supports NTSF's moisture content reporting.  In summary, pursuant to the Court's *Remand Opinion*, and in light of the record evidence as a whole, Commerce continues to find that its selection of India as the primary surrogate country, its valuation of certain FOPs, and its

---

[123] *See Remand Opinion* at 8-9 (citing Petitioners Confidential Brief at 56)*; see also* Petitioners February 11, 2019 RFI at Exhibit 13 (including (1) Study by the Department of Safety and Quality of Milk and Fish Products, Max Rubner-Institut, Federal Research Institute of Nutrition and Food, Hamburg, Germany "Natural Chemical Composition of Commercial Fish Species:  Characterisation of Pangasius, Wild and Farmed Turbot and Barramundi"; (2) Vietnamese Report - The National Agro-Forestry-Fisheries Quality Assurance Department Reference Testing & Agrifood Quality Consultancy Center:  Results of Topic "The Supplementation Research on the Factors That are Capable of Influence to Moisture Intra Fish Production and Processing and to Propose Appropriate Moisture in Frozen Tra Fish Fillet Products"; and (3) Affidavit of Indonesian professor Dr. Malanurilmala, stating that "I have been asked, given my expertise with the production and processing of *pangasius hypophthalmus* fish in Indonesia as well as Southeast Asia, to determine the natural moisture content of *pangasius hypophthalrnus* fish fillets); and Petitioners' Letter, "CFA's Submission to Clarify Information Contained in NTSF's Supplemental Section C Questionnaire Response," dated May 6, 2019, at Exhibit 2 (Affidavit by Solon Scott, III, President of America's Catch, a U.S. producer and processor of whole live food size fish, who was asked by Cassidy Levy Kent (USA) LLP to acquire frozen pangasius (*pangasianodon*) *hypophthalmus* fish fillets that were farm raised in Vietnam and sold in the United States in order to have the fillets analyzed to determine their natural moisture content).

reliance on NTSF's reporting with respect to the consumption rate for whole live fish and moisture content, is supported by substantial evidence.

## IV.    COMMENTS ON THE DRAFT RESULTS

As noted above, Commerce released the Draft Results on July 19, 2022.[124]  The petitioners and NTSF submitted comments on July 26, 2022.[125]  These comments related to (A) the selection of India as a surrogate country, and Commerce's reliance on NTSF's data relating to (B) the consumption rate for a main input, *i.e.*, whole live fish, and (C) moisture content. These arguments are addressed in turn.

### A.  Selection of India as a Surrogate Country

*1.   Application of Commerce's Sequential Surrogate Country Selection Method*

*Petitioners' Comments*[126]

- In the Draft Results, Commerce unsuccessfully attempts to assuage the Court's concerns that Commerce misapplied the Act's economic comparability standard.  The Draft Results also fail to adequately explain and support the conclusion that Indonesia was not economically comparable with Vietnam.

- As an initial matter, it is self-evident that the six countries on the Surrogate Country List for this review did not have the "same" level of economic development as Vietnam. None of them have GNIs identical to Vietnam's; rather, their GNIs range from 44 percent higher to 16 percent lower than Vietnam's GNIs.  They are not even the six countries with GNIs closest to that of Vietnam.

- It remains unclear why only these six countries are included on the list – and, more

---

[124] *See* Draft Results.
[125] *See* Petitioners Comments; and NTSF Comments.
[126] *See* Petitioners Comments at 3-12.

crucially, why only these six countries are considered to have a comparable level of development to Vietnam.  Commerce has not provided any explanation of how the list was developed, or why it has considered the particular range of GNIs that it represents (and only that range).

- Commerce's reliance on prior case law does not add anything to its explanation, and the precedent fails to support its position that it has interpreted the Act reasonably on its face and applied the statutory standard reasonably here.  Commerce relies on the Court's 2016 opinion in *Clearon III*.[127]  However, the parties in that case accepted Commerce's "same"-level analysis implicitly, such that the Court was not required to opine on it.  Instead, the parties opposing the remand results in *Clearon III* focused their arguments on relative data quality and significant producer status.  Rather than attack Commerce's economic comparability methodology, they attacked Commerce's treatment of economic comparability as a threshold issue, *i.e.*, what Commerce calls its "sequential" analysis.  Here, however, the issue is the reasonableness of its "same"-level comparability methodology, both facially and as applied in this review.

- Commerce's citation of *Jacobi Carbons*[128] is likewise unhelpful to Commerce's position in the Draft Results.  In *Jacobi Carbons*, the Court reviewed remand results in which Commerce explained at length the methodology and analysis underlying the Office of Policy's identification of potential surrogate countries in the relevant segment.  The *Jacobi Carbons* Court noted specifically that Commerce had generated its list through a review of the historical, contextual growth rate of the relevant NME country, inclusive of

---

[127] *See* Petitioners Comments at 7 (citing *Clearon III* and *Clearon Corp. et al. v United* States, No. 13-00073, Slip Op. 15-91 at 8 (CIT August 20, 2015) (*Clearon II*) (determining that Commerce provided a reasonable explanation of how it generated its surrogate country list)).
[128] *Id.* at 8 (citing *Jacobi Carbons*, 313 F. Supp. 3d at 1316-1318).

whether "recenter{ing}" of the list was required, and how and whether the GNI range of potential surrogate sources should be expanded commensurate with the NME country's rapid increase in development.[129]  The Court also noted favorably Commerce's position that "when a surrogate country's *per capita* GNI tracks {the NME country's} *per capita* GNI," this confluence of trends supports the potential surrogate country's continued treatment as economically comparable with the NME country.[130]  The kind of explanation and analysis discussed in *Jacobi Carbons* is not present in the Draft Results.

- Here, the Office of Policy's list excluded Indonesia, although the country's GNI in 2017 was closer to Vietnam's GNI than in multiple prior years in which Indonesia was included on the list.  Not only does the record show that both Vietnam and Indonesia's GNIs have trended upwards over time, the magnitude of the difference between their GNIs has fallen simultaneously.  As such, Indonesia's GNI was closer to, and therefore, more closely comparable to, Vietnam's than it had been in multiple prior reviews in which Indonesia was selected as the primary surrogate country.

- By contrast, the record shows that the GNIs of India and Vietnam reflect divergent trends.  Over the period from 2011 to 2017, India's GNI shifted from being higher than Vietnam's to being markedly lower.  Not only did Vietnam's GNI overtake India's, the magnitude of difference between the countries' GNIs widened even as the difference between the GNIs for Indonesia and Vietnam narrowed.  In light of these facts, *Jacobi Carbons* does not support the analysis in the Draft Results.

- Commerce's Draft Results also briefly cite *Jiaxing Brother*,[131] *Xiping Opeck*,[132] and

---

[129] *Id.*
[130] *Id.*
[131] *Id.* at 9 (citing *Jiaxing Brother*, 428 F. Supp. 3d at 1372-73).
[132] *Id.* (citing *Xiping Opeck*, 551 F. Supp. 3d. at 1348 (n.18)).

*Juancheng Kangtai*[133] in support of Commerce's "same"-level analysis of economic comparability.  However, these cases do not support Commerce's position here.

- o *Jiaxing Brother* involved the relative specificity of the data in two different potential surrogate countries that Commerce found to be at the "same" level of economic development as the relevant NME country.  As such, no party challenged the "same"-level methodology and the Court was not called upon to judge its appropriateness either facially or as applied.

- o In *Xiping Opeck*, the Court merely observed in a footnote that Commerce's surrogate country selection process is governed by the requirements of the Act.  Moreover, the litigation itself centered on Commerce's selection of a tariff subheading to value a specific FOP, rather than the appropriateness of the "same"-level methodology.

- o In *Juancheng Kangtai*, the Court approved Commerce's inclusion of only a narrow band of GNIs in its list of surrogate countries, but did so based on the specific facts and arguments involved in the proceeding under consideration.  There, the Court noted that the plaintiff in that case had "argued foremost in its case brief for the use of countries that were on the {Office of Policy's} List."[134]  That is, of course, not the case here.  The petitioners have argued continuously for use of Indonesian data and have made arguments not presented in *Juancheng Kangtai.*

- • Commerce's citation of administrative precedent does not help its position either.  The Draft Results quote multiple prior cases in which the agency has stated that it will

---

[133] *Id.* (citing *Juancheng Kangtai*, Slip Op. 15-93, at *17).
[134] *Id.* at 10 (citing *Juancheng Kangtai*, Slip Op. 15-93, at *17).

consider countries that are not at the "same" level of economic development as the relevant NME country only where there is inadequate data from "same"-level countries. The fact that Commerce has employed the methodology reflected in the Draft Results in the past, however, does not establish that the methodology is lawful and appropriate in this review.

- The Draft Results assert that, because Indonesia was not on the Surrogate Country List, it was not economically comparable with Vietnam. But Commerce's axiomatic treatment of the range of GNIs in the Surrogate Country List as establishing the outer bounds of comparability remains unexplained. Moreover, doing so produced arbitrary results in this review, as the list excluded Indonesia despite the fact that the country's GNI was closer in 2017 to Vietnam's GNI than it was in multiple prior years in which Indonesia was selected as the primary surrogate country. This outcome is unreasonable on its face. It is also at odds with the logic of the agency's analysis in cases like *Jacobi Carbons*.

- Finally, Commerce pushed back against the Court's view that the agency conceded flaws in its economic comparability methodology and/or engaged in circular reasoning. Commerce asserts that the Court misunderstood the agency's "sequential" analysis, pursuant to which Indonesia was not under consideration as a primary surrogate country from the outset, given that the country did not appear on the Surrogate Country List of "same"-level countries. This assertion does not establish the appropriateness of Commerce's economic comparability analysis. Rather, the problems identified by the Court remain. Commerce should revisit its economic comparability analysis, find Indonesia economically comparable with Vietnam, and rely on Indonesia as the surrogate country in its final results of redetermination.

**Commerce's Position:**  As explained in the Draft Results, Commerce relied on its sequential surrogate country selection process in this administrative review.  Having determined that a country at the same level of economic development (India) offered quality SV data, we appropriately relied on India as the primary surrogate country.  In its comments on the Draft Results, the petitioners raise a number of arguments relating to Commerce's preference to rely on a surrogate country at the same level of economic development as the NME in question and with respect to Commerce's development of the Surrogate Country List itself.  None of these arguments warrant a modification to the positions adopted in the Draft Results.

First, the petitioners critique Commerce's creation of the Surrogate Country List (and the concomitant range of the *per capita* GNIs deemed to represent the "same" level of economic development) by asserting that none of the countries on the list actually have the same *exact per capita* GNI amount as Vietnam.  As explained in Policy Bulletin 04.1, "{t}he surrogate countries on the {(non-exhaustive) surrogate country} list are not ranked."[135]  This lack of ranking reflects Commerce's long-standing practice that, for the purpose of surrogate country selection, the countries on the list "should be considered equivalent," from the standpoint of their level of economic development, with respect to each other and to the NME country in question.[136]  This also recognizes that the term "level" in this economic development context necessarily – and practically – implies a *range* of *per capita* GNIs, not a specific *per capita* GNI figure.  Commerce's approach fulfills the statutory requirement that we value FOPs using data from "one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country."[137]  In this regard, the phrase "countries that are at a

---

[135] *See* Policy Bulletin 04.1
[136] *Id.*
[137] *See* section 773(c)(4) of the Act.

level of economic development comparable to that of the NME country" *necessarily includes* any country that is at the same level of economic development as the NME country.

As discussed further below, Commerce has applied this methodology in numerous proceedings and has been upheld by the Court in previous opinions. The petitioners summarily dismiss the extensive administrative precedent cited in the Draft Results, and suggest that Commerce is systematically incorrect in applying a preference for countries at the same level of economic development. This line of precedent, however, reflects application of a practice that Commerce has relied on in numerous proceedings involving different NMEs and that has been affirmed by the Court. The practice demonstrates a concerted effort by Commerce to achieve consistency in its approach while also adopting a practice that is administratively practical.

In addition to disagreeing with Commerce's preference for relying on countries at the same level of economic development as the NME in question, the petitioners also fault Commerce for not providing additional explanation regarding the generation of the Surrogate Country List itself and an explanation of why Indonesia was not on the list. With regard to establishing the set of countries on the list, it is important to recall the two basic objectives that underlie Commerce's approach to developing the Surrogate Country List. The first objective is to provide a consistent starting point for all proceedings involving the same NME country, in this case Vietnam, at a given point in time. The second objective is to provide a reasonably predictable process so that, in any proceeding involving an NME country, interested parties understand the process and methodology that Commerce follows. At the same time, however, as noted and upheld by the Court, Commerce's long-standing practice is to treat each segment of an AD proceeding, including the less-than-fair-value investigation and the subsequent administrative reviews that may follow, as independent segments with separate records and

which lead to independent determinations.[138]  Thus, while Commerce seeks to ensure a consistent process to establish the Surrogate Country List, there is no basis for the petitioners' insistence that the process must yield a particular result from one review period to the next.

Here, we applied the same process as in all NME investigations and reviews.  The annual release of the *World Bank Development Report,* which includes the latest *per capita* GNI data, initiates the process of generating a list of countries at the same level of economic development as the NME in question.  Commerce examines the new *per capita* GNI data for the NME (and the change in *per capita* GNI from the year before) and compares the change in the country's *per capita* GNI to the respective changes in *per capita* GNIs of the existing set of surrogate countries.  Commerce places emphasis on achieving a degree of balance in the GNI range represented by the list.  We try to preserve the same number of surrogate countries above and below the NME country (often three countries with *per capita* GNIs each higher and lower than the *per capita* GNI for the NME, for a total of six).  In arriving at this list of countries, Commerce considers a range of factors, including the SV requirements for the existing products under examination, the expected data quality and availability of alternative surrogate countries, the economic diversity of the manufacturing sector in the alternative countries, and the degree of specificity in the import data potentially relied on to value the FOPs.[139]

Commerce relies on its case experience and professional judgment to develop this list of surrogate countries.  Although the petitioners assert that the countries on the list "are not even the six countries with GNIs closest to that of Vietnam,"[140] this is not a hidden process or a

---

[138] *See E.I. DuPont de Nemours & Co. v. United States*, Court No. 96-11-02509**,** Slip Op. 98-07 (CIT January 29, 1998); *see also Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1289-99 (Fed. Cir. 2016) (Commerce only examines the record before it, and each record stands on its own).
[139] *See, e.g.*, *Clearon II*, Slip Op. 15-91 at *7 and n.5.
[140] *See* Petitioners Comments at 6.

surprising result; Commerce identified this possibility in prior segments, including the remand cited by the petitioners.[141]  Even more significant, Commerce's construction of the range of countries at the same level of economic development is non-exhaustive.  When an interested party, therefore, identifies another alternative surrogate country that is within the *per capita* GNI range of potential surrogate countries on the list, Commerce accords that alternative surrogate country the same consideration as given to those identified on the Surrogate Country List, *i.e.*, the alternative surrogate country is also at the same level of economic development as the NME in question.

Taken in this context, the *per capita* GNI range of potential surrogate countries on the list represents a guideline for interested parties, consistent with the statutory criteria enumerated under section 773(c)(4)(A) of the Act and 19 CFR 351.408(b).  It is intended to initiate a process whereby parties can focus their attention on a manageable set of potential surrogate countries. To initiate the process, Commerce provides a range of *per capita* GNI, as reflected by potential surrogate countries on the list, to parties as a starting point.  One benefit of this approach is that interested parties do not expend their resources focusing on potential surrogate countries that are not at the same level of economic development as the NME country in question when there is a same-level country that provides adequate data.  Although the petitioners assert that "it remains unclear why only these six countries are included on the list,"[142] we have articulated the considerations underlying our establishment of a Surrogate Country List in the past, including in the cases emphasized by the petitioners, and the Court has found Commerce's explanation to be

---

[141] *See, e.g.*, *Clearon II*, Slip Op. 15-91 at *7 and n.5.  Elsewhere in their brief, the petitioners acknowledge the reason for this, noting that "the list omitted certain countries that had GNIs closer to that of Vietnam's than the six countries on the list (Morocco, Ukraine, Honduras), apparently because the Office of Policy found them unlikely to have available, good quality data."  *See* Petitioners Comments at 4 (n.14).

[142] *See* Petitioners Comments at 6.

reasonable.[143]

The petitioners misconstrue the Draft Results by asserting that Commerce did not "meaningfully address the court's concerns regarding Commerce's conclusory treatment of only countries on its surrogate country list as economically comparable with the relevant NME country."[144]  However, that was not the finding that Commerce made in the *Final Results* in the underlying review or in the Draft Results.  Rather, Commerce determined that quality SV data from a country at the same level of economic development as Vietnam was available.  As a result, it was unnecessary to consider data from a less comparable country.  We did not, as the petitioners assert, state that the list "establish{es} the outer bounds of comparability" or that Commerce only considers "countries at the same level of economic development … as primary surrogates."[145]

Ultimately, the petitioners' complaint is with the outcome of Commerce's application of a well-established preference for focusing on a subset of comparable countries, where possible, that are at the same level of economic development as the NME country.  The sequential selection process and the establishment of a surrogate country list, however, has been upheld by the Court and has been applied in a wide array of administrative cases (including several NME cases involving the same country and time period in question[146]).

Next, with respect to the creation of a surrogate country list under the particular facts of this review, the petitioners emphasize that the gap between the *per capita* GNI of Vietnam and

---

[143] *See, e.g.*, *Clearon II*, Slip Op. 15-91 at *7 and n.5; and *Jacobi Carbons*, 313 F. Supp. 3d at 1317-23 (explaining that "Commerce's decision to limit the {Office of Policy}'s list of potential surrogates to six countries represents 'precisely the type of discretion left within the agency's domain.'") (citing *Baoding Yude Chem. Indus. Co., Ltd. v. United States*, 170 F. Supp. 2d 1335, 1343 (2001)).
[144] *See* Petitioners Comments at 7.
[145] *Id*. at 10-11.
[146] *See, e.g., Nails from China* IDM at Comment 1; *QSP from China* IDM at Comment 8; and *OCTG from Vietnam* PDM at "Surrogate Country," unchanged in *OCTG from Vietnam Final*.

Indonesia was less than the corresponding gap observed in prior review periods when Indonesia

was included on the list.  This observation is immaterial because construction of a surrogate

country list is not based on differences in nominal *per capita* GNI figures.  The Surrogate

Country List here, as in all cases, is based on an assessment of the countries whose *per capita*

GNIs are closest to *per capita* GNI to the NME country in question and that are likely to provide

usable data, *at a given point in time*.  Thus, a country that is represented on the list at one point in

time can be removed from the list if the *per capita* GNI of one or more other potential surrogate

countries converges with the *per capita* GNI of the NME country in question.  As the Court

explained in *Jacobi Carbons*:

> Commerce's compilation of the list is reasonably based on its examination of
> annual changes to China's *per capita* GNI and re-centering of the list based on
> China's rapid economic expansion … {and} it would be inappropriate for this
> court to impose that type of bright-line requirement.  As {Commerce} notes,
> {t}he GNI data on which the surrogate country list is based is a fluid
> measurement that can change from year to year.[147]

Thus, a country does not remain on the list indefinitely based on an earlier classification or based

on nominal differences in *per capita* GNI.  Instead, the subset of countries that are designated as

being at the same level of economic development may fluctuate year to year, and Commerce is

not beholden to prior designations.  As noted above, Commerce tries to preserve the same

number of surrogate countries on the list (*e.g.*, three countries each with *per capita* GNIs higher

and lower than the NME country, for a total of six) to limit the number of potential surrogate

countries for analysis.  By insisting that Indonesia must remain on the list despite the relative

changes in development and current *per capita* GNIs of other potential surrogate countries, the

petitioners' position implies that Commerce should be required to include numerous additional

countries on the list in any given year (*i.e.*, by necessarily broadening the outer bounds of

---

[147] *See Jacobi Carbons*, 313 F. Supp. 3d at 1317-23 (internal citations omitted).

"same"-ness to force the inclusion of Indonesia simply because Indonesia previously had been

on the list), which defeats the purposes of Commerce's holistic approach in this regard.

The petitioners also assert that the *per capita* GNI trends of the three countries under

discussion here support the selection of Indonesia as a surrogate.  The petitioners argue that:

> the record shows that Indian and Vietnamese GNIs reflect divergent trends …
> India's GNI shifted from being higher than Vietnam's to being markedly lower.
> Not only did Vietnam's GNI overtake India's, the magnitude of difference
> between the countries' GNIs widened even as the difference between Indonesia's
> and Vietnam's GNIs narrowed.[148]

Although this description appears to suggest some sort of convergence between Indonesia

and Vietnam, and a corresponding divergence between Vietnam and India, an examination

of the data does not reveal any such trend.  The data[149] are plotted below:



While India did transition from having a higher *per capita* GNI than Vietnam's before 2012 to a

lower *per capita* GNI after 2012, the *per capita* GNIs remain within a narrow range.  Of course,

---

[148] *See* Petitioners Comments at 9.
[149] *See* Petitioners' Letter, "CFA's Comments on Surrogate Country List," dated November 30, 2018, at Exhibits 1-2.

the observed "shift{}"[150] described by the petitioners was made possible by the proximity of the two countries in terms of *per capita* GNI; given the consistently wide disparity between Indonesia and Vietnam, such a shift between those countries was unlikely.  In any case, the *per capita* GNI data on the record reveal a tight proximity between India and Vietnam throughout the entire period, whereas Indonesia is markedly greater than either.  While we again emphasize that Commerce's determination in this segment is based on the record of this review, again, to address comments and to the extent that the petitioners are asserting that the trend reflects some ongoing or future convergence of Indonesia and Vietnam to the exclusion of India, that is incorrect as well.  The chart shows a highly comparable relationship between India and Vietnam both before and during the instant period of review while Indonesia's GNI remained substantially higher than both.  Moreover, we note that the observed relationship continued in subsequent PORs, where India remained on the list while Indonesia did not return to the list.[151]

The process used to develop the Surrogate Country List here was applied, and upheld, in various Court opinions relied on in the Draft Results.  The petitioners attempt to dismiss numerous court opinions that endorse, or acknowledge, the existence of Commerce's sequential surrogate country selection process.  Although many of the opinions involve different factual context (*e.g.*, were proceedings involving China) or entailed litigation involving issues beyond surrogate country selection, these opinions support the proposition that Commerce has consistently and properly applied the process described above over time.

For instance, the petitioners assert that Commerce's citation to *Clearon III* is misplaced because both parties in that review accepted Commerce's same-level analysis implicitly.  However, in *Clearon III* – at which point Commerce had already been upheld on the application

---

[150] *Id*.
[151] *See Fish from Vietnam 18-19* IDM at Comment 3; and *Fish from Vietnam 19-20* IDM at Comment 10.

of the sequential surrogate country selection process for the review in question in an earlier

redetermination – the Court summarized the holding of *Clearon II* as follows:

> Commerce on second remand concluded from the foregoing that absent adequate
> showing that the Philippines lacks the quality of data necessary to complete the
> review, it was not required to conduct a comparison of those data with those of a
> country at a less comparable level of economic development.  The court is unable
> to conclude that is an unreasonable interpretation of *Clearon II*, and the results of
> the second remand comply to that extent with what was ordered.[152]

Thus, the *Clearon* opinions are consistent with Commerce's position here.

Additionally, the petitioners assert that, unlike in the final results of redetermination

preceding *Clearon II* and *Jacobi Carbons*, Commerce has failed to explain how it generated the

Surrogate Country List in this segment.[153]  Our basis for the development of the Surrogate

Country List was consistent with the approach discussed in multiple determinations cited by

Commerce and, further, we have provided additional explanation of the generation of the

Surrogate Country List for this review above.

The petitioners also dismiss Commerce's citation to *Jiaxing Brother* and *Juancheng

Kangtai*, claiming that the underlying facts or the arguments raised by the parties were

sufficiently distinct from those presented in this litigation so as to render the cases uninstructive.

While we agree that *Jiaxing Brother* focused on the relative specificity of the data in two

different potential surrogate countries, the Court nonetheless acknowledged that Commerce's

practice was to focus on "the GNI band of countries that are considered to be at the same level of

economic development to {China}."[154]  Thus, although the case presented several different

issues from those arising here, Commerce cited this opinion in support of the proposition that

---

[152] *See Clearon III*, Consol. Court No. 13-00073, at *11-12.
[153] *See* Petitioners Comments at 9.
[154] *See Jiaxing Brother*, 428 F. Supp. 3d at 1372-73.

Commerce develops a list of countries at the same level of economic development.[155]  Finally, the petitioners emphasize that the Court's decision in *Juancheng Kangtai* to approve a narrow band of *per capita* GNIs on the surrogate country list was "based on the specific facts and arguments involved in the proceeding under consideration" and that the parties made primary arguments about the on-list countries.[156]  Despite these purported distinctions, the opinion nonetheless addressed numerous arguments about the appropriate basis for ascertaining countries at the same level of economic development, and upheld Commerce's approach in this regard.[157]

Without engaging the citations to numerous administrative determinations applying the process described above, which involved China and Vietnam, the petitioners simply dismiss the practice with the assertion that "{t}he fact that Commerce has employed the methodology reflected in the draft results in the past, however, does not establish that the methodology is lawful and appropriate in this review."[158]  While we agree with this proposition in general, this argument rings hollow in this context; Commerce has demonstrated that it consistently applies a particular process to satisfy the dictates of section 773(c)(4) of the Act.  The petitioners are dissatisfied with the results produced by that process, but that alone does not make the methodology employed by Commerce unlawful.

To summarize, Commerce's judicially affirmed practice is to examine *relative* differences in *per capita* GNI over time to construct its non-exhaustive list of countries at the same level of economic development as the NME country under consideration.  Commerce

---

[155] Similarly, the *Xiping Opeck* Court noted that Commerce has a developed practice "in identifying countries that are at the same level of economic development."  *See Xiping Opeck*, 551 F. Supp. 3d. at 1348 (n.18).

[156] *See* Petitioners Comments at 10.

[157] *See Juancheng Kangtai*, Slip Op. 15-93, at *2 ("The court in this matter adheres to precedent holding that primary reliance on per capita GNI in compiling the surrogate country list is reasonable" and "rejects the notion that Commerce's policy of narrowing the list of countries to a band, around a level, of economic comparability is in violation of the statute.") (internal citations and quotations omitted).

[158] *See* Petitioners Comments at 10.

prefers to rely on such countries, or other countries whose per capita GNI is within the range of the *per capita* GNIs of such countries, where possible, and will use such a country if one is a significant producer of comparable merchandise and provides quality data.  Commerce continues to find that its creation of the Surrogate Country List and its sequential selection process is appropriate, practical, and in accordance with law.

> 2. *Indian Data in this Administrative Review - Key Inputs and Labor*

*Petitioners' Comments*[159]

- Commerce has not put forward a reasonable, supported basis for treating Indonesia as not economically comparable with Vietnam, and an analysis of relative data quality was necessary.  Moreover, the quality of Indonesian data was a relevant factor that the Act requires Commerce to consider in assessing whether Indian data was the best available information to value FOPs.

- First, the *Fishing Chimes* data, in general, and as the SV for whole live fish, are flawed for several reasons.  The record establishes that the prices for whole live fish are not from 54 farmers.  Rather, the data reflect prices from a maximum of 11 farmers, and even then, for only one month of the POR.  Next, the *Fishing Chimes* study provided no data at all regarding whole live fish values from February to June 2018, a full five months of the POR, and the July 2018 data are based on a single farm's sales.  Furthermore, there is no volume data provided for each reporting farm's monthly prices; without volume data, it is impossible for Commerce to evaluate the limited pricing data in relation to the record regarding *pangasius* production in Andhra Pradesh or India generally.  Accordingly, even if the farms providing prices for whole live fish were located in key districts, there were

---

[159] *See* Petitioners Comments at 12-23.

too few farms and data points for Commerce to reasonably conclude that the data were representative of broad market averages.

- Second, the *Fishing Chimes* data are not appropriate for use as the SV for fingerlings. The *Fishing Chimes* study was based on 108 question data sets from 54 farmers. While Commerce argues that the fingerlings data are representative, because the 54 surveyed farms obtained seed from the predominant suppliers in the areas surveyed, it is evident that not all 54 farmers provided responses to every question. Crucially, the *Fishing Chimes* study does not indicate how many farmers actually provided data regarding fingerling prices, or what the volume of trade is represented by the pricing data for each size of fingerling. Thus, the Draft Results do not establish that the fingerlings data reflect broad market averages or are otherwise representative.

- Third, with respect to corroboration, while Commerce states that there is no record data undermining the *Fishing Chimes* source, the *Fishing Chimes* data themselves indicate that they do not reflect broad-market averages, but only the subset of responses to an already limited survey. As noted above, the data regarding fish feed also lack volume information that would allow the agency to reasonably conclude that they are broad-based or representative. Moreover, Commerce asserts that *Fishing Chimes* data have been used elsewhere. However, Commerce's reliance on *Fishing Chimes* data regarding shrimp pricing does not establish that the *Fishing Chimes* study at issue here weas reliable or reflected broad-market averages regarding Indian whole live *pangasius* or feed values.

- Fourth, Commerce inappropriately relied on the Indian wage data here. Commerce does not necessarily value all FOPs within the primary surrogate country; it must seek the best

available information for each FOP, and contemporaneity is, of course, one of the hallmarks of data quality.[160]  Not only is the 2006 data out of date, but it is also not clear that it is industry-specific, unlike the Indonesian labor data, which is both contemporaneous with the review period and specific.  Moreover, the labor FOP does not necessarily comprise a very small portion of NV.

- To summarize, the Indian data do not meet the agency's requirements for SV data quality.  For the final remand results, Commerce should rely on the contemporaneous, specific Indonesian labor data.

*NTSF's Comments*[161]

- Commerce correctly explained that it does not need to corroborate the *Fishing Chimes* article with additional record evidence because the absence of detracting information supports the reasonableness of relying on the *Fishing Chimes* data.

- However, the record contains additional information that does, in fact, corroborate the *Fishing Chimes* data.  Specifically, the *Undercurrent* news article corroborates the fish feed SV used by Commerce from *Fishing Chimes*.  The *Undercurrent* news article stated that the cost of commercial feed in India ranged from Indian rupees (INR) 29 to INR 31/kilogram for 24-28 percent protein content, which corroborates the prices provided in the *Fishing Chimes* report.  Commerce should consider the *Undercurrent* news article as further corroborating evidence for the fish feed data in *Fishing Chimes*.

---

[160] *Id*. at 22 (citing *Bristol Metals L.P. et al. v. United States,* 703 F. Supp. 2d 1370, 1374 (CIT 2010); and *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008) (*Tires from China*), and accompanying IDM, at Comment 10)).

[161] *See* NTSF Comments at 1-3.

**Commerce's Position:**  For the reasons stated below, we continue to find that India provides appropriate information for valuing certain key inputs – including whole live fish, fish feed and fingerlings – as well as labor.

First, with respect to the *Fishing Chimes* data, the petitioners incorrectly claim that the data came from only 11 farms.  In reaching this conclusion, it appears that the petitioners simply picked the POR month that had the highest number of farms reporting (which was August 2017 with 11 farms harvested) and determined that the figure (*i.e.*, 11) represented the entire universe of reporting entities.[162]  There is no basis for such an interpretation.  The study showed 83 farms in 2017 and 2018, of which 41 were during seven months of the POR.  The petitioners' presumption that it is only 11 individual farms (or a subset thereof) reporting each month is unfounded.[163]

Regarding the petitioners' claim that there were no data for certain months, the record indicates that this is not due to missing data.  The study noted that stocking patterns are not constant and change according to many factors, such as market price, the prevalence of other types of farming activities, and water availability.[164]  Furthermore, the study observed that the peak stocking season during 2017 and 2018 was in the early part of the year.[165]  Thus, we also find no basis to conclude that variations in response rates are somehow suspect; rather, the clustering of reporting times is due to the nature of the farmers' stocking patterns and subsequent

---

[162] *See* NTSF's August 27, 2019 Submission at Exhibit SV-2 and 3.
[163] *Id*.  Stated differently, not all farms would be expected to report data for every month; for instance, some farms might harvest in June while others harvest in July.  Accordingly, the record does not show that there were only 11 farms providing survey responses during the POR.  To the contrary, the names of the responders are not indicated in the survey and, therefore, it is simply speculation to assume the same 11 responders, or a subset of those same responders, are the only entities providing a response to the survey.  Even accepting the petitioners' interpretation, *arguendo*, we do not agree that numerous data points over time, from 11 responders, would be insufficient to establish that data represent a broad market average or are necessarily unreliable.
[164] *Id*.
[165] *Id*.

harvesting.

Regarding the petitioners' claim that the data do not contain volume data for whole live fish sales, although the study did not quote specific volumes on a transaction- or entity-specific basis, the study does enumerate certain parameters allowing an estimation of the total volume covered.  For example, the publication states that:  (1) the study covered farms ranging in size from 0.4 hectares to 56 hectares; (2) average productivity per hectares was 17.9 metric tons (2017) and 18.4 metric tons (2018); (3) 45 farms reported in 2017, and 38 in 2018 (with 41 farms reporting during the POR); and, (4) on average, farms had three harvests over a two year period.[166]  Using these parameters, and assuming a 28.2 hectares per farm size (*i.e.*, the average of 0.4 and 56 hectares), the *pangasius* prices in the *Fishing Chimes* are based on approximately 28 million kilograms of *pangasius* fish in 2017 and 2018, and approximately 14 million kilograms during the POR.[167]  This is a significant volume of fish.

Second, with respect to the fingerling data from *Fishing Chimes*, the petitioners argue that not all of the farmers responded and/or did not respond to all the questions in the survey. However, the study stated that it involved 108 data sets that were collected in 2017 and 2018 from 54 farmers in Krishna and West Godavari, *i.e.*, the two largest *pangasius*-producing districts in Andhra Pradesh.[168]  The study does not identify a response rate and, thus, the petitioners' argument is speculative.

As in the context of whole live fish, the petitioners' claim that the fingerling data do not contain volume figures is not entirely correct.  Although the study did not quote a specific

---

[166] *Id*.
[167] We calculated the volume of whole live *pangasius* fish by multiplying the average MT productivity per Ha per year by the average MT size of the farm and by the number of farms.  We then multiplied this by the average harvest per year and finally by 1,000, *i.e.*:  (2017 All months, 28.2 x 17.9 x 45 x .67 x 1000 = 15,143,249 Kg); (2018 All months, 28.2 x 18.4 x 38 x .67 x 1000 = 13,144,829 Kg); (2017 POR months, 28.2 x 17.9 x 37 x .67 x 1000 = 12,451,115 Kg); and (2018 POR months, 28.2 x 18.4 x 4 x .67 x 1000 = 1,383,665 Kg).
[168] *See* NTSF's August 27, 2019 Submission at Exhibit SV-3.

volume (or transaction-specific volumes) the study does enumerate certain parameters allowing

an estimation of the total volume.  For example, in addition to the parameters included in the

calculation of the whole live fish volumes above, the study states that the average stocking

density is recorded as 25,000 pieces per hectare.[169]  Using this figure, the *pangasius* fingerling

prices in *Fishing Chimes* are based on approximately 39 million pieces in 2017 and 2018, and

approximately 19 million pieces during the POR.[170]  This is a significant quantity of fingerlings.

Accordingly, we find that the *Fishing Chimes* fingerling data – based on the pricing experience

of the numerous farmers in Andhra Pradesh – are representative of a broad market average.

We also note that, in the context of their corroboration argument, the petitioners' assert

that the *Fishing Chimes* fish feed data also lack volume information that would allow Commerce

to reasonably conclude that they are broad-based or representative; again, we disagree.  Although

the study does not indicate a specific volume regarding fish feed, the study provided parameters

regarding the feed conversion ratio (FCR) during the study period, in this case 1.35 to 1.46

kilograms of feed to one kilogram of whole fish.[171]  Using the average FCR (1.405) along with

the volumes of whole live fish above, the fish feed prices in the *Fishing Chimes* are based on

approximately 40 million kilograms of feed in 2017 and 2018, and approximately 19 million

kilograms of feed during the POR.[172]  This is a significant volume of feed.

---

[169] *Id*.

[170] We calculated the number of piece of fingerlings by multiplying the average stocking density per Ha by the average size per farm, then by the number of farms, then by the average harvest per year, and finally by 1,000, *i.e.*: (2017 All months, 25,000 x 28.2 x 45 x .67 x 1,000 = 21,149,789 pieces); (2018 All months, 25,000 x 28.2 x 38 x .67 x 1,000 = 17,859,821 pieces); (2017 POR months, 25,000 x 28.2 x 37 x .67 x 1,000 = 17,389,826 pieces); and (2018 POR months, 25,000 x 28.2 x 4 x .67 x 1,000 = 1,879,981 pieces).

[171] *See* NTSF's August 27, 2019 Submission at Exhibit SV-2

[172] We calculated the volume of *pangasius* fish feed by multiplying the volume of whole live fish by the average FCR, *i.e.*:  (2017/2018 All months, 28,288,077 x 1.405 = 39,744,748 kg); and (POR months, 13,834,782 x 1.405 = 19,437,868 kg).

For the reasons stated above, we find that the petitioners' argument that there were too few farms or data points to conclude that the *Fishing Chimes* data represent broad market averages, is unfounded.  As highlighted in the Draft Results, the study selected 54 farmers from 46 villages, and the researchers explicitly considered the representativeness of the data in selecting their survey sample.  The number of survey respondents, the method of sample selection, and the proportion/volume of *pangasius* production covered indicate a valid and representative sampling procedure.

Third, with respect to the petitioners' arguments regarding corroboration, as an initial matter, we do not find that any information on the record undermines the *Fishing Chimes* source.  As noted in the Draft Results, under these circumstances, further corroboration of its reliability is unnecessary.  However, and to address parties' comments, we note that the record *does* contain corroborating information regarding the whole live fish and fish feed data.

Regarding the whole live fish prices, *Fishing Chimes* states that the study cross-verified the economic data outcomes (*i.e.*, prices), by obtaining farm-gate prices from vernacular language newspapers for 2017 and 2018.[173]  Thus, the *Fishing Chimes* authors corroborated the whole live fish prices as an internal data integrity check already.[174]

Regarding fish feed, the record contains an *Undercurrent* news article that corroborates the *Fishing Chimes* pricing data.  Specifically, the *Undercurrent* news article identified the cost of commercial feed in India as ranging from 29 to INR to 31 INR per kilogram for 24-28 percent protein content feed,[175] which is consistent with the prices provided in *Fishing Chimes*.

---

[173] *See* NTSF's August 27, 2019 Submission at Exhibit SV-3.
[174] The petitioners repeat their argument, in the context of their position regarding corroboration, that the *Fishing Chimes* data reflect only a subset of respondents to a limited survey.  This point was addressed above.
[175] *See* NTSF's Letter, "Frozen Fish Fillets from Vietnam:  Factual Information Submission," dated September 10, 2019, at Exhibit 2.

Although the petitioners dismiss Commerce's statement that we have relied on *Fishing Chimes* in multiple segments of this proceeding, and elsewhere, we made this statement to highlight that:  (1) Commerce continued to find the *Fishing Chimes* data reliable in subsequent segments of this proceeding; and (2) Commerce found the *Fishing Chimes* data reliable in other proceedings, highlighting the source's general reliability.

Fourth, the petitioners argue that the Indonesian labor data are superior and represent the best available information for this SV.  However, given our sequential surrogate country selection, and given our preference to use data from the primary surrogate country where possible, the question is whether the Indian labor SV Commerce used in the *Final Results* represents quality/usable data.  In this case they are.[176]  Accordingly, we continue to find that the Indian labor data are appropriate for use here.

Moreover, we note that the petitioners' proposed approach with respect to the labor SV in this case would essentially require Commerce to compare each potential SV, from all potential surrogate country sources (without regard to economic comparability), on an SV-by-SV basis.[177] This would be impractical and, in fact, demonstrates the rationale underlying Commerce's effort to focus its analysis on a certain set of potential surrogate countries.  The petitioners' citation to *Tires from China* does not compel a different result.  The issue in that case related to competing data options within the same surrogate country where Commerce found that certain same-

---

[176] The petitioners, in passing, state with respect to the India data that "it is not clear that it is industry-specific."  *See* Petitioners Comments at 22.  Regarding the specificity of the labor data, we note that the Court did not remand this issue to Commerce for further consideration.  The petitioners appear to be making a comparison between the Indian and Indonesia data, which is unnecessary for the reasons stated above.  In any case, they do not point to any evidence on the record demonstrating that the Indian labor data are not specific.  Thus, their argument is speculative.
[177] Further, to the extent they argue that Commerce is obliged, in seeking the "best information available," to switch to Indonesian labor data, the petitioners appear to ignore the economic comparability prong of our surrogate country analysis in favor of exclusive consideration of contemporaneity.  *See Dorbest Ltd. v. United* States, 604 F.3d 1363, 1372 (Fed. Cir. 2010) (holding that the statute requires the use of data from economically comparable countries "to the extent possible.") (internal citations omitted).  Moreover, as explained above, we inflated the Indian labor data to reflect wage rates during the POR.

country competing information was unreliable and incomplete.[178]  *Tires from China* did not

speak to the issue at hand regarding an SV that is not contemporaneous to the POR with an SV

that is from a country not on the Surrogate Country List.

In sum, we continue to find that India provides the necessary quality information for

valuing NTSF's whole live fish, fish feed, fingerling, and labor inputs.  Accordingly, we

continue to find that reliance on India as the surrogate country here is appropriate.

### B.  RATIO OF WHOLE LIVE FISH TO FILLETS

*Petitioners' Comments*[179]

- First, NTSF's reported ratio of whole live fish to fillets was understated as a result of

  NTSF allocating fish usage rates across both in-scope and out-of-scope merchandise.  As

  a result, NTSF's reporting not only failed to be on a product-specific basis, but also

  resulted in understated usage rates.  This problem was then exacerbated by Commerce

  also granting a by-product offset for certain by-products, resulting in a distorted NV.  The

  petitioners are not claiming that Commerce subtracted the weight of the by-products to

  get the input FOPs.  Instead, the petitioners demonstrated that the fish input FOPs

  calculated were adjusted downward to account for out-of-scope products, and that

  Commerce double-counted by granting a by-product offset, resulting in a distorted NV.

  Yet, Commerce has not discussed this issue, and the Draft Results do not indicate that the

  agency considered or engaged with this information in any manner.

- Second, with respect to the whole fish to fillet ratio, independent, third-party

  documentation demonstrates that the fish-to-fillet yield is approximately 3.2 kilograms of

  whole fish per one kilogram of fillet.  In contrast, NTSF's reported ratio of whole fish to

---

[178] *See Tires from China* IDM at Comment 10.
[179] *See* Petitioners Comment at 23-27.

fillets was inconsistent with such a yield rate.  Commerce failed to adequately consider the relevance of these supporting reports as instructed by the Court, and continues to reject the reports out of hand without providing any meaningful discussion.  Instead, Commerce devotes most of its discussion on its verification here and in prior reviews, as it did in its original administrative determination.

- Commerce stated only that the information proffered by the petitioners is less probative and should be afforded less weight because it is not based on the agency's own observations.  But this is a conclusion without a discussion.

- As discussed above, NTSF's input/output reporting was distorted.  As such, for the final redetermination, Commerce should find that NTSF's whole live fish to fillet ratio reporting is distorted and has resulted in an inaccurate NV calculation.

**Commerce's Position:**  For the reasons stated below, we continue to find that NTSF's reporting with respect to the ratio of whole live fish to fillets was supported by the record.  Accordingly, we find no basis to disregard NTSF's data in calculating a margin for the *Final Results*.

As an initial matter, we note that the Court identified two items for further discussion relating to NTSF's reported ratio of whole live fish to fillets:  (1) consideration of whether the yields were accurate, in light of external evidence provided by the petitioners, and (2) whether the reporting/treatment of by-products in this review led to double counting.  Despite this directive, the petitioners' first argument relating to NTSF's ratio of whole live fish to fillets is an attempt to resurrect an issue that the Court already decided – namely that NTSF properly allocated its fish usage rates in a manner that was product/control number (CONNUM)-specific.[180]  The Court considered whether Commerce appropriately accepted NTSF's usage rate

---

[180] *See* Petitioners Comments at 23-24 and 26.

reporting (which was based on "standard usage rates"), and stated that "{o}nce again, Commerce found that NTSF followed instructions in reporting its data" and "{t}he court will not second-guess that finding."[181]  Because the Court already decided this issue and did not further remand the issue to Commerce, we are not addressing it under remand.  Instead, we have addressed the issues the Court remanded to Commerce, specifically, on this topic, "for Commerce to address the reports, and … the issue noted in footnote 23 {(regarding whether Commerce double counted NTSF's by-products)}."[182]

The petitioners assert that the standard usage rates relied on by NTSF accounted for by-products because part of the fish input was allocated to by-products.  Specifically, the petitioners contend that the fish input FOPs NTSF calculated were already adjusted downward to account for by-products, resulting in understated fish usage rates, and that this problem was exacerbated by the fact that Commerce also accounted for the revenue generated from the sale of certain by-products in the calculation of NV.[183]  However, the record does not support this conclusion.  The documentation cited by the petitioners, *i.e.*, Exhibits Q-61 and Q-92 of NTSF's July 30, 2019 submission, does not demonstrate that NTSF's allocation removed the weight associated with any by-products from the fish input.[184]  Rather, these exhibits simply demonstrate that the input-in-question was allocated to both in and out-of-scope merchandise, which Commerce (and the Court) found acceptable.[185]  In some cases, Exhibit Q-92 references "PORTIONS" of fish, but this reference is related to frozen cross-sections of well-trimmed fillets;[186] these exhibits do not

---

[181] *See Remand Opinion* at 61.
[182] *Id*. at 66.
[183] *See* Petitioners Comment at 23-24.
[184] *See* NTSF July 30, 2019 SACDQR at 36 and Exhibits Q-61 and Q-92.
[185] *See Remand Opinion* at 61.
[186] *See* NTSF July 30, 2019 SACDQR at 36 and Exhibit Q-92 "Type Code, Type Description, and PRODFORM"; *see also* NTSF's Letter, "Certain Frozen Fish Fillets from Vietnam:  Rebuttal Brief," dated March 25, 2020, at 24 ("all portions produced by NTSF are coded as 05 and all well-trimmed fillets are coded as 02.").

reference any non-frozen by-products, *i.e.*, the type of by-products which contributed to NTSF's by-product offset.  In fact, NTSF did not request or obtain an offset related to frozen portions of fillets or any other frozen by-product in this segment.  Therefore, after considering the evidence cited by the petitioners and the record as a whole, we do not find any basis to conclude that NTSF's allocation reduced its input reporting by deducting by-products which were also the subject of a by-product offset.

Regarding the petitioners' argument that the studies/reports it placed on the record support a whole live fish to fillet ratio of approximately 3.2, the petitioners' comments do little more than repeat their initial positions.  In the Draft Results, we stated that prior verifications support NTSF's reported ratio, and that the petitioners' studies/reports may reflect different products and procedures, given that Commerce officials did not directly perform and/or observe the procedures used therein.[187]  Although, the petitioners argue that we did not engage in any meaningful manner with the reports and studies it submitted, they did not provide any basis to find that the verification reports were unreliable, and we explained the basis for our assignment of probative value to the respective sources, *i.e.*, that Commerce is confident in the similarities of the products and procedures used in the context of agency verifications, as opposed to the third-party sources in question.  Moreover, the petitioners did not challenge Commerce's prior findings in past verifications where Commerce verified similar products using similar procedures.  Accordingly, we find that the petitioners' studies/reports are inherently less probative and, in view of the totality of information on the record, including Commerce's findings in prior verifications and in this review's verification of NTSF, we continue to find that reliance on NTSF's fish-to-fillet yield, as reported, is appropriate.

---

[187] *See* Draft Results at 28.

### C.     MOISTURE CONTENT

*Petitioners' Comments*[188]

- NTSF did not correctly report its moisture content.  Commerce disregards the results of its moisture tests at verification because it determined that they did not conform with NTSF's actual production experience.  However, the very purpose of verification is to test the accuracy of a respondent's reporting and, if Commerce is unable to replicate NTSF's reporting, then such information cannot be considered verified and accurate.  That Commerce proffered an explanation for why it could not replicate NTSF's results does not change the fact that NTSF was not able to demonstrate the accuracy of its reporting during the verification process.  The verification test results are also consistent with other record information, including information from NTSF, demonstrating that NTSF's reporting is incorrect.

- NTSF's own statements and estimates of moisture content contained in its questionnaire response support the accuracy of the verification test results.  Consequently, this information demonstrates the accuracy of Commerce's test results during verification and the inaccuracy of NTSF's reporting.

- The results of the moisture content test for soaked fillets at verification were consistent with the labels provided by NTSF's customers.  Thus, NTSF reported a certain moisture content notwithstanding that fact that the corresponding customer labels reported that the product was a lower moisture content.  Although Commerce explained that it is not clear how the customer determined the information on the labels, Commerce fails to engage with this discrepancy in any meaningful way.

---

[188] *See* Petitioners Comment at 27-32.

- Commerce dismissed third-party studies and documentation provided by the petitioners, asserting that they may reflect different procedures and merchandise, and noting that it did not find this documentation to be more reliable than the data in this review. However, these documents do not simply report information that differs from NTSF's data but, critically, support the results of Commerce's verification tests.

- Commerce's determination is not justified by the information it identifies as supportive of its conclusion. Commerce points to two pieces of information: (1) inspection certificates showing that NTSF's moisture content did not exceed the stated maximum in the contract; and (2) sample test reports showing moisture levels consistent with NTSF's reporting. As to the former, a certificate stating that the reported moisture did not *exceed* the contract maximum is of little relevance given that other record evidence shows that the actual moisture content is below what has been reported. As to the latter, Commerce fails to reconcile the inherent inconsistency of relying on this information notwithstanding the fact that it is from a third party (and the basis for identifying the moisture content is not explained) when it rejected the data in the customer labels on this very basis. As such, Commerce has not explained why the inspection certificates and sample test reports should be considered more probative.

**Commerce's Position:** We continue to find no basis to conclude that NTSF misreported its moisture content. Accordingly, we continue to rely on NTSF's data in determining the company's dumping margin.

The petitioners argue that, if Commerce was unable to replicate NTSF's reporting at verification, then such information cannot be considered verified and accurate.[189] At the outset,

---

[189] *Id*. at 29.

we note that the fact that a portion of information was not fully verified does not render NTSF's

reporting unreliable.  For instance, Commerce frequently performs spot checks at verification,[190]

and doing so does not indicate that all information not reviewed during verification is suspect.

The petitioners also argue that Commerce's tests at verification demonstrate that NTSF

overstated the moisture content of soaked and unsoaked fillets and misreported the net weight

code.  However, we explained, at length, why such test results did not completely reconcile to

the information reported by NTSF, and the Court considered Commerce's discussion of its

verification procedures and noted that:

> Commerce briefly addressed the moisture content issue in its final determination
> and stated that two of its three moisture tests 'were not done in a manner that fully
> conforms to NTSF's actual production experience' for two reasons.  First, the
> fillets were 'patted dry more than is typical in the regular production process.'
> Second, in one of the tests the fillet did not sit in chilled water for several hours
> before freezing.  {Commerce} noted that time constraints on verification
> prevented re-testing and concluded, 'Given these facts, we do not find that the
> moisture test results are fully representative of NTSF's actual experience, and
> thus, do not necessarily undermine the reliability of NTSF's reporting with
> respect to moisture.'
>
> … As to verification procedures, Commerce stated that time constraints prevented
> following NTSF's actual production processes in full.  The court will not disturb
> that finding because the agency has discretion to determine verification
> procedures, including on an ad hoc basis.[191]

Accordingly, the Court sustained Commerce's conclusion that the tests conducted at verification

did not demonstrate that NTSF overstated the moisture content, because they were not fully

representative of NTSF's actual experience.[192]  In making the finding, the Court also observed

that deference to Commerce in the context of verification procedures was appropriate in light of

---

[190] *See, e.g., Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (*Micron Tech*) (noting that Commerce need not "trace through every number of the response — a representative sample is sufficient.") (internal citations omitted); and *NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (CIT 2002) ("A verification is a spot check and is not intended to be an exhaustive examination of the respondent's business.").
[191] *See Remand Opinion* at 67-68 (internal citations omitted).
[192] *Id*.

the time constrains and other practical limitations presented in such a setting.[193]  Therefore, we disagree with the petitioners that the results of verification demonstrate NTSF overstated the moisture content of unsoaked fillets and misreported the net weight code.  Such a conclusion distorts the record information.

The petitioners continue to distort record information by arguing that NTSF's own statements support Commerce's verification findings.  In its initial section C response, NTSF provided estimates for the moisture content, the corresponding soaking percentage, and the corresponding reported net weight for three product types.[194]  The petitioners attempted to calculate moisture content using NTSF's estimates, using the following formula:  (moisture content of soaked fillet – moisture content of unsoaked fillet) / (1 - moisture content of unsoaked fillet).[195]  Thus, the petitioners use a formula that relies on the unsoaked fillet as the basis for trying to determine the moisture of a soaked fillet.  However, relying on the data specific to soaked fillets, *i.e.*, the proper basis for consideration, results in a much higher moisture content.  Not only is the petitioners' calculation flawed, but it is also based on overall estimates, whereas Commerce relied on multiple third-party inspection reports,[196] and verified internal documentation,[197] which support NTSF's actual reported moisture content.  Thus, the petitioners' characterization of NTSF's questionnaire response as "support{ing} the accuracy of the verification tests"[198] is incorrect and unsupported by the record.

Regarding the moisture-related data contained in the product labels provided by NTSF's customers, the petitioners argue that we inappropriately dismissed the information contained in

---

[193] *Id*. (citing *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1318 (CIT 2001); and *Micron Tech*, 117 F.3d at 1396).
[194] *See* NTSF December 12, 2018 CQR at Sec C-11.
[195] *See* Petitioners Comments at 29.
[196] *See* Verification Report at Attachment 1 (page 16) and Verification Exhibits 9 and 40.
[197] *Id*. at Attachment 1 (page 18) and Verification Exhibit 44.
[198] *See* Petitioners Comment at 29.

the label because the labels came from a third party (*i.e.*, NTSF's customer) while continuing to rely on third-party information elsewhere in our determination (*i.e.*, in considering third-party inspection certificates).[199]   However, we do not find all third-party sources to be analogous and we must scrutinize the intent and purpose of each source.   The third-party information that we identified as supporting NTSF's reported moisture content in the Draft Results was an inspection document from an independent facility whose purpose is to conduct such testing.[200]   The record does not indicate that NTSF's customer labels are tied to any testing protocols or that NTSF fully controls the information placed on the labels.   Indeed, NTSF referred to these labels as the "U.S. customers' artwork related to the sale," and explained the steps it takes when there are discrepancies between the "artwork" and sales contract terms.[201]   It is clear from the record that neither NTSF nor its customers rely on the customer-provided "artwork" to satisfy the sales contract terms and instead rely on the information obtained from an inspection/testing facility.

Furthermore, the petitioners note that the information contained in the customer labels is consistent with the results of the moisture content tests performed at verification and, thus, support the figures from verification which Commerce declined to credit.[202]   In the Draft Results, however, Commerce explained why it did not find the customer labels to be sufficiently reliable. In addition to the considerations identified above, Commerce also explained that it is not clear how the customer determined the information to be used on the labels, and we do not know with certainty the basis on which that moisture content percentage was derived in order to determine whether it is presented on the same terms as NTSF's reporting in the underlying review.[203]   For

---

[199] *Id.* at 30.
[200] *See* Verification Report at Attachment 1 (page 16) and Verification Exhibit 9.
[201] *Id.*
[202] *See* Petitioners Comment at 30-31.
[203] *See* Draft Results at 31.

example, if a company reports that a product contains 30 percent of a solution of water, it could indicate that the contained moisture of the as-packaged product is:  30 percent (30 percent added moisture divided by a base of 100), or 23 percent (30 percent added moisture divided by a base of 130, *i.e.*, 100 + 30), *etc*.  We do not have definitive evidence regarding the methodology adopted by NTSF's customers.[204]  Accordingly, what is reflected in the label depends on how the customer defines "contains," and the accuracy of the information therein.  Thus, we do not find that these labels undermine NTSF's reporting.  The petitioners also argue that the sample inspection reports are no more reliable than customer labels because they, similarly, came from a third party; we disagree.  These inspection reports came from an independent third party and nothing on the record undermines the reliability of the party or the results obtained by its testing. Moreover, as an entity hired by NTSF's unaffiliated customer, there is no reason to suspect that the testing was not thorough and accurate.  We, therefore, continue to find that the third-party inspection certificates are more probative than NTSF's customers labels.

Regarding the results included in the inspection certificates, the petitioners argue that, just because the reported moisture does not exceed a maximum threshold allowed by the contract, that does not mean that the content level reported is accurate.  The petitioners argue that a maximum level of moisture content is of little relevance given that other record evidence shows that the actual moisture content is *below* what has been reported, therefore, the inspection certificates, according to the petitioners are not relevant to the issue at hand.  However, not only did the inspection certificates indicate that the moisture content was under the maximum

---

[204] We also note that, unlike the labels, the moisture content figures reported in the test reports (*i.e.*, 85.7, 85.8, 85.9) closely correspond with the figures reported by NTSF (*i.e.*, 86).  *See* Verification Report at Exhibit 40.

threshold, but the certificates also included the actual results of the moisture content.[205]  These

actual results are consistent with NTSF's moisture content reporting.

## V.   FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Opinion*, and in light of the record evidence, Commerce

has provided additional explanation regarding its:  (1) selection of the primary surrogate country

for valuing NTSF's FOPs; (2) analysis of NTSF's reporting of the consumption rate for the

whole live fish input; and (3) reliance on NTSF's reported moisture content.  For the reasons

explained above, we have made no changes to the *Final Results* and NTSF's dumping margin

remains 0.15 dollars/kilogram.

8/23/2022

X 

Signed by: LISA WANG

Lisa Wang
Assistant Secretary
  for Enforcement and Compliance

---

[205] *Id.* at Attachment 1 (page 16) and Verification Exhibit 9.