NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| CATFISH FARMERS OF AMERICA, *et al.*, |
| Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| NTSF SEAFOODS JOINT STOCK COMPANY, |
| Defendant-Intervenor. |

Before: Hon. M. Miller Baker, Judge

Consol. Court No. 20-00105

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages: 36, 37, 40-43, 46

## <u>PLAINTIFFS CATFISH FARMERS OF AMERICA, *ET AL*.'S COMMENTS ON REMAND DETERMINATION</u>

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiffs, Catfish Farmers of America, et al.*

Dated: October 20, 2022

**Ct. No. 20-00105**                          NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................... 1

II.   BACKGROUND ..................................................................... 2

    A.   Selection of India as the Primary Surrogate Country and Reliance on Certain Indian FOP ............................................ 2

    B.   NTSF's Reporting of the Ratio of Whole Live Fish to Fillets ........................................................................................ 5

    C.   Moisture Content ..................................................................... 6

III.  ARGUMENT ............................................................................ 7

    A.   The Court Should Remand Commerce's Surrogate Country Selection and Reliance on Indian SVs ..................... 8

          1.   Commerce's Economic Comparability Analysis Remains Flawed ............................................... 9

          2.   Commerce's Reliance on Indian SVs to Value Whole Live Fish, Fingerlings, Feed, and Labor Requires Further Remand ........................... 26

    B.   Commerce's Treatment of NTSF's Reporting of the Ratio of Whole Live Fish to Fillets Requires Remand ................... 37

    C.   The Court Should Also Remand Commerce's Acceptance of NTSF's Moisture Content Reporting ................................ 44

IV.  CONCLUSION ...................................................................... 48

NON-CONFIDENTIAL VERSION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Bristol Metals L.P. et al. v. United States*,
   34 CIT 478, 703 F. Supp. 2d 1370 (2010)............................................ 35

*Clearon Corp. et al. v. United States*,
   No. 13-00073, slip op. 15-91 (Ct. Int'l Trade Aug. 20,
   2015) ....................................................................................... 19, 22

*Clearon Corp. et al. v. United States*,
   No. 13-00073, slip op. 16-110 (Ct. Int'l Trade Nov. 23,
   2016) ....................................................................................... 18, 22

*Jacobi Carbons AB v. United States*,
   313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ........................... 18, 19, 20

*Jiaxing Brother Fastener Co., Ltd. v. United States*,
   428 F. Supp. 3d 1364 (Ct. Int'l Trade 2020) ................................ 18, 23

*Juancheng Kangtai Chemical Co. v. United States*,
   No. 14-0056, slip op. 15-93 (Ct. Int'l Trade Aug. 21, 2015).......... 19, 24

*Xiping Opeck Food Co., Ltd. v. United States*,
   551 F. Supp. 3d. 1339 (Ct. Int'l Trade 2021) ............................... 19, 23

## Statutes

19 U.S.C. § 1677a........................................................................... 3

19 U.S.C. § 1677b(a) ...................................................................... 3

19 U.S.C. § 1677b(b) ...................................................................... 3

19 U.S.C. § 1677b(c)(1) ........................................................... *passim*

19 U.S.C. § 1677b(c)(4) ............................................................... 3, 8

19 U.S.C. § 1677f-1(d).................................................................... 2

**Ct. No. 20-00105**                                    NON-CONFIDENTIAL VERSION

**Regulations**

19 C.F.R. § 351.408(b) ........................................................................ 9

19 C.F.R. § 351.408(c)(2) ................................................................... 3

# GLOSSARY

**CFA**

America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively)

**Commerce**

U.S. Department of Commerce

**FOP**

Factors of Production

**GNI**

Gross National Income

**NMEs**

Non-Market Economies

**NTSF**

NTSF Seafood Joint Stock Company

**SVs**

Surrogate Values

Ct. No. 20-00105                    NON-CONFIDENTIAL VERSION

## I.   <u>INTRODUCTION</u>

On behalf of the Catfish Farmers of America and individual U.S.

catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a

Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC

d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish,

Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride

of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively,

"CFA"), we respectfully submit the following comments in opposition to

the August 23, 2022 remand results filed by the U.S. Department of

Commerce ("Commerce"). *See* Final Results of Redetermination

Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United

States*, Court No. 20-00105, Slip Op. 22-38 (CIT April 25, 2022)

(Aug. 23, 2022), ECF No. 75-1, P.R.R. 5,[1] Appx_____-_____ ("Remand

Results").

---

[1]     In this submission, CFA uses the rubric "C.R.R." and "P.R.R." to
identify documents listed on the confidential and public remand record
indices filed with the Court on September 6, 2022. *See* ECF Nos. 76-2
and 76-3. CFA uses the rubric "C.R." and "P.R." to identify documents
listed on the confidential and public pre-remand record indices filed
with the Court on July 8, 2020. *See* ECF Nos. 24-1 and 24-2.

## II.   <u>BACKGROUND</u>

The remand results arise from the 2017-2018 administrative review of the antidumping duty order on certain frozen fish fillets from Vietnam. *See, e.g.*, *Catfish Farmers of America, et al. v. United States*, No. 20-00105, slip op. 22-38 at 4, 70 (Ct. Int'l Trade Apr. 25, 2022), ECF No. 68 ("Slip Op. 22-38"). CFA appealed several aspects of the review's final results, including Commerce's selection of India as the primary surrogate country, its choice to rely on Indian surrogate values ("SVs") for certain factors of production ("FOP"), the manner in which Commerce permitted NTSF Seafood Joint Stock Company ("NTSF") to report certain FOP, and the agency's acceptance of NTSF's methodology for reporting the moisture content of its fish. *Id.* at 33.

### A.    **Selection of India as the Primary Surrogate Country and Reliance on Certain Indian FOP**

Normally, Commerce calculates antidumping duty margins by comparing the prices at which respondent companies sell goods subject to the relevant order in the United States ("export price") against the prices that the respondent companies charge for like goods in their home market ("normal value"). *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also*

*id.* §§ 1677a, 1677b(a), 1677b(b). However, in cases involving non-market economies ("NMEs") such as Vietnam, Commerce determines normal value by building up surrogate, market economy values for (1) FOPs, (2) general expenses and profit, and (3) packing costs. *Id.* § 1677b(c)(1).

> In selecting SVs, Commerce is directed to:
>
>> {U}tilize, to the extent possible, prices . . . in one or more market economy countries that are—
>>
>> (A)   at a level of economic development comparable to that of the {NME} country, and
>>
>> (B)   significant producers of comparable merchandise.

*Id.* § 1677b(c)(4). The agency "normally will value all factors in a single surrogate country" that complies with the statutory requirements. 19 C.F.R. § 351.408(c)(2). If more than one country meets the requirements, Commerce will rely on values from the country that provides the highest quality data. *Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004), https://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin"). In all cases, the agency must rely on the "best available information." 19 U.S.C. § 1677b(c)(1).

In its pre-remand briefing to the Court, CFA argued that Commerce failed to properly assess the economic comparability of CFA's preferred primary surrogate country, Indonesia, with Vietnam. *See, e.g.*, Slip Op. 22-38 at 38-40. The Court agreed, finding that Commerce treated Indonesia as non-comparable with Vietnam simply because Indonesia did not appear on a list, prepared by Commerce's Office of Policy (the "Office of Policy"), of countries deemed economically comparable with Vietnam on the basis of Gross National Income ("GNI"). *Id.* at 38-39. The Court also found that Commerce's explanation of its surrogate country selection suggested that the agency had applied too strict a standard in assessing economic comparability. *Id.* at 39-40.

CFA also argued that Commerce had not appropriately weighed the relative quality of the available Indonesian and Indian data for valuing certain FOPs. *Id.* at 40-53. The Court agreed in part with CFA's arguments, finding that Commerce employed circular reasoning in finding Indian data superior to Indonesian data. *Id.* at 41. The Court also held that Commerce had not adequately explained or supported its conclusion that Indian data for valuing live fish, fingerlings, and feed reflected "broad market averages." *Id.* at 41-48. Likewise, the Court

found Commerce's reliance on outdated Indian wage rate data inadequately explained. *Id.* at 48-49.

On remand, Commerce continues to select India as its primary surrogate country, and to rely on Indian data to value live fish, fingerlings, feed, and labor, despite CFA's objections. Remand Results at 8-27, 38-48, 51-56, Appx_____-_____, Appx_____-_____, Appx_____-_____; *see also* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments on Draft Results of Redetermination* (July 26, 2022), C.R.R. 2, P.R.R. 4 at 3-23, Appx_____-_____ ("CFA's Draft Comments").

## B. NTSF's Reporting of the Ratio of Whole Live Fish to Fillets

In NME cases, Commerce requires respondents to report the FOPs used to produce subject goods, as well those FOPs' usage rates. Here, CFA argued, on the basis of certain studies and reports, that NTSF's FOP reporting understated the volume of whole live fish required to produce its fillets. *See* Slip Op 22-38 at 62-63. The Court found that Commerce did not explain its assessment of these studies and reports. *Id.* at 63-66. The Court likewise found that Commerce did not address a

double-counting issue that CFA raised with respect to NTSF's allocation of part of its whole live fish input to the company's production of by-products. *Id.* at 65-66.

On remand, Commerce continues to accept NTSF's reporting of the ratio of whole live fish to fillets, as well as to find no double-counting issue to arise from NTSF's reporting, despite CFA's objections. Remand Results at 27-29, 57-59, Appx_____-_____, Appx_____-_____; *see also* CFA's Draft Comments at 23-27, Appx_____-_____.

### C.   Moisture Content

Beyond data regarding respondents' FOPs and usage rates, Commerce requires accurate data identifying the physical characteristics of each model of subject merchandise that respondents sell in the U.S. market. Accordingly, for each antidumping duty order, Commerce develops a list of key product characteristics, and creates a coding system by which respondents report the "Control Number" or "CONNUM" for each product model. *See, e.g.*, Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Frozen Fish Fillets from Vietnam – Section C Questionnaire Response and Appendix IV Questionnaire Response* (Dec. 12, 2018), C.R. 161-163, P.R. 138 at C-7 – C-11,

Appx_____-_____. For the order at issue here, the relevant product characteristics included the weight of added ice/water and the moisture content of the final product. *Id.* at C-9 – C-11, Appx_____-_____.

CFA challenged Commerce's acceptance of NTSF's reported moisture content, arguing that NTSF had systematically overreported the amount of water used, while understating the usage rates for fish meat. Slip Op. 22-38 at 66; *see also* Mem. in Supp. of the Rule 56.2 Mot. for J. on the Agency R. filed by Pls. CFA, *et al.* (Nov. 5, 2020), ECF 31 at 4, 9, 55-61 ("CFA's Opening Brief"). While the Court did not agree with all of CFA's arguments on this issue, it agreed with CFA that Commerce failed to appropriately address record evidence that CFA cited in support of its arguments. Slip Op. 22-38 at 69.

On remand, Commerce continued to accept NTSF's moisture content reporting, over CFA's objections. Remand Results at 29-33, 61-66, Appx_____-_____, Appx_____-_____; *see also* CFA's Draft Comments at 29-32, Appx_____-_____.

## III.  <u>ARGUMENT</u>

The Court should find that Commerce has not yet complied with the remand order. Commerce's remand results fail to adequately explain

the selection of India as the primary surrogate country and the agency's reliance on Indian SVs to value whole live fish, fingerlings, fish feed, and labor. Likewise, Commerce has not yet appropriately explained or supported its acceptance of NSTF's reporting of the ratio of whole live fish to fillets, or the moisture content used in its production. Further remand is therefore required.

### A.    The Court Should Remand Commerce's Surrogate Country Selection and Reliance on Indian SVs

The Act directs Commerce, in selecting SVs, to "utilize, to the extent possible, . . . prices . . . in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country," and are significant producers of goods comparable to subject merchandise. 19 U.S.C. § 1677b(c)(4). If more than one country meets these requirements, Commerce will rely on values from the country that provides the highest quality data. *See* Policy Bulletin. In all cases, the agency must rely on the "best available information." 19 U.S.C. § 1677b(c)(1).

The Court remanded Commerce's selection of India as the primary surrogate country because the agency did not appropriately explain or

support its determination that Indonesia was not economically comparable with Vietnam. Slip Op. 22-38 at 38-40. The Court further found that Commerce engaged in circular reasoning when considering the quality of Indian SV data, and failed to adequately explain or support its reliance on Indian data to value whole live fish, fingerlings, feed, and labor. *Id.* at 41-49. As explained below, Commerce's remand results are flawed as to both issues. Accordingly, CFA respectfully submits that further remand is required.

      1.    <u>Commerce's Economic Comparability Analysis Remains Flawed</u>

Commerce's regulations state that, "{i}n determining whether a country is at a level of economic development comparable to the nonmarket economy," the agency "will place primary emphasis on *per capita* GDP . . . ." 19 C.F.R. § 351.408(b). Commerce has issued a policy bulletin stating that, in NME proceedings, its Office of Policy will "provide{} a list of potential surrogate countries that are at a comparable level of economic development to the NME country." *See* Policy Bulletin. Echoing the regulations, the policy bulletin states that economic comparability will be determined "on the basis of per capita

{GNI}." *Id.* The policy bulletin observes that the Act "does not require that {Commerce} use a surrogate country that is at a level of economic development most comparable to the NME country . . . ." *Id.*

In this review, the Office of Policy provided a list of six countries, not including Indonesia, that were "likely to have good data availability and quality" and which the Office of Policy deemed to be at the "same" level of economic development as Vietnam. *See* Letter from Catherine Bertrand, Program Manager, AD/CVD Operations, Off. V, to All Interested Parties, re: *Fifteenth Administrative Review of Frozen Fish Fillets from Vietnam: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (Nov. 23, 2018), P.R. 102 at 1 and Attachment 1, Appx_____, Appx_____-_____ ("Surrogate Country Memo"). These countries' 2017 *per capita* GNIs ranged from $1,820 (India) to $3,130 (Bolivia); Vietnam's *per capita* 2017 GNI was $2,170. *Id.* at Attachment 1, Appx_____-_____. CFA argued that Indonesia (GNI $3,540) was also appropriately economically comparable with Vietnam, despite not appearing on the Office of Policy's list. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of*

*Vietnam: Case Brief* (Mar. 18, 2020), C.R. 518, P.R. 497 at 35-36,

Appx_____-_____ ("CFA's Case Brief"); *see also* CFA's Opening Brief at

17-21. CFA noted that Commerce had selected Indonesia as its primary

surrogate country in prior reviews where there was a much greater

difference between Vietnam's and Indonesia's GNIs. CFA's Case Brief

at 35-36, Appx_____-_____; CFA's Opening Brief at 17-20; *see also*

Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re:

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:*

*CFA's Comments on Surrogate Country List* (Nov. 30, 2018), P.R. 108-

114 at 7 and Exhibit 1, Appx_____, Appx_____-_____ ("CFA's Nov. 30,

2018 Comments").

The Court found that Commerce had not adequately analyzed or

discussed whether Indonesia was economically comparable with

Vietnam. Slip Op. 22-38 at 38-40. Rather, Commerce simply concluded

that Indonesia was not at the "same" level of development as Vietnam,

while stating that "{t} he band of countries that Commerce selected in

this review, in absolute terms, is a reasonable range of countries given

the entire worldwide range of GNIs." *Id.* at 39. The Court found that

this explanation ignored CFA's argument that Indonesia was at a level

of economic development comparable to that of Vietnam, and left open the possibility that the agency applied "too strict a standard." *Id.* at 39-40.

On remand, Commerce has continued to find Indonesia not economically comparable with Vietnam. Remand Results at 8-18, 38-48, Appx_____-_____, Appx_____-_____. Commerce begins by responding to the Court's concern that it misapplied the statutory standard in requiring potential surrogates to be at the "same" level of economic development as the subject country, although the statute refers only to "comparable" levels of development. *Id.* at 9-10, 38-39, Appx_____-_____, Appx_____-_____. Commerce argues that requiring potential countries be at the "same" level of economic development as the subject country is consistent with the statute's requirements, because any country that is at the "same" level of development as the subject country is necessarily economically comparable to the subject country. *Id.* Commerce also states that it has used its "same"-level approach in multiple proceedings, and that this approach has been upheld by the Court. *Id.* at 10-14, 38-39, Appx_____-_____, Appx_____-_____.

As CFA pointed out in its comments on the draft results, Commerce's explanation is confusing and inadequate. CFA's Draft Comments at 6-7, Appx_____-_____. It is self-evident that the six countries on the Office of Policy's list for this review did not have the "same" level of economic development as Vietnam, at least as the word "same" is commonly used. None of them have GNIs identical to Vietnam's; rather, their GNIs range from 44% higher than Vietnam's to 16% lower. *See* Surrogate Country Memo at Attachment 1, Appx_____-_____. They were not even the six countries with GNIs closest to that of Vietnam. *Id.* Commerce does not explain what difference it perceives between "same" and "comparable" levels of development and, again, the answer is not obvious, given that it deems countries with quite different GNIs than Vietnam to be at the "same" level of development as that country.

Taken in the most favorable light, Commerce's explanation at best indicates that the agency is inexplicably using the word "same" as interchangeable with "comparable." But even if this is so, it does not itself explain why only six countries are included on the list – and, more crucially, why Commerce deemed only those six countries to have the "same" level of economic development as Vietnam.

Moreover, Commerce's attempt to provide such an explanation falls flat. Remand Results at 8-18, 38-48, Appx_____-_____, Appx_____-_____. Commerce states that it has developed a practice of deeming six countries, per period of review ("POR"), economically comparable with the subject country (or at the "same" level of development, in the agency's odd parlance), based on a "range of factors." *Id.* at 39-40, Appx_____-_____. The agency attempts to preserve "balance" by identifying three countries with GNIs higher than that of the subject country, and three with GNIs lower than the subject country. *Id.* at 40, Appx_____.[2] Commerce explains that this methodology provides a consistent and "reasonably predictable process" that allows interested parties to focus their SV research on a manageable number of potential surrogate countries, while recognizing that every segment of a proceeding is separate. *Id.* at 39-41, Appx_____-_____.

---

[2]      Commerce does not uniformly follow this approach. Commerce's surrogate country list in the 2009-2010 review included five countries with GNIs higher than Vietnam's, and just one country with a lower GNI. The list generated for the 2012-2013 review contained four countries with GNIs higher than Vietnam's, and two with lower GNIs. CFA's Nov. 30, 2018 Comments at Exhibit 1, Appx_____-_____.

This explanation is inadequate. The crux of CFA's argument is that, *as applied here*, Commerce's methodology produced arbitrary and inadequately explained results. In particular, Commerce found Indonesia not to be at the "same" level of economic development as Vietnam, despite having a GNI closer to that of Vietnam's than in multiple prior reviews in which Indonesia was deemed to be at Vietnam's "same" level of economic development. Commerce's generalized explanation of its methodology does not specify or demonstrate what "range of factors" it considered in developing the specific list at issue here, or why it considered the particular range of GNIs here (and only that range) as "reasonable" and otherwise determinative of economic comparability. Remand Results at 8-18, 38-48, Appx_____-_____, Appx_____-_____; Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29, 2020) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2017-2018), P.R. 509 at 14, Appx_____.

Nor, contrary to Commerce's implication, has CFA argued that Indonesia should be considered economically comparable with Vietnam

regardless of the facts. Remand Results at 43-44, Appx_____-_____.

Rather, CFA has compared the facts underlying past reviews with the

facts here. For example, in the 2010-2011 review, Indonesia was treated

as economically comparable despite having a GNI 2.34 times that of

Vietnam's. *See, e.g.*, CFA's Opening Brief at 18-19; CFA's Nov. 30, 2018

Comments at Exhibit 1, Appx_____-_____. More recently in the 2014-

2015, 2015-2016, and 2016-2017 reviews, Indonesia was treated as a

"same"-level country despite having a GNI between 1.75 and 1.93 times

that of Vietnam's. CFA's Opening Brief at 19; CFA's Nov. 30, 2018

Comments at Exhibit 1, Appx_____-_____. Here, Indonesia's GNI was

just 1.63 times that of Vietnam's. CFA's Opening Brief at 19; Surrogate

Country Memo at Attachment 1, Appx_____-_____. Yet it was not

deemed economically comparable with Vietnam. It is the arbitrary and

unexplained disconnect between the facts and the results that animates

CFA's arguments, not the mere fact that Indonesia has previously been

included on Commerce's surrogate country lists.

Further, while Commerce explains that its methodology is meant to

produce "reasonably predictable" results, Remand Results at 39,

Appx_____, the results here were not "reasonably predictable."

Commerce inexplicably treated Indonesia as not economically comparable with Vietnam despite having a GNI closer with Vietnam's than in the immediately preceding three reviews, in all of which Indonesia was deemed economically comparable. For that matter, the sudden appearance of Egypt and Honduras on the surrogate country list was not "reasonably predictable," given that these countries had not appeared on the surrogate country lists in prior reviews despite having GNIs well within the ranges covered by those reviews' lists. For example, the GNI range represented in Commerce's surrogate country list for the 2016-2017 review was $1330 - 3580$; Egypt's GNI during the relevant period was 3460 while Honduras's was 2150. CFA's Nov. 30, 2018 Comments at Exhibit 1, Appx_____-_____. This underscores the lack, thus far, of any cogent explanation for how the particular selections for the surrogate country list in this review were made.

Commerce next argues that it conducts a "sequential" analysis of potential surrogate countries. Pursuant to this "sequential" methodology, Indonesia was not under consideration as a primary surrogate country from the outset, because it did not appear on the Office of Policy's list of "same"-level countries. Remand Results at 16-18,

42, Appx_____-_____, Appx_____. But this explanation is no more helpful to Commerce than its general explanation of how it approaches the development of a list of "same"-level countries. The existence of a "sequential" methodology does not explain why Indonesia was not included on the particular list at issue here or establish that its exclusion from consideration was reasonable.[3]

In further support of its finding that Indonesia was not economically comparable with Vietnam, Commerce points to *Jacobi Carbons AB v. United States*, two opinions arising from *Clearon Corp. et al. v United States* and, to a lesser extent, *Jiaxing Brother Fastener Co., Ltd. v. United States*, *Xiping Opeck Food Co., Ltd. v. United States*, and *Juancheng Kangtai Chemical Co. v. United States*. *See* Remand Results at 9-11, 45-47, Appx_____-_____, Appx_____-_____; *see also Jiaxing Brother*, 428 F. Supp. 3d 1364 (Ct. Int'l Trade 2020); *Jacobi Carbons*, 313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018); *Clearon Corp.*, No. 13-

---

[3]     Further, as discussed below, the agency is required to use the "best available information" in all cases. 19 U.S.C. § 1677b(c)(1). It cannot shield itself from its duty to meaningfully confront weaknesses in SV data available from a country that appears on its "same"-level list simply because that country is on the list.

00073, slip op. 16-110 (Ct. Int'l Trade Nov. 23, 2016) ("*Clearon III*");

*Juancheng Kangtai*, No. 14-0056, slip op. 15-93 (Ct. Int'l Trade Aug. 21,

2015); *Xipeng Opeck*, 551 F. Supp. 3d 1339 (Ct. Int'l Trade 2021); and

*Clearon Corp.*, No. 13-00073, slip op. 15-91 (Ct. Int'l Trade Aug. 20,

2015) ("*Clearon II*"). These cases, however, do not establish that

Commerce's economic comparability analysis in the 2017-2018 review is

reasonable, adequately explained, or otherwise supported by the record.

In *Jacobi Carbons*, the Court reviewed remand results in which

Commerce explained at length the methodology and analysis

underlying the Office of Policy's identification of potential surrogate

countries in the relevant proceeding. *Jacobi Carbons,* 313 F. Supp. 3d

at 1316-18. The *Jacobi Carbons* Court noted specifically that Commerce

had generated the list at issue through a review of the historical,

contextual growth rate of the relevant NME country, inclusive of

whether "recenter{ing}" of the list was required, and how and whether

the GNI range of potential surrogate sources should be expanded

commensurately with the NME country's rapid increase in

development. *Id.* The Court also noted favorably Commerce's position

that "when a surrogate country's per capita GNI tracks {the NME

country's} per capita GNI," this confluence of trends supports the potential surrogate country's continued treatment as economically comparable with the NME country. *Id.* at 1317.

This kind of explanation and analysis is not present in the remand results. Moreover, Commerce's list excluded Indonesia although the country's GNI in 2017 was closer to Vietnam's GNI than in multiple prior years in which Indonesia was included on the list. CFA's Opening Brief at 18-19. While, as Commerce notes, Remand Results at 45, Appx_____, Indonesia's GNI has consistently been higher than Vietnam's, the magnitude of the difference between their GNIs has narrowed over time, reaching its lowest point in the 2017-2018 review. CFA's Nov. 30, 2018 Comments at Exhibit 1, Appx_____-_____; *see also* CFA's Opening Brief at 18-19. By contrast, over the period from 2010 to 2017, India's GNI shifted from being 23% higher than Vietnam's to being 16% lower. CFA's Nov. 30, 2018 Comments at Exhibit 1, Appx_____-_____. Not only did Vietnam's GNI overtake India's, the absolute difference between the countries' GNIs widened, even as Indonesia and Vietnam's GNIs narrowed. *See, e.g.*, CFA's Opening Brief at 18-19. Given these facts, *Jacobi Carbons* does not support

Commerce's remand results. Instead, it highlights the ways in which the remand analysis is lacking.

To be sure, in response to CFA's comments on the draft results, Commerce analyzed GNI trends among Vietnam, Indonesia, and India, concluding that there was a "tight proximity" between Vietnam and India's GNIs from 2011-2018, while Indonesian GNI has been "markedly greater than either" Vietnam or India's GNIs during the same period. Remand Results at 44-45, Appx_____-_____. Commerce concludes that there has been no divergence between India and Vietnam's GNIs, nor any convergence between the GNIs of Indonesia and Vietnam. *Id.* But this is not the case. As discussed above, the data show the gap between Indian and Vietnamese GNIs widening as the gap between Indonesian and Vietnamese GNIs narrows. *See* discussion supra at 20. Further, while any "tight proximity" between Indian and Vietnamese GNIs might support India's inclusion on the list, it does not explain Indonesia's exclusion. Commerce's analysis leaves the Court in the same position in which it started – with an arbitrary, inadequately explained, and inadequately supported decision to treat Indonesia as not economically comparable with Vietnam despite having a GNI closer

to Vietnam's than in other reviews in which Indonesia was deemed economically comparable.

The *Clearon* cases are similarly unsupportive of Commerce's position. In *Clearon II*, the Court considered remand results in which "Commerce provided a reasonable explanation of how it generated the Surrogate Country List and selected the range of GNI's that qualify countries as proximate and 'economically comparable' to {the NME country}." *Clearon II*, slip op. 15-91 at 8. Commerce has yet to provide such an explanation here, much less an explanation that makes sense in the context of its prior treatment of Vietnam as economically comparable with Indonesia despite GNI differences of greater magnitude than were seen in this review. In *Clearon III*, the parties focused on attacking not the agency's methodology for developing a list of "same"-level countries, but the agency's treatment of economic comparability as a threshold issue, *i.e.*, what Commerce calls its "sequential" analysis. *See generally Clearon III*, slip op. 16-110. Here, however, the issue of the reasonableness of Commerce's comparability analysis has been squarely joined.

With respect to the other judicial precedents that the agency cites, it concedes that while *Jiaxing Brother* may have provided the agency with a convenient quotation to cite in the draft results, the case is not substantively apposite. Remand Results at 46-47, Appx_____-_____. In particular, *Jiaxing Brother* involved the relative specificity of the data in two different potential surrogate countries that Commerce found to be at the relevant NME's "same" level of development. *Jiaxing Brother*, 428 F. Supp. 3d at1372-73. As such, no party challenged Commerce's economic comparability analysis and the Court was not called upon to judge its appropriateness either facially or as applied. *See generally id.* In *Xiping Opeck*, the Court merely observed that Commerce's surrogate country selection process is governed by (and thus putatively reflects) the requirements of the Act. *Xiping Opeck*, 551 F. Supp. 3d. at 1348 n.18. Moreover, the litigation itself centered on Commerce's selection of a tariff subheading to value a specific FOP, rather than Commerce's analysis of economic comparability. *See generally id.*

As for *Juancheng Kangtai Chem. Co.*, there the Court approved Commerce's inclusion of only a "narrow band" of GNIs in its list of economically comparable countries, but did so based on the specific facts

and arguments involved in the proceeding under consideration. *See generally Juancheng Kangtai*, slip op. 15-93. Among those facts, the Court noted that the plaintiff in that case had "argued foremost in its case brief for the use of countries that were on the {Office of Policy's} List." *Id.* at 17. That is not the case here. CFA has argued continuously for use of Indonesian data, and has made arguments not presented in *Juancheng Kangtai*. Regardless, *Juancheng Kangtai* cannot answer the question of why, and on what basis, Commerce found the particular band of GNIs (and only that range) at issue here "reasonable," excluding Indonesia from consideration.

For the same reason, the agency's citation of its own precedents is bootless. Commerce quotes or cites multiple cases in which it has stated that it will look to countries that are not at the "same" level of economic development as the relevant NME country only where there is inadequate data from "same"-level countries. Remand Results at 12-14, 42, 47, Appx_____-_____, Appx_____, Appx_____. But this assertion – no matter how many times it is repeated – cannot establish that Commerce appropriately treated Indonesia as not being at the "same" level of economic development as Vietnam in this review. Likewise,

Commerce's insistence that it followed its typical processes here does not explain the particularized basis for the agency's GNI-range selection in this review. Nor does it explain Commerce's larger decision to treat Indonesia as not being economically comparable with Vietnam despite having a GNI closer to Vietnam's than in prior reviews in which Commerce found Indonesia and Vietnam to be at the "same" level of economic development.

In sum, the problems that the Court perceived in the agency's original results remain uncorrected. Commerce continues to employ a bizarre reading of the statutory term "comparable." It has yet to adequately explain how it arrived at the particular GNI range that it considered determinative of economic comparability here. It also has yet to appropriately explain why it was reasonable for the agency to treat Indonesia as not economically comparable with Vietnam despite the two countries' GNIs being closer in this review than in prior reviews in which Indonesia and Vietnam were considered to be at the "same" level of development. Further remand is accordingly required.

 2. Commerce's Reliance on Indian SVs to Value Whole
Live Fish, Fingerlings, Feed, and Labor Requires
Further Remand

Even where Commerce deems a country to be at the "same" level of development as the subject NME, it is not necessarily suitable as the primary surrogate country, or an appropriate choice for valuing all FOPs. "After all, a country that perfectly meets the requirements of economic comparability . . . is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." *See* Policy Bulletin. As such, where there are widespread concerns with data from economically comparable countries, Commerce may select a non-economically comparable country as the primary surrogate country. *Id.* Further, where quality data is lacking in the primary surrogate country for specific FOPs, Commerce will value those FOP using data from countries it does not deem economically comparable. *See id.* In the review at bar, for example, while selecting India as the primary surrogate country, Commerce relied on Indonesian data to value certain byproducts. Memorandum from Javier Barrientos, Senior Case Analyst, through Matthew Renkey, Acting Program Manager, Off. V, Enf't & Compliance, to The File, re: *Fifteenth*

*Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary Results*, P.R. 460 at 5, Appx_____ ("Preliminary SV Memo").

The relative quality of surrogate values depends on whether the values are (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the POR; (4) representative of a broad market average; and (5) publicly available. *See, e.g.*, Remand Results at 18, Appx_____. In all cases, Commerce must rely on the "best available information" to value FOPs. 19 U.S.C. § 1677b(c)(1).

In remanding the original final results, the Court held that Commerce's finding that India provided superior-quality data reflected circular reasoning. Slip Op. 22-38 at 41. The Court also found that the agency had not adequately explained or supported its conclusion that Indian data for valuing whole live fish, fingerlings, and feed reflected broad market averages and/or were corroborated, or its reliance on non-contemporaneous Indian labor/wage rate data. *Id.* at 41-49.

On remand, Commerce has continued to value these FOP using Indian data. Remand Results at 18-27, 51-56, Appx_____-_____, Appx_____-_____. At the outset, Commerce asserts that its reliance on

Indian information reflects neither circular reasoning nor any evaluation of the relative quality of Indian and Indonesian data, but simply hews to its sequential analysis. *Id.* at 16-18, Appx____-____. This assertion is non-responsive as to the Court's concerns regarding relative data quality. As an initial matter, even assuming that a "sequential" analysis is appropriate, that analysis requires that the agency first make a reasonable, supported determination regarding what countries are economically comparable with Vietnam. This, as explained above, Commerce has yet to do. As such, the quality of Indonesian data is a relevant factor that the statute required Commerce to consider in assessing whether Indian data was the "best available information" to value FOPs as a whole, or individually.

Further, as explained below with respect to the agency's defense of its reliance on Indian data to value whole live fish, fingerlings, feed, and labor, there is reason to believe that the agency's "sequential" analysis, at least as applied in this review, is inappropriate. In particular, Commerce appears to have elevated economic comparability to the breaking point, refusing to consider valuing specific FOP using data from countries other than its primary surrogate, even where the data

from the primary surrogate do not hew to normal indicia of reliability. The problems that gave rise to the Court's concerns regarding the circularity of the agency's analysis have not been extinguished. Further, the agency has not yet adequately supported or explained its findings that the Indian data for whole live fish, fingerlings, feed, and labor reflect broad market averages, are contemporaneous, or are otherwise reliable.

### a.   *Reliance on Fishing Chimes Data*

Commerce continues to find that the *Fishing Chimes* pricing data for whole live fish, fingerlings, and feed reflect broad market averages. Commerce explained in the draft results that the *Fishing Chimes* study covered 54 farmers in two "key" districts in the Indian state that accounted for the "majority" of Indian pangasius production during the POR. Remand Results at 21-24, Appx_____-_____.

In its comments on the draft results, CFA pointed out that the *Fishing Chimes* data are based on 108-question questionnaires sent to study participants. CFA's Draft Comments at 17, Appx_____. But not all 54 participants provided data in response to every question. *Id.* at 15-19, Appx_____-_____. For example, the study's whole live fish data

reflect farm-gate prices from a maximum of eleven farmers monthly, and even then, only in one month of the August 2017-July 2018 POR. *Id.* at 15-16, Appx_____-_____. The study provided no whole live fish prices for five months of the POR (February-June 2018), and the July 2018 data is based on a single farm's sales. *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Frozen Fish Fillets from Vietnam: Factual Information Submission* (Aug. 27, 2019), P.R. 422-427 at Exhibit SV-3 (final page of English translation), Appx_____ ("Aug. 27, 2019 Factual Information Submission"); *see also* Preliminary SV Memo at Attachment 1, PDF p. 13, Appx_____ (reproducing chart from Exhibit SV-3 and calculating a POR-wide average value).

Accordingly, even if the farms providing prices for whole live fish were located in "key" districts, too few farms provided data for Commerce to reasonably conclude that the data for any month, or as a whole, reflected broad market averages. CFA's Draft Comments at 16, Appx_____. CFA further argued that the study lacked volume data for each reporting farm's monthly prices, as well as participant numbers and volume data for fingerlings and feed prices. *Id.* at 16-19, Appx_____-_____. Absent such data, CFA argued that Commerce could

not reasonably conclude that the pricing data reflected broad market averages.

Commerce nonetheless relies on the *Fishing Chimes* data on remand. With respect to whole live fish, it explains that while no more than 11 farms provided prices in any given month of the POR, 83 farms provided such prices in total. Remand Results at 51, Appx_____. To reach this conclusion, Commerce appears to have added up the number of reporting farms for each month in 2017 and 2018, while simultaneously assuming that no farm provided data in more than one month. But its interpretation makes no sense, given (1) the study's identification of a maximum of 54 surveyed farms, and (2) Commerce's own assumption that surveyed farms had three harvests apiece across 2017-2018. Aug. 27, 2019 Factual Information Submission at Exhibit SV-3 (pp. 1-4 of English translation), Appx_____-_____; Remand Results at 52, Appx_____. Further, while Commerce finds the lack of pricing data for certain months not "suspect," Remand Results at 51-52, Appx_____-_____, that lack further undermines the agency's conclusion that the data reflect broad market averages.

Commerce attempts to address this issue, as well as the lack of information on the number of farms providing fingerlings/feed prices and the overall volume-data gap, with an estimate of the volume of whole live fish, fingerlings, and feed covered by the study's pricing data. But the estimates are speculative. *Id.* at 52, Appx_____. For example, Commerce assumes that 45 individual farms reported whole live fish prices in 2017, and 38 in 2018. *Id.* But again, these figures appear to result from Commerce summing the number of monthly respondents, while assuming none provided data for more than one month. This assumption is undermined by the record. Nor is it the only assumption underlying the agency's estimate. Rather, Commerce also assumes that every reporting farm had a size, productivity, and harvesting frequency that equaled the study average. *Id.* Commerce relies on a similar set of assumptions to estimate the coverage of the study's fingerings and feed. *Id.* at 53, Appx_____. But these multi-layered exercises in speculation does not amount to substantial evidence, particularly given that the data reflect only the subset of respondents that deigned to respond to any particular question.

Commerce also argues that the *Fishing Chimes* researchers "corroborated" the whole live fish prices reported by responding farmers with farm-gate prices from newspapers. *Id.* at 54, Appx_____. But the study does not identify the newspapers, the corroborating prices, or provide any other information that would allow for a reasonable conclusion that the limited whole fish pricing data reflect "broad market averages." *See* Aug. 27, 2019 Factual Information Submission at Exhibit SV-3 (p.2 of English translation), Appx_____. Likewise, Commerce asserts that an *Undercurrent News* article corroborates the *Fishing Chimes* pricing data for fish feed. Remand Results at 54, Appx_____. But as the Court noted, data points may be "corroborated" yet still not represent a broad market average. Slip Op. 22-38 at 48.

Finally, Commerce asserts that the *Fishing Chimes* data are reliable and represent broad-market averages because the agency has relied on *Fishing Chimes* in elsewhere. Remand Results at 25, 55, Appx_____, Appx_____. But Commerce's reliance on different *Fishing Chimes* information in the context of a different order does not establish that the data issue here were reliable or reflected broad-market averages. Further, the other segments of this proceeding to which Commerce

alludes (1) post-date this review and (2) are subject to separate challenges to the agency's reliance on the same *Fishing Chimes* study. *See, e.g.*, *Catfish Farmers of America, et al. v. United States*, CIT Ct. No. 21-00380 and *Catfish Farmers of America, et al. v. United States*, CIT Ct. No. 22-00125.

Again, the remand results do not support Commerce's reliance on Indian data to value whole live fish, fingerlings, or feed. The agency has yet to properly analyze economic comparability or the quality of Indonesian data. Further, its conclusion that the *Fishing Chimes* data reflect broad market averages and are otherwise reliable are inadequately explained and supported.

### b. Surrogate Labor/Wage Rate Data

In its remand opinion, the Court found that Commerce had not adequately explained or supported its reliance on non-contemporaneous Indian labor/wage rate data. Slip Op. 22-38 at 48-49. On remand, Commerce argues that while the Indian data may be from 2006, they are "relevant" (being from the primary surrogate country) and "usable," obviating any need for comparison with Indonesian data. Remand Results at 25-26, Appx_____-_____.

Further remand is required. To the extent that Commerce relies on its "sequential" methodology, the agency has yet to properly evaluate economic comparability, or to show that it has reasonably implemented that methodology here. *See* discussions *infra* at Sec. III.A.1. Further, as the agency's policy bulletin explains, Commerce does not simply default to the primary surrogate country to value all FOPs regardless of data quality. *See* Policy Bulletin. Rather, it seeks the "best available information" for each FOP, and relies on non-primary country data where it is of higher quality. 19 U.S.C. § 1677b(c)(1); *see also* Policy Bulletin. Contemporaneity is, of course, one of the hallmarks of data quality. *See, e.g.*, *Bristol Metals L.P. et al. v. United States*, 34 CIT 478, 481, 703 F. Supp. 2d 1370, 1374 (2010).

Commerce argues that the 2006 Indian data is, in fact, contemporaneous, inasmuch as they were inflated, and the inflated value is (1) non-anomalous and (2) represents a very small portion of normal value. Remand Results at 26-27, 55, Appx_____-_____, Appx_____. These defenses, however, do not establish that the 2006 Indian data are the "best available information." 19 U.S.C. § 1677b(c)(1). Not only are the data woefully out of date, but it is also

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

not clear that they are industry-specific, unlike the Indonesian labor data, which is both contemporaneous with the POR and specific to "agriculture" and "manufacturing" workers. Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Frozen Fish Fillets from Vietnam: Response to Request for Surrogate Value Information* (Feb. 25, 2019), P.R. 304-305 at Exhibit SV-10, Appx_____-_____; Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: CFA's Submission of Proposed Factor Values* (Feb. 25, 2019), P.R. 245-290 at Exhibit I-7, Appx_____-_____. Moreover, the SAS Output shows that labor [

], accounting for [

]. Memorandum from Javier Barrientos, Senior Case Analyst, Off. V, AD/CVD Operations, through Robert Galantucci, Program Manager, Off. V, AD/CVD Operations, to The File: re: *15th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results Analysis Memorandum for NTSF Seafoods Joint Stock Company* (Apr. 20, 2020), C.R. 525, P.R. 510 at Attachment 3, pp. 36-37, Appx_____-_____. Commerce's decision to rely on the Indian data ignores the actual record.

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

Finally, while Commerce implies that CFA would have the agency conduct a global hunt for labor SVs, Remand Results at 55, Appx\_\_\_\_\_, this is simply not the case. Commerce advocates for a system in which data from an economically comparable country is treated as necessarily "the best available information," even if does not otherwise bear indicia of quality. But as explained above, Commerce has yet to conduct a reasonable economic comparability analysis. Further, in relying on the Indian labor data despite its obvious flaws, Commerce has failed to discharge its statutory duty to utilize the "best available information." 19 U.S.C. § 1677b(c)(1).

### B.   Commerce's Treatment of NTSF's Reporting of the Ratio of Whole Live Fish to Fillets Requires Remand

In its opinion, the Court identified two issues in Commerce's original determination regarding NTSF's reporting of its whole live fish to fillet ratio: (1) Commerce failed to address evidence supplied by CFA that was contrary to its finding that NTSF's reported yield rate was accurate and (2) Commerce failed to address CFA's argument that NTSF's [                                                        ] double-counting the reported by-products. Slip Op. 22-38 at 62-66; Remand Results at 28-29, 57,

Appx_____-_____, Appx_____. In its remand determination, Commerce continues to find that NTSF's reported ratio of whole live fish to fillets was supported by the record and disregarded the arguments raised by CFA. Remand Results at 28-29, 57, Appx_____-_____, Appx_____. As discussed below, Commerce's remand determination fails to adequately address the issues identified by the Court and thus continues to be unsupported by the record.

With respect to the information CFA placed on the record detracting from the conclusion that NTSF's reporting was accurate, Commerce dismissed this information in two sentences, stating only that it does not "find that the reports and studies have greater probative value" than the other information on the record and that it affords these documents less weight because the agency itself did not "directly perform and/or observe the procedures . . . ."*Id.* at 28-29, Appx_____-_____. Thus, Commerce here, as it did in its original investigation, does little more than acknowledge the existence and dismiss the relevance of this evidence. As such, the agency continues to fail to engage with this information, just as it did in its original investigation.

NON-CONFIDENTIAL VERSION

In its remand determination, Commerce faults CFA for not challenging the other information on which the agency relied, *id.* at 59, Appx_____, but this misses the point. As the Court notes in its opinion, Commerce must address conflicting evidence for its determination to be supported by substantial evidence. Slip Op. 22-38 at 65. As outlined by CFA, the record contains multiple sources—an industry report on "Slaughtering process for farmed Pangasius in Vietnam," a report by Can Tho University on "Description of the Pangasius Value Chain in Vietnam," and an affidavit from a Pangasius expert—all of which show that the fish to fillet yield is about 31%, or 3.2 to 1. CFA's Opening Brief at 52. In light of Commerce's summary dismissal of these documents, it is not clear whether the agency actually examined or considered the information in these reports; to the contrary, it appears that the agency disregarded them as less probative without consideration of their substance or identifying any shortcomings or errors in the information. Thus, Commerce has not adequately addressed the information on the record that detracts from its conclusion and, consequently, its determination regarding NTSF's whole live fish to fillet ratio is not supported by substantial evidence.

**Ct. No. 20-00105**                                    NON-CONFIDENTIAL VERSION

With regard to NTSF's by-product reporting, Commerce continues to fail to address CFA's argument. *See* Slip Op. 22-38 at 65 n.23; Remand Results at 29, Appx_____. In its remand determination, Commerce acknowledged the Court's instruction to address this concern, but in doing so stated only:

> Commerce did not subtract the weight of the by-products to get the input FOPs. Additionally, Commerce's calculation of NTSF's overall dumping margin includes the labor and energy associated with producing the by-products, as this labor and energy was already incorporated into NTSF's reported labor and energy FOPs. Thus, the record does not demonstrate that any information is missing (or double counted) with respect to NTSF's input/output reporting.

Remand Results at 29, Appx_____ (internal citation omitted). As CFA explained in its comments on the draft remand, this statement did not address the actual concern that was raised regarding NTSF's reporting. CFA's Draft Comments at 26, Appx_____. Specifically, CFA did not claim that Commerce "subtract{ed} the weight of the by-products to get the input FOPs{,}" and instead demonstrated that [



]. *See id.* This was distortive in part because [

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

]. *Id.*

In addressing CFA's comments in its remand determination, Commerce continues to claim that no double counting has occurred. Remand Results at 58-59, Appx_____-_____. According to Commerce, this is because the exhibits referenced by CFA—Exhibits Q-61 and Q-92—only address frozen products and NTSF claimed a by-product offset for non-frozen products only. *Id.* Thus, the agency concluded, the record did not show that NTSF's allocation methodology reduced its input reporting through the inclusion of by-products. *Id.* This, however, fails to acknowledge the full record.

Specifically, Exhibit Q-61 provides the "Calculation of Reported Fish Consumption by Month and Product Code" and shows the total standard and total actual consumption values relied on by NTSF. Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Frozen Fish Fillets from Vietnam – NTSF's Response to the Department's Supplemental Sections A, C, and D Questionnaire* (July 30, 2019), C.R. 460-461, P.R. 409-411 at Exhibit Q-61, Appx _____-_____. Included in this chart

**Ct. No. 20-00105**                    **NON-CONFIDENTIAL VERSION**

are [

]. *Id.* at Exhibit Q-61 and Exhibit Q-92,

Appx _____-_____, Appx_____-_____. As an initial matter, it is unclear

how [

].

Moreover, NTSF's documentation demonstrates that [

]. In providing

information as part of verification, NTSF submitted a document [

]. Letter from Trade Pacific PLLC

to Sec'y Commerce, re: *Frozen Fish Fillets from Vietnam – NTSF's*

*Verification Exhibits Resubmission* (Mar. 11, 2020), C.R. 508-515,

P.R. 491, at Exhibit 21, Appx _____-_____ ("NTSF Verification

Exhibits"). This document shows that [

]. *Id.* Further, the [

]. *Id.*;

Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Frozen Fish*

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

*Fillets from Vietnam – Voluntary Section D Questionnaire Response and Section D Appendix Questionnaire Response* (Dec. 18, 2018), C.R. 214-222, P.R. 172 at Exhibit D-15, Appx _____-_____. Thus, contrary to Commerce's claims otherwise, [

].

As a result, Commerce's remand determination is not supported by the record and fails to grapple with CFA's argument regarding the distortion created by [

]. CFA's Draft Comments at 24-26, Appx_____-_____. In particular, by [

]. Commerce's remand determination does not address this issue or explain how NTSF's reporting avoids double-counting or is otherwise non-distortive. Remand Results at 58-59,

Appx_____-_____. As such, Commerce's remand determination does not adequately address the issue identified by CFA and, consequently, fails to comply with the Court's instruction that CFA's argument be addressed. Slip Op. 22-38 at 65 n.23 and 66. Thus, CFA respectfully requests that this issue again be remanded for further consideration by Commerce.

## C.   The Court Should Also Remand Commerce's Acceptance of NTSF's Moisture Content Reporting

In examining the concerns CFA raised regarding NTSF's reported moisture content, the Court found that Commerce failed to "address any of the record evidence introduced by either Catfish Farmers or NTSF in support of their contentions." Slip Op. 22-38 at 69. Accordingly, the Court remanded to Commerce for the agency to "address the parties' evidence on the 'moisture content' issue{,}" noting that Commerce's determination is not supported by substantial evidence where it fails to consider record evidence contrary to its determination. *Id.* In its remand determination, Commerce continued to find that NTSF's reported moisture content was supported by the record and disregard the information highlighted by CFA. Remand Results at 30, Appx_____. In

rejecting the evidence identified by CFA, the agency fails to adequately address this information or provide a reasoned basis for dismissing it.

To start, as CFA highlighted, the record contains customer labels reporting moisture content that demonstrate NTSF overstated moisture content in its reporting. *See* CFA's Draft Comments at 28, Appx_____. Commerce dismissed this information because the product labels were "templates" provided by the customer, the customer determined what information to provide, and Commerce did not know how the information was derived. Remand Results at 30-32, Appx_____-_____. However, as CFA noted, Commerce relied on other documentation that contains similar flaws. *Id.* at 63-64, Appx_____-_____.

In particular, in support of its determination regarding moisture content, Commerce pointed to certain third-party inspection reports. *See id.* at 29, Appx_____. Commerce stated that these reports were reliable because they "came from an independent third party and nothing on the record undermines the reliability of the party or the results obtained by its testing. Moreover, as an entity hire by NTSF's unaffiliated customer, there is no reason to suspect that the testing was not thorough and accurate." *Id.* at 65, Appx_____. However, this is

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

equally true of the customer labels. They are from a third party and nothing on the record undermines their reliability or gives reason to suggest they are unreliable. In fact, the record indicates that [

]. NTSF Verification Exhibits at Exhibit 9, Appx _____-_____. Furthermore, while Commerce finds the customer labels less reliable that the inspection certifications because it did not "know with certainty the basis on which that moisture content percentage was derived in order to determine whether it is presented on the same terms as NTSF's reporting in the underlying review{,}" Remand Results at 64, Appx_____, this is equally true of the inspection reports. As such, it was arbitrary for Commerce to disregard the relevance of the customer labels while relying on the inspection reports to support its determination.

The arbitrariness of Commerce's determination is further underscored by the fact that other record information is consistent with the information in the customer labels. Most notably, as CFA explained, the result of the tests conducted at verification are consistent with the information in the customer labels. *See* CFA's Opening Brief at 57; CFA's Draft Comments at 28, Appx_____. In addressing the verification

report, Commerce repeated the fact that verification did not replicate NTSF's actual process, Remand Results at 62, Appx_____, but this fails to fully address the issue at hand. CFA recognizes the Court's finding that the agency was not required to undertake further steps as part of the verification process and is not challenging that conclusion here. Slip Op. 22-38 at 68. Nonetheless, the fact that the results of verification serve to corroborate other record evidence regarding moisture content tends to give support to the relevance and accuracy of that other information.

In short, in rejecting the information proffered by CFA regarding moisture content—namely, the customer labels—Commerce failed to identify any errors with the information, rejected the information based on shortcomings that also exist in other information the agency relied on, and did not address the fact that this information was consistent with other record evidence. As a result, Commerce failed to adequately address the information regarding moisture content that detracts from its determination and therefore fails to present a determination that is supported by substantial evidence.

Ct. No. 20-00105                                NON-CONFIDENTIAL VERSION

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, CFA respectfully submits that the Court should remand for a second time Commerce's final results in the 2017-2018 administrative review of the antidumping duty order covering frozen fish fillets from Vietnam.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: October 20, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(l) and the Court's Scheduling Order, ECF No. 78, the undersigned certifies that these remand comments comply with the word limitation requirement. The word count for Plaintiffs Catfish Farmers of America, et al.'s Comments on Remand Determination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 8,954 words.

<u>/s/ Nazak Nikakhtar</u>
(Signature of Attorney)

<u>Nazak Nikakhtar</u>
(Name of Attorney)

<u>Catfish Farmers of America, *et al.*</u>
(Representative Of)

<u>October 20, 2022</u>
(Date)