# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CATFISH FARMERS OF AM., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Consol. No. 20-00105 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| NTSF SEAFOODS JOINT STOCK CO., ) | |
| ) | |
| Intervenor-Defendant.) | |
| ) | |

## DEFENDANT'S RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION

<div style="margin-left: 40%;">

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station

</div>

OF COUNSEL
Hendricks Valenzuela

Of Counsel
Office if the Chief Counsel
  for Trade Enforcement &
Compliance
U.S. Department of Commerce

Washington, D.C.  20044
Tel:  (202) 307-7571
Email:
kara.m.westercamp@usdoj.gov


Attorneys for Defendant

November 23, 2022

# TABLE OF CONTENTS

**PAGE**

BACKGROUND.................................................................................2

I.   Commerce's Final Results And The Court's Remand
     Order ....................................................................................2

II.  Remand Results......................................................................5

     A.   Commerce's Selection Of India As The Primary
          Surrogate Country ........................................................5

     B.   The Indian Data Are The Best Available
          Information ................................................................12

          1.   Commerce's Preference To Use To Use Data From
               The Surrogate Country List ...............................12

          2.   The Indian Data Represent A Broad Market
               Average ..........................................................13

     C.   The Ratio Of Whole, Live Fish ...................................16

     D.   NTSF Did Not Overstate The Moisture Content .......18

ARGUMENT...................................................................................20

I.   Standard Of Review..............................................................20

II.  Commerce's Remand Results Comply With The Remand
     Order....................................................................................21

     A.   Commerce's Selection Of India As The Primary
          Surrogate Country Is Supported By Substantial
          Evidence And In Accordance With Law ....................21

i

B.  Substantial Evidence Supports Commerce's Determination That Indian Surrogate Values Are the Best Available Information .........................................32

1.  Commerce's Preference For Indian Data Reflects The Standard Application Of The Sequential Surrogate Country Selection Process ................33

2.  Substantial Evidence Supports Commerce's Determination That Indian Data Are The Best Available Information For Valuing Main Inputs ..............................................................35

3.  Commerce's Preference To Use Labor Data From The Primary Surrogate Country Is Supported By Substantial Evidence And In Accordance With Law.......................................................39

C.  Commerce's Reliance On NTSF's Reporting Is Supported By Substantial Evidence And In Accordance With Law ....................................................42

1.  Substantial Evidence Supports NTSF's Whole Live Fish Ratio Reporting ...................................42

2.  Substantial Evidence Supports Commerce's Reliance On NTSF's Moisture Content Reporting .........................................................46

CONCLUSION .....................................................................50

**Table of Authorities**

<u>**Cases**</u>

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
  203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) .............................. 32, 33

*Catfish Farmers of Am. v. United States,*
  641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ................................... 39

*Catfish Farmers of America, et al. v. United States,*
  2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022).................... *passim*

*Clearon Corp. v. United States,*
  Consol. Ct. No. 13-00073, 2016 WL 6892556 (Ct. Int'l Trade 2016) . 28

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) .......................................................................... 20

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1996) .......................................................................... 20

*Diamond Sawblades Mfrs.' Coal. v. United States,*
  219 F. Supp. 3d 1368 (Ct. Int'l Trade 2017) .............................. 24-25

*Dorbest Ltd. v. United States,*
  604 F.3d 1363 (Fed. Cir. 2010) ........................................................ 33

*Heze Huayi Chemical Co., Ltd. v. United States,*
  2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) ..................... 40, 41

*Jacobi Carbons AB v. United States,*
  222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017) ............................ *passim*

*Juangcheng Kangtai Chem. Co., Ltd. v. United States,*
  2015 WL 4999476 (Ct. Int'l Trade Aug. 21, 2015) ......................... 26

*MacLean-Fogg Co. v. United States,*
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ................................... 20

*Qingdao Sea-Line Trading Co. v. United States,*
  766 F.3d 1378 (Fed. Cir. 2014) .................................................. 38-39

*SolarWorld Americas, Inc. v. United States*,
  910 F.3d 1216 (Fed. Cir. 2018) ................................... 45, 46, 47, 48, 49

*Tri Union Frozen Products, Inc. v. United States*
  163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ..................................... 23

Statutes and Regulations

19 C.F.R. § 351.408 ...................................................... 41, 42, 43, 44, 45
19 U.S.C. § 1677b ........................................................................ *passim*

Administrative Determinations

*Antidumping Methodologies in Proceedings Involving Non-Market
Economies: Valuing the Factor of Production: Labor,*
  76 Fed. Reg. 36,092 (Dep't of Commerce June 21, 2011) ............... 40

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
  85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020).................. 2

## **GLOSSARY**

CFA:            Catfish Farmers of America, *et al.*

GNI:            Gross National Income

IDM:            Issues and Decision Memorandum

NTSF:           NTSF Seafood Joint Stock Company

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | | |
|---|---|---|
| _____ | ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Consol. Court No. 20-00105 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| NTSF SEAFOODS JOINT STOCK CO., | ) ) | |
| Defendant-Intervenors. | ) ) | |
| _____ | ) | |

**DEFENDANT'S RESPONSE IN SUPPORT
OF THE REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments filed by the plaintiffs, Catfish Farmers of America, America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA),

ECF Nos. 80 and 81 (CFA's Cmnts.), concerning the United States

Department of Commerce's (Commerce) final results of redetermination

filed in accordance with this Court's decision and remand order in

*Catfish Farmers of America, et al. v. United States*, Ct. No. 20-00105,

Slip Op. 22-38, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022).  *See*

Final Results of Redetermination Pursuant to Court Remand, Aug. 23,

2022 (Remand Results), ECF No. 75 (Remand P.R. 5).[1]  For the reasons

explained below, we respectfully request that the Court sustain

Commerce's remand results and enter judgment for the United States.

<u>BACKGROUND</u>

I.    <u>Commerce's Final Results And The Court's Remand Order</u>

CFA filed an action challenging certain aspects of Commerce's

final results of the 15th administrative review of the order covering

certain frozen fish fillets from Vietnam.  *See Certain Frozen Fish Fillets*

*from the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of

Commerce Apr. 29, 2020) (final results) (P.R. 521), Appx____, and

---

[1] Citations to the public record "P.R. _" and confidential record
"C.R._" refer to the underlying administrative review record.  Citations
to "Remand P.R._" and "Remand C.R._" refer to the public and
confidential record of the remand redetermination, respectively.

accompanying Issues and Decision Memorandum (IDM) (P.R. 515),

Appx____.  Specifically, CFA challenged Commerce's selection of India

as the primary surrogate country, the selection of certain factors of

production, and Commerce's determination to rely on the reporting of

the sole mandatory respondent, NTSF Seafoods Joint Stock Co. (NTSF),

with respect to its whole-fish-to-fillet yield ratio and moisture content.

On April 25, 2022, the Court issued its remand order.  The

remand order sustained, in part, and remanded, in part, certain aspects

of the final results.[2]  *See Catfish*, 2022 WL 1375140, at \*11-24.

On the issue of the primary surrogate country selection, the Court

ordered Commerce to explain:  (a) whether Indonesia is economically

comparable to Vietnam using the same World Bank gross national

income (GNI) data that Commerce had used to identify India and the

five other countries on the Surrogate Country List, and whether

Commerce had improperly focused its analysis on a set of countries at

the "same" level of economic development as Vietnam; (b) whether the

---

[2] NTSF also challenged certain aspects of the final results, which, in the same slip opinion, the Court sustained in their entirety.  *NTSF Seafoods Joint Stock Co. v. United States*, Ct. No. 20-00104, 2022 WL 1375140, at \*3-11 (Ct. Int'l Trade Apr. 25, 2022).

Indian factors of production data are the best available information compared to Indonesian data CFA had submitted; (c) why Commerce treated the Indian data as superior to the Indonesian data; (d) Commerce's finding that the Indian surrogate values for whole fish, fingerlings, and fish feed represented broad market averages that constituted the best available information; and (e) Commerce's decision to use non-contemporaneous 2006 Indian data to value labor inputs.  *Id.* at *11-18.

For the remaining issues, the Court sustained NTSF's reporting that "its production inputs—whole live fish, fish feed, and other inputs used to produce the finished frozen fish fillets—weighed less than the finished outputs NTSF obtained from those inputs." *Id.* at *18-19. With respect to NTSF's reported factors of production, the Court sustained NTSF's inclusion of non-U.S. bound merchandise as consistent with Commerce's instructions, as well as its reporting of the standard usage rates.  *Id.* at *19-21.

However, on the issue of NTSF's factors of production reporting, the Court directed Commerce to address contradictory reports and studies on the record regarding NTSF's whole-live-fish-to-fillet ratio,

4

and to consider whether Commerce's analysis had properly accounted for the cost to produce by-products. *Id.* at 21-22 & n.23. Similarly, the Court held that Commerce's determination regarding NTSF's reported moisture content was not supported by substantial evidence, because Commerce had "failed to address both the record evidence contrary to its decision and the record evidence potentially supportive of its decision." *Id.* at 22-23.

II.   <u>Remand Results</u>

Commerce complied with the Court's remand order by providing additional explanation relevant to the issues remanded in the Court's opinion. *See generally* Remand Results, Appx_____. On remand, Commerce further explained why it had selected India as the primary surrogate country, its use of Indian surrogate data to value certain factors of production, and its reliance on NTSF's reporting of whole fish input/output ratios and moisture content. *See generally id.* We address each issue in turn.

A.   Commerce's Selection Of India As The Primary Surrogate Country

The Court remanded to Commerce "to explain whether Indonesia is comparable using the same World Bank gross national income data

used to identify India and the five other countries." *Catfish*, 2022 WL 1375140, at *13 (suggesting that "Commerce may have applied too strict a standard in rejecting Indonesia"). On remand, Commerce provided extensive explanation of its sequential surrogate country selection process, and why it had selected India as the primary surrogate country. *See* Remand Results at 7-18, 38-48, Appx____-_____, Appx_____-_____.

Generally, Commerce explained that in selecting surrogate values for factors of production in a non-market economy country, the statute mandates that Commerce shall, to the extent possible, use the best available information from a market economy country or countries that are at a level of economic development comparable to the non-market economy and are significant producers of comparable merchandise. *Id.* at 8, Appx____ (citing 19 U.S.C. § 1677b(c)(4)). However, the statute is "silent with respect to how, or on what basis, Commerce may make this determination." *Id.*; *Catfish*, 2022 WL 1375140 at *11 (noting "this statutory scheme leaves many questions unanswered").

As a result, Commerce explained that it has developed a "sequential" surrogate country selection process that is "guided by

Policy Bulletin 04.1[3] and subsequent case law." *Id.* at 8, Appx____.

Commerce's process consists of the following sequential analysis:

> (1) using *per capita* GNI information from the World Bank, Commerce identifies a list of countries that are at a comparable, *i.e.*, "same," level of economic development to the {non-market economy} country in question; (2) Commerce determines whether the potential surrogate countries are "significant" producers of comparable merchandise; and (3) *if* there are multiple countries that meet the first two prongs of the analysis, Commerce takes into consideration the quality of data offered by those countries.

*Id.* (internal citations omitted) (emphasis added). As Commerce explained, "{t}hrough this approach, Commerce first analyzes which countries meet the level of economic development and significant producer criteria; then, Commerce will rely on the data considerations prong to facilitate the selection of a country where *multiple* countries have met the first two criteria." *Id.* at 9, Appx____ (emphasis added).

Regarding how Commerce determines whether a country is at a "comparable" level of economic development to the non-market economy

---

[3] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process" (Mar. 1, 2004) (Policy Bulletin 04.1), available at https://enforcement.trade.gov/policy/bull04-1.html.

in question, Commerce first establishes a surrogate country list of countries "that are considered to be at the same level of economic development for surrogate country selection purposes" using World Bank *per capita* GNI data. *Id.* "Surrogate countries that are not at the same level of economic development as the {non-market economy} country, but still at a level of economic development comparable to the {non-market economy} country, are selected only to the extent that data considerations outweigh level-of-economic-development differences or significant producer considerations." *Id.* at 10, Appx____; *id.* ("Commerce considers countries at the 'same' level of economic development to be 'comparable.'").

As Commerce explained, the goal of this process is to present for consideration a range of potential surrogate countries that reasonably represent the market values that would be present in the non-market economy if it were a market economy. *Id.* at 9, Appx____. The list "provide{s} a consistent starting point for all proceedings involving the same {non-market economy} country, in this case Vietnam," and also "provide{s} a reasonably predictable process" and methodology. *Id.* at 39, Appx____.

8

In compiling the surrogate country list, "Commerce considers a range of factors, including the surrogate value requirements for the existing products under examination, the expected data quality and availability of alternative surrogate countries, the economic diversity of the manufacturing sector in the alternative countries, and the degree of specificity in the import data potentially relied on to value the {factors of production}." *Id.* at 40, Appx____. Commerce explained that it "relies on its case experience and professional judgment to develop this list of surrogate countries," and "tr{ies} to preserve the same number of surrogate countries above and below the {non-market economy} country (often three countries with *per capita* GNIs each higher and lower than the *per capita* GNI for the {non-market economy}, for a total of six)." *Id.*

Moreover, this surrogate country selection process is consistent with the statutory requirement of 19 U.S.C. § 1677b(c)(4) – to use data from market economy countries at a comparable level of economic development – because "the same level of economic development between two countries will necessarily also be comparable." *Id.* As Commerce explained, the Court has sustained Commerce's sequential surrogate country selection process applying the "same level of economic

9

development" standard used in this administrative review. *Id.* at 10-14 and n.45, Appx____ (citing multiple administrative decisions implementing this practice); *id.* at 10 (quoting *Clearon Corp. v. United States*, Consol. Ct. No. 13-00073, 2016 WL 6892556, at *3 (Ct. Int'l Trade 2016) (*Clearon III*), *aff'd, Clearon Corp. v. United States*, 711 F. App'x 648 (Fed. Cir. 2018)) ("*Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the *same level of economic development* as the home country measured by *per capita* GNI . . .") (emphasis in original).  Put another way, "'Commerce considers those countries that occupy a 'relatively narrow *per capita* GNI range that is *centered* on the *per capita* GNI of the {non-market economy} country' to have attained the same level of economic development.'" *Id.* at 11, Appx____ (quoting *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1316-18 (Ct. Int'l Trade 2018)).

Here, Commerce identified India as one of the six countries at the same level of economic development as Vietnam, based on *per capita* GNI data.  *Id.* at 14, Appx____.  Commerce explained that "Indonesia was outside the *per capita* GNI range set forth by the countries included in the Surrogate Country List, that Commerce determined were at the

10

same level of economic development in Vietnam." *Id.* at 15, Appx____.
For example, "Vietnam's 2017 *per capita* GNI was $2,170, and the
*highest per capita* GNI of the six countries" on the list was "Bolivia's
2017 *per capita* GNI of $3,130." *Id.* (emphasis added).  In contrast,
Indonesia's 2017 *per capita* GNI was "3,540, which is outside the range
of the *per capita* GNI Commerce considered for countries that had the
same level of economic development as Vietnam." *Id.*

Commerce also addressed CFA's comments on the draft remand
results that Commerce should have included Indonesia on the list
because "the gap between the *per capita* GNI of Vietnam and Indonesia
was less than the corresponding gap observed in prior review periods
when Indonesia was included on the list," and explained that
"construction of a surrogate country list is not based on differences in
nominal *per capita* GNI figures." *Id.* at 42-43, Appx____-____.  In
other words, "a country that is represented on the list at one point in
time can be removed from the list if the *per capita* GNI of one or more
other potential surrogate countries converges with the *per capita* GNI of
the {non-market economy} in question." *Id.* at 43, Appx____.  Thus, "a
country does not remain on the list indefinitely based on an earlier

classification or based on nominal differences in *per capita* GNI" as the "subset of countries that are designated as being at the same level of economic development may fluctuate from year to year, and Commerce is not beholden to prior designations." *Id.*

B.    The Indian Data Are The Best Available Information

Next, Commerce explained why the Indian factors of production data are the best available information compared to the competing Indonesian data submitted by CFA, as directed by the Court. *Catfish*, 2022 WL 1375140, at *14-17. Specifically, the Court remanded for Commerce to (1) reconsider the "circular reasoning" for why the Indian data were superior because they were from India; (2) address contradictory evidence on Commerce's findings that Indian surrogate values represented a broad market average; and (3) explain Commerce's decision to use non-contemporaneous 2006 Indian data to value labor inputs. *Id.*

1.    Commerce's Preference To Use Data From A Country
On The Surrogate Country List

On remand, Commerce addressed the Court's concerns regarding "circular reasoning" and explained that it never "intended to suggest any inherent superiority of the Indian data." Remand Results at 17,

Appx____.  Rather, the preference for Indian data reflects the standard application of Commerce's sequential surrogate country selection process.  *Id.*

Commerce determined that it was "inappropriate" to consider Indonesian data because India, not Indonesia, was at the same level of economic development as Vietnam; India was a significant producer of comparable merchandise; and India provides adequate data for this review.  *Id.* at 17-18, Appx____-____.  As Commerce explained, the statement that "the Indian data were 'superior because they were from India'" is "only 'circular' insofar as Commerce analyzes the 'level of economic development' and 'data considerations' steps of the surrogate country selection process *in tandem with* considering the availability and quality of the {surrogate value} data, which is not Commerce's court-affirmed (sequential) practice."  *Id.* at 18, Appx___ (emphasis in original).

> 2.  The Indian Data Represent A Broad Market Average

Commerce also addressed the Court's concerns regarding contradictory evidence of market share and broad market representation of the Indian data generally, for key inputs, and the

contemporaneity of the labor data.  *See* Remand Results at 18-27, 51-56,
Appx____-_____, Appx_____-_____.  After considering both supporting
and contradicting record evidence on the matter, Commerce determined
that the Indian surrogate value data constituted the best available
information consistent with 19 U.S.C. §1677b(c)(4)(A).  *See id.*

On remand, with respect to the *Fishing Chimes* data pertaining to
the key inputs, Commerce explained that it does "not endorse a
particular production percentage threshold to determine if a region
reflects a broad market average."  *Id.* at 20, Appx____.  That is "because
the question of whether a region is reflective of the country-wide
experience can vary by country, product, and time period."  *Id.*  Still,
Commerce explained the fact that Andhra Pradesh, the region in which
the *Fishing Chimes* data was collected, "represents the majority of
Indian production across the relevant time period is a significant
consideration."  *Id.*

Moreover, Commerce relied on observations made by the *Fishing
Chimes* study's researchers that explicitly demonstrate the
representativeness of the data when selecting the survey sample of 54
farmers from 46 villages in the two key districts within Andhra

14

Pradesh. *Id.* at 21-22, Appx____-____ ("{t}he number of survey respondents, the method of sample selection, and the proportion of *pangasius* production covered, all support Commerce's decision to select the *Fishing Chimes* data"). Commerce also explained that it "did not intend to imply that other pricing data corroborated Commerce's finding that the *Fishing Chimes* data represented a broad market average{;} {r}ather, Commerce's observation was intended to emphasize that the other pricing data corroborated the pricing data in *Fishing Chimes*, and, thus, helped to establish the overall reliability and useability of the data." *Id.* at 23, Appx____. Thus, Commerce continued to find that the *Fishing Chimes* data represent a sufficiently broad market average. *Id.* at 22, Appx____.

Similarly, Commerce determined that the fingerling data in *Fishing Chimes* were representative of a broad market average because "its fingerling data were from commercial nurseries in two locales, which collectively supplied fingerlings to 94.5 percent and 96 percent of the *pangasius* farms in 2017 and 2018, respectively." *Id.* at 24, Appx____. And with respect to the fish feed data in *Fishing Chimes*, Commerce explained that it would no longer rely on an invoice from

15

"Godrej" because it was ambiguous whether it was the same fish feed producer identified in the study. *Id.* at 24-25, Appx____-_____. In any event, Commerce determined that no record information "undermines the *Fishing Chimes* source, and further corroboration of its reliability is unnecessary." *Id.* at 25, Appx____.

Finally, Commerce explained that consistent with its methodology to value the labor input from the primary surrogate country, "the fact that the data are from India *is* relevant." *Id.* at 26, Appx____ (emphasis in original). Although Commerce prefers to have more contemporaneous data, Commerce "inflated" the 2006 data relating to wages in India "to reflect wage rates for the {period of review}" and "there is nothing on the record to suggest, nor do parties argue, that the values are anomalous." *Id.* Indeed, the inflated Indian data value is $.84 per hour, whereas the Indonesian value for labor is $.72 per hour on average. *Id.*

C.  <u>The Ratio Of Whole, Live Fish To Fillets</u>

Next, Commerce, as directed by the Court, addressed three studies and reports on the record that contradicted NTSF's reported yield ratios. *Id.* at 27, Appx____. Commerce explained that "{t}hese

16

studies and reports claim that the number of whole fish necessary to produce one kilogram of fillet is 3.2, 3.2, and 3.1-3.4 kilograms, . . . whereas NTSF's reporting differed from those figures." *Id.*

In continuing to rely on NTSF's own reported data, Commerce explained that other data on the record—verification reports from prior administrative reviews—had information about "the starting whole fish volume and the resultant raw fillet weights that Commerce directly observed." *Id.* at 28, Appx____.  NTSF's data closely tracked and was "within the range of input/output ratios reported in those prior reviews," and, notably, "*none* of the companies verified in these earlier segments, or NTSF in this segment, had a whole fish to fillet ratio as high as the ratios proposed by" CFA.  *Id.* (emphasis in original).

Commerce also considered the probative value of three reports and studies, and determined that because it "did not directly perform and/or observe the procedures (*e.g.*, the types and levels of processing, weighing techniques, *etc.*) relied on in those reports and studies, {it} found it appropriate to afford these documents less weight," as compared to NTSF's own data and prior verifications Commerce had performed.  *Id.* at 28-29, Appx____-____.

17

Finally, in addressing the Court's question as to whether the cost to produce by-products was taken into account, Commerce explained that "Commerce did not subtract the weight of the by-products to get the input {factors of production}." *Id*. at 29, Appx____.  Indeed, Commerce included "the labor and energy associated with producing the by-products" and the record did "not demonstrate that any information is missing (or double counted) with respect to NTSF's input/output reporting." *Id.*

D.   NTSF Did Not Overstate The Moisture Content

Finally, Commerce considered record evidence "that both contradicted and supported Commerce's conclusion that NTSF did not overreport the moisture content in its finished frozen fish fillets." *Id.* Commerce examined third-party documentation that NTSF had placed on the record, which included "inspection certificates relating to the moisture content of the merchandise underlying the sales in question," and determined that these certificates "establish that NTSF's reported moisture did not exceed the stated maximum in the contract." *Id.* at 30, Appx____.

Also, verified internal documentation showed that for a product

18

coded as a 86 percent moisture product, the test reports showed "moisture levels of 85.7, 85.8, and 85.9 percent," and washing and additive soaking test reports were likewise consistent with NTSF's reported moisture content. *Id.* And even though Commerce had not been able to completely replicate NTSF's production experience, as it had explained in the final results, Commerce determined that the verification results did "not undermine the reliability of NTSF's reporting with respect to moisture." *Id.* at 31, Appx_____.

With respect to the contradictory evidence, Commerce examined the product labels that CFA claimed showed that NTSF had misreported the data, and noted that "the printing templates for these labels are provided by the customer to NTSF and, thus," NTSF had no control over what the customer prints. *Id.* It was also unclear to Commerce how the customer had determined a label's information. *Id.* Similarly, while CFA pointed to other studies and documentation on the record, Commerce explained that the figures in these sources were not more reliable than NTSF's own data because "these studies and documentation {} may reflect different procedures and merchandise than those in this review." *Id.* at 32, Appx____.

Thus, Commerce determined that "the weight of the evidence supports NTSF's moisture content reporting." *Id.*

<div align="center">ARGUMENT</div>

I.   <u>Standard Of Review</u>

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996).

II.   <u>Commerce's Remand Results Comply With The Remand Order</u>

Commerce's remand results comply with the Court's remand order by providing additional explanation and addressing record evidence regarding:  (1) its selection of India as the primary surrogate country for valuing NTSF's factors of production; (2) the analysis of NTSF's reporting of the consumption rate for the whole live fish input; and (3) reliance on NTSF's reported moisture content.  *See generally* Remand Results, Appx____-____.  The Court should reject CFA's arguments that Commerce failed to provide adequate explanation to support its remand results because they are without merit, as we explain below.  *See generally* CFA's Cmnts.

    A.   Commerce's Selection Of India As The Primary Surrogate
          Country Is Supported By Substantial Evidence And Is In
          <u>Accordance With Law</u>

Although CFA makes various arguments as to why Indonesia *should* be considered economically comparable to Vietnam, CFA's Cmnts. at 9-25,[4] these arguments do not undermine either Commerce's

---

      [4] Importantly, CFA does *not* challenge Commerce's methodology of developing a surrogate country list; rather, CFA argues only that, "*as applied here*, Commerce's methodology produced arbitrary and inadequately explained results."  CFA's Cmnts. at 15 (emphasis in original).

determination that India was at the same level of economic comparability to Vietnam, or its selection of India as the primary surrogate country.  *See* Remand Results at 14-18, 38-48, Appx____; 19 U.S.C. § 1677b(c)(4).  As we explain below, Commerce's determination to select India as the primary surrogate country is supported by substantial evidence and is otherwise in accordance with law.

As a general matter, CFA largely repeats the same argument that Commerce, this Court, and the United States Court of Appeals for the Federal Circuit, have found unpersuasive—that the determination that Indonesia is not economically comparable to Vietnam in this review is "inadequate" because "Commerce had selected Indonesia as its primary surrogate country in prior reviews where there was a much greater difference between Vietnam's and Indonesia's GNIs."  CFA's Cmnts. at 11, 15-17, 20, 22, 25; *id.* at 16 (arguing that in various prior reviews, "Indonesia was treated as a 'same'-level country despite having a GNI between 1.75 and 1.93 times that of Vietnam's," whereas, "{h}ere, Indonesia's GNI was just 1.63 times that of Vietnam's.").

In addressing similar arguments in *Jiaxing Brothers Fastener Co., Ltd. v. United States*, the Federal Circuit explained, "Commerce is

22

required to base surrogate country selection on the facts presented in
each case, and not on grounds of perceived tradition." 822 F.3d 1289,
1299 (Fed. Cir. 2016) (rejecting Jiaxing's argument that Commerce
failed to explain why its practice changed when India had served as a
surrogate country to China for nearly three decades, but was not
included on the surrogate country list in the instant review). As the
Federal Circuit held, although India had been on the surrogate country
list in past reviews, it "discern{ed} nothing in the statute that requires
Commerce to consider any particular country as a surrogate country."
*Id.* at 1295, 1298. Similarly, in *Tri Union Frozen Products, Inc. v.
United States*, although plaintiffs had argued "that Commerce can carry
over its determination from other proceedings that Indonesia is
economically comparable to Vietnam in this review" with respect to an
anti-dumping duty order covering shrimp from Vietnam, the Court held
that "the fact that Commerce selected Indonesia as the primary
surrogate country in those proceedings does not detract from
Commerce's surrogate country selection here." 163 F. Supp. 3d 1255,
1275 n.14 (Ct. Int'l Trade 2016), *aff'd*, 741 F. App'x 801 (Fed. Cir. 2018).

Second, CFA argues that none of the countries on the surrogate country list have "GNIs identical to Vietnam's; rather, their GNIs range from 44% higher than Vietnam's to 16% lower," such that Commerce failed to explain why "only those six countries { } have the 'same' level of economic development as Vietnam."  CFA's Cmnts. at 13.  This argument does not pass muster.

Commerce explained that Policy Bulletin 04.1 clarifies that the countries on the list are not ranked; rather, the countries are equivalent and the list "implies a *range* of *per capita* GNIs, not a specific *per capita* GNI figure."  Remand Results at 38, Appx____ (emphasis in original); *id.* at 38-39, Appx____-____ ("In this regard, the phrase 'countries that are at a level of economic development comparable to that of the {non-market economy} country' *necessarily includes* any country that is at the same level of economic development as the {non-market economy} country.") (emphasis in original).  The Court has previously acknowledged that "{t}his kind of distinction, however, is a well-established {Commerce} practice insofar as Commerce views countries on its surrogate country list as being 'at' the 'same' level of economic comparability and it views countries outside of this band (*i.e.*, lower and

24

upper ranges of the per capita GNI) *as still being economically comparable*, only less so." *Diamond Sawblades Mfrs.' Coal. v. United States*, 219 F. Supp. 3d 1368, 1382 (Ct. Int'l Trade 2017) (emphasis added). Thus, contrary to the Court's suggestion in the remand order that Commerce "potentially misapplies the statutory standard" of economic comparability, *Catfish*, 2022 WL 1375140, at *13 (citing 19 U.S.C. § 1677b(c)(4)), there is no tension in Commerce's determination that countries on the surrogate country list are at the *same* level of economic comparability and "off-list" countries are merely *less* economically comparable. *See* Remand Results at 42-45, Appx____-____.

Relatedly, CFA incorrectly argues that Commerce's "generalized explanation of its methodology does not specify or demonstrate what 'range of factors' it considered in developing the specific list at issue here, or why it considered the particular range of GNIs here (and only that range) as 'reasonable' and otherwise determinative of economic comparability." CFA's Cmnts. at 15. To the contrary, Commerce explained that consistent with its practice in *every* non-market economy investigation and review, Commerce first examines the new *per capita*

GNI data for Vietnam, and then compares "the change in the country's *per capita* GNI to the respective changes in *per capita* GNIs of the existing set of surrogate countries." Remand Results at 40, Appx____. Commerce "places emphasis on achieving a degree of balance in the GNI range represented by the list" and strives to "preserve the same number of surrogate countries above and below the {non-market economy country." *Id.* In selecting the six countries to include, Commerce considers such factors as surrogate value requirements for the product at issue, the expected data availability and quality, the economic diversity of the manufacturing sector, and the "degree of specificity in the import data potentially relied on to value the {factors of production}." *Id.* The purpose of having a "manageable set of potential surrogate countries" is so that "interested parties do not expend their resources focusing on potential surrogate countries that are not at the same level of economic development as the {non-market economy} country in question when there is a same-level country that provides adequate data." *Id.* at 41; *see Juangcheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 15–93, 2015 WL 4999476, at *7–8 (Ct. Int'l Trade Aug. 21, 2015) (recognizing that Commerce may "narrow a

list of countries within a band for purposes of administrative feasibility").

While this is "not a hidden process or a surprising result," Commerce explained that when an interested party proposes an alternative surrogate country that is "within the *per capita* GNI range of potential surrogate countries on the list, Commerce accords that alternative surrogate country the same consideration as given to those identified on the Surrogate Country List, *i.e.*, the alternative surrogate country is also at the same level of economic development as the {nonmarket economy} in question." Remand Results at 40-41, Appx____-____. But here, Indonesia was not *within* the *per capita* GNI band that Commerce had developed, with the result being that Commerce considered Indonesia to be less economically comparable and thus it was not required to consider Indonesian data.

Finally, CFA argues that cases Commerce cited in the remand results are inapposite to the situation at hand. *See* CFA's Cmnts. at 18—24. For example, CFA argues that, unlike here, "Commerce explained at length the methodology and analysis underlying the Office Of Policy's identification of potential surrogate countries" in *Jacobi*

27

*Carbons*. That is incorrect. Similar to *Jacobi Carbons*, 313 F. Supp. 3d at 1316-18, Commerce's explanation of the development of the surrogate country list is "consistent with the approach discussed in multiple determinations cited by Commerce" and it also "provided additional explanation of the generation of the Surrogate Country List for this review{.}" Remand Results at 46, Appx____.

CFA also argues that the "*Clearon* cases are similarly unsupportive" because, unlike in those cases, Commerce has yet to explain why it treated Indonesia as economically comparable in prior reviews, but not here. CFA's Cmnts. at 22-23. CFA misses the point of Commerce's citation. The Court held in *Clearon III* that Commerce had complied with the remand order because "absent {an} adequate showing that the Philippines lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a *less comparable* level of economic development." *Clearon III*, 2016 WL 6892556, at *3 (emphasis added). Here, Commerce explained at length in the remand results why it had determined Indonesia to be *less* economically comparable than India in this segment of the proceeding, even though Indonesia had been on the

28

surrogate country list in prior reviews, which is why Commerce was not required to consider Indonesian data.  Remand Results at 44-45, Appx___-____.

Fundamentally, the common thread of CFA's comments reflects a fixation on Commerce's supposed failure to explain why Indonesia did not *remain* on the surrogate country list.  *See* CFA's Cmnts. at 9-25. But such an explanation is not required, as this Court has repeatedly "affirmed Commerce's discretion to exclude countries from consideration on the basis of economic comparability." *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1172 (Ct. Int'l Trade 2017) (citing *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1341 (Ct. Int'l Trade 2015) (recognizing that beginning its analysis with economically comparable countries, in normal cases, better enables Commerce to calculate normal value in a hypothetical market economy country; however, economic comparability should not be a first step when the subject merchandise is unusual or unique, is produced in only a few countries, or the major inputs are not widely traded); *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323, 1331 (Ct. Int'l Trade 2014) ("India though cannot be a suitable primary surrogate

country on this administrative record because it is not economically comparable to the PRC."); *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313, 1321–22 (Ct. Int'l Trade 2013) (affirming Commerce's decision to exclude India from its surrogate country list when it had the lowest GNI relative to China as compared to other countries under consideration); *Clearon Corp. v. United States*, 2014 WL 3643332, at \*11–12, \*15 (Ct. Int'l Trade 2014) (rejecting argument that Commerce wrongfully applied *per capita* GNI as a threshold consideration in rejecting India as a potential surrogate country; remanding for further explanation of how Commerce determined the range of GNIs reflected on OP's list of potential surrogate countries)).

While Indonesia may have been on the surrogate country list in past reviews, in the remand results, Commerce provided a detailed examination of the *per capita* GNI data trends to support its decision to exclude Indonesia from the surrogate country list in *this* review. Remand Results at 44-45, Appx____ (explaining that the trends "shows a highly comparable relationship between India and Vietnam both

before and during the instant period of review while Indonesia's GNI remained substantially higher than both.").

Moreover, CFA's comments ignore Commerce's reasoning for why a country does not remain on the surrogate country list indefinitely merely based on an earlier classification or on nominal differences in *per capita* GNI. *Id.* at 38-45, Appx____-____. As Commerce explained "there is no basis for {CFA's} insistence that the process must yield a particular result from one review to the next." *Id.* at 40, Appx____. "{B}y insisting that Indonesia remain on the list despite the relative changes in development and current *per capita* GNIs of other potential surrogate countries, {CFA's} position implies" that Commerce should continually broaden the list despite other record evidence. *Id.* at 43-44, Appx____-____. To the best of our knowledge, no Court has endorsed CFA's view; rather, the Federal Circuit "disagree{s} that Commerce is forever bound by its past practices" in keeping any particular country on a surrogate country list. *Jiaxing Bro. Fastener Co.*, 822 F.3d at 1299.

At bottom, CFA is simply dissatisfied with the results produced by Commerce's application of its consistent surrogate country list practice. Nonetheless, "Commerce has provided reasoned analysis in support of

31

its surrogate country determination," *Jiaxing Bro. Fastener Co.*, 822 F.3d at 1298, and Commerce is not required to consider CFA's unsupported demand that it must consider Indonesia to be at the same level of economic comparability as Vietnam, such that it is included on the surrogate country list. *See An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1266 n.11 (Ct. Int'l Trade 2017) ("Commerce acted consistently with its practice, as applied here, because it declined to consider a potential surrogate country that is at a less comparable level of economic development."). Thus, the Court should find that Commerce's determination to select India as the primary surrogate country is supported by substantial evidence and in accordance with law.

B.   Substantial Evidence Supports Commerce's Determination That Indian Surrogate Values Are The Best Available Information

CFA argues that Commerce's remand results "simply hews to its sequential analysis" and is "non-responsive as to the Court's concerns regarding relative data quality." CFA's Comments at 26-44. Contrary to CFA's various arguments, we explain below how Commerce complied with the remand order in re-examining the Indian data.

32

1.   Commerce's Preference For Indian Data Reflects The Standard Application Of The Sequential Surrogate Country Selection Process

CFA, citing Policy Bulletin 04.1, claims that "a country that perfectly meets the requirements of economic comparability . . . is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." CFA's Cmnts. at 26. CFA contends that where there are widespread concerns with data from economically comparable countries, Commerce may a select a non-economically comparable country as the primary surrogate country. *Id.*; *id.* at 28 ("there is reason to believe that the agency's 'sequential' analysis, *at least as applied in this review*, is inappropriate") (emphasis added).

However, CFA overlooks the fact that Commerce made no such determination regarding the Indian data in this case, and, as a result, there was no reason for Commerce to go "off-list" and examine the Indonesian data. The Federal Circuit's rationale in *Dorbest* is instructive on this point. *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1371-72 (Fed. Cir. 2010). Specifically, the Federal Circuit held that 19 U.S.C. §1677b(c)(4)(A) requires use of data from economically

33

comparable countries *except* in situations where such data were not available or were irretrievably tainted by some statistical flaw. *Id.* The statute requires Commerce to use data from economically comparable countries "to the extent possible." *Id.* (citing 19 U.S.C. § 1677b(c)(4)(A)).

"In other words, Congress has instructed Commerce to first select an appropriate market economy country (or countries), and then evaluate, *from the range of data available from those countries*, what constitutes the 'best available information.'" *Jacobi Carbons AB*, 222 F. Supp. 3d at 1175 n.14 (emphasis added). What Congress has not instructed, is for "Commerce to first look for the 'best available information' from some unspecified list of countries and then decide which of that information comes from countries that are economically comparable significant producers of comparable merchandise, nor has Congress instructed Commerce to simultaneously weigh the statutory factors." *Id.*

Here, as explained in the previous section, consistent with its sequential approach to surrogate country selection, Commerce first determined that India is economically comparable to Vietnam. Remand Results at 8-18, Appx____-____. Having also determined that India is a

34

significant producer of comparable merchandise, Commerce then

determined that India offers surrogate data that meets its criteria for

data availability and quality. *Id.* at 16, Appx___. Thus, Commerce's

reasoning that the Indian data were superior "reflects application of a

sequential analysis wherein the Indonesian data already had been

eliminated from consideration" because "there were countries that were

at the same level of economic development as Vietnam." *Id.* at 18,

Appx___. In any event, we further explain below why the Indian data

are the best available information for valuing main inputs.

> 2.   Substantial Evidence Supports Commerce's
>       Determination That Indian Data Are The Best
>       <u>Available Information For Valuing Main Inputs</u>

CFA challenges Commerce's continued reliance on *Fishing Chimes*

data as representative and reflective of broad market averages with

respect to whole, live fish, fingerlings, and fish feed. CFA's Cmnts. at

29-34. These arguments are without merit.

CFA also argues that the lack of pricing for whole live fish data for

certain months "further undermines the agency's conclusion that the

data reflect broad market averages." CFA's Cmnts. at 31. However,

Commerce explained that this is not the result of missing data, but

rather, the study noted that stocking patterns are not constant and change according to many factors, such as market prices, the prevalence of other types of farming activities, and water availability. Remand Results at 51, Appx____. Further, the clustering of reporting times is a result of the nature of the farmers' stocking patterns and subsequent harvesting. *Id.* at 51-52, Appx____-____.

Also, CFA argues that Commerce's attempt to address the lack of information on the number of farms providing fingerlings, feed prices, and the overall volume-data gap is speculative. CFA's Cmnts. at 32. Although the *Fishing Chimes* data do not contain volume data, Commerce explained how it calculated the estimated volume of inputs based on the record evidence. Remand Results at 52, Appx____. Specifically, Commerce relied on the parameters stated in the publication and used by the researchers in collecting the data. *See id.* at 52-53, Appx____-____ (based on these parameters, Commerce estimated a significant volume of fish (approximately 14 million kilograms), fingerlings (approximately 19 million pieces), and feed (approximately 19 million kilograms) during the period of review on which the data are based).

Furthermore, Commerce addressed the corroboration concerns highlighted by the Court, and explained that while corroboration and representativeness are distinct concepts, Commerce's observation that the whole fish data were corroborated by other pricing data was intended to establish the "overall reliability and usability of the data." *Id.* at 23, Appx____. Regarding fish feed, again, Commerce discontinued its reliance on the "Godrej" invoice because it was unclear whether it was from one of the feed brands relied on in the study. *Id.* at 24, Appx___.

Commerce also explained that because it did not find any information on the record that undermines the *Fishing Chimes* source, further corroboration of its reliability would not be necessary. *Id.* at 54, Appx___. Even so, Commerce pointed to the internal data integrity check performed by the authors of the *Fishing Chimes* study that cross-verified the prices of whole live fish with vernacular language newspapers for 2017 and 2018, and the *Undercurrent News* article which corroborated the fish feed prices provided in *Fishing Chimes* as examples of corroborating evidence that support the source's general reliability. *Id.*

37

Undeterred, CFA argues that the study does not sufficiently identify the newspapers to allow for a reasonable conclusion the prices reflect broad market averages.  CFA's Cmnts. at 33.  For fish feed, it argues that although the *Undercurrent News* article corroborates the *Fishing Chimes* data, the data points may be corroborated yet still not represent a broad market average.  *Id.*  For one data point, CFA argues *additional* corroboration, that is, names and prices, are necessary for "a reasonable conclusion" that data are reflective of a broad market average, but for another data point, it argues that, although corroborated, this is insufficient to represent a broad market average. *See id.*  This suggests that no amount of analysis or corroboration would satisfy CFA except for Commerce's acceptance of its preferred Indonesian surrogate values, which is not the standard of review.

In any event, Commerce has complied with the remand order because it has explained why the Indian data are the best available information for valuing certain key inputs because they represent a broad market average.  *See* Remand Results at 51-55, Appx____-____; 19 U.S.C. § 1677b(c)(1)(B); *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("Commerce has broad

discretion to determine what constitutes the best available information, as this term is not defined by statute."); *Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable").

> 3.   Commerce's Preference To Use Labor Data From The Primary Surrogate Country Is Supported By Substantial Evidence And In Accordance With Law

Finally, CFA argues that Commerce's selection of India as the primary surrogate country undermines its selection of the Indian labor data. CFA's Cmnts. at 35-36. CFA also argues that the Indian labor data are not the "best available information" because the data are out of date, are unclear as to specificity, and they do not support Commerce's determination that the labor input is not a major input. *Id.* These arguments are without merit.

First, Commerce explained that because it relied on its sequential surrogate country selection process to select India as the primary surrogate country, and had usable labor data from India, consistent with its methodology, Commerce prefers to value the labor input using

39

labor rates from the primary surrogate country.  Remand Results at 26,

Appx____ (citing *Antidumping Methodologies in Proceedings Involving*

*Non-Market Economies: Valuing the Factor of Production: Labor*, 76

Fed. Reg. 36,092, 36,093 (Dep't of Commerce June 21, 2011)).  While

Commerce prefers to value factors of production with contemporaneous

surrogate values, Commerce selects primary surrogate country labor

values even when there are other values on the record that may have

been more contemporaneous.  *Id.*; *see also Jiangsu Zhongji Lamination*

*Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1350-51

(Ct. Int'l Trade 2019) ("Commerce was therefore justified in using the

South African labor data despite its lack of contemporaneity because

the other factors favored the South African data as a whole over the

Bulgarian data"); *Heze Huayi Chemical Co., Ltd. v. United States*, 2018

WL 2328183, at *8 (Ct. Int'l Trade May 22, 2018) ("Commerce was able

to adjust the labor value for Mexico through its normal method of

inflating the value for labor . . . to account properly for inflation or

changes in the labor rate over this time period").

In this instance, because the labor data were from 2006,

Commerce accounted for the lack of contemporaneity by inflating the

data to reflect wage rates for the period of review.  *Id.*  Commerce also determined that nothing on the record suggests that the inflated Indian labor data are anomalous compared to the contemporaneous Indonesian data.  *Id.* at 26-27, Appx\_\_\_-\_\_\_\_ (explaining Indian data are $.85 per hour (after inflation) and Indonesian data are $.72 per hour, on average).

Commerce also explained that, while CFA speculates that the Indian labor data were not industry-specific, the Court did not remand that issue, and CFA does not cite *any* record evidence demonstrating the Indian labor data are not specific.  *Id.* at 55 n.176, Appx\_\_\_\_.

Finally, Commerce explained that to engage in an input-by-input based surrogate value analysis, would be "impractical, and, in fact, demonstrates the rationale behind Commerce's effort to focus its analysis on a certain set of potential surrogate countries.  *Id.* Therefore, Commerce's preferred method to use data (inflated to reflect the period of review) from the primary surrogate country, India, to value labor is supported by substantial evidence and in accordance with law.  *Id.*; 19 C.F.R. § 351.408(c)(2).

41

C.    Commerce's Reliance On NTSF's Reporting Is Supported By
      Substantial Evidence And Is In Accordance With Law

      1.    Substantial Evidence Supports NTSF's Whole Live
            Fish Ratio Reporting

CFA argues that Commerce failed to address certain record
evidence showing that NTSF's reported yield rate was inaccurate, and
failed to "grapple with" the by-product double-counting issue.  CFA's
Cmnts. at 37-44.  This is incorrect.  As explained below, Commerce
complied with the remand order and addressed conflicting evidence on
the record that contradicted NTSF's reported yield ratios and the
potential for double counting with regard to the by-product offsets that
NTSF received.  *See* Remand Results at 27-28, Appx____-____.

      First, Commerce considered the *Fisheriforskning* report, the 2007
"discussion paper" prepared by a Can Tho University employee in
Vietnam, and a 2017 affidavit from an Indonesian professor.  *Id.* at 27-
29, Appx____.  Commerce observed that these studies and reports claim
that the number of whole fish necessary to produce one kilogram of
fillet is 3.2, 3.2, and 3.1-3.4 kgs, respectively, which differed from
NTSFs reporting.  *Id.* at 27, Appx____.

42

In contrast, Commerce explained that the results of yield tests conducted by Commerce in prior reviews resulted in figures that are consistent with NTSF's reported yield of subject merchandise in this review. *Id.* at 27-28, Appx____-____. In fact, given its experience in this proceeding, Commerce explained that not only did NTSF *not* underreport its whole live fish consumption rate, but none of the companies Commerce verified in the earlier proceedings had a whole-fish-to-fillet ratio as high as the one CFA had proposed. *Id.*

Regarding the conflicting reports and studies proffered by CFA, Commerce explained that because the record contains direct findings of NTSF's experience and evidence from past verifications, it does not assign the reports and studies greater probative value. *Id.* In other words, because Commerce did not directly perform and/or observe the procedures relied on in those studies, Commerce determined that it was appropriate to afford these documents less weight. *Id.* at 28-29, 59, Appx___-____, Appx____. Thus, the Court should reject CFA's baseless argument that Commerce had failed to engage with the record information. *See* CFA's Cmnts. at 37-44.

43

Turning to the double-counting issue, CFA argues that NTSF's reporting was distortive because the standard usage rates relied on by NTSF accounted for by-products because part of the fish input was allocated to by-products. *Id.* at 41-43. However, substantial evidence supports Commerce's determination that the record does not support CFA's argument. Remand Results at 58, Appx____.

For example, Commerce explained that it did not subtract the weight of the by-products to get the input factors of production, and its calculation of NTSF's dumping margin includes the labor and energy associated with producing the by-products because this was already incorporated into NTSF's reported labor and energy factors of production. *Id.* at 29, Appx____. Commerce explained that although CFA contends that the fish input factors of production which NTSF calculated were already adjusted downward to account for by-products, resulting in understated fish usage rates, the documentation cited by CFA does not demonstrate that NTSF's allocation removed the weight associated with any by-products from the fish input. *Id.* at 58, Appx____. Rather, the exhibits demonstrate that the input-in-question

44

was allocated to both in and out-of-scope merchandise, which the Court

sustained.  *Id.* (citing *Catfish*, 2022 WL 1375140, at *19-20).

Commerce further explained that while Exhibit Q-92 references

"PORTIONS" of fish, this reference is related to frozen cross-sections of

well-trimmed fillets, and the exhibits cited by CFA do not reference any

non-frozen by-products.  *Id.* at 58-59, Appx____-____.  Commerce added

that NTSF did not request or obtain an offset related to frozen portions

of fillets or any other frozen by-product in this segment.  *Id.* at 59,

Appx____.  Thus, Commerce, after evaluating the record evidence as a

whole, and considering the evidence cited by CFA, determined that

there is no basis to conclude that NTSF's allocation reduced its input

reporting by deducting by-products which were also the subject of a by-

product offset.  *Id.*

Therefore, because substantial evidence supports Commerce's

remand results, the Court should decline CFA's invitation to reweigh

the evidence.  *See e.g., SolarWorld Americas, Inc. v. United States*, 910

F.3d 1216, 1225 (Fed. Cir. 2018) ("SolarWorld also invites us to reweigh

the evidence already considered by Commerce . . . However, we may not

reweigh the evidence") (internal citations omitted).

45

2.    Substantial Evidence Supports Commerce's Reliance
On NTSF's Moisture Content Reporting

Similarly, CFA argues that Commerce disregarded the evidence that CFA had highlighted and failed to address adequately the information or provide a reasoned basis for dismissing it. CFA's Cmnts. at 44-45. As we explain below, Commerce addressed both the supporting and detracting record evidence on the moisture content issue, and substantial evidence supports Commerce's reliance on continued NTSF's moisture content reporting. Remand Results at 61-66, Appx____-____.

During on-site verification, Commerce reviewed documentation relating to NTSFs reported moisture content, including third-party inspection certificates relating to the moisture content of the merchandise underlying certain sales in question. *Id.* at 29-30, Appx____. Commerce determined that this evidence established that NTSF's reported moisture did not exceed the stated maximum in the contract. *Id.* at 30, Appx____.

Moreover, Commerce also verified the moisture content of NTSF's products by examining sample test reports for a product coded as an 86 percent moisture content product. *Id.* This product was also inspected

46

by another third party, and the results showed moisture levels of 85.7, 85.8, and 85.9 percent.  *Id.*  Commerce also determined that the washing and additive soaking test reports for four invoices it examined were consistent with the moisture amounts reported by NTSF.  *Id.* Thus, Commerce concluded that the third-party inspection reports and verified internal documentation support NTSF's reported moisture content.  *Id.*

However, CFA argues that it was "arbitrary for Commerce to disregard the relevance of the customer labels {on the record} while relying on the inspection reports to support its determination."  CFA's Cmnts. at 46.  CFA points out that the customer labels are also "from a third party and nothing on the record undermines their reliability or gives reason to suggest they are unreliable," rather, CFA argues that "the result of tests conducted at verification are consistent with the information in the customer labels."  *Id.*

In the remand results, Commerce explained that the customer decides the information on the labels, and it is not clear how the customer determined the information for the labels.  Remand Results at 31, Appx____; *id.* at 64, Appx____ ("The record does not indicate that

47

NTSF's customer labels are tied to any testing protocols or that NTSF fully controls the information placed on the labels."). Commerce noted that "NTSF referred to these labels as the 'U.S. customers' artwork related to the sale,' and explained the steps it takes when there are discrepancies between the 'artwork' and sales contract terms." *Id.* at 64, Appx___. As Commerce observed, "{i}t is clear from the record that neither NTSF nor its customers rely on the customer-provided 'artwork' to satisfy the sales contract terms and instead rely on the information obtained from an inspection/testing facility." *Id.*; *id.* ("{Commerce} do{es} not find all third-party sources to be analogous and {it} must scrutinize the intent and purpose of each source."). Accordingly, substantial evidence supports Commerce's determination that because the information on these labels is controlled by the customer, and not NTSF, the labels do not undermine NTSF's reporting. *See id.*

With respect to CFA's argument that the labels are consistent with NTSF's verification tests, Commerce explained that the results of the tests conducted at verification did not undermine NTSFs reporting because the test results were not fully representative of NTSF's actual experience. *Id.* at 31, 62, Appx___, Appx___. Commerce emphasized

48

that the time constraints and other practical limitations presented during the on-site verification prevented Commerce from replicating NTSF's actual production experience when conducting tests at verification.  *Id.* at 61-62, Appx____-_____.  And again, with respect to the labels supposedly supporting the verification tests, Commerce does "not have definitive evidence regarding the methodology adopted by NTSF's customers" and "what is reflected in the label depends on how the customer defines 'contains,' and the accuracy of the information therein."  *Id.* at 65, Appx____.

Finally, Commerce considered the extrinsic studies and documentation on the record, and explained that, as in the context of the whole fish ratio discussion above, such evidence may reflect different procedures and merchandise than those subject to this review. *Id.* at 32, Appx____.  Commerce did not find the figures in those studies to be more probative than the independent third-party moisture tests, *id.*, and CFA does not appear to contest that determination.  *See* CFA's Cmnts. at 44-47.

Therefore, Commerce's determination to rely on NTSF's moisture content is supported by substantial evidence.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
HENDRICKS VALENZUELA
Of Counsel
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce
Hendricks.Valenzuela@trade.gov

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044
Tel: (202) 305-7571
Fax: (202) 514-8640

November 23, 2022

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's order regarding type-volume limitation rules.  According to the word-count calculated by the word processing system with which the brief was prepared, the brief contains a total of 8,936 words.

November 23, 2022                                /s/ Kara M. Westercamp
                                                 Kara M. Westercamp

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| CATFISH FARMERS OF AMERICA, ) | |
| *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Consol. |
| v. ) | Court No. 20-00105 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| NTSF SEAFOODS JOINT STOCK CO., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____) | |

## <u>ORDER</u>

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety.


Dated: _____, 2022   _____
        New York, NY                                    JUDGE