A-552-801
Remand
Slip Op 24-23
POR:  08/01/2017 – 07/31/2018
**Public Document**
E&C/OV:  Team

*Catfish Farmers of America, et al. v. United States*
**Consol Ct. No. 20-00105, Slip Op. 24-23 (CIT February 26, 2024)**
**Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) in *Catfish Farmers of America, et al. v. United States*, Court No.

20-00105, Slip Op. 24-23 (CIT February 26, 2024) (*Second Remand Opinion*).  These final

results concern the *Final Results* in the 15th administrative review of the antidumping duty (AD)

order on certain frozen fish fillets (fish fillets) from the Socialist Republic of Vietnam

(Vietnam)[1] covering the period of review (POR) August 1, 2017, through July 31, 2018.[2]

On August 23, 2022, in response to the *First Remand Opinion*,[3] Commerce issued the

First Remand Results.[4]  In the *Second Remand Opinion*, the Court sustained, in part, and

remanded, in part, certain aspects of the *Final Results*.[5]  In particular, the Court remanded, for

---

[1] *See Notice of Antidumping Duty Order:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 FR 23756 (April 29, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Catfish Farmers of America, et al. v. United States,* Court No. 20-00105, Slip Op. 22-38 (CIT April 25, 2022) (*First Remand Opinion*).
[4] *See Final Results of Redetermination Pursuant to Court Remand, Catfish Farmers of America, et al. v. United States*, Court No. 20-00105, Slip Op. 22-38 (CIT April 25, 2022), dated August 23, 2022, available at https://access.trade.gov/Resources/remands/22-38.pdf (First Remand Results).
[5] *See, generally, Second Remand Opinion.*

the second time, the following four decisions:  (1) Commerce's finding that it was unnecessary to address whether Indonesia is economically comparable to Vietnam when selecting India as the primary surrogate country;[6] (2) Commerce's conclusion that prices for whole live fish and fingerlings contained in the Indian *Fishing Chimes* publication represent a broad market average;[7] (3) Commerce's reliance on non-contemporaneous labor data;[8] and (4) Commerce's analysis of NTSF Seafoods Joint Stock Company (NTSF)'s reporting with respect to the consumption rate for a main input, *i.e.*, whole live fish.[9]  With respect to the first issue, the Court directed Commerce to address whether Indonesia is economically comparable to Vietnam and, if it finds that it is, to compare the relative merits of the Indonesian data vis-à-vis Indian data in terms of viability as potential sources for surrogate values (SVs);[10] the Court instructed Commerce to provide additional explanation with respect to the latter three issues.[11]  Finally, the Court granted Commerce's request for a voluntary remand to consider whether double counting occurred as a result of NTSF's reporting of its byproduct offsets.[12]

In accordance with the *Second Remand Opinion*, Commerce further explains its findings regarding these issues, as discussed below.

## II.    BACKGROUND

### A.    Commerce's *Final Results*

On October 4, 2018, Commerce initiated the 15th administrative review of the *Order*.[13] Because of the large number of exporters covered by the review, on October 31, 2018,

---

[6] *Id*. at 4-7.
[7] *Id*. at 8.
[8] *Id*. at 10.
[9] *Id*. at 11.
[10] *Id*. at 4-7; and *Second Remand Order*, CIT ECF No. 105 February 26, 2024) (*Second Remand Order*) at 1.
[11] *See Second Remand Order* at 1-2.
[12] *Id.*
[13] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 FR 50077 (October 4, 2018).

Commerce selected the three largest exporters for individual examination.[14]  Because all review

requests for these exporters were timely withdrawn, on February 4, 2019, Commerce selected

NTSF for individual review as a mandatory respondent.[15]

On October 22, 2019, Commerce published the *Preliminary Results*.[16]  In the *Preliminary*

*Results*, Commerce calculated a weighted-average dumping margin of $0.00/kilogram (kg) for

NTSF.[17]  In calculating NTSF's weighted-average dumping margin, Commerce selected India as

the primary surrogate country because we found that India was:  (1) at the same level of

economic development as Vietnam; (2) a significant producer of comparable merchandise; and

(3) the country that provided the best available information with which to value NTSF's factors

of production (FOPs).[18]

In February 2020, Commerce conducted verification of the questionnaire responses of

NTSF.[19]  On April 29, 2020, Commerce published its *Final Results*.[20]

In the *Final Results* Commerce calculated an individual weighted-average dumping

margin of $0.15/kg for NTSF[21] and continued to select India as the primary surrogate country.[22]

In the *Final Results*, Commerce explained its reasoning behind using the following three

surrogate country selection criteria:  the level of economic development of the potential

---

[14] *See* Memorandum, "Selection of Respondents for Individual Review," dated October 31, 2018.
[15] *See* Memorandum, "Selection of Replacement Respondent for Individual Review," dated February 4, 2019.
[16] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018*, 84 FR 56420 (October 22, 2019) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[17] *See Preliminary Results*, 84 FR at 56421; *see also* Memorandum, "15th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results Analysis Memorandum for the NTSF Seafoods Joint Stock Company," dated October 10, 2019.
[18] *See Preliminary Results* PDM at 12.
[19] *See* Memorandum, "Verification of the Questionnaire Responses of NTSF Seafoods Joint Stock Company in the 2017-2018 Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam," dated March 13, 2020 (Verification Report).
[20] *See*, *generally*, *Final Results.*
[21] *See Final Results*, 85 FR at 23757; *see also Final Results* IDM at Comment 1.
[22] *See Final Results* IDM at Comment 2.

surrogate countries vis-à-vis Vietnam; whether the potential surrogate countries were significant producers of comparable merchandise; and the data availability and quality in the potential surrogate countries.[23]

With regard to the first of these criteria, level of economic development, Commerce stated:

> Thus, for all of the foregoing reasons, we find that Indonesia is not at the same level of economic development as Vietnam. Nonetheless, even if, *arguendo*, we were to find Indonesia to be at the same level of economic development, for the reasons expressed below in the "Data Considerations" subsection, we would still find India to be a superior choice as the primary surrogate country.[24]

In our subsequent discussion of the data from the proposed surrogate countries, Commerce highlighted the following major components of normal value (NV): the SVs for fingerlings, fish feed, whole fish, and by-products, as well as the financial ratios determined by reference to producers of comparable products.[25] We explained that, when considering what constitutes the best available information, Commerce considers several criteria, including whether the SV data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the inputs in question.[26] We found that the India data (including the data contained in the publication *Fishing Chimes*) met our SV criteria, including the broad market average criterion, with respect to fingerlings, fish feed, and whole live fish.[27]

We also relied on NTSF's reporting with respect to its reported whole-fish-to-fillet yield ratio and its reported moisture content. Regarding the former, in the *Final Results*, Commerce stated, in part:

---

[23] *Id*.
[24] *Id*. (internal citations omitted); *see also* Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the Socialist Republic of Vietnam," dated August 2, 2018 (Surrogate Country List).
[25] *See Final Results* IDM at Comment 2.
[26] *Id*.
[27] *Id*.

{w}e note that both parties point to reports on the record and proffered their estimations of what the appropriate yield should be. However, given the above analysis, we find that the small difference between the outputs and inputs could reasonably be accounted for by: (1) the fact that {the} post-trimmed fillets {used in Commerce's tests} did not sit in chilled water for several hours, as is typical; and (2) the fact that Commerce's yield test did not weigh the by-products in the way NTSF normally weighs them, *i.e.*, after being transported by water to the by-products staging area.

Finally, in past verifications, we have seen the output weights exceed the input weight by very similar amounts as NTSF's experience here. As a consequence, we find that NTSF's experience and yield reporting is consistent with our prior findings.[28]

Thus, we found NTSF's yield (including its reporting of by-products) to be reliable. With respect to NTSF's moisture content, we accepted its moisture content reporting in the *Final Results*.[29] Lastly, with respect to our valuation of labor, we relied on the Indian data, as inflated, for this input.

NTSF and the petitioners appealed.[30]

### B.    *First Remand Opinion*

On April 25, 2022, the Court issued its *First Remand Opinion*[31] and affirmed the *Final Results* with respect to the claims brought by NTSF. With respect to the claims brought by the petitioners, the *First Remand Opinion* addressed whether four aspects of the *Final Results* were supported by substantial evidence: (1) Commerce's selection of India as a primary surrogate country for valuing FOPs; (2) NTSF's reporting with respect to the weight of its production

---

[28] *Id*. at Comment 1 (citing Memorandum, "Antidumping Duty Review of Certain Fish Fillets from the Socialist Republic of Vietnam: Placing Information on the Record," dated October 24, 2019 (October 24, 2019 Memorandum)).

[29] *Id*. (declining to find that information submitted by the parties, or information contained in Commerce's verification report, provided a basis to disregard NTSF's moisture content reporting).

[30] The petitioners are: The Catfish Farmers of America and individual U.S. catfish processors; America's Catch, Inc.; Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc.; Consolidated Catfish Companies, LLC d/b/a Country Select Catfish; Delta Pride Catfish, Inc.; Guidry's Catfish, Inc.; Heartland Catfish Company; Magnolia Processing, Inc. d/b/a Pride of the Pond; and, Simmons Farm Raised Catfish, Inc.

[31] *See*, *generally*, *First Remand Opinion*.

inputs and finished outputs, on an aggregate basis; (3) NTSF's consumption rate reporting for whole live fish; and (4) NTSF's reporting of moisture content.  The Court affirmed Commerce on the second issue and remanded the *Final Results* with respect to the first, third, and fourth issues, in whole or in part.

With respect to the selection of India as the primary surrogate country,[32] the Court directed Commerce to explain:  (i) whether Indonesia is economically comparable to Vietnam using the same World Bank Gross National Income (GNI) data used to identify India and the five other countries on the Surrogate Country List and whether Commerce improperly focused its analysis on a set of countries at the "same" level of economic development as Vietnam;[33] (ii) whether the Indian FOP data are the best available information as compared to the Indonesian data submitted by the petitioners;[34] (iii) why Commerce treated the Indian data as, on balance, superior to the Indonesian data;[35] (iv) why the Indian SVs for whole fish, fingerlings, and fish feed represent broad market averages;[36] and (v) why 2006 Indian data used to value labor inputs are the best available information.[37]

With respect to NTSF's FOP reporting,[38] the Court directed Commerce to address reports and studies on the record which seemingly called into question NTSF's reported whole-live-fish-to-fillet ratio, and to consider whether Commerce properly considered the cost to produce by-

---

[32] The Court affirmed the *Final Results* with respect to Commerce's decision to find India to be a significant producer of comparable merchandise, the selection of by-product SVs, and the selection of the surrogate financial statements/ratios.  *Id*. at 38, 51, and 52, respectively.

[33] *Id*. at 39-40.

[34] *Id*. at 53.

[35] *Id*. at 41.

[36] *Id*. at 41-48.

[37] *Id*. at 49.

[38] The Court affirmed Commerce's decision with respect to the inclusion of non-U.S.-bound merchandise in NTSF's reported FOPs, and NTSF's reliance on standard usage rates.  *Id*. at 58-59 and 61-62, respectively.

products in its analysis.[39]  With respect to NTSF's reporting of moisture content,[40] the Court directed Commerce to address the record evidence that supports, and the evidence that contradicts, NTSF's reported moisture content.[41]

### C.    First Remand Results and the *Second Remand Opinion*

In the First Remand Results, Commerce further explained its *Final Results.*  We continued to select India as the primary surrogate country from our list of countries that we considered to be at the "same" level of economic development as Vietnam.  We explained that this decision was not only consistent with administrative practice and court precedent relating to our sequential surrogate country selection practice, but it was also warranted by the fact that India's GNI was far more proximate to Vietnam's than Indonesia's.[42]

With respect to our reliance on India, we explained that the Indian SV sources were preferable on balance.  We noted that the Indian data sources represented broad market averages for key inputs, including whole live fish and fingerlings, because the data were sourced from a survey of major fish-producing districts within the state of Andhra Pradesh, which was the predominant location of *pangasius* production in India.[43]  We explained that our reliance on the 2006 Indian labor data was appropriate in light of Commerce's practice to rely on a single country for SVs, to the extent possible.[44]

We also addressed certain reports proffered by the petitioners, which purportedly undermined the respondent's reported whole-live-fish-to-fillets yield ratio.  We explained that

---

[39] *Id*. at 65-66.
[40] The Court affirmed Commerce's decision with respect to:  (1) Commerce's decision not to base NTSF's final dumping margin on total adverse facts available; and (2) whether Commerce's verification procedures were acceptable under the circumstances.  *Id*. at 68 and 68-69, respectively.
[41] *Id*. at 69.
[42] *See* First Remand Results at 8-18 and 38-48.
[43] *Id*. at 18-27 and 51-56.
[44] *Id*. at 55-56.

Commerce officials verified the respondent's consumption figures, and that the figures were within the ranges seen in verification reports from yield tests Commerce conducted during prior administrative reviews that were part of this record.[45]  We also noted that we had limited information regarding the procedures undertaken by the parties that prepared such reports, unlike our own procedures which we ourselves performed during the tests undertaken at verification.[46]

Finally, at the Court's directive, we considered whether information on the record contradicted the respondent's reported moisture content for its fish fillets.  We analyzed the various potential inconsistencies in this record evidence and concluded that the record, as a whole, did not support that NTSF misreported its moisture content.[47]

Following the issuance of Commerce's First Remand Results, the Court requested a supplemental briefing relating to the potential double counting in NTSF's reporting of certain by-products.  In researching the answer to the Court's question, we realized that we had made a misstatement relating to a small portion of NTSF's by-product claim, given that we observed certain inconsistencies in the relevant terminology on the record.  As a result, we requested a voluntary remand to provide further explanation of this issue.[48]

On February 26, 2024, in the *Second Remand Opinion*, the Court sustained, in part, and remanded, in part, the First Remand Results.  The Court sustained Commerce's findings regarding NTSF's reported moisture content and Commerce's finding regarding the appropriateness of the fish feed sources relied upon in the *Final Results*.[49]

---

[45] *Id*. at 27-29 and 57-59.
[46] *Id*. at 28-29 and 59.
[47] *Id*. at 29-33 and 61-66.
[48] *See Second Remand Opinion* at 11.
[49] *Id*. at 8 and 13.

However, the Court remanded several areas of Commerce's analysis. First, the Court again remanded Commerce's selection of India as the primary surrogate country, directing Commerce to address whether, in accordance with section 773(c)(4) of the Tariff Act of 1930, as amended (the Act), Indonesia is economically comparable to Vietnam and, if so, the relative merits of the Indonesian data vis-à-vis Indian data in terms of the countries' respective viability as a potential surrogate country.[50] Second, related to the issue of whether India represents an appropriate surrogate country, the Court remanded Commerce's conclusion that the Indian *Fishing Chimes* publication represents a broad market average for whole live fish and fingerlings, given that Commerce did not show how the *Fishing Chimes* data compare to India's overall *pangasius* production.[51] Third, also related to our assessment of the Indian data, the Court again directed Commerce to explain why reliance on non-contemporaneous labor data was appropriate, given that Commerce's choice of India as the primary surrogate was contrary to law absent a consideration of Indonesia.[52] Fourth, the Court remanded Commerce's analysis of NTSF's reporting with respect to the consumption rate for a main input, *i.e.*, whole live fish, with the instruction to explain why the studies proffered by the petitioners are unconvincing or unreliable.[53] Fifth, the Court granted Commerce's request for a voluntary remand to consider whether double counting occurred as a result of NTSF's reporting of byproduct offsets.[54]

---

[50] *Id*. at 4-7.
[51] *Id*. at 8.
[52] *Id*. at 10.
[53] *Id*. at 11.
[54] *Id*.

### D.    Draft Results of Redetermination

Commerce released the Draft Results on April 9, 2024.[55]  The petitioners submitted

comments on the Draft Results on April 22, 2024.[56]

## III.    ANALYSIS

### A.    Surrogate Country Selection – India and Indonesia Comparison

Commerce continues to find that its selection of India as the primary surrogate country

was appropriate.  For the purposes of this remand, in accordance with the Court's *Second*

*Remand Opinion*, we are considering both Indonesia and India, within very broad parameters, to

satisfy the statutory standard of being at a "comparable" level of economic development.  We

acknowledge that section 773(c)(4) of the Act provides that, in valuing the FOPs in a non-market

economy (NME) country, Commerce will use SVs from one or more market economies "at a

level of economic development *comparable* to that of the nonmarket economy country."[57]

However, we disagree that this language requires Commerce to consider all countries which may

broadly meet the definition of "comparable" on an equal basis.

Indeed, Commerce's regulations at 19 CFR 351.408(b) directs Commerce as follows:

> *Economic Comparability*.  In determining whether a country is at a level of
> economic development comparable to the nonmarket economy under section
> 773(c)(2)(B) or section 773(c)(4)(A) of the Act, {Commerce} will place primary
> emphasis on *per capita* GDP as the measure of economic comparability.

Thus, this regulation contemplates that Commerce will consider relative national income as a

factor in evaluating economic comparability.  Importantly, while neither the Act nor the

regulations define the term "comparable," neither source prohibits Commerce from considering

---

[55] *See* Draft Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Consol Court No. 20-00105, Slip Op. 24-23 (CIT February 26, 2024), dated April 9, 2024 (Draft Results).
[56] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated April 22, 2024 (Petitioners' Comments).
[57] *See* section 773(c)(4) of the Act (emphasis added).

the extent to which the economies of potential surrogate countries are similar to the economy of the NME country at issue. Over time Commerce has developed a practice of preferring surrogate countries to have economies at the "same" level of economic development as the NME country, not only in the interests of limiting administrative burden (*i.e.*, it would be time consuming to routinely consider a large number of countries in our analysis) but also in the interests of accuracy of the result (*e.g.*, price levels within a country tend to broadly track with GNI).

Nonetheless, in accordance with the Court's *Second Remand Opinion*,[58] Commerce has considered the relative merits of the Indian and Indonesian data, while affording no preference to India, despite its inclusion on the Surrogate Country List. We note that – although we previously outlined Commerce's position that such a comparison was not required in light of our surrogate country selection process[59] – we did consider the relative merits of the two countries' data in the underlying administrative review.[60] We found, at that time, that the Indian data were superior. Certain conclusions regarding the Indian data sources (*e.g.*, the *Fishing Chimes* data and the labor SV) are discussed further below, but the subsequent litigation has not undermined the totality of that analysis and, therefore, consistent with our analysis in the underlying administrative review, we continue to find that the Indian data are superior to the Indonesian data and are the most appropriate source the FOPs here.

When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs.[61] There is no hierarchy among these

---

[58] The Court directed that, insofar as Commerce considers Indonesia to be "at a comparable level {of economic development, the agency} must evaluate the Indian data on its relative merits vis-à-vis Indonesian data." *See Second Remand Opinion* at 6.
[59] *See* First Remand Results at 25.
[60] *See Final Results* IDM at 16-21.
[61] *See* Surrogate Country List.

criteria. It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[62] Commerce must weigh the available information with respect to each input value and make product-specific and case-specific decisions as to what constitutes the "best" available SV for each input.[63]

In both the *Preliminary Results* and *Final Results*, we found that the SV criteria were, on balance, best satisfied by relying on Indian data. We provided discussion with respect to whole live fish, fingerlings, fish feed, by-products, and the surrogate financial ratios.[64] We now provide a more extensive comparison of the Indian and Indonesian data.

For whole live fish, as we explained in the *Final Results*, the record contains a reliable source from India, in the form of the *Fishing Chimes* publication; we also stated that "{t}he record contains one potentially suitable Indonesian source, the 2017 production data from the Indonesian Ministry of Marine Affairs and Fisheries' *One Data* website."[65] We found in the *Final Results* that the Indian data for whole live fish were publicly available, contemporaneous, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs, including the particular species of *pangasius* in question.[66] The Indonesian data for whole live fish meet several of these criteria as well (*i.e.,* they are publicly available, tax- and duty-exclusive, and representative of a broad market average), but they also are less desirable in terms of specificity of the input and contemporaneity with the POR. As we explained in the *Final*

---

[62] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin), available on Commerce's website at https://access.trade.gov/Resources/policy/bull04-1.html.
[63] *See, e.g.*, *Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1; *see also* section 773(c)(1) of the Act.
[64] *See Final Results* IDM at 16-21.
[65] *Id*. at 19.
[66] *Id*. at 18-20. The only one of these criteria that is in dispute relates to broad market average, which is discussed further below.

*Results,* the Indonesian data to value this input are not species-specific[67] and are only partially contemporaneous with the POR, unlike the Indian data."[68]

With respect to broad market average, as it relates to the whole live fish data, the Court directed Commerce to consider whether the *Fishing Chimes* data met that criterion.[69]  We find that they do.  The *Fishing Chimes* study provides survey responses from farmers within the state of Andhra Pradesh.  As we previously noted, in either year of the POR (2017/2018), the single state of Andhra Pradesh was the majority producer of *pangasius* in India.  As the report explains, "*Pangasius* or *Pangasianodon hypophthalmus* is now cultivated in around 43,000 ha {*i.e.*, hectares} of production area and a total volume of around {855,500} MT has been produced in 2018 in the country.  In Andhra Pradesh alone, the production has reached {500,000} MT."[70]  Although 15 Indian states produced *pangasius* during the period, about 60 percent was produced in Andhra Pradesh by the end of 2018,[71] and Table 1 of the exhibit shows that no other state is close to Andhra Pradesh in terms of production volume (the next two largest states account for 150,000 MT, and 120,000 MT, respectively, and the remaining states represent a tiny percentage of the country-wide total).[72]  In addition, the researchers explicitly stated that the "study team focused on Andhra Pradesh as it has major representation in production of *pangasius*."[73]

---

[67] *See* Petitioners' Letter, "CFA's Pre-Preliminary Surrogate Value Submission," dated September 10, 2019 (Petitioners September 10, 2019 SV Submission), at Exhibit 3.  Specifically, Appendix 4, which contains the Statistical Data and Information Centre for the Indonesian Ministry of Marine Affairs and Fisheries, states that "Collection of production data has not been conducted at the species level," and "*Patin* production of 319,967 tons includes all types of *patin*."

[68] *See Final Results* IDM at Comment 2.C; *see also* NTSF's Letter, "Factual Information Submission," dated August 27, 2019 (NTSF August 27, 2019 SV Submission), at Exhibit SV-2 and SV-3 (Table 6 "Comparison of Farm gate Prices and No. of Farms Harvested" 2017-2018).

[69] *See Second Remand Opinion* at 9.

[70] *See* NTSF August 27, 2019 SV Submission at Exhibit 2 (citing a publication titled "Current Status of Pangasis (Pangasianondon hypopthalmus) Farming in India," July 2019 Edition (*Fishing Chimes*), page 35).

[71] *Id*.  This estimate is conservative, since the POR was August 1, 2017 through July 31, 2018, and Andhra Pradesh's share of the Indian pangasius supply was 58 percent in 2018, while it was 80 percent in 2017.

[72] *Id*. at Exhibit 2, page 37; *see also* page 35 ("Based on the inputs from the stakeholders the study was then focused on Andhra Pradesh because of its largescale representation in pangasius farming.").

[73] *Id*.

In the *Second Remand Opinion*, the Court raised concerns regarding the study's coverage within Andhra Pradesh. Specifically, the Court questioned:

> {w}hile the study refers to pangasius farming in 'more than 300 villages' in the two districts in question {within Andhra Pradesh}, it also says that only 46 of the 300 villages studied were located *in those districts*. By negative implication, that means the other 254 studied villages were *not so* located. This is the same problem the court identified when it first remanded, and {Commerce}'s explanation fails to engage with it.[74]

We do not disagree with the Court's observation that the farm harvest data were not sourced from all 300 of the villages that were covered by the study; however, we do not find that this fact renders the data unrepresentative or otherwise unusable. The study states that "{f}ield visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh" and "108 data sets were collected for one crop each in 2017 and 2018 from 54 farmers" in 46 villages.[75] We understand the source's description of its methodology to mean that the information gathering processes involved interviews and/or site visits to 300 locations, while the 54 farmers that provided quantitative survey data based on crop harvests were from 46 villages within the two main districts. It is undisputed that all of the survey data and the field visits were conducted in Andhra Pradesh. Thus, there is no question that the survey relied on a large number of data points from the state that accounted for a clear majority of India's production. Regardless of whether the other 254 villages were outside of the geographic territory of the districts in question (*i.e.*, West Godavari and Krishna), we do not find that this undermines the validity of the study. For instance, if the crop datasets were from the two major producing areas within the primary producing state, but the researchers *also* did field visits outside of these areas, that would, similarly, serve to buttress the broadly representative nature of the data.

---

[74] *See Second Remand Opinion* at 8.
[75] *See* NTSF August 27, 2019 SV Submission at Exhibit 2 (citing a publication titled "Current Status of Pangasius (Pangasianondon hypopthalmus) Farming in India," July 2019 Edition (*Fishing Chimes*), page 38).

The *Fishing Chimes* publication, in multiple instances, emphasizes the steps that the researchers took to achieve generalizable data, *i.e.*, reflective of a broad market average.[76]  In the methodology section of the report, the researchers explained that the "farmers from 46 villages were interviewed to decode the general trend" and stated that "{t}he collected data {were analyzed} for qualitative and quantitative results using statistical methods."[77]  The source also states that, following field collection, "{f}or cross verification of economic data outcomes, farm-gate prices were also obtained from vernacular newspapers from 2017 and 2018."[78]  The number of survey respondents and the method of sample selection all support Commerce's decision to rely on the *Fishing Chimes* data.

Regarding the total volume of whole live fish represented by the source, the Court also noted that "{Commerce} did state that the prices cited in *Fishing Chimes* were based on around 28 million kg of fish in 2017–18 and 14 million kg during the period of review…. {but e}ven so, it does not indicate anything as to a 'broad market average' absent any discussion showing how those amounts compare to India's overall pangasius production."[79]  The volume of merchandise covered by the study is a fraction of the total production in India; however, this is neither surprising nor problematic.  Data analysis relying on survey methodology does not necessarily (*and typically does not*) cover the entirety of a population and they are, naturally, likely to focus on groups or regions where there is a significant concentration of data points.  Some of the sources that are most frequently used by Commerce, such as the World Bank's "Doing Business"

---

[76] It is important to note that Commerce's regulations do not define the term "broad market average."  When Commerce uses this term, we generally mean that the data themselves are broader than a single data point (such as an offer for sale or a transaction-specific price) and are generally reflective of market conditions on a larger scale. We do not require that the data be absolutely representative of an entire market; such an interpretation would not only be overly restrictive, it would also be virtually impossible to achieve.

[77] *Id*. at Exhibit 2, page 35.

[78] *Id*.

[79] *See Second Remand Opinion* at 9.

publication, are often based on survey data that focus on a subset or a region from which representative data may be obtained.[80]  In the First Remand Results, Commerce cited numerous instances in this proceeding[81] and elsewhere[82] where we relied on a subset of an economy's prices and still found the data to be representative of a broad market average.[83]  Here too, beyond the size/location of the sample, there are numerous indicators in *Fishing Chimes* that demonstrate that the data were tested for representativeness.  Against this background, the record supports a finding that the data constitute a broad market average.  Moreover, we emphasize that a determination of whether data reflect a broad market average is a consideration that is made on a spectrum; even assuming *arguendo* that the *Fishing Chimes*' whole live fish data are lower on

---

[80] *See, e.g.*, *Hangzhou Yingqing Material Co. v. United States*, 195 F. Supp. 3d 1299, 1311 (December 21, 2016) (*Hangzhou Yingqing*) (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because:  (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) (*Diamond Sawblades AR 2011-2012*), and accompanying IDM at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks.  Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average"); and *Certain Steel Threaded Rod from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 71743 (December 3, 2014) (*STR from China AR 2012-2013*), and accompanying IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business: Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

[81] *See, e.g., Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 75 FR 22726 (March 17, 2010), and accompanying IDM at Comment 1.A ("Petitioners argue that the FAO Report price does not represent as broad a market average as the Fish Pond Report, as the data contained within the FAO Report is based on only one region in Bangladesh as opposed to the Fish Pond Report data that is based on three provinces.  While Petitioners are correct that the FAO Report is not based on multiple provinces, we note that the data in the FAO Report is based on more fish farmers (60) than the Fish Pond Report (34).  Moreover, it is not clear that other provinces in Bangladesh have any meaningful production of Pangas fish.  However, the FAO Report does state why this particular region was selected (*i.e.*, importance of this region in Pangas farming, the availability of hatchery produced fry, availability of ponds, warm climate, cheap and abundant labor.)" (internal citations omitted)).

[82] *See, e.g., Raw Honey from the Socialist Republic of Vietnam:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22184 (April 14, 2022), and accompanying IDM at Comment 1 ("The five Indian news articles are specific to ingredient raw beekeeper honey, representative of the broad market average because they are from the largest raw honey producing regions of India … .").

[83] *See, e.g.*, *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311; *Diamond Sawblades AR 2011-2012* IDM at Comment 20; and *STR from China AR 2012-2013* IDM at Comment 3.

such a continuum, there are still various aspects of the data that make them reliable and preferable to the Indonesian data.

With respect to fish feed, we again find that the Indian *Fishing Chimes* data meet the SV criteria and are superior to the Indonesian data for fish feed. The Court sustained Commerce's reliance on the Indian fish feed data, following additional explanation from Commerce, and the petitioners do not dispute this finding.[84] For the purpose of thoroughness in this remand and to comply with the *Second Remand Opinion,* we find that the selection of Indian fish feed data further supports the selection of India as the primary surrogate, because the Indian data are clearly superior for this input to the Indonesian data and meet each of the SV criteria.[85] The Indonesian data, in contrast, are from affidavits obtained for the purpose of this review, and there is no other record evidence to corroborate the information in the affidavits.[86] Commerce has a well-established general preference for using price sources that were not generated for the purpose of a proceeding (*e.g.*, published sources), where possible.[87] Furthermore, the petitioners provide a limited number of affidavits on the record for fish feed pricing.[88] Thus, while the petitioners question whether the *Fishing Chimes* whole live fish data, for instance, are sufficiently broad in terms of data points (*i.e.*, 108 datasets in a published study that entailed field visits to 300 villages) and volume (many millions of kg of fish), the proposed Indonesian

---

[84] *See Second Remand Opinion* at 8 ("Commerce accordingly cited an article from a source called *Undercurrent* as substantiating that {fish feed} data. As {the petitioners} do not dispute that finding, the court—putting aside its other concerns with *Fishing Chimes*—sustains the agency's reliance on that study's fish feed data.") (internal citations omitted).

[85] *See* First Remand Results at 53-54; *see also Final Results* IDM at 19.

[86] *See* Petitioners September 10, 2019 SV Submission at Exhibit 5; *see also* Petitioners' Letter, "CFA's Submission of Proposed Factor Values," dated February 25, 2019 (Petitioners February 25, 2019 SV Submission), at Exhibit SV I-3B.

[87] *See, e.g.*, *Certain Cased Pencils from the People's Republic of China from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 FR 33406 (July 13, 2009), and accompanying IDM at Comment 4a (noting that Commerce favors "a published source that is publicly available" in applying its surrogate value methodology).

[88] *See* Petitioners February 25, 2019 SV Submission at Exhibit SV I-3B.

data they proffer for fish feed was based on small sets of price quotes:  data from 11 sources, with no actual volume because the quotes are for hypothetical sales.[89]

With respect to another key input, fingerlings, we also find that the *Fishing Chimes* India data are superior to the Indonesian data.  Both the Indian and Indonesian data are contemporaneous with the POR and are publicly available.[90]  As noted above, the survey data for *Fishing Chimes* were based on responses from numerous farmers and were corroborated by field visits and comparisons to other data sources.  The downsides of the corresponding Indonesian source (*i.e.*, data from the Indonesian Ministry of Marine Affairs and Fisheries) are that they are less specific with respect to size and the particular species.  With respect to size, the Indonesian data do not cover fingerlings over 5 inches in size, whereas the Indian data offer coverage up to nine inches in length.[91]

Regarding the surrogate financial ratios, we do not find that either the Indian or Indonesian data offer an advantage.  The record contains a contemporaneous financial statement from an Indian seafood processor, Mulpuri Aqua Processors Private Limited (Mulpuri), which we used in the *Final Results*.[92]  With respect to Indonesia, the petitioners provided the contemporaneous financial statements of PT Dharma Samudera Fishing Industries Tbk (Dharma) and PT Japfa Comfeed Indonesia Tbk (Japfa).[93]  While the Indonesia sources on the record

---

[89] *Id.  See Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 81 FR 13331 (March 14, 2016), and accompanying IDM at Comment 2 ("Our general practice is not to use price quotes to value factors of production.  {Commerce} often does not know the conditions under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes.  Without access to all of the information on how the price quotes were obtained (including any negotiations or agreed-upon adjustments), it is impossible to confirm that quotes reflect a typical broad market average cost.").

[90] *See Final Results* IDM at Comment 2; and *Preliminary Results* PDM at 11.

[91] *See* Petitioners September 10, 2019 SV Submission at Exhibit 2.

[92] *See Final Results* IDM at 20.

[93] *See* Petitioners February 25, 2019 SV Submission at Exhibit I-10A and I-10C; and Petitioners September 10, 2019 SV Submission at Exhibit 7.

reflect more than one financial statement (a potential – but here, uncertain – advantage; *see* below) unlike the Indian data, in other respects the Indonesian financial statements are less favorable than the one from India.  The statements from Dharma are accompanied by an unqualified auditor's opinion, but contain a note regarding the company's ability to continue as a going concern.[94]  Commerce has previously found such notes to be relevant to our assessment of whether a financial statement serves as the best available evidence as a source of surrogate financial ratios.[95]  Regarding Japfa's financial statements, information therein indicates that "Aquaculture" comprises a relatively small percentage of the company's sales.[96]  Although we do not find that either of these observations render the statements automatically unusable, they are relevant to our determination that the Indonesian statements are not preferable to the Indian statement.  Therefore, we do not conclude that the one potential advantage offered by the Indonesian statements (*i.e.*, the fact that there are multiple statements[97]) outweighs the downsides of the statements.

With respect to the other categories of data (*i.e.,* farming and processing chemicals, and packing inputs), there are limited differences across the SVs when comparing them vis-a-vis the

---

[94] *See* Petitioners February 25, 2019 SV Submission at Exhibit I-10A; and Petitioners September 10, 2019 SV Submission at Exhibit 7.
[95] *See, e.g.*, *Certain Hardwood Plywood Products from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017- 2018*, 85 FR 77157 (December 1, 2020) (*Plywood from China*), and accompanying IDM at Comment 3 (noting that "the Company recorded negative operating cash flows … {and} the Company's current liabilities exceeded its current assets … . These events or conditions indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern … . In this review, given the concern raised by the auditor with respect to Megamas, and in light of other usable financial statements available on the record to calculate the surrogate financial ratios, we find Megamas' financial statements do not constitute the best available information.").
[96] *See* Petitioners September 10, 2019 SV Submission, at Exhibit 7.
[97] Commerce prefers to use multiple financial statements to calculate ratios, where possible.  *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2020-2021*, 87 FR 67671 (November 9, 2022), and accompanying IDM at Comment 6.

factors identified above.[98]  Many of the remaining material inputs are based on import data, regardless of which surrogate country is selected.[99]  Because neither country's trade data offer an advantage with respect to the evaluation criteria (*e.g.*, contemporaneity, public availability, specificity, *etc.*), there is no basis to conclude that the Indonesian data are preferable to the Indian data in this regard.

There are two areas where the Indonesian data fare better.  First, the Indian data used to value labor inputs are not contemporaneous with the POR.  Commerce used 2006 International Labor Organization wage data for India.[100]  Although these data do not satisfy the contemporaneity criterion, Commerce favors selecting SVs from a single country to the extent possible, pursuant to 19 CFR 351.408(c)(2).  Although Commerce will "resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable,"[101] there is nothing on the record to suggest that the Indian values are anomalous.  Therefore, because India provides better SV data overall -- and the wage data are usable (if not preferable) -- Commerce relied on such data and inflated them to reflect wage rates for the POR.[102]

Second, the Indonesian data provide a better option for certain by-products, such as broken meat, fish skin, and fish fat, as well as boat freight.[103]  Although we relied on an Indian source for certain key by-products (*e.g.*, waste), for other minor by-product claims, we relied on

---

[98] *See Preliminary Results* PDM at 12; *see also* Memorandum, "Surrogate Value's for the Preliminary Results," dated October 10, 2019 (Preliminary SV Memorandum); and Petitioners September 10, 2019 SV Submission at Exhibit 6.

[99] *See Preliminary Results* PDM at 12; Preliminary SV Memorandum; and Petitioners September 10, 2019 SV Submission at Exhibit 6.

[100] *See* NTSF Letter, "Response to Request for Surrogate Value Information," dated February 25, 2019, at Exhibit SV-10.

[101] *See, e.g., Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1332-33 (CIT 2014), *aff'd* 822 F.3d 1289, 1293-96, 1298 (Fed. Cir. 2016).

[102] *See, e.g., Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1284 (CIT 2020) (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) (recognizing that Commerce has discretion in SV selection and may select non-contemporaneous data)).

[103] *See Preliminary Results* PDM at 15; and Preliminary SV Memorandum; and *Final Results* IDM at 20.

the Indonesian data provided by the petitioners, because only less specific Indian data were available on the record.[104]  Additionally, for boat freight, the only source was an Indonesian one on the record.[105]

Examining the relative merits of the data, and given that three key inputs, *i.e.*, whole live fish, fingerlings, and fish feed, in the aggregate, comprise a substantial portion of the NV, we find it significant that the Indian data are superior to the Indonesia data for these FOPs.  It also bears noting that, as NTSF is a producer that primarily farms its own fish for processing, it relies especially heavily on the consumption of fingerlings and fish feed inputs – as they are the inputs necessary to raise fish for production.[106]  Accordingly, the fact that the Indian data are preferable for feed and fingerlings is significant to Commerce's consideration of how to compute the most accurate NV.

In conclusion, consistent with our analysis in the underlying administrative review,[107] we continue to find that the Indian data are superior overall to the Indonesian data, and that the Indian data are appropriate for valuing the FOPs here.  Moreover, assuming *arguendo* that the Indonesian data and Indian data were equivalent, Commerce has the discretion to choose between potential surrogate countries.[108]

---

[104] *See Final Results* IDM at 3 and 20; and Preliminary SV Memorandum.
[105] *See Preliminary Results* PDM at 15; and Preliminary SV Memorandum.
[106] *See* NTSF's Letter, "NTSF's Response to the Department's Supplemental Sections A, C, and D Questionnaire," dated July 30, 2019 (NTSF July 30, 2019 Submission), at Exhibit Q-61 and Q-92.
[107] *See Preliminary Results* PDM at 15 (noting that the "Indonesian data generally are less preferable than the Indian data for use in this review"); and *Final Results* IDM at Comment 3 ("No new information on the record exists to make us reverse our {preliminary} finding with regard to the reliability of the Indian data or the drawbacks of the Indonesia data.").
[108] *See GGB Bearing Tech (Suzhou) Co., Ltd. v. United States*, 279 F. Supp. 3d 1233, 1249 (CIT 2017) (noting that section 773(c)(1) of the Act "grants Commerce wide discretion in selecting potential surrogate countries and the information available in those countries."); and *Union Camp Corp. v. United States*, 941 F. Supp. 108, 116 (CIT 1996) ("When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly.").

## B.    Ratio of Whole Live Fish to Fillets

Regarding NTSF's reported ratio of whole live fish to fillets, the Court remanded this issue and directed Commerce to address reports on the record that contradicted NTSF's reported yield ratios.[109]  Specifically, the Court stated that Commerce did not address a 2005 report by the Norwegian Institute of Fisheries and Aquaculture Research, known as the *Fiskeriforskning* Report,[110] a 2007 "discussion paper" prepared by an employee of Can Tho University in Vietnam,[111] and a 2017 affidavit[112] from an Indonesian professor specializing in *pangasius* fish production and processing in Indonesia.[113]  The petitioners provided these studies and reports to demonstrate that the number of whole fish necessary to produce one kg of fillet is 3.2, 3.2, and 3.1-3.4 kgs, respectively,[114] whereas NTSF's reporting differed from these figures.  The Court rejected, as insufficient, Commerce's explanation that we would give greater weight to evidence solicited and verified by Commerce officials, rather than rely on third party reports provided by the petitioners.[115]

At the outset, we note that Commerce solicits information throughout the course of its proceedings to calculate accurate company-specific dumping margins for individually-examined respondents.  Such data collection is a fundamental part of Commerce's analysis, and Commerce

---

[109] *See Second Remand Opinion* at 11.
[110] *See* Petitioners' Letter, "CFA FOP-Related Factual Information Submission," dated November 21, 2018, at Exhibit FS-AR12-F (*Fiskeriforskning* Report).
[111] *See* Petitioners' Letter, "CFA's Submission to Clarify Information Contained in NTSF's Section D Questionnaire Response," dated February 11, 2019, at Exhibit 7 (Can Tho University Discussion Paper).
[112] *See* Petitioners' Letter, "CFA's Submission to Clarify Information Contained in NTSF's Supplemental Sections A, C, and D Questionnaire Response," dated August 8, 2019, at Appendix 2 (Dr. Nurilmala Affidavit).
[113] *See Second Remand Opinion* at 62-63.
[114] *Id*.
[115] *See Second Remand Opinion* at 11.

also has a strong preference to rely on verified company-specific information.[116]  As the Court

has explained:

> {w}hen a verification has occurred, as it has here, the verified information must be
> considered more reliable than unverified information.  Failing to give due deference
> to verified information would be a tragic waste of time, resources, and energy with
> seemingly no end to the administrative review process.[117]

Commerce accordingly determines that it should not – and, indeed, is not permitted to –

disregard NTSF's verified information.  The proposition set forth in the quotation above is

especially relevant here, where the record information in question was also corroborated by prior

verification reports on the record.[118]  Nonetheless, in accordance with the Court's *Second*

*Remand Order,* we have undertaken an assessment of the three reports submitted by the

petitioners.  We find that this assessment does not change the conclusions we reached with

respect to the verified company-specific data.

First, with respect to the report by Fiskeriforskning[119] titled "Slaughtering processes for

farmed Pangasius in Vietnam:  Consultancy surveying slaughter processes and by-products

handling in the Vietnamese industry:  Published July 2005," this document is a survey of the

slaughtering processes and the handling of waste material (blood and fat) for farmed *Pangasius*

performed in the Mekong delta.[120]  In support of the claim that fish yield is 3.2 kgs of whole fish

for one kg of fillet, the petitioners point to a statement in the report stating that:

---

[116] *See Certain Corrosion-Resistant Carbon Steel Flat Products; Cold-Rolled Carbon Steel Flat Products; and Cut-to-Length Carbon Steel Plate Products from Germany; Final Results of Full Sunset Reviews*, 65 FR 47407 (August 2, 2000), and accompanying IDM at Comment 5.

[117] *See Timken U. S. Corp. v. United States*, Slip Op. 04-135 at 10 (CIT October 29, 2004); *see also Tosçelik Profil ve Sac Endüstrisi A.S. v. United States*, 348 F. Supp. 3d 1321, 1328 (CIT 2018) (finding that Commerce cannot "unreasonably undercut{} its stated goals of accuracy, transparency, and predictability by ignoring verified record information {and concluding that t}he one reasonable thing to do here is calculate Plaintiffs' duty drawback adjustments consistent with that verified information.").

[118] *See* October 24, 2019 Memorandum.

[119] *Fiskeriforskning* (Norwegian Institute of Fisheries and Aquaculture Research) conducts research and development for the fisheries and aquaculture industry.  *See Fiskeriforskning* Report.

[120] *See, generally, Fiskeriforskning* Report.

> According to information given by the factories, fish from cage and net give a higher yield. 2,8 kg whole fish from cages and nets give 1 kg. fillet, fillet yield ca 35 %; while 3,2 kg whole fish from ponds is needed to give 1 kg. fillet, fillet yield 31 %.[121]

While the author states that the figures provided were "information given by the factories," the author neither annotates this statement nor points to supporting documentation. In addition, assuming this information was provided by the companies, the author did not provide the underlying ranges, as the figures provided appear to be averages of some unknown ranges from multiple sources. Furthermore, the report does not mention the type of fillet (regular, shank, *etc*.) and the level of trimming, all of which affect the yield. Accordingly, we do not find that the unsubstantiated statements in this report are equally probative to the data that Commerce solicited and verified.

Second, the Can Tho University Discussion Paper was a study designed to analyze the value chain of *Pangasius*, estimate costs and benefits, and identify obstacles for stakeholders.[122] Regarding yield, the paper states:

> On average, fillets account for 30-40% of the weight of a whole fish. More specifically, 3.2 kilograms of live Tra or 3.9 kilograms of Basa are required to produce one kilogram of fillets.[123]

The author does not cite any evidence in support of these statements or provide any support for them. Further, on close inspection, the statements are in conflict with each other. According to the first statement, the input necessary to produce 1 kg of fillet is live fish weighing 2.50 (*i.e.*, 1/.40) to 3.33 (*i.e.*, 1/.30) kgs. However, the author does not reconcile this statement with the later statement "3.2 kilograms of live Tra or 3.9 kilograms of Basa," leaving an unresolved discrepancy between the proposed yields (2.50-3.33 versus 3.2-3.9). Finally, the paper makes no

---

[121] *Id*. at 8.
[122] *See* Can Tho University Discussion Paper at 4-5.
[123] *Id*. at 36.

mention as to the type of fillet (regular, shank, *etc.*) or the level of trimming, both of which affect

the yield, nor does it state whether the figures were verified/duplicated with direct observation

(and, if so, the methods undertaken). Accordingly, we do not find that the unsubstantiated and

inconsistent statements in this report are probative, nor do they call into question the company-

specific information verified by Commerce.

The third document, an affidavit by Dr. Mala Nurilmala, states: "My areas of research

expertise and instruction include *pangasius* fish production and processing in Indonesia."[124] In

the affidavit, Dr. Nurilmala states "I have been engaged by Cassidy Levy Kent (USA) LLP {the

petitioners}, a U.S. law firm, to provide information regarding the production of pangasius fish

fillets."[125] Dr. Nurilmala further states:

> Based on my research and expertise in the pangasius processing industry, the fish-
> to-fillet yields for the production of one (1) kilogram of pangasius fillets, starting
> with whole live 800 gram fish, are as follows:
>
> a. Trimmed Shank Fillets: 3.1 to 3.4 kgs of whole pangasius fish
> b. Untrimmed Shank Fillets: 2.8 to 3.1 kgs of whole pangasius fish
> c. Trimmed Regular Fillets: 2.4 to 2.7 kgs of whole pangasius fish
> d. Untrimmed Regular Fillets: 2.1 to 2.4 kgs of whole pangasius fish.[126]

As with the Can Tho Discussion Paper, the author does not cite any evidence in support of her

statements. For example, the author does not annotate "Based on my research" with any

evidence or citations. Moreover, the author makes no mention as to the level of trimming of the

trimmed fillets in question; such specifications are a function of the type/quality of the product

being prepared, all of which affect the yield. In addition, although the affidavit is based on the

affiant's "research and expertise," the affidavit does not state how the author determined the

presented figures (*e.g.*, are they based on the author's own estimates? Are they derived from

---

[124] *See* Dr. Nurilmala Affidavit.
[125] *Id*.
[126] *Id*.

research studies?  If so, which ones and over what time period?) or confirmed their accuracy, nor does she identify the methods undertaken to arrive at them.  Furthermore, the author does not state that the figures provided are specific to *pangasius hypophthalmus* (*i.e.*, the species of live fish processed by NTSF).  Based on the foregoing, we find no reason to reject NTSF's verified data, in preference to information which is both unsubstantiated and general in nature.

Accordingly, we do not find that the reports and studies proffered by the petitioners have substantial probative value.  At a minimum, because these documents do not detail the procedures (*e.g.*, the types and levels of processing, weighing techniques, *etc.*) underlying the findings in those reports and studies, we find it appropriate to afford these documents significantly less weight than Commerce's own, observed findings.

In contrast, we are confident that the NTSF data are reliable.  Not only did Commerce verify these data during the course of this administrative review, but the information is corroborated by information in several verification reports from prior administrative reviews wherein Commerce conducted yield tests.[127]  At each of these verifications, as with NTSF, we performed several yield tests where we weighed the output products immediately after each processing stage as they were generated.[128]  The information in these reports includes details on the starting whole fish volume and the resultant raw fillet weights that Commerce directly observed.  When Commerce calculated a whole fish-to-fillet ratio from the information in these verification reports, the figures are consistent with NTSF's reported yield for its subject merchandise here.  Accordingly, Commerce continues to find that the evidence on the record supports our reliance on NTSF's reporting with respect to its ratio of whole live fish inputs to fillet outputs.

---

[127] *See* October 24, 2019 Memorandum.
[128] *Id.*; *see also* Verification Report at 7.

### C.     By-Product Reporting and Potential Double Counting

In May 2023, the Court requested supplemental briefing related to NTSF's fish FOP consumption reporting[129] in response to the petitioners' argument that NTSF had already accounted for some by-products in calculating the total consumption amounts.[130]  Specifically, the petitioners argued that information in the NTSF July 30, 2019 Submission at Exhibit Q-61, when read in conjunction with the information in Exhibit Q-92 of the same submission,[131] shows that control numbers (CONNUMs)[132] starting with "BPI-01"[133] represent "Frozen Pangasius Broken, skinless, boneless, belly off, Well-trimmed" products, and that NTSF assigned these products separate consumption rates distinct from subject merchandise sold to the United States. Accordingly, the petitioners contended that NTSF's allocation of whole live fish to "Frozen Pangasius Broken" diverted consumption away from NTSF's FOP reporting for the subject merchandise.

The petitioners also asserted that the record[134] shows that NTSF's by-product offset includes frozen broken meat.[135]  The petitioners argued that, when this fact is viewed in conjunction with NTSF's CONNUM reporting noted above, the documents show that NTSF reduced its consumption of whole live fish for subject merchandise by allocating some portion to

---

[129] *See* CIT Order, *Catfish Farmers of America, et al. v. United States* Ct. No. 20-00105, dated May 12, 2023 ("The court further directs the parties to file supplemental briefs addressing the evidence cited in the parties' remand comments as to the byproduct offset issue.").

[130] *See* Plaintiffs Catfish Farmers Of America, *et al*'s Supplemental Brief Regarding Remand Determination, Consol. Ct. No. 20-00105, dated June 2, 2023, at 5.

[131] *See* NTSF July 30, 2019 Submission at Exhibit Q-61 (Calculation of Reported Fish Consumption by Month and Product Code) and Exhibit Q-92 (Type Code, Type Description, and PRODFORM).

[132] CONNUMs are numbers used to identify products that are unique with respect to a given set of physical characteristics.

[133] *See* Memorandum, "Business Proprietary Information Memorandum for the Draft Results of Redetermination," dated April 9, 2024, for a key to codes to "BPI-*xx*" herein.

[134] *See* Verification Report at Exhibit 21.

[135] NTSF classifies trimmings during the trimming stage as "broken meat" where it is more generally known as "Trimmings."  *See* October 24, 2019 Memorandum (containing verification reports of several past respondents in this proceeding).

"Frozen Pangasius Broken" products, while also receiving a by-product offset for the same product (as "frozen broken meat"); this led to double counting of the by-product offset.

After a close review of the information on the record, we disagree with the petitioners' interpretation of these documents. The petitioners are correct that: (1) Exhibit Q-61 (the fish allocation chart) shows the volume of whole live fish going into production of frozen products, including subject and non-subject fish products; and (2) such frozen products include "Frozen Pangasius Broken," *i.e.*, the CONNUMs that start with "BPI-01." We also agree with the petitioners that: (1) NTSF did sell something that it referred to as "frozen broken meat"; and (2) in the First Remand Results, we stated that NTSF had <u>no</u> frozen by-product sales. However, on further review, we find that our statement in the First Remand Results was incorrect. Following the additional briefing on this matter, we re-examined the verification document identified by the petitioners, and we agree that a small portion of the "Broken Meat" by-product offset did relate to "frozen broken meat." NTSF reported the "Broken Meat" offset in an aggregated manner, covering fresh and frozen product.[136] Thus, we did grant NTSF a by-product offset for a frozen product, even if the offset was very small in comparison to its non-frozen by-products.

That said, we disagree with the petitioners' interpretation of the information contained in the cited exhibits. While the petitioners asserted that the "Frozen Pangasius Broken" referenced in the allocation/consumption chart (Exhibit Q-61) overlaps with the "frozen broken meat" referenced in the verification exhibit relating to NTSF's by-product, the record does not support that finding.

First, NTSF used some of the allocated "Frozen Pangasius Broken" in Exhibit Q-61 in the production of merchandise that was in individually quick frozen (IQF) form, *i.e.*, IQF frozen

---

[136] *See* Verification Report at Exhibit 21.

form (frozen form is the fifth CONNUM characteristic).  (This can be seen by examining the sixth or seventh character of the applicable product code; "I" represents IQF, whereas "B" represents block.)[137]  Any IQF merchandise cannot be the same product later sold as a "frozen broken meat" by-product because the frozen by-product was sold in block form, not IQF form.[138]

Second, NTSF used some of the allocated "Frozen Pangasius Broken" in Exhibit Q-61 in the production of merchandise that it sold to customers other than the sole customer who purchased the "frozen broken meat" by-product, *i.e.*, BPI-02.  This can be seen by examining the two-letter code after "I" or "B" above, with the first letter being the country and second letter the customer, *e.g.*, VK, V for Vietnam and K for customer BPI-03.[139]  Thus, for these two categories, we can conclude that the "Frozen Pangasius Broken" does not overlap with "frozen broken meat."

Third, the remainder of the allocated "Frozen Pangasius Broken" – *i.e.*, not including IQF product or product sold to a customer other than the by-product purchaser – was heavily soaked product, *i.e.*, BPI-04.  This can be seen by examining the two-digit number "BPI-04" before the "I" or "B" above.  It is unlikely that this would be the "frozen broken meat" by-product, because the by-product contract between NTSF and BPI-02 does not stipulate for soaked by-product.[140]

Given the foregoing facts, we disagree with the petitioners' assertion that "Frozen Pangasius Broken" is equivalent to "frozen broken meat."  Accordingly, we find no basis to conclude, based on record evidence, that double counting is taking place.

---

[137] *Id*. at Exhibit 7-A for product code identification.
[138] *Id*. at Exhibit 21.
[139] *Id*. at Exhibit 7-A for Country and Customer codes.
[140] *Id*. at Exhibit 21.

## IV.    INTERESTED PARTY COMMENTS

As noted above, we released the Draft Results on April 9, 2024.  The petitioners provided

comments.[141]  In the Draft Results, Commerce addressed each of the issues identified by the

Court:  (i) whether to treat Indonesia as economically comparable to Vietnam in selecting the

primary surrogate country; (ii) the relative merits of the Indian and Indonesia data (including an

assessment of whether certain pricing data in the Indian *Fishing Chimes* publication represent a

broad market average, and whether the Indian labor data are appropriate to use); and (iii) whether

Commerce properly analyzed NTSF's reporting with respect to the consumption rate for a main

input, *i.e.*, whole live fish, along with NTSF's associated by-product reporting.  In their

comments on the Draft Results, the petitioners do not contest Commerce's approach to economic

comparability[142] and do not present any arguments relating to the consumption rate/by-product

issues.[143]  We address the petitioners' comments on the remaining issue, *i.e.*, the relative merits

of the Indian and Indonesian data, in turn.

**Fishing Chimes Publication; Main Input Data**[144]

- The *Fishing Chimes* data do not reflect a broad market average.  The data presented therein
  are based on interviews/questionnaire responses of 54 farmers located in 46 villages within
  the Krishna and West Godavari districts of Andhra Pradesh.  However, there is no
  indication of how many pangasius-producing farms (rather than villages) are located
  overall in those two districts, or what percentage of production in those districts (or Andhra
  Pradesh more generally) is accounted for by the surveyed farms.  Nor does the report
  provide any information on the actual volume of whole live fish production accounted for
  by the surveyed farms, or the volume of fingerlings or feed that those farms purchased.

- <u>Whole Live Fish</u>.  With respect to whole live fish, the *Fishing Chimes* study sought
  information on the surveyed farms' monthly farm-gate prices.[145]  However, the data reflect

---

[141] *See*, *generally*, Petitioners' Comments.
[142] *See* Petitioners' Comments at 5 ("CFA thus does not object to {Commerce}'s economic comparability analysis on remand.").
[143] *Id.* at 24-25 ("CFA has reviewed {Commerce}'s draft results as to these issues...CFA does not intend to further pursue these issues going forward…").
[144] *Id.* at 7-18.
[145] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 39 (containing a chart comparing monthly farm-gate prices with number of farms harvested per month) and Exhibit SV-3 (same in English translation)).

prices from a maximum of eleven farms per month during the August 2017 - July 2018 review period.[146]  The study provides no data for February-June of 2018 (five months of the POR), and prices for July 2018 are based on a single farm.[147]

- Neither version of the publication indicates what volume of fish is reflected in the monthly prices.[148]  Volume data, however, are particularly important here given the small and geographically limited subset of observations.  Without such data, Commerce cannot reasonably find that this small sample reflects a broad market average.

- Fingerlings.  With respect to the fingerling prices, the data are too limited to permit a reasonable conclusion that they reflect broad market averages.  The vast majority of the survey participants (*i.e.,* the 54 farmers surveyed in 46 villages within the West Godavari and Krishna districts of Andhra Pradesh) bought fingerlings from commercial nurseries located surrounding Eluru and Undi,[149] which are mandals within the West Godavari district.[150]  However, the study also indicates that the vast majority of India's pangasius fingerling production takes place outside of the state of Andhra Pradesh, in the state of West Bengal.[151]  While the study states that the bulk of West Bengal's fingerling production is sent to Andhra Pradesh, study participants evidently did not use such fingerlings, but instead bought locally.  Thus, the fingerling pricing data in the study appears to be disconnected from the majority of fingerling production/pricing within India, and even within Andra Pradesh.

- Neither version of the study indicates the volume of fingerlings reflected in the presented data, which is a shortcoming given the small number of observations.  Moreover, the study indicates that surveyed farms did not buy fingerlings in each month of the review period, *i.e.*, there are no reported purchases/pricing for July-November 2017, May 2018, or July 2018, six months of the review period.[152]  Additionally, while the *Chepala Sandadi* version of the study (but not the *Fishing Chimes* version) provides a table of fingerling prices by size, it does not provide the number of surveyed farms reporting purchases of each size, the volume by size represented in the data, or monthly pricing data.[153]

- Fish feed.  The data regarding feed is equally limited and is not reflective of broad market averages.  The researchers collected feed prices from the farmers through a

---

[146] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 39, and Exhibit SV-3).
[147] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 39, and Exhibit SV-3).
[148] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 39, and Exhibit SV-3).
[149] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 38 and Exhibit SV-3 (English translation)).
[150] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 35 and Exhibit SV-3 (English translation), and Exhibit SV-2, p. 35).
[151] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 38 and Exhibits SV-3 (English translation)).
[152] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-2, p. 39 (providing a chart comparing fingerling prices and number of farms stocked on a monthly basis for 2017-2018) and Exhibit SV-3 (p. 14 of Telegu version, providing same chart)).
[153] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-3 (p. 17 of Telegu version and English translation)).

questionnaire.[154]  The *Chepala Sandadi* version of the paper provides a table of the average price of floating feed in 2017 and 2018, by certain protein contents.[155]  However, the study provides no information on the volume of feed covered or how many farms provided information as to each kind of feed.

- Overall, the record demonstrates that the data contained in the *Fishing Chimes / Chepala Sandadi* study are not reflective of broad market averages.

- Commerce's estimates of the volume of the data covered by the study are unreliable.  For example, in developing these estimates, Commerce assumed that 45 individual farms reported whole live fish prices in 2017, and 38 in 2018, but in some cases an individual farm may have provided data for more than one month per year; Commerce further assumed that each farm had a size, productivity, and harvesting frequency that equaled the study average.[156]  Commerce's fingerlings and feed volume estimates are equally speculative, particularly as there is no information regarding the number of farms reporting each size of fingerling or information on the volume of feed for specific protein contents, or what percentage of the overall reporting was associated with each size/protein content.

- Commerce's emphasis on the fact that surveys typically are based on a subset of a population does not answer the question of whether the data *here* are representative of broad market averages.  While Commerce argues that the study authors took steps to corroborate their data, such as by looking to farm-gate whole live fish prices sourced from newspapers,[157] the study does not identify the newspapers or any other information that would support a conclusion that the limited whole live fish pricing reflect a broad market average.[158]

- Further, the "field visits" that Commerce references appear to have been to the same 54 farms that provided the hard data.  And, even if there were additional farms to which field visits were conducted, there is no discussion of any specific information obtained from the responding farmers, their particular locations, productive sizes, *etc*.[159]

- Moreover, Commerce has emphasized that it prefers country-wide data over data that are regional or that reflect only a small portion of a country's production.  In *Fresh Garlic Producers*, for example, the Court upheld Commerce's use of a national average annual price for Ukrainian garlic bulbs over a price that reflected 18 percent of Ukraine's production.[160]  Commerce's preference for the broadest possible data calls into question its

---

[154] *Id.* (citing NTSF August, 27, 2019 Submission at Exhibit SV-2, pp. 38-39, and Exhibit SV-3 (English translation)).

[155] *Id.* (citing NTSF August 27, 2019 SV Submission at Exhibit SV-3 (p. 19 of Telegu version and English translation)).

[156] *Id.* at 15 (citing First Remand Results at 52).

[157] *Id.* at 16 (citing Draft Results at 14-15).

[158] *Id.* (citing NTSF's August 27, 2019 SV Submission at Exhibit SV-2, pp. 34-40 and Exhibit SV-3)).

[159] *Id.* (citing NTSF's August 27, 2019 SV Submission at Exhibit SV-2, pp. 34-40 and Exhibit SV-3).

[160] *Id.* at 16-17 (citing *Fresh Garlic Producers' Ass'n v. United States*, 83 F. Supp. 3d 1330, 1337-1338 (CIT 2015) (*Fresh Garlic Producers*) and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of*

use of data sourced from a small number of individual farms located in a geographically-limited area of India, particularly over nationwide Indonesian statistics.

- Although Commerce finds that the Indonesian data for whole live fish and fingerlings are not input-specific, asserting that they cover species other than *pangasius hypophthalmus* and are only partially contemporaneous, the record contains official statements from the Indonesian Ministry of Marine Affairs confirming that the predominant species represented in the official statistics is *pangasius hypophtalmus*. Similarly, the record contains an affidavit of an Indonesian fisheries expert confirming that virtually all of the production volumes and values in the Indonesian data (99 percent) are for *pangasius hypophthalmus* fish.[161]

- Further, while the agency emphasizes that the Indonesian feed data were sourced from affidavits and a small set of price quotes, the record also contains official Indonesian statistics for feed prices, as well as price lists supported by sworn affidavits specifying their manner of collection.[162]

**Surrogate Financial Factors**[163]

- The record contains one Indian financial statement covering the period from April 2017-March 2018, while it contains statements from two Indonesian producers, which cover the entirety of the POR.

- Regarding Indonesian producer Dharma, Commerce observes that its statements, while reflecting an unqualified auditor's opinion, also contain a note regarding the company's ability to continue as a going concern.[164] It is not obvious why the note, which indicates the possibility that a currently-profitable company may suffer in the future, are relevant, particularly as the note specifies that the statements have been prepared based on the assumption that the company will continue as a going concern and without any adjustment relating to the potential for future business disruption.

- Moreover, the note states that the company achieved net profitability in both 2017 and 2018 and that its management believes it will continue to deliver positive results. Furthermore, the company was more profitable in both years than the company covered by the Indian financial statements upon which Commerce has relied.[165]

---

*Antidumping Duty Administrative Review and New Shipper Review; 2011–2012*, 79 FR 19053 (April 7, 2014), and accompanying IDM at Comment VI (declining to rely on certain labor data in part because it only reflected labor within one district of the country to which it pertained)).

[161] *Id.* at 17 (citing Petitioners' Letter, "CFA's Surrogate Country Selection Comments," dated December 14, 2018 (Petitioners December 14, 2018 SC Comments), at Exhibit I-3H and Exhibit I-1B).

[162] *Id.* at 18 (citing Petitioners February 25, 2019 SV Submission at Exhibit I-2 and Exhibit I-3B).

[163] *Id.* at 20-24.

[164] *Id.* at 21.

[165] *Id.* at 21-22 (citing Petitioner's September 10, 2019 SV Submission at Exhibit 7, and NTSF's February 25, 2019 SV Submission at Exhibit SV-13).

- Regarding Commerce's reliance on *Plywood from China*, the relevant company in that case recorded negative operating cash flows.[166]  Further, its current liabilities exceeded its current assets.[167]  Here, however, Dharma had positive overall cash flow in both 2017 and 2018, and its current assets exceeded current liabilities in both years (and total assets also exceeded total liabilities).[168]

- As for the other Indonesian company, Japfa, Commerce improperly emphasizes that aquaculture represents a relatively small portion of its overall business, making its financial data less preferable.  However, not only does Commerce appear to concede that Japfa makes comparable goods, but Commerce has also relied on Japfa's statements in other reviews, notwithstanding parties' claims in those segments that its non-aquaculture activities made it less comparable.[169]

- Finally, the Indonesian statements cover the entirety of the POR.  This itself supports reliance on the Indonesian statements – whether those of Dharma or Japfa individually or collectively – over the Indian statement.

### Surrogate Labor/Wage Rate Data[170]

- While conceding that the contemporaneous Indonesian wage data are "better" than the outdated Indian data, Commerce's Draft Results state that the Indian data are nonetheless being employed because India is the primary surrogate country, which is circular reasoning.[171]

- However, not only is the Indian data not contemporaneous, it is also not clear that they are industry-specific, unlike the Indonesian data, which is both contemporaneous with the POR and specific to agriculture and manufacturing workers.

- Commerce is required to use the "best available information,"[172] not merely data that is usable.  There seems to be no valid reason for the agency to persist in using the Indian value for this particular FOP.

- Finally, while Commerce concludes that its inflated Indian data are not anomalous, it cites nothing for this assertion.

---

[166] *Id.* at 22 (citing Draft Results at 18, and *Plywood from China* IDM at Comment 3).
[167] *Id.*
[168] *Id.* (citing Petitioner's September 10, 2019 SV Submission at Exhibit 7; and Dharma's 2018 Financial Statements, Auditor's Report at Consolidated Statement of Cash Flows).
[169] *Id.* at 23-24 (citing *NTSF Seafoods Joint Stock Co v. United States*, 487 F.Supp.3d 1310, 1316-1319 (CIT 2020); *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review; 2016-2017*, 84 FR 18007 (April 29, 2019), at Comments 4-6 and 11; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results and Partial Rescission of Administrative Review; 2021-2022*, 89 FR 18595 (March 14, 2024) (*Vietnam Fish AR 21-22*), and accompanying  IDM at Comment 5).
[170] *Id.* at 18-20.
[171] *Id.* at 19-20.
[172] *Id.* at 20.

**Commerce's Position:**  Commerce has considered the relative merits of the Indian and Indonesia data, and, consistent with the underlying administrative review, we find that reliance on the Indian surrogate value data is appropriate.  Our analysis of the five surrogate value assessment criteria, as well as other additional factors that Commerce routinely considers, demonstrates that the Indonesian data do not offer an advantage here.

With respect to the main inputs, the petitioners raise a number of arguments regarding the whole live fish, feed, and fingerling data in *Fishing Chimes*.  These arguments are without merit.  As noted above, the Act doesn't define what a broad market average is and we have found that data based on the experience of multiple companies – especially when accompanied by other indicia of representativeness (*e.g.*, where data are drawn from a location where the majority of the relevant transactions take place or are ascertained based on a trusted source/methodology) -- constitute a broad market average.[173]

The petitioners have turned this concept on its head, positing that there are various specific and stringent data requirements (such as an unidentified minimum number of survey respondents and transaction-specific volume data) which must be met in order for Commerce to find the *Fishing Chimes* survey data represent a broad market average.  This proposed standard, however, is not required by the Act or the regulations, nor is it grounded in Commerce's practice.  Indeed, such requirements are not even met by the SV sources for other inputs

---

[173] *See, e.g.*, *Hangzhou Yingqing*, 195 F. Supp. 3d at 1311 (affirming Commerce's finding that the *Doing Business* survey reflects a broad market average, because:  (1) Bangkok is the largest and most industrial city in Thailand; (2) the survey was done by a trusted source, the World Bank; and (3) the survey was based on multiple sources and companies' actual experience); *Diamond Sawblades AR 2011-2012* IDM at Comment 20 ("*Doing Business* contains data collected from local freight forwarders, shipping lines, customs brokers, port officials and banks.  Thus, although *Doing Business* provides freight costs solely for the distance between the main city and the port, it reflects the freight costs of multiple vendors and users (*i.e.*, shipping lines, customs brokers, port officials and banks) and it is a broad market average"); and *STR from China AR 2012-2013* IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in *Doing Business: Thailand 2014* is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").

proposed by the petitioners in this very segment of the proceeding (as discussed further below). Rather, the petitioners make a series of strawman arguments that are designed to impugn the Indian data, irrespective of the merits of that data and the breadth of the experience from which it was drawn.

With respect to whole live fish, the petitioners fail to recognize that the survey was based on a significant number of responses and covered a large number of transactions, both of which are important considerations. It is undisputed that all of the survey data and the field visits were conducted in Andhra Pradesh, which is the largest *pangasius* producing state in India. The researchers state that "field visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh."[174] The researchers further state that they relied on a large number of data points -- "108 data sets were collected for one crop each in 2017 and 2018 from 54 farmers" in 46 villages[175] -- from that state. Although the petitioners note that the survey never consisted of more than 11 participants in a single month, this is not surprising, as farmers do not all seed/harvest in unison. The researchers conducted a longitudinal study over a two-year period, rather than relying on any single month as a snapshot. The fact that the data points – which were numerous – were not evenly distributed across the POR is irrelevant.

Similarly, the petitioners note that *Fishing Chimes* provides no information on the actual[176] volume of whole live fish production by the surveyed farms or the volume of

---

[174] *See* NTSF August 27, 2019 SV Submission at Exhibit 2 (citing a publication titled "Current Status of Pangasius (Pangasianondon hypophthalmus) Farming in India," July 2019 Edition (*Fishing Chimes*), page 38).
[175] *Id*.
[176] The petitioners also critique Commerce's estimates of the volume covered by the study, which required certain assumptions. The petitioners suggest that certain farms may have responded more than once in the two-year period (to reflect an 18-month harvest period) and also assert that the surveyed farms may have been below average in terms of size and/or productivity. While the record does not contain details on each farm that responded to the questionnaire, it is unclear why this is relevant; the survey covered a meaningful volume of fish/feed/fingerlings. There is nothing to suggest that the researchers deliberately picked small or unrepresentative farms for their survey – to the contrary, the researchers made extensive efforts to ensure that they obtained generalizable data and their focus

fingerlings or feed that they purchased. While this observation is true, it is unclear why such farm-specific information is necessary; the relevant fact here is that the estimated aggregate production volume covered by the survey is substantial. In any event, it is curious that the petitioners have deemed such data "particularly important,"[177] given that the data proffered by the petitioners themselves for the two most important inputs, *i.e.*, feed and fingerlings, were from a small number of sources and did not have volume information.[178]

In any case, we find that the researcher's explanation regarding sample selection and generalizability to be sound. As noted above, beyond survey responses, the methodology consisted of "interviews to decode the general trend," "qualitative" analysis, and "quantitative {analysis} using statistical methods,"[179] and it also relied on other pricing data --- the authors noted that, following field collection, "{f}or cross verification of economic data outcomes, farm-gate prices were also obtained from vernacular newspapers from 2017 and 2018."[180] Ultimately, there is no information on the record to indicate that these practices and pricing patterns would not be representative of other regions of India, or that the researchers did not, in fact, cross-check their data as they indicated in the report. Here too the petitioners identify proposed flaws in the data, *i.e.*, that the researchers did not identify the specific newspapers used for corroborating prices and they did not provide the results of their numerous interviews conducted in conjunction with the study. We disagree that these observations regarding supplementary data (not even relating to the survey data themselves) reveal fatal flaws in the source or represent a departure

---

on "large-scale" pangasius producing districts in Andhra Pradesh. *See* NTSF August 27, 2019 SV Submission at Exhibit 2. In any case, the petitioners' critiques notwithstanding, volume data are not available for the petitioners' proposed SVs for the two most important inputs, and, accordingly, such information is clearly not essential, even to the petitioners.

[177] *See* Petitioners' Comments at 12.

[178] *See* Petitioner's February 25, 2019 SV Submission at Exhibit I-3B (feed), and Petitioners September 10, 2019 SV Submission at Exhibit 2 (fingerlings).

[179] *Id*. at Exhibit 2, page 35.

[180] *Id*.

from standard practices in the context of survey methodology. As noted above, the survey identified its: sampling methods; data collection methodology; analysis methods; corroborating steps; findings; and conclusions.[181] The petitioners' arguments reflect an effort to critique the source relied upon by Commerce by imposing a standard that cannot even be met by the information submitted by the petitioners here for valuing other SVs. We continue to find that the *Fishing Chimes* data represent a broad market average.

We also again note that the Indonesian data for whole live fish include prices for other species of fish and are, thus, not exclusively species-specific,[182] unlike the Indian data. Although the petitioners claim that the species in question (*i.e.*, *Pangasianodon hypophthalmus*) is the dominant species in Indonesia and, thus, the underlying data are *predominantly* specific to that species,[183] the information provided in support of this claim is not definitive. For instance, the petitioners submitted a letter from personnel at the Indonesian Ministry of Marine Affairs and Fisheries which state that the data "includes all types of patin" and "data of pangasius production collected from the regions is not specified according to the species"[184] and another letter which notes that "{t}he production of patin siam is more dominant than the production of patin jambal and patin pasopati. *However, we do not have any data on the percentage of such dominant species*."[185] Another source indicates that "approximately 90% of pangasius fish cultivators are still cultivating patin siam."[186] Further, the petitioners cite an affidavit from an academic who studies fisheries, who indicated that the data are 99 percent patin siam;[187] however, this

---

[181] *See* NTSF August 27, 2019 SV Submission at Exhibits 2-3.

[182] *See, e.g.*, Petitioners September 10, 2019 SV Submission at Exhibit 3 and Exhibit I-3H.

[183] *Id.*

[184] *See* Petitioners September 10, 2019 SV Submission at Exhibit 3 (containing a letter from the "Head of Statistical Data and Information Centre" of the Indonesian Ministry of Marine Affairs and Fisheries).

[185] *See* Petitioners December 14, 2018 SC Comments at Exhibit I-3H (containing a letter from the Director of Aquaculture from the Indonesian Ministry of Marine Affairs and Fisheries) (emphasis added).

[186] *Id.* (containing a letter from the Directorate General of Aquaculture of and Fisheries).

[187] *Id.* (containing a letter from Dr. Ir. Agus Oman Sudrajat).

individual cited no evidence in support of their statements.  Thus, we find no basis to conclude

that their estimate is more probative than the information provided by the individuals associated

with the agency that actually collected the data.  In summary, the record shows that the

Indonesian data cover multiple species, without any information which would allow us to

reliably assess how much of that data relates to *Pangasius Hypophthalmus*, the species under

consideration here.

In this regard, we again note that the broad market average analysis is made on a

continuum, with, for example, a sufficiently representative/meaningful number of data points or

volume of production on one end, and perfect data covering an entire market on the other.  Under

this rubric, we find the *Fishing Chimes* data to be sufficiently representative of whole live fish

production in the Indian market, and the fact that the Indonesian data may reflect a broader

average (albeit of a broader range of products) does not undermine use of the Indian data where,

as discussed above, these data are more desirable in terms of specificity of the input and

contemporaneity with the POR.[188]

Additionally, we find that the fish feed[189] and fingerling data are clearly less favorable for

Indonesia.  Regarding fish feed, the Indian data were sourced from *Fishing Chimes*.  They were

---

[188] We do not disagree with the petitioners' assertion that, as described in *Fresh Garlic Producers* (*see* 83 F. Supp. 3d at 1337-1338), Commerce prefers to use national level data or, more generally, the broadest data available, *all things being equal*.  However, here, for the reasons discussed throughout, the Indian and Indonesian data are not otherwise equal.  Similarly, the petitioners' citation to *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012*, 79 FR 19053 (April 7, 2014), and accompanying IDM at Comment VI, is easily distinguishable.  There, we critiqued certain labor data for being sourced from a single district.  Here, the data are from two major producing districts and the authors took steps to ensure generalizability.

[189] The petitioners assert in a footnote that "{n}otwithstanding Commerce's statement to the contrary, {the petitioning coalition} has continuously disputed the agency's finding as to feed, and continues to do so."  *See* Petitioners Comments at 14 n.64.  However, as noted above, the Court affirmed Commerce's reliance on the feed data and understood that the petitioners had abandoned this line of argument, stating "Commerce accordingly cited an article from a source called *Undercurrent* as substantiating that {fish feed} data.  As {the petitioners} do not dispute that finding, the court—putting aside its other concerns with *Fishing Chimes*—sustains the agency's reliance on that study's fish feed data."  *See Second Remand Opinion* at 8.

based on responses from numerous farmers, were contemporaneous with the POR and were

publicly available (and not obtained for the purpose of this proceeding).[190]  In contrast, the data

proffered by the petitioners consists of fish feed price lists supported by sworn affidavits

specifying their manner of collection.[191]  Importantly, the price lists are compiled from price

quotes which the petitioners obtained solely for the purpose of this review.  Commerce has a

well-established general preference for using price sources that were not generated for the

purpose of a proceeding (*e.g.*, published sources), where possible.[192]  Further, the data are not

from a large number of sources and they also do not contain volume information (which the

petitioners themselves have deemed essential in other contexts).[193]

The petitioners also provided official Indonesian import statistics for feed prices, *i.e.*,

POR Global Trade Atlas import statistics for "Commodity: 230990, Animal Feed Preparations

(Mixed Feeds, *Etc.*), Other Than Dog Or Cat Food Put Up For Retail Sale."[194]  However, these

data cover a basket category of feed encompassing feed for many types of animals and the

characteristics of the underlying feed, *e.g.*, protein content, are unknown.  Thus, these data are

not even specific to fish feed in general, let alone *pangasius hypophthalmus* feed.

With respect to fingerlings, the Indian data were sourced from *Fishing Chimes*.  They

were based on responses from numerous farmers, were contemporaneous with the POR and were

---

[190] *See Final Results* IDM at Comment 2; and *Preliminary Results* PDM at 11.
[191] In particular, the affidavit states that the petitioners contacted an Indonesian lawyer, who in turn contacted a seller of fish in one province (West Java), who in turn obtained price quotes for a bag of *patin siam* fish feed from 11 sellers in 2016, 2017, up to early February 2018.  *See* Petitioner's February 25, 2019 SV Submission at Exhibit I-3B.
[192] *See, e.g.*, *Certain Cased Pencils from the People's Republic of China from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 FR 33406 (July 13, 2009), and accompanying IDM at Comment 4a (noting that Commerce favors "a published source that is publicly available" in applying its SV methodology).
[193] *Id.*
[194] *See* Petitioners February 25, 2019 SV Submission at Exhibit I-2.

publicly available (and not obtained for the purpose of this proceeding).[195]  Regarding the Indonesian fingerling prices, in this instance too, an attorney at an Indonesian law firm was engaged by the petitioners to obtain fingerling pricing information.[196]  This attorney, in turn, contacted the Director of Hatchery (DH) under the Director General of Aquaculture under the Ministry of Marine Affairs and Fisheries of Indonesia requesting this information via a questionnaire.[197]  The DH responded by providing a table with a range of sizes (from 0.5" to 4.0"), number of fingerlings per kilogram, and the associated prices for 2017 and 2018.[198]  The DH also states that "sizes 4.0-5.0" and 5.0-6.0" are not traded so that we do not have such data."[199]  Thus, the DH data are not specific to the size of NTSF's fingerlings, as all of NTSF's 16 fingerling FOPs were greater than 4.0", *i.e.*, 5.7" or greater.[200]  Furthermore, the DH data are not species-specific as the DH states that "it is not distinguished between pangasius hypophthalmus and other pangasius for fingerlings number per kg, fingerlings sizes and prices."[201]  Stated differently, the Indonesian data include prices for other types of pangasius (*e.g.*, *patin jambal*), whereas the Indian data are specific to *patin siam*, *i.e.*, *pangasius hypophthalmus*.[202]

Moreover, notwithstanding the petitioners' comments regarding the alleged deficiency regarding a lack of volume data for Indian whole live fish and fingerlings, the DH data have no

---

[195] *See Final Results* IDM at Comment 2; and *Preliminary Results* PDM at 11.
[196] *See* Petitioners September 10, 2019 SV Submission at Exhibit 2.
[197] *Id*.
[198] *Id*.
[199] *Id*.
[200] *See* NTSF's Letter, "Response to Section D Supplemental Questionnaire," dated February 11, 2019, at Attachment I.
[201] *See* Petitioners September 10, 2019 SV Submission at Exhibit 2.
[202] *See* Petitioners September 10, 2019 SV Submission at Exhibit 2, and NTSF August 27, 2019 SV Submission at Exhibits 2-3.

volume data.[203]  Moreover, there is no mention of the number of districts/provinces included or the number of respondents who provided pricing data.  In addition, there is no indication that the data are published and/or finalized, or that the DH data are an official published statistic by the government of Indonesia.  For example, the DH does not state how the presented pricing figures were determined (*e.g.*, are they based on the DH's own estimates?  Were the pricing figures derived from research studies/field visits, and, if so, which ones and what methods were undertaken to arrive at them and how was their accuracy was confirmed?).  Given these uncertainties and the lack of data specificity, we view the Indonesian fingerling pricing data inferior to the Indian data.[204]

Taken together, we find that the data for India are clearly better for the main inputs into the production of subject merchandise.  In this regard, in terms of contribution to NV, there is one clear major input, fish feed, which accounts for the majority of NV, and this FOP valuation has been sustained by the Court.  Fingerlings are the second most significant input, and these two FOPs together account for the majority (almost two thirds) of NV.[205]  This, in and of itself, is enough to determine that India provides superior data to value a sizeable majority of NV.[206]

---

[203] *Id.*  The DH data also do not contain citations to source/corroborating data or associated interviews (which the petitioners have considered a flaw in the context of whole live fish).

[204] The petitioners also assert that the fingerling pricing in the stage "appears to be disconnected from the majority of fingerlings production/pricing within India, and even within Andra Pradesh," because it is not clear whether the farmers in the survey sourced fingerlings from local suppliers or those located in West Bengal.  *See* Petitioners' Comments at 13.  This point is inapposite, because regardless of the source, the prices reflect the purchase price of fingerlings in the major producing region of India.

[205] This figure was calculated by multiplying the feed/fingerling FOP by the surrogate value and dividing by the NV, weighing them by the respective quantity and summing these to arrive at the weighted-average percent, then finally summing the weighted feed and fingerling percentages *i.e.*, $\sum((\sum(FEED\_n \text{ x } FEEDnSV\_USD)) / NV) \text{ x } (QTYU/\sum QTYU) + \sum((\sum(FINGERLING\_n \text{ x } FINGERnSV\_USD)) / NV) \text{ x } (QTYU/\sum QTYU))$.  *See* Memorandum, "Final Results Analysis Memorandum for NTSF Seafoods Joint Stock Company," dated April 20, 2020 (Final Analysis Memorandum) at Attachment 3.

[206] We note that whole live fish is not major input, in this review, as it accounts for less than two percent of NV, because the respondent mainly farmed its own whole live fish input.  This figure was calculated by multiplying the fish FOP by the SV and dividing by the NV, then weighing them by the respective quantity and summing these to arrive at the weighted-average percent, *i.e.*, $\sum((FISH \text{ x } FISHSV\_USD / NV) \text{ x } (QTYU/\sum QTYU))$.  *See* Final Analysis Memorandum at Attachment 3.

Beyond the key inputs, the petitioners also assert that Commerce's assessment of the Indonesian financial statements in this review was inappropriate; they emphasize that Commerce has relied on these statements in other instances and has a preference for using multiple financial statements.[207]  We do not find that a comparison of the relative merits of these Indonesian statements and the Indian statement warrants a modification to the primary surrogate country selection here.  As noted above, and as discussed in the *Final Results*,[208] the record contains an unqualified and contemporaneous Indian statement from a profitable company (Mulpuri) that produces comparable merchandise.  The record also contains contemporaneous statements for two Indonesian companies; one has a "going concern" note (Dharma), and the other is from a company that reflects a low percentage of business activity relating to aquaculture (Japfa).[209]

First, regarding the Dharma statement, our consideration of the going concern note is appropriate.  While the petitioners assert that the Dharma statements were prepared "based on the assumption that the company will continue as a going concern and without any adjustment relating to the potential for future business disruption" and "the company achieved net profitability in in both 2017 and 2018,"[210] these observations do not render the going concern note irrelevant.

In *PVLT from China*, we recently considered the import of a going concern note, and provided the following discussion:

> {i}n the *Preliminary Results*, we rejected these financial statements because of the going concern note in the financial statements.  The auditor's note states that, as of December 31, 2022, Toyo Tyre's current liabilities exceeded its current assets and that Toyo Tyre intended to utilise the available funds from the cash pooling arrangements with its related companies to meet its liabilities as and when they fall

---

[207] *See* Petitioners' Comments at 20-24.
[208] *See Final Results* IDM at 20.
[209] *See* Petitioners February 25, 2019 SV Submission at Exhibit I-10A and I-10C; and Petitioners September 10, 2019 SV Submission at Exhibit 7.
[210] *See* Petitioners' Comments at 21-22.

due. As a result, the auditor stated that a material uncertainty exists that may cast
significant doubt about the Company's ability to continue as a going concern … .
Giti and Sumitomo contend that the going concern note is not an issue where the
company is profitable and demonstrates increased profitability from the previous
year. However, a company with greater current liabilities than current assets, which
is offsetting its obligations with external funds, may potentially understate its full
costs of production. Where there is a going concern on a company's ability to
continue operating, and where there are other viable financial statements on the
record, Commerce has rejected the financial statements with the going concern.[211]

Thus, profitability alone does not render an auditor's concern with whether a company can

continue as a going concern irrelevant. Here, the Dharma statements indicated that "The

Company and its subsidiary has suffered deficits as of 31 December 2018 of Rp 100,574,805,538

(2017: Rp 109,157,057,555)."[212] The auditors determined that this situation warranted a going

concern note despite company management's belief[213] that Dharma's financial performance

would continue to grow.

We do not disagree with the petitioners' assertion that the going concern note in *Plywood*

*from China*, cited above, was indicative of a more concerning financial situation for the proposed

surrogate company (*i.e.*, where the company had both negative cash flow and its liabilities

exceeded assets). However, that does not undermine our reasoning that the Dharma going

concern note should not be ignored.

Finally, with respect to the fact that Commerce has used these statements elsewhere, that

is inapposite in this context. Commerce has not indicated that the Dharma/Japfa statements are

unusable as financial statements – nor is that the relevant question. Rather, our conclusion here

is simply that the statements do not offer a clear advantage that would warrant a conclusion that

---

[211] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022*, 89 FR 17817
(March 12, 2024) (*PVLT from China*), and accompanying IDM at Comment 2.
[212] *See* Petitioners September 10, 2019 SV Submission at Exhibit 7.
[213] *Id*.

the statements – in conjunction with the array of data presented for the other SVs – support treating Indonesia as the primary surrogate country over India.[214]

As noted above, while the Indonesian statements offer certain advantages (they cover the full POR and there are two statements available), they also come with certain drawbacks.  The petitioners, ultimately, ask that we reweigh these various considerations to find that, not only are the Indonesian statements preferable to the Indian statement, but that they offer an advantage that warrants selecting Indonesia as the primary surrogate country overall.  We do not find that the records supports – much less requires – such a conclusion.

Lastly, regarding the Indian labor SV that we relied upon, the petitioner maintains that Commerce should instead rely on the Indonesian data, asserting that "{t}o the extent that quality data is lacking in the primary surrogate country for particular FOPs, {Commerce} will rely on data from a country other than its primary surrogate."[215]  This is a partially accurate, but incomplete, statement of Commerce's practice in this regard.

Commerce's court-affirmed practice and preference is to value as many FOPs as possible a single surrogate country.[216]  Specifically, pursuant to 19 CFR 351.408(c)(2) and administrative practice, Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."[217]  The Court has held that this preference for

---

[214]  Moreover, the recently-completed final results of the 2021-2022 administrative review is not instructive, because no party challenged the surrogate country selection.  Thus, the question there did not require Commerce to analyze how the Dharma and Japfa statements fared against an Indian alternative.  *See Vietnam Fish AR 21-22* IDM at Comment 5).

[215]  *See* Petitioners' Comments at 5.

[216]  *See Clearon Corporation v. United States*, Slip Op. 13-22 (CIT February 20, 2013) (*Clearon*) at 6 ("{T}he court must treat seriously {Commerce's} preference for the use of a single surrogate country."); *see also Fine Furniture (Shanghai) Ltd. v. United States*, Slip Op. 18-163 at 42 (CIT November 26, 2018); and *Jiaxing Brother Fastener Co. v. United States*, 822 F. 3d 1289, 1302 (Fed. Cir. 2016) (*Jiaxing Brother*) (affirming Commerce's preference to source SVs from a single surrogate country).

[217]  *See Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1335 (CIT 2014) (quoting *Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment I).

valuing FOPs with information from a single surrogate country is reasonable, given that deriving surrogate data from one surrogate country limits the amount of distortion introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market.[218]  As a result, Commerce tries to "use as much data as possible from the primary surrogate country."[219]  Thus, the fact that India is a better surrogate country overall, and is thus being used as the primary surrogate country, does not amount to "circular reasoning,"[220] as the petitioners contend.  Rather, it reflects adherence to a long-established and court-affirmed methodology designed to limit distortions resulting from mixing and matching SVs from different source countries.

The petitioners also mischaracterize Commerce's determination by arguing that "the agency is required to use the best available information, not merely data that is usable."[221] Although we agree with the petitioners' statement in general, the application that the petitioners propose here would lead to absurd results.  Specifically, the petitioners appear to be arguing that Commerce must select the "best" SV data on a factor-specific basis, regardless of the primary surrogate country chosen on an *aggregate* basis.  Pursuant to this interpretation, Commerce could elect to source SVs from a wide range of countries, on an *ad hoc* basis, simply because each country offers the best data for valuing a particular FOP.  However, this is not the surrogate

---

[218] *See Clearon*, Slip Op. 13-22, at 12-14; *see also Hand Trucks and Certain Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 44008 (July 29, 2014), and accompanying IDM at Comment 2.

[219] *See, e.g.*, *Jiaxing Brother.*, 822 F.3d at 1294 & n.3; and *T. T. International v. United States*, 439 F. Supp. 3d 1370, 1382 (CIT 2020); *Certain Walk-Behind Snow Throwers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 87 FR 17984 (March 29, 2022), and accompanying IDM at Comment 3, n.101 ("Commerce has a regulatory preference to use as much data as possible the primary surrogate country); and *Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment I.

[220] *See* Petitioners' Comments at 19.

[221] *Id*.

country process that is contemplated in the law or the approach that is applied by Commerce. Moreover, as noted above, the courts have recognized that the decision to source SVs from multiple surrogate countries can introduce distortions into the calculation and, accordingly, Commerce only does it to the extent necessary.[222]

Against this backdrop, the petitioners urge Commerce to deviate from a well-developed practice. For instance, they suggest that reliance on the Indonesia labor data is warranted, because Commerce went beyond the primary surrogate country when it "relied on Indonesian data to value certain byproducts and boat freight."[223] However, Commerce's approach in the context of those SVs is inapposite in the context of labor. The record did not contain a boat freight value from India and, therefore, reliance on the Indonesian data was appropriate and fully consistent with the stated exception to the general rule stated above, *i.e.*, that data from another country can be used because the data were "*unavailable* or unreliable" in the primary surrogate country. With respect to the by-products in question (fresh broken meat, fish fat, and fish skin),[224] the record similarly did not contain appropriate Indian values.

Finally, the petitioners also claim that Commerce's observation that the Indian labor rate data were not anomalous was unsupported by the record. This is incorrect. In our assessment of the Indian wage data, Commerce analyzed the relative value of the Indian (inflated) data and the Indonesian data on the record. The figures differed by 17 percent.[225] Although there is no bright

---

[222] We note that, as with the preferred Indonesian data, the Indian labor data were sourced from the International Labor Organization, and it is Commerce's preference to rely on that source for valuing labor. *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36,092 (June 21, 2011); *see also Preliminary Results* PDM at 15.

[223] *See Preliminary Results* PDM at 6.

[224] Most of the by-products, by value (fish waste), were derived using an Indian SV.

[225] The Indian value was calculated by multiplying the inflated labor SV by the POR average exchange rate (*i.e.*, 38.08 x 0.015313). The Indonesian value was calculated by multiplying the average labor wage rate by the POR average exchange rate (*i.e.*, 9650.5 x 0.000073).

line test to determine what constitutes an aberrational value, the comparability of the two countries' labor rates indicates that the values for both countries are viable.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Second Remand Opinion*, and in light of the record evidence, Commerce has provided additional explanation regarding its: (1) selection of the primary surrogate country for valuing NTSF's FOPs, including a discussion of the (i) broad market nature of key Indian input SVs, (ii) financial statements from each country, and (iii) Indian labor source on the record; (2) analysis of NTSF's reporting of the consumption rate for the whole live fish input; and (3) potential double counting regarding NTSF's by-product reporting. For the reasons explained above, we have made no changes to the *Final Results* and NTSF's dumping margin remains $0.15/kg.

5/31/2024

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance