# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| CATFISH FARMERS OF AMERICA, *et al.*,<br><br>          Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>MTSF SEAFOODS JOINT STOCK COMPANY,<br><br>          Defendant-Intervenor. |

Before: Hon. M. Miller Baker, Judge

Court No. 20-00105

## COMMENTS IN OPPOSITION TO SECOND REMAND RESULTS

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: August 15, 2024

CIT Ct. No. 20-105

## <u>**TABLE OF CONTENTS**</u>

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND .................................................................................. 1

III.  ARGUMENT ....................................................................................... 5

     A.    Fishing Chimes / Chepala Sandadi Data ................................ 7

     B.    Surrogate Labor/Wage Rate Data .......................................... 31

     C.    Financial Factors .................................................................... 35

IV.  CONCLUSION ................................................................................... 42

CIT Ct. No. 20-105

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Comm. v. United States,*
    618 F.3d 1316 (Fed. Cir. 2010) ............................................................ 25

*Bristol Metals L.P. v. United States,*
    34 CIT 478, 703 F. Supp. 2d 1370 (2010)............................................. 5

*Catfish Farmers of America v. United States,*
    No. 21-00380, slip op. 24-67 (Ct. Int'l Trade June 5, 2024) ... 34, 35, 41

*Fresh Garlic Producers' Ass'n v. United States,*
    83 F. Supp. 3d 1330 (Ct. Int'l Trade 2015) ......................................... 24

*NTSF Seafoods Joint Stock Co. v. United States,*
    487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020) ................................. 36, 40

**Statutes**

19 U.S.C. § 1677b(c)(1) ....................................................................... 33, 34

**Regulations**

Import Administration Policy Bulletin 04.1............................................. 5

**Administrative Materials**

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam,* 79 Fed. Reg. 19,053 (Dep't Commerce Apr. 7,
    2014) ............................................................................................... 24, 25

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam,* 89 Fed. Reg. 18,595 (Dep't Commerce Mar. 14,
    2024) ....................................................................................................... 40

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam,* 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29,
    2019) ....................................................................................................... 40

ii

CIT Ct. No. 20-105

*Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020) ........................................... 38

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) ........................................... 6

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 89 Fed. Reg. 17,817 (Dep't Commerce Mar. 12, 2024) ........................................... 38

**Other Authorities**

Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Dep't Commerce Mar. 1, 2004) ........................................... 5, 6, 34

CIT Ct. No. 20-105

# <u>GLOSSARY</u>

**Commerce**
 Department of Commerce

**FOP**
 Factors of Production

**POR**
 Period of Review

**SV**
 Surrogate Value

CIT Ct. No. 20-105

## I.    <u>INTRODUCTION</u>

On behalf of the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively "CFA"), we respectfully submit the following comments in opposition to the May 31, 2024 remand results filed by the U.S. Department of Commerce ("Commerce") in this action. *See* Final Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Court No. 20-00105, Slip Op. 24-23 (CIT February 26, 2024) (May 31, 2024), ECF No. 109, Appx_____-_____ ("Second Remand Results").

## II.    <u>BACKGROUND</u>

The Second Remand Results arise from the final results of the 2017-2018 administrative review of the antidumping duty order on certain frozen fish fillets from Vietnam. *See, e.g.*, *Catfish Farmers of America, et al. v. United States*, No. 20-00105, slip op. 24-23 at 3 (Ct. Int'l Trade

CIT Ct. No. 20-105

Feb. 26, 2024), ECF No. 104 ("Slip Op. 24-23"); *Catfish Farmers of America, et al. v. United States*, No. 20-00105, slip op. 22-38 at 4, 70 (Ct. Int'l Trade Apr. 25, 2022), ECF No. 68 ("Slip Op. 22-38"). CFA appealed the final results, challenging Commerce's (1) selection of India as the primary surrogate country, (2) use of Indian surrogate values ("SVs") for certain factors of production ("FOP"), (3) acceptance of the manner in which NTSF Seafood Joint Stock Company ("NTSF") reported usage rates for certain FOP, and (4) acceptance of NTSF's methodology for reporting the moisture content of its fillets. *See, e.g.*, Slip Op. 22-38 at 33.

In Slip Op. 22-38, this Court remanded so that Commerce might further consider the economic comparability of India and Indonesia, its basis for concluding that Indian data used to value live fish, fingerlings, and feed reflected "broad market averages," and its reliance on outdated Indian wage rate data. *Id.* at 38-49. With regard to NTSF's reporting of the usage rates for whole live fish, the Court remanded so that Commerce could address certain studies/reports and consider whether there had been double counting. *Id.* at 65-66. Finally, with respect to CFA's arguments regarding the moisture content of NTSF's finished

CIT Ct. No. 20-105

fillets, the Court remanded for further consideration of certain record evidence that CFA had cited to support its arguments. *Id.* at 69.

Upon considering Commerce's first remand results, the Court remanded aspects of the determination for a second time. The Court held that Commerce failed to apply the statutory standard for assessing the economic development of potential surrogate countries and remanded for application of the appropriate standard. Slip Op. 24-23 at 4-6. The Court also remanded Commerce's determination that India offered superior SV data, finding that the agency employed circular reasoning, failed to adequately explain or support its conclusion that certain Indian data reflected "broad market averages" and/or were corroborated, and failed to justify its reliance on non-contemporaneous labor/wage rate data. *Id.* at 6-10. Finally, the Court found that Commerce inappropriately failed to address reports that CFA placed on the record regarding the ratio of whole live fish to fillets and granted a voluntary request for Commerce to again reconsider whether NTSF's FOP reporting raised double-counting issues. *Id.* at 10-11.

Commerce issued draft results on April 9, 2024. *See* Draft Results of Redetermination Pursuant to Court Remand (Apr. 9, 2024), Appx_____-

CIT Ct. No. 20-105

_____ ("2nd Draft Results"). In the draft results, Commerce treated Indonesia as economically comparable with Vietnam, but continued to select India as the primary surrogate country. Commerce reasoned that Indian data that it used to value whole live fish, fingerlings, and feed reflected broad market averages, and were otherwise superior to Indonesian data for valuing these FOP. *Id.* at 12-18, Appx_____-_____. Commerce also defended its reliance on Indian labor/wage rate data from 2006 and explained that the relative quality of Indian and Indonesian SV data for other FOPs, most notably surrogate financial factors, supported selection of India as the primary surrogate country. *Id.* at 18-20, Appx_____-_____.[1]

CFA filed comments on the draft results, in which it agreed with Commerce's treatment of Indonesia as economically comparable with Vietnam but disputed the agency's continued selection of India as the primary surrogate country. CFA 2nd Draft Comments at 3-24,

---

[1]    With respect to the remaining remanded issues, Commerce continued to take the substantive positions it took pre-remand. 2nd Draft Results at 21-29, Appx_____-_____. CFA did not dispute these positions in its comments on the draft results and does not challenge them here. CFA's Comments on Draft Results of Redetermination (Apr. 22, 2024) at 24-25, Appx_____-_____ ("CFA 2nd Draft Comments").

CIT Ct. No. 20-105

Appx_____-_____. In the Second Remand Results, Commerce continues to select India as the primary surrogate country, and to rely on Indian data to value virtually all FOP. *See generally* Second Remand Results, Appx_____-_____; Memorandum re: *Surrogate Values for the Preliminary Results* (Oct. 10, 2019) at 5, Appx_____ ("Preliminary SV Memo").

## III.  <u>ARGUMENT</u>

Where more than one potential surrogate country is economically comparable with the subject country, Commerce compares the relative quality of the SV data available from each in order to select a primary surrogate country. Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Dep't Commerce Mar. 1, 2004), *available at* https://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin"). The relative quality of SV data depends on whether the values are (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the period of review ("POR"); (4) representative of a broad market average; and (5) publicly available. Second Remand Results at 11, Appx_____; *see also Bristol Metals L.P. v. United States*, 34 CIT 478, 481, 703 F. Supp. 2d 1370, 1374 (2010)

CIT Ct. No. 20-105

(citing Issues and Decision Memorandum accompanying *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) (final affirm. deter. of sales at less than fair value and partial affirm. deter. of critical circumstances) at cmt. 10).

To the extent that quality data is lacking in the primary surrogate country for particular FOPs, Commerce will rely on data from a country other than its primary surrogate. *See* Policy Bulletin. Here, for example, while selecting India as the primary surrogate country, Commerce nonetheless relied on Indonesian data to value certain byproducts and boat freight. Preliminary SV Memo at 5, Appx____.

In its Second Remand Results, Commerce appropriately treats Indonesia as economically comparable with Vietnam. But it does not adequately explain or support its conclusion that India offers better quality data for valuing FOP generally, or for valuing whole live fish, fingerlings, fish feed, labor, and financial factors specifically. Below, CFA details the flaws in Commerce's Second Remand Results, beginning with the data used to value the three main inputs, before proceeding to labor and financial factors.

6

CIT Ct. No. 20-105

### A.   *Fishing Chimes / Chepala Sandadi Data*

In its original final results, Commerce valued certain crucial FOP, *i.e.*, whole live fish, fingerlings, and feed, based on reports of a study of pangasius production conducted in the Indian state of Andhra Pradesh. *See* Preliminary SV Memo at 3-4, Appx_____-_____. The relative quality of this data, and particularly whether it reflects broad market averages, has been a key issue over the course of this litigation. *See, e.g.*, Slip Op. 24-23 at 6-9; Slip Op. 22-38 at 41-48.

In remanding for the second time Commerce's finding that the study data reflected broad market averages in general, and for the whole fish and fingerlings inputs in particular, the Court noted that most of Andhra Pradesh's production sites for *pangasius* appeared to be located outside of the two districts covered by the study. Slip Op. 24-23 at 6-9; Slip Op. 22-38 at 41-48. The Court questioned how a study covering only these two districts could represent a broad market average absent data showing that those districts "produced far more fish than anywhere else." Slip Op. 22-38 at 44.

To fully understand the Second Remand Results, and why they fail to establish that the data at issue reflect broad market averages, a review

CIT Ct. No. 20-105

of the record is in order. The record contains two versions of a paper detailing a study of pangasius production in Andhra Pradesh: one from the English language publication *Fishing Chimes*, and a "variation" "published in the Telegu language sister publication, *Chepala Sandadi*," with an accompanying English translation. NTSF Factual Information Submission (Aug. 27, 2019) at Ex. SV-2, pp. 34-40 and Ex. SV-3, Appx_____-_____ and Appx_____-_____ ("August 27 Submission"). The *Chepala Sandadi* version contains certain data that are not included in the *Fishing Chimes* version, and which Commerce relied on to value fingerlings and feed. *See id.*; *see also* Preliminary SV Memo at 3-4 and Att. 1, Appx_____-_____ and Appx_____-_____.

   The *Fishing Chimes* paper "discusses the current state and influencing factors" of Indian pangasius production, and "analyses the questionnaire based survey that was conducted by the authors." August 27 Submission at Ex. SV-2, p. 34, Appx_____. The paper explains that the authors' study was focused on the Indian state of Andhra Pradesh due to its "largescale representation in pangasius farming." *Id.* It then goes on to explain that "direct field visits were conducted to collect data from farmers" in Andhra Pradesh. Specifically, "a total of 54 farmers

CIT Ct. No. 20-105

from Krishna and West Godavari districts of Andhra Pradesh were interviewed." *Id.*

The *Fishing Chimes* report includes a map showing the locations of the 54 surveyed farms and clarifies that they were located in 46 villages. *Id.* at 34-35, Appx_____-_____; *see also id.* at 35, Appx_____ ("Around 54 farmers from 46 villages were interviewed."). The report then explains that "it is estimated that, pangasius is currently being farmed in more than 300 villages in West Godavari and Krishna districts," before naming specific mandals within those districts where "major pangasius farming villages are located." *Id.* at 35, Appx____.[2] The report further explains that the survey focused on villages within these mandals, before (confusingly) stating that "out of the 300 villages that the study covered, 46 of them are in these two districts." *Id.* The report then states that "{f}ield visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh. 108 data sets were collected for one crop each in 2017 and 2018 from 54 farmers." *Id.* at 38, Appx____. Overall, the *Fishing Chimes* report is

_____

[2]    Andhra Pradesh contains 13 districts, including West Godavari and Krishna. *See, e.g.*, CFA's Pre-Preliminary Comments and Rebuttal Information (Sept. 10, 2019) at Ex. 3, Appx_____-_____.

CIT Ct. No. 20-105

consistent in stating that the study surveyed 54 farms located in Krishna and West Godavari districts. The report is internally inconsistent regarding whether, in addition to surveying these 54 farmers, the study involved field visits made to additional farms that may or may not have been in the Krishna and West Godavari districts.

The *Chepala Sandadi* report, with its English translation, provides some clarity. It describes the study as having been "carried out in West Godavari and Krishna districts of Andhra Pradesh by interviewing 54 farmers in 46 villages." *Id.* at Ex. SV-3 (English translation), Appx_____-_____. Like the *Fishing Chimes* report, the *Chepala Sandadi* report confirms that it "is estimated that, at present Pangasius farming is carried out more than 300 villages in West Godavari and Krishna districts." *Id.* The *Chepala Sandadi* report then clarifies that "{o}ut of 300 villages study covered 46 villages in these two districts." *Id.* That is, the study is based on the data collected from 54 farmers in 46 of the 300 villages estimated to be producing pangasius within the West Godavari and Krishna districts. The report reiterates that the "study interviewed 54 farmers in 46 villages to obtain the general trend," and that the "study data" were "obtained by collecting data comprising 108 question

CIT Ct. No. 20-105

data sets from 54 farmers, in Krishna and West Godavari districts between 2017-2018 for better comparison of production." *Id.*

The two reports of the study agree that the study data were based on interviews/questionnaires of 54 farmers located in 46 villages within the Krishna and West Godavari districts. *Id.* at Ex. SV-2, pp. 34-40, and Ex. SV-3, Appx_____-_____ and Appx_____-_____. But neither report indicates how many pangasius-producing farms (rather than villages) are located overall in those two districts, or what percentage of production in those districts (or Andhra Pradesh more generally) was accounted for by the surveyed farms. *Id.* Nor is any information provided on the actual volume of whole live fish production accounted for by the surveyed farms, or the volume of fingerlings or feed that they purchased, either on an absolute basis or as a percentage of the fingerlings/feed sold within Krishna and West Godavari districts, or within Andhra Pradesh as a whole. *Id.*

However, both versions of the paper confirm that the study's hard data regarding prices for whole live fish, fingerlings, and feed are extremely limited, and that not all surveyed farms provided information

CIT Ct. No. 20-105

relevant to all aspects of the survey.[3] It is clear, for example, that the authors sought information on the surveyed farms' monthly farm-gate prices for whole live fish. *See id.* at Ex. SV-2, p. 39, Appx_____ (chart comparing monthly farm-gate prices with number of farms harvested per month) and Ex. SV-3, Appx_____-_____ (same in English translation). But the resulting data reflect prices from a maximum of eleven farms monthly, and even then, for only one month of the August 2017 - July 2018 POR. *See id.* No data are provided for February-June of 2018, a full five months of the POR, and prices for July 2018 are based on a single farm's experience. *Id.* And neither version of the study paper indicates what volume of fish is reflected in the monthly prices. *Id.* Without such data, one cannot reasonably infer that the study data reflect a broad market average, particularly given the data's geographic limitations.

---

[3]    The data are based on "108 question data sets" or, alternatively, "108 data sets" collected from 54 farmers *Id.* at Ex. SV-2, p. 38, and Ex. SV-3, Appx____, Appx_____-_____. 108 is the same as two times 54. Thus, it appears that the study authors may have issued questions for 2017, and separately, questions for 2018, to 54 farmers, resulting in "108 data sets."

CIT Ct. No. 20-105

The reports' data regarding fingerling prices are similarly too limited to permit a reasonable conclusion that they reflect broad market averages. Both reports indicate that most of the survey participants that provided fingerlings pricing data (*i.e.*, some unknown portion of the 54 farmers surveyed in 46 villages within the West Godavari and Krishna districts of Andhra Pradesh) bought fingerlings from "commercial nurseries located surrounding Eluru, Undi." *Id.* at Ex. SV-2, p. 38, Appx_____, and Ex. SV-3 (English translation), Appx_____-_____. Both reports likewise identify Eluru and Undi as mandals within the West Godavari district. *Id.*[4] Obtaining fingerlings locally may make sense for farms within the highly geographically limited reach of the study, but both papers state that the vast majority of India's pangasius fingerlings production takes place not just outside of these two mandals, but outside of the state of Andhra Pradesh, in the state of West Bengal. *Id.* And while the papers state that the bulk of West Bengal's fingerlings production is sent to Andhra Pradesh, study participants evidently did not use such fingerlings as a general matter, instead

---

[4]    Eluru's location is also visible on the map included with the *Fishing Chimes* report. *Id.* at Ex. SV-2, p. 35, Appx_____.

CIT Ct. No. 20-105

buying locally. The fingerlings pricing data in the study thus appears to be disconnected from the majority of fingerlings production/pricing within India, and even within Andra Pradesh.

Further, neither report indicates the volume of fingerlings reflected in the data presented—a major problem given the small subset of observations. Underscoring the issue, surveyed farms did not buy fingerlings in each month of the POR. Indeed, there are no reported purchases/pricing for August-November 2017 or May 2018 - July 2018, seven months of the POR. *Id.* at Ex. SV-2, p. 39, Appx_____ (providing chart comparing fingerlings prices and number of farms stocked on a monthly basis for 2017-2018) and Ex. SV-3, Appx_____-_____ (p. 14 of Telegu version, providing same chart). Finally, while the *Chepala Sandadi* report provides a table of fingerling prices by size, it does not indicate how many surveyed farms reported purchases of each size, the volume by size represented, or provide monthly pricing. *Id.* at Ex. SV-3, Appx_____ (p. 17 of Telegu version and English translation).

The data regarding feed are equally limited, and thus not reflective of broad market averages. While the Court in Slip Op. 22-38 concluded that CFA had not disputed Commerce's contention in the first remand

CIT Ct. No. 20-105

results that an article in *Undercurrent News* corroborated the *Fishing Chimes* data[5] regarding feed prices, this is not the case. *Compare* Slip Op. 24-23 at 8, *with* CFA's Comments on Remand Determination (Oct. 20, 2022), ECF No. 81 at 32-33 (disputing Commerce's reliance on the *Undercurrent News* article to corroborate the feed data); *see also* Second Remand Results at 17, Appx_____ (noting Court's prior finding but nonetheless analyzing Indian and Indonesian feed data). For that matter, NTSF, the sole mandatory respondent in the review, used 26%, 28%, and 35% feed; the *Undercurrent New*s article does not cover 35% feed, while the article's prices for 26% feed do not even overlap with those in the *Chepala Sandadi* report. *Compare* NTSF's Factual Information Submission (Sept. 10, 2019) at Ex. 2, Appx_____-_____, *with* August 27 Submission at Ex. SV-3, Appx_____-_____.[6]

---

[5]    Technically, the *Chepala Sandadi* data, as the *Fishing Chimes* report did not include the data that Commerce used to value NTSF's fish feed.

[6]    Indeed, even the *Chepala Sandadi* report does not contain any information on the value of 35% feed. August 27 Submission at Ex. SV-3, Appx_____-_____. Rather, Commerce appears to have used the report's price for 32% feed to value NTSF's 35% feed. *Compare* Preliminary SV Memo at 3 and Att. 1, p. 1, Appx_____, Appx_____, *with* August 27 Submission at Ex. SV-3, Appx_____-_____.

CIT Ct. No. 20-105

In any event, the *Fishing Chimes* report states that the "{p}rices of the feeds {purchased by studied farms} were collected from the farmers through a questionnaire and then their averages were calculated;" the *Chepala Sandadi* report similarly states that "price of feeds recorded from the data questionnaire from farmers." August 27 Submission at Ex. SV-2, pp. 38-39, Appx_____-_____ and Ex. SV-3 (English translation), Appx_____-_____. The *Chepala Sandadi* report then provides the average prices for certain feeds in 2017 and 2018. *Id.* at Ex. SV-3 (English translation), Appx_____-_____. However, no information is provided on the volume of feed at issue or even how many farms provided information as to each kind of feed. *Id.* Thus, as with whole live fish and fingerlings, there is insufficient information from which to reasonably infer that the *Chepala Sandadi* feed prices reflect broad market averages.

Nonetheless, Commerce attempts in the Second Remand Results to show that the *Fishing Chimes*/*Chepala Sandadi* reports provide data reflecting broad market averages both generally, and for the three main FOP. Commerce explains that the study underlying the *Fishing Chimes/Chepala Sandadi* reports focused on Andhra Pradesh because

CIT Ct. No. 20-105

this state accounts for the majority of India's pangasius production. Second Remand Results at 13, Appx_____. Commerce concedes that the quantitative study data come from only 46 villages, but finds this does not render the data unrepresentative, because the 54 surveyed farms within those villages were all located in Andhra Pradesh. *Id.* at 14, Appx_____. The agency concludes that the study authors conducted field visits throughout the 300 villages producing pangasius within Andhra Pradesh's West Godavari and Krishna districts, buttressing the "broadly representative nature" of the 54 surveyed farms' hard data. *Id.* at 14, 17, 36, Appx_____, Appx_____, Appx_____. Commerce notes the *Fishing Chimes* report's explanation that the study authors used "statistical methods" in presenting their data and performed "cross verification" of farm-gate prices for whole live fish using vernacular newspaper reports. *Id.* at 15, 37, Appx_____, Appx_____. While conceding that the hard data relate to "a fraction of the total production in India," Commerce notes that relying on a subset of data extracted from a population is typical for studies and statistical analyses, and that it has previously found data reflecting a subset of an economy's prices to nonetheless reflect a broad market average. *Id.* at 15-16, 35,

17

CIT Ct. No. 20-105

37-38, Appx_____-_____, Appx_____, Appx_____-_____. In this regard,

Commerce argues that the study underlying the *Fishing*

*Chimes*/*Chepala Sandadi* reports covered "a large number of

transactions" reflecting significant volumes of fish, fingerlings, and

feed. *Id.* at 36, Appx_____.

Commerce then argues that beyond reflecting broad market averages

generally, the data in the *Fishing Chimes*/*Chepala Sandadi* reports

provide superior SVs for the three main inputs in this review, by

comparison with Indonesian data. Commerce notes that given NTSF's

production methods, feed is the most important FOP in this review in

terms of overall contribution to normal value, followed by fingerlings.

*Id.* at 42, Appx_____. While arguing that the Court has already upheld

the agency's use of the *Chepala Sandadi*[7] data to value feed, it explains

that these data are "clearly superior" to Indonesian data because the

latter were sourced from affidavits/price quotes. *Id.* at 17, Appx_____.

Commerce explains that the Indonesian fingerlings data are less

specific to species than the *Fishing Chimes*/*Chepala Sandadi* data, and

do not reflect the fingerling sizes that NTSF used. *Id.* at 18, Appx_____.

---

[7]    The *Fishing Chimes* report does not provide feed prices.

CIT Ct. No. 20-105

Commerce argues that the *Fishing Chimes*/*Chepala Sandadi* reports' lack of volume data for fingerlings and feed prices is irrelevant because there is no volume data undergirding the Indonesian data for these inputs either. *Id.* at 37 n.177, 39-42, Appx_____, Appx_____-_____. Finally, Commerce states that even if the *Fishing Chimes*/*Chepala Sandadi* data for whole live fish are on the "lower" end of what constitutes a broad market average, they are preferable to Indonesian data, *id.* at 16, Appx_____, which the agency finds only partially contemporaneous and not species-specific. *Id.* at 12-13, 38-39, Appx_____-_____, Appx_____-_____.

Commerce's remand results do not respond adequately to the Court's concerns; nor do they grapple with record information showing that the *Fishing Chimes*/*Chepala Sandadi* data are not representative of broad market averages in general, or for the three main inputs. The agency also fails to demonstrate that the data they present are superior to the data available from Indonesia.

Overall, and as explained above, the record shows that the *Fishing Chimes*/*Chepala Sandadi* data are not reflective of broad market averages. While the papers relate to a study conducted in Andhra

CIT Ct. No. 20-105

Pradesh, the state said to account for the majority of Indian pangasius production, the study data were collected from just 54 farms within just 46 of the estimated 300 villages producing pangasius within just two of that state's thirteen districts. Beyond this, not all surveyed farms provided data relevant to the inputs, as confirmed by the reports' data regarding prices for whole live fish. The data regarding fingerlings prices cover purchases in only five months of the POR and moreover appear unrepresentative of Indian fingerlings prices as a whole, reflecting a handful of farms' purchases of locally farmed fingerlings, rather than fingerlings from West Bengal. There is no information at all regarding how many of the 54 surveyed farms provided size-specific fingerlings prices or in what months, or how many provided feed pricing data for each protein content, or in what months, and there is no volume data available for *any* of the pricing. These facts are not consistent with the agency's conclusion that the study reflects broad market averages.

Commerce argues that the study underlying the *Fishing Chimes/Chepala Sandadi* reports covered "a large number of transactions" reflecting significant volumes of fish, fingerlings, and

CIT Ct. No. 20-105

feed. Second Remand Results at 36, Appx_____. But as noted above, the report does not indicate how many study participants provided data for fingerlings and feed, much less the volume of trade or its significance in relation to trade within Andhra Pradesh or India as a whole.[8] Tellingly, the data presented for whole live fish and fingerling reflect no pricing at all for large periods of the POR, and indicate that even for those months in which prices are provided, they may be based on as few as a single farm's data.

Commerce rejoins that it is typical for studies to present data for a subset of a population, rather than the population as a whole. Second Remand Results at 14-15, Appx____-____. But this generic observation does not establish that the study underlying the *Fishing Chimes*/*Chepala Sandadi* reports generated data reflecting a broad

---

[8]    In the first remand results, Commerce attempted to backfill the lack of volume data in the study papers through mathematical estimates. *Compare* Second Remand Results at 12-18, 35-48, Appx_____-_____, Appx_____-_____, *with* Final Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Ct. No. 20-00105, Slip Op. 22-38 (Ct. Int'l Trade Apr. 25, 2022) (Aug. 23, 2022) at 52. The Court criticized this approach on the basis that the significance of the estimated volumes could not be understood or assumed in a vacuum, *i.e.*, without data on the volume of trade within Andhra Pradesh or India as a whole. Slip Op. 24-23 at 9.

CIT Ct. No. 20-105

market average. Again, it is not clear what percentage of farms within even the West Godavari and Krishna districts were surveyed (just that farms located in approximately one-sixth of the villages estimated to produce pangasius in these districts were included), and these are just two districts of a large state. The surveyed farms did not provide data for every month or respond to every question; the study does not identify the volumes covered, monthly pricing data for each input is spotty and/or missing, and there is no indication as to the number of participants reporting fingerlings and feed prices, while the number of participants reporting monthly fish prices was very low.

Commerce argues that the "broad market" nature of the study data is nonetheless confirmed by the study authors' use of "statistical" methods, as well as steps they took to corroborate their data, such as reviewing newspaper accounts of farm-gate whole live fish prices. Second Remand Results at 15, 37-38, Appx_____, Appx_____-_____. But vague references to "statistical" methods do not establish that the underlying data—regardless of how it was processed—resulted in pricing information reflecting a broad market average. As for corroboration of surveyed farms' data, neither report identifies the

22

CIT Ct. No. 20-105

newspapers, the corroborating prices, or any other information that would allow for a reasonable conclusion that the study's limited pricing data reflect a broad market average. August 27 Submission at Ex. SV-2, pp. 34-40, Appx_____-_____ and Ex. SV-3, Appx_____-_____. Likewise, while Commerce cites the "field visits" that the study authors undertook, there is no data identified as specifically having been obtained through of these visits other than the survey data itself, which is attributable to just 54 farms in 46 of the 300 villages estimated to produce pangasius in two of Andhra Pradesh's thirteen districts. Second Remand Results at 14, Appx____; *see also* discussion *supra* at 10-11. It is not clear, in fact, that "field visits" were conducted to farms other than the 54 that were surveyed; indeed, the *Chepala Sandadi* report of the study indicates otherwise.

Commerce states that it has treated geographically limited studies as nonetheless providing data reflecting a broad market average where the study data reflect multiple companies' experience and are accompanied by other indicia of representativeness. *Id.* at 35, Appx_____. In support, it cites its use of *Doing Business in . . .* , a series of annually prepared World Bank reports that have been found reliable

CIT Ct. No. 20-105

in valuing movement expenses—generally a small portion of overall normal value—across multiple products and cases. *See id.* But here, we have a one-off, private study that is not associated with a well-known and vetted source like the World Bank, and which is being used to value major FOP. This situation is a far cry from undergirding the agency's use of *Doing Business in . . . .* And as explained above, the "indicia of representativeness" that Commerce has cited here, such as the use of statistical methods and corroboration of whole live fish prices with newspaper reports, adequately demonstrate that the data here reflect broad market averages.

Too, Commerce has previously emphasized that it prefers "country wide" data over data that is regional or reflects only a small portion of a country's production. *See, e.g.*, *Fresh Garlic Producers' Ass'n v. United States*, 83 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2015); *see also* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 79 Fed. Reg. 19,053 (Dep't Commerce Apr. 7, 2014) (final results of antidumping duty admin. rev. and new shipper rev.; 2011-2012) at 46. Commerce does not disagree, Second Remand Results at 39 n.188, Appx____, but observes

CIT Ct. No. 20-105

that its preference for "the broadest data available" only holds where potential sources of SV data are "otherwise equal." *Id.* Commerce cites no legal sources for this proposition, but prior case law calls it into question. *See, e.g.*, *Ad Hoc Shrimp Trade Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010) (characterizing Commerce's practice as that of "using countrywide data, whenever available" and resorting to data of less breadth only "when countrywide data are not available."). Relevantly here, and as explained further below, the Indonesian data for whole live fish and fingerlings are country-wide information obtained from the country's fisheries ministry, and the feed data are sourced from a greater number of provinces (the equivalent of an Indian state) than the Indian feed data.

Commerce's specific criticisms of the Indonesian data do not withstand scrutiny or provide an adequate basis for its reliance on the *Fishing Chimes*/*Chepala Sandadi* reports. With respect to feed, Commerce complains that the Indonesian data come from affidavits/price quotes or import statistics that are not specific to fish feed. Second Remand Results at 17, 39-40, Appx_____, Appx_____-_____. Commerce also notes that, like the *Chepala Sandadi* feed pricing data

25

CIT Ct. No. 20-105

used to value NTSF's feed, the Indonesian affidavits/price quotes do not reflect volume information. *Id.* at 39-40, Appx_____-_____. However, the Indonesian affidavits/price quotes, unlike the Indian data, clearly indicate the exact number of entities providing the prices, and also provide prices corresponding to each of the three protein contents used by NTSF. CFA's Submission of Proposed Factor Values (Feb. 25, 2019) at Ex. I-3B, Appx_____-_____ ("CFA's Feb. 25, 2019 SV Submission"). By contrast, it is unclear how many entities provided the data presented in the *Chepala Sandadi* report, and the data presented for whole live fish indicate that it may be a very small number indeed. The *Chepala Sandadi* report also includes no prices for 35% feed. *See* discussion *supra* at 15. Finally, while the Chepala Sandadi report provides data taken from questionnaires issued to 54 farmers operating in two districts of an Indian state, the Indonesian affidavit/price quote data come from feed sellers in three different Indonesian provinces (the equivalent of India's states). CFA's Feb. 25, 2019 SV Submission at Ex. I-3B, Appx_____-_____. While all things may not "be equal" with respect to the Indian and Indonesian feed data, this inequality is tilted toward the Indonesian data, which clearly identifies the number of data

26

CIT Ct. No. 20-105

sources, is more specific to the input, and reflects a broader geographic area.

Turning to Commerce's concerns with the Indonesian data for whole live fish, Commerce argues that the data are not specific to *pangasius hypophthalmus,* but reflects some quantity of other pangasius subspecies. Second Remand Results at 12, 38-39, Appx_____, Appx_____-_____. Commerce concedes that the record contains information, including statements from the Director General of Aquaculture of the Indonesian Ministry of Marine Affairs, confirming that *pangasius hypophthalmus* is the predominant species represented in the Indonesian data. *Id.* at 38, Appx_____. Similarly, Commerce notes that the record contains the affidavit of an Indonesian fisheries expert confirming that virtually all of the production volumes and values in the Indonesian data (99%) are for *pangasius hypopthalmus* fish. *Id.*; *see also* CFA's Surrogate Country Selection Comments (Dec. 14, 2018) at Ex. I-3H, Att. C – Att. 5, Appx_____-_____ (stating that "there are 2 types of pangasius commonly grown in Indonesia, namely patin siam (Pangasius hypopthalmus) and patin jambal (Pangasius sp), that the "the pangasius species predominantly grown is patin siam,"

CIT Ct. No. 20-105

and reaffirming that "the production of patin siam is more dominant."),

and Att. 3 – Att. 5, Appx_____-_____ (again asserting that "the patin

siam species are predominantly grown compared to the patin jambal

species"), and June 16, 2016 Letter from Indonesian Ministry,

Appx_____-_____ (indicating that 90% of farmers cultivating pangasius

fish in Indonesia are cultivating patin siam); *see also* CFA's Feb. 25,

2019 SV Submission at Ex. I-1B (Affidavits of Dr. Ir Agus Oman

Sudrajat), Appx_____-_____.

   Commerce nonetheless complains that these sources do not allow the

agency to reliably assess what percentage of the Indonesian data relate

to *pangasius hypophthalmus*. Second Remand Results at 38-39,

Appx_____-_____. This skepticism is both unwarranted and

insufficiently explained given the sources' agreement that the data

relate mainly—if not overwhelmingly—to *pangasius hypophthalmus*,

and the nature of the sources (Indonesian government officials and an

Indonesian university professor specializing in pangasius aquaculture).

   The whole live fish data from Indonesia are also clearly nationwide,

volume information is available, they are from a public source (the

Indonesian "OneData" statistical website) and have been confirmed by

28

CIT Ct. No. 20-105

the Indonesian government to be tax-exclusive.  CFA's Pre-Preliminary

SV Submission (Sept. 10, 2019) at Ex. 3, Appx_____-_____ ("CFA's Pre-

Prelim SV Submission"). Thus, even if the Indonesian data are not

perfectly species-specific, they reflect a broad market average, and

otherwise satisfy the requirements of the agency's Policy Bulletin.

Further, because they have been obtained from Indonesia's

governmental ministry that is responsible for collecting and

disseminating aquaculture statistics, they are more reliable overall

than the Fishing Chimes data, which comes from a one-off, private

survey of a very geographically limited area, and for which there is no

indication of what volume of trade is represented.

Finally, while Commerce states that the Indonesian fingerlings data

are similarly less specific with respect to species than the *Fishing

Chimes/Chepala Sandadi data*, Second Remand Results at 17-18,

Appx____-____, the affidavits noted above confirm that *pangasius

hypophthalmus* is the predominant species farmed in Vietnam and

reflected in its governmental data collections/statistics. Commerce

additionally faults the data for not being an "official" statistic, and for

lacking volume data or information on the areas of Indonesia from

CIT Ct. No. 20-105

which the data was gathered. *Id.* at 41-42, Appx____-____. But the size-specific Indonesian pricing data were provided by the Head of the Statistical Data and Information Center in the Indonesian fisheries ministry. CFA's Feb. 25, 2019 SV Submission at Ex. I-3A, Att. 3 (August 1, 2018 Letter), Appx____-_____; *see also* CFA's Pre-Prelim SV Submission at Ex. 2 (March 26, 2019 Letter), Appx____-____. CFA's 2018 request to the ministry for fingerlings pricing data also contains, as an attachment, a ministry-published table providing volume data for fingerlings stocked in ponds throughout Indonesia and relating the request to that data. CFA's Feb. 25, 2019 SV Submission at Ex. I-3A, Att. 2, Appx____-____.

Commerce also notes that the Indonesian data relates to fingerlings smaller than those used by NTSF (which only used fingerlings over 5.7" in length), while the Indian data covers fingerlings over this length. Second Remand Results at 40-41, Appx____-____. But the Indonesian data came from a government ministry charged with collecting and disseminating nationwide statistical information regarding aquaculture, while the Indian data is taken from a one-off, geographically limited private study with spotty coverage of the POR,

CIT Ct. No. 20-105

and does not identify even the number of survey participants that provided the pricing data, much less the volume of trade reflected. *See* discussion *supra* at 12-17. Thus, even if not perfectly input-specific, the Indonesian data reflect better quality data than do the data from India.

### B. *Surrogate Labor/Wage Rate Data*

In Slip Op. 24-23, the Court found that Commerce had not yet adequately explained or supported its reliance on non-contemporaneous Indian labor/wage rate data. Slip Op. 24-23 at 9-10; *see also* Slip Op. 22-38 at 48-49. The Court found that although Commerce's Policy Bulletin "places significance on whether data are 'contemporaneous' with the period of review," the agency nonetheless relied on Indian wage rate data from more than a decade before the POR at issue in this case. Slip Op. 24-23 at 9; Slip Op. 22-38 at 48. The Court noted that regardless of which country is selected as the primary surrogate country, Commerce's policy is to use contemporaneous data when possible. Slip Op. 24-23 at 9-10. As such, regardless of the primary surrogate country selection, Commerce needed to explain why it was reasonable to rely on outdated surrogate labor data or, alternatively, discontinue that use. *Id.* at 10.

CIT Ct. No. 20-105

In the Second Remand Results, Commerce continues to rely on the

outdated data, but has not provided an explanation that adequately

addresses the Court's concerns. Second Remand Results at 20, 46-48,

Appx____, Appx____-____. While conceding that the contemporaneous

Indonesian wage data "fare better" than the outdated Indian data with

respect to indicia of data quality, *id.* at 20, Appx____. Commerce states

that the Indian data are nonetheless being employed because India is

the primary surrogate country. *Id.* This is the same circular reasoning

that the Court has repeatedly found insupportable. Slip Op. 24-23 at 6-

7, 9-10; Slip Op. 22-38 at 41, 48-49. It also is inconsistent with the

Court's finding that, regardless of the primary surrogate country,

Commerce must put forth independently reasonable grounds for relying

on outdated data.

The agency does not put forth such grounds. Not only are the Indian

data woefully out of date, it is not clear that they are industry-specific,

unlike the Indonesian data, which are both contemporaneous with the

POR and specific to "agriculture" and "manufacturing" workers. NSTF

Response to Request for Surrogate Value Information (Feb. 25, 2019) at

Ex. SV-10, Appx_____-_____; CFA's Feb. 25, 2019 SV Submission at

CIT Ct. No. 20-105

Ex. I-7, Appx_____-_____. Nonetheless, Commerce states that even if the outdated Indian data are not "preferable," they are "usable" and otherwise "viable."  Second Remand Results at 20, 47 n.225, 48, Appx_____, Appx_____, Appx_____. The agency justifies this conclusion on the basis that the Indian data, once inflated, produce an SV that differs from the Indonesian SV by 17%. *Id.*[9]

   This explanation is insufficient. As an initial matter, the agency is required to use the "best available information," not merely data that is "usable" or "viable." 19 U.S.C. § 1677b(c)(1). Moreover, while Commerce concludes that the Indian SV is not anomalous and in fact has "comparability" with the Indonesian SV, it does adequately not explain this finding. Second Remand Results at 47-48, Appx_____-_____. It simply treats the 17% difference as self-evidently meaningless—a far from obvious proposition.

---

[9]    While Commerce states that it calculated the percentage difference between the SVs, it appears to have instead calculated the percentage change from the higher value (0.70 cents for Indonesia) to the lower value (0.58 cents for India). Second Remand Results at 47 n.225, Appx_____. The percentage difference *between* the two figures is 18.75%, not 17%.

CIT Ct. No. 20-105

Regardless, there is no valid reason for Commerce to continue using an Indian value where it concedes that the Indonesian one "fare{s} better," *id.* at 20, Appx_____, particularly given its duty to seek the "best available information" for each FOP, and its policy of relying on non-primary country data where it is of higher quality. 19 U.S.C. § 1677b(c)(1); *see also* Policy Bulletin. Commerce protests that CFA would force the agency into a global hunt for the "best" SVs. Second Remand Results at 47, Appx_____. But CFA is not asking for that. It is asking that Commerce not rely on outdated and non-specific data that, even when inflated, results in a value at odds with the one the agency itself characterizes as "far{ing} better." And to the extent that the agency perceives its conclusion that "India . . . provides better surrogate data overall" as providing a basis to rely on Indian wage rate data, that conclusion has not yet been adequately explained or supported. Second Remand Results at 20, 47-48, Appx_____, Appx_____-_____.

Indeed, the Court has rejected the agency's reliance on its regulatory preference for valuing FOP in a single surrogate country to justify the use of the same outdated Indian wage rate data in the 2018-2019 review. *See Catfish Farmers of America et al. v. United States*, No. 21-

CIT Ct. No. 20-105

00380, slip op. 24-67 at 13-14 (Ct. Int'l Trade June 5, 2024) ("Slip Op.

24-67"). The Court reasoned that while the regulatory preference may

function as a tiebreaker where two potential sources of SV data are

otherwise equal, the agency cannot rely on that regulatory preference to

select an SV that is otherwise inferior. Here too, the agency has yet to

adequately explain or support its reliance on the outdated Indian wage

rate data despite its apparent deficiencies.

### C.    *Financial Factors*

In the Second Remand Results, Commerce finds Indian and

Indonesian SV data comparable for certain FOP, and thus reasons that

the relative quality of SV data from the two sources does not move the

needle toward selection of Indonesia as the primary surrogate country.

Second Remand Results at 18-20, 43-45, Appx_____-_____, Appx_____-

_____. With respect to financial factors in particular, Commerce

concedes that the record contains two contemporaneous Indonesian

financial statements, and only one statement from India. *Id.* at 18-19,

44, Appx_____-_____, Appx_____. Nonetheless, Commerce concludes

that the Indonesian data are not more advantageous and do not

undermine continued reliance on Indian data generally, or call use of

CIT Ct. No. 20-105

Indian financial data into question. *Id.* at 19-20, 44-45, Appx_____-

_____, Appx_____-_____. Commerce does not adequately explain or

support these conclusions.

When valuing financial factors in NME proceedings, "Commerce's

standard practice is to use multiple financial statements to calculate

surrogate financial ratios when possible." *NTSF Seafoods Joint Stock

Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020).

Commerce "prefers to use multiple financial statements in order to

normalize any potential distortions that may arise from using the

statements of a single producer." *Id.*; *see also* Second Remand Results at

18-19, Appx_____-_____. Here, the record contains one Indian

statement covering the period from April 1, 2017-March 31, 2018, while

it contains four statements from two Indonesian producers, collectively

covering the full POR. *See* NTSF's Feb. 25, 2019 SV Submission at Ex.

SV-13, Appx_____-_____; CFA's Feb. 25, 2019 SV Submission at Exs. I-

10A and I-10C, Appx_____-_____, Appx_____-_____; CFA's Pre-Prelim

SV Submission at Ex. 7, Appx_____-_____.

While conceding that the number of Indonesian statements and their

fuller coverage of the POR are "advantages," Commerce nonetheless

CIT Ct. No. 20-105

finds that the Indonesian statements present "drawbacks" that neither compel their use nor weigh in favor of selecting Indonesia as the primary surrogate country Second Remand Results at 19, 44-45, Appx_____, Appx_____-_____. First, Commerce observes that the statements of PT Dharma Samudera Fishing Industries Tbk ("Dharma") contain a note regarding the company's ability to continue as a going concern. *Id.* at 19, 43-44, Appx_____, Appx_____-_____. As for the other Indonesian company, PT Japfa Comfeed Indonesia Tbk ("Japfa"), Commerce concludes that "Aquaculture" represents a relatively small portion of its overall business, making its data less preferable than those of the Indian producer. Second Remand Results at 19, 44-45, Appx_____, Appx_____-_____.

Regarding Dharma, Commerce concedes that, despite the presence of the note, the company was profitable and its management expected further growth. *Id.* at 43-44, Appx_____-_____. *See also* CFA's Feb. 25, 2019 SV Submission at Ex. I-10A, p. 2 of the Auditor's Report and note 35, Appx_____ and Appx_____; CFA's Pre-Prelim SV Submission at Ex. 7, Dharma's 2018 Financial Statement at p. 2 of the Auditor's Report and note 36, Appx_____ and Appx_____. Indeed, Dharma was far more

37

CIT Ct. No. 20-105

profitable in both 2017 and 2018 than the Indian company whose

financial statement Commerce used to value financial factors. CFA's

Pre-Prelim SV Submission at Ex. 7, Appx_____-_____ (summary chart of

profit ratios, showing profit ratio of 1.56% in 2017 and 1.94% in 2018);

NTSF's Feb. 25, 2019 SV Submission at Ex. SV-13, Appx_____-_____

(summary chart showing profit ratio of 0.494% for Mulpuri Aqua

Processors Private Limited).

Nonetheless, Commerce asserts that it has notes like those present

in Dharma's statement relevant to its selection of SVs for financial

factors in other cases. Second Remand Results at 19, 43-44, Appx____,

Appx_____-_____ (citing Issues and Decision Memorandum

accompanying *Certain Hardwood Plywood Products from the People's*

*Republic of China*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020)

(final results of antidumping duty admin. rev.; 2017-2018) at cmt. 3

("Hardwood IDM") and Issues and Decision Memorandum

accompanying *Certain Passenger Vehicle and Light Truck Tires from*

*the People's Republic of China*, 89 Fed. Reg. 17,817 (Dep't Commerce

Mar. 12, 2024) (final results of antidumping duty admin. rev. and final

deter. Of no shipments; 2021-2022) at cmt 2 ("Tires IDM")).  But the

CIT Ct. No. 20-105

facts of those cases were, in Commerce's own words, "more concerning" than those here. Second Remand Results at 44, Appx_____. Both cases involved companies that not only had "going concern" notes, but current liabilities exceeding their current assets. Hardwood IDM at cmt 3; Tires IDM at cmt 2. Dharma, however, did not have this problem—its statements show that its assets exceeded its liabilities. CFA's Pre-Prelim SV Submission at Ex. 7, Dharma's 2018 Financial Statements, Auditor's Report at Consolidated Statement of Cash Flows and Consolidated Statement of Financial Position, Appx_____, Appx_____. Commerce's reliance on the Dharma "going concern" notes to discount the company's statements accordingly appears unwarranted, and at the very least has not been adequately explained.

As for the other Indonesian company, PT Japfa Comfeed Indonesia Tbk ("Japfa"), Commerce concludes that "Aquaculture" represents a relatively small portion of its overall business, making its data less preferable than those of the Indian producer. Second Remand Results at 19, Appx_____. Commerce concedes it has relied on Japfa's statements in other reviews, but finds this fact "inapposite." *Id.* at 44, Appx_____. Commerce reasons that the question at hand is not whether Japfa's

CIT Ct. No. 20-105

statements are "usable," but whether they confer a "clear advantage." *Id.*

Commerce, however, must adequately explain and support its conclusion that the Japfa statements do not confer a "clear advantage." In this regard, it is relevant that Commerce's rationale for discounting Japfa's statements here parrot arguments that it has rejected in the past, right down to the phrasing (*i.e.*, "relatively small"). *Compare NTSF Seafoods*, 487 F. Supp. 3d at 1316-19, *with* Second Remand Results at 19, Appx_____. Treating similar situations distinctly smacks of arbitrary treatment rather than reasoned decisionmaking.

Moreover, Commerce has previously found that Japfa's statements do confer an advantage with respect to calculating a margin for the sole mandatory respondent in this review (NTSF), because both companies engage in multiple activities beyond the production of frozen fish fillets. *See* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 89 Fed. Reg. 18,595 (Dep't Commerce Mar. 14, 2024) (final results and partial recession of admin. rev.; 2021-2022) at 23; Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of*

CIT Ct. No. 20-105

*Vietnam*, 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) (final

results, and final results of no shipments of the antidumping duty

admin. rev.; 2016-2017) at cmts. 4-6, 11.[10] Accordingly, even if Dharma's

statements are discounted, the agency would be left with statements

covering the entirety of the POR from a company whose business model

is particularly relevant with respect to calculating a margin for the sole

mandatory respondent here.

While the agency's regulatory preferences may be a tiebreaker in

situations where SV data from two different countries are otherwise

equal, *see, e.g.*, Slip Op. 24-67 at 14, Commerce has yet to adequately

explain or support its treatment the financial statements on the record

as presenting such a "tiebreaker" situation. Rather, it has multiple

statements from Indonesia covering the full POR, compared with one

statement from India that only covers a part of the POR. And again,

even if the statements of Dharma are discounted, it would be left with

---

[10]    The record of this review also contains certain information from
Japfa's website, which Commerce cited favorably in the 2016-2017 and
2021-2022 decision memoranda. *See* CFA's Feb. 25, 2019 SV
Submission at Ex. I-10C, Appx_____-_____ (noting that Japfa's tilapia
operation is the largest in Indonesia and that the company processes
tilapia, including frozen tilapia products, from its operations).

CIT Ct. No. 20-105

Japfa's statements—which not only cover the entire POR, but relate to a company whose operations the agency has found particularly relevant in calculating a margin for NTSF.

## IV.    <u>CONCLUSION</u>

The Second Remand Results fail to appropriately assess the quality of Indian versus Indonesian data. The agency has not demonstrated that the *Fishing Chimes/Chepala Sandadi* data on which it has relied for valuing the main FOP reflect broad market averages and are otherwise reliable, and it has not adduced reasonable bases for rejecting the Indonesian data or judging it inferior. The agency's continued use of outdated wage data has not been adequately explained or supported. Finally, the agency's assessment of the relative quality of the surrogate financial data available from India and Indonesia is lacking. CFA respectfully requests that the Court once again remand the agency' determination for further consideration.

CIT Ct. No. 20-105

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Catfish Farmers of
America and individual U.S.
catfish processors America's
Catch, Inc., Alabama Catfish,
LLC d/b/a Harvest Select
Catfish, Inc., Consolidated
Catfish Companies, LLC d/b/a
Country Select Catfish, Delta
Pride Catfish, Inc., Guidry's
Catfish, Inc., Heartland Catfish
Company, Magnolia Processing,
Inc. d/b/a Pride of the Pond,
and Simmons Farm Raised
Catfish, Inc.*

Dated: August 15, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Comments on Second Remand Results, Catfish Farmers of America, *et al.*, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 8,173 words.

<u>/s/ Nazak Nikakhtar</u>
(Signature of Attorney)

<u>Nazak Nikakhtar</u>
(Name of Attorney)

The Catfish Farmers of America and individual U.S. catfish processorsAmerica's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and <u>Simmons Farm Raised Catfish, Inc.</u>
(Representative Of)

<u>August 15, 2024</u>
(Date)