# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

---

|  |  |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*,<br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>THE UNITED STATES,<br>　　　　　　　Defendant,<br><br>　　　　and<br><br>NTSF SEAFOODS JOINT STOCK CO.,<br>　　　　　　Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 20-00105 |

---

## DEFENDANT'S RESPONSE IN SUPPORT OF THE SECOND REMAND REDETERMINATION

　　　　　　　　　　　　　BRIAN M. BOYNTON
　　　　　　　　　　　　　Principal Deputy Assistant
　　　　　　　　　　　　　Attorney General

　　　　　　　　　　　　　PATRICIA M. McCARTHY
　　　　　　　　　　　　　Director

OF COUNSEL:　　　　　　　KARA M. WESTERCAMP
K. GARRETT KAYS　　　　　Senior Trial Counsel
Office of the Chief Counsel　U.S. Department of Justice
　For Trade Enforcement &　Civil Division
　Compliance　　　　　　　Commercial Litigation Branch
U.S. Department of Commerce　P.O. Box 480
Kenneth.Kays@trade.gov　　Ben Franklin Station
　　　　　　　　　　　　　Washington, D.C. 20044
　　　　　　　　　　　　　Tel: (202) 305 7571

Fax: (202) 514-8640

October 4, 2024

Attorneys for Defendant

# TABLE OF CONTENTS

BACKGROUND ....................................................................... 2

    I.    Commerce's Final Results ................................................ 2

    II.   The Court's First Remand Order And Commerce's First
         Remand Results ......................................................... 5

    III.  The Court's Second Remand Order ...................................... 9

    IV.  Commerce's Second Remand Results ................................... 11

ARGUMENT ........................................................................ 14

    I.    Standard Of Review ..................................................... 14

    II.   Commerce's Second Remand Results Comply With The
         Second Remand Order And Are Supported By Substantial
         Evidence ................................................................ 14

         A.   Substantial Evidence Supports Commerce's Findings
              Regarding "Broad Market Average" For Whole, Live
              Fish And Fingerlings ................................................ 15

              1.   Whole, Live Fish ............................................ 19

              2.   Fingerlings .................................................. 24

         B.   Substantial Evidence Supports Commerce's
              Determination That Indian Surrogate Values Are The
              Best Available Information .......................................... 26

              1.   Legal Standard For Best Available
                   Information .................................................. 27

i

2.    Indian Data Are The Best Available Information For Whole Live Fish ..........................................28

3.    Indian Data Are The Best Available Information For Fingerlings.....................................................31

4.    Indian Data Are The Best Available Information For Fish Feed .......................................................33

5.    The Indian Financial Statements Are The Best Available Information For Financial Ratios ......35

C.    Substantial Evidence Supports Commerce's Reliance On Indian Labor Data As The Best Available Information ...................................................40

D.    Commerce Complied With The Court's Order Regarding The NTSF Issues.........................................45

CONCLUSION .........................................................................46

# TABLE OF AUTHORITITES

## CASES

*Ad Hoc Shrimp Trade Comm. v. United States*,
  618 F.3d 1316 (Fed. Cir. 2010) .............................................................. 17

*Bristol Metals L.P. v. United States*,
  703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ...................................... 27

*Carbon Activated Tianjin Co. v. United States*,
  547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ...................................... 44

*Catfish Farmers of America, et al. v. United States*,
  Ct. No. 20-00104, Slip Op. 22-38, 2022 WL 1355140 (Ct. Int'l Trade
  April 25, 2022 ..................................................................................... 5

*Catfish Farmers of America, et al. v. United States*,
  Ct. No. 20-00105, Slip Op. 24-23, 2024 WL 775181 (Ct. Int'l Trade
  Feb. 26, 2024)............................................................................... passim

*Changzhou Trina Solar Energy Co. v. United States*,
  975 F.3d 1318 (Fed. Cir. 2020) .............................................................. 27

*Fresh Garlic Producers Ass'n v. United States*,
  83 F. Supp. 3d 1330 (Ct. Int'l Trade 2015) ........................................ 17

*Globe Metallurgical, Inc. v. United States*,
  865 F. Supp. 2d 1269 (Ct. Int'l Trade 2012)....................................... 23

*Goldlink Indus. Co. v. United States*,
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)....................................... 27

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
  335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018)....................................... 18

*Hangzhou Yingqing Material Co. v. United States*,
  195 F. Supp. 3d 1299 (Ct. Int'l Trade 2016)............................ 16, 20, 24

*Heze Huayi Chemical Co., Ltd. v. United States,*
  Ct. No. 17-32, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018)........ 43

*Home Meridian Int'l, Inc. v. United States*,
  772 F.3d 1289 (Fed. Cir. 2014) ............................................................ 41

*Jacobi Carbons AB v. United States*,
  222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017)........................................ 7

*Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*,
  396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019)...................................... 43

*Jiaxing Bro. Fastener, Co., Ltd. v. United States*,
  822 F.3d 1289 (Fed. Cir. 2016) ...................................................... 39, 41

*JMC Steel Corp. v. United States*,
  24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ................................. passim

*List Indus. v. United States*,
  641 F. Supp. 3d 1400  (Ct. Int'l Trade 2023)...................................... 44

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)...................................... 14

*NTSF Seafoods Joint Stock Co. v. United States*,
  487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020)...................................... 36

*Shenzhen Xinboda Indus. Co. v. United States*,
  456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020)...................................... 41

*Tri Union Frozen Prods., Inc. v. United States*,
  227 F. Supp. 3d 1387 (Ct. Int'l Trade 2017)...................................... 44

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) ......................................................... 27

iv

# STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................... 14

19 U.S.C. § 1677b(c)(1) .................................................................... passim

# REGULATONS

19 C.F.R. § 351.408(c)(2) .................................................................. 40, 44

# FEDERAL REGULATION NOTICES

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    75 Fed. Reg. 12,726 (Dep't of Commerce Mar. 17, 2010)...................22

*Utility Scale Wind Towers from the People's Republic of China*,
    77 Fed. Reg. 75,992 (Dep't of Commerce Dec. 24, 2012). ..................34

*Certain Steel Threaded Rod from the People's Republic of China*,
    79 Fed. Reg. 71,743 (Dep't of Commerce Dec, 3, 2014) ..............16, 22

*Certain Polyethylene Terephthalate Resin from the People's Republic of China,*
    81 Fed. Reg. 13,331 (Dep't of Commerce Mar. 14, 2016...................33

*Certain Frozen Fish Fillets from the Socialist,*
    85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) .....................2

*Certain Hardwood Plywood Products from the People's Republic of China,*
    85 Fed. Reg, 77,157 (Dep't of Commerce Dec. 1, 2020) .....................37

# **GLOSSARY**

| | |
|---|---|
| CFA: | Catfish Farmers of America, *et al.* |
| FOP: | Factor of Production |
| GNI: | Gross National Income |
| IDM: | Issues and Decision Memorandum |
| NTSF: | NTSF Seafood Joint Stock Company |
| POR: | Period of Review |
| SV: | Surrogate Value |

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE**

---

|  |  |  |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Consol. |
| v. | ) ) | Court No. 20-00105 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| NTSF SEAFOODS JOINT STOCK CO., | ) ) | |
| Defendant-Intervenor. | ) ) | |

---

## DEFENDANT'S RESPONSE IN SUPPORT
## OF THE SECOND REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response

to the comments filed by the plaintiffs, CFA,[1] ECF No. 113 (CFA

---

[1] Catfish Farmers of America, America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA).

Cmnts.), concerning the United States Department of Commerce's (Commerce) final results of redetermination filed in accordance with this Court's decision and remand order in *Catfish Farmers of America, et al. v. United States,* Ct. No. 20-00105, Slip Op. 24-23, 2024 WL 775181 (Ct. Int'l Trade Feb. 26, 2024) (*CFA II*). *See* Final Results of Redetermination Pursuant to Court Remand, May 31, 2024 (Second Remand Results), ECF No. 109 (Remand P.R. 6), Appx17536-17583.[2] For the reasons explained below, we respectfully request that the Court sustain Commerce's remand results and enter judgment for the United States.

BACKGROUND

I. <u>Commerce's Final Results</u>

On April 29, 2020, Commerce published the final results of the 2017-2018 administrative review of the antidumping duty order covering certain fish fillets covering the Socialist Republic of Vietnam. *See Certain Frozen Fish Fillets from the Socialist*

---

[2] Citations to the public record "P.R. _" and confidential record "C.R._" refer to the underlying administrative review record. Citations to "Remand P.R._" and "Remand C.R._" refer to the public and confidential record of the remand redetermination, respectively.

*Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) (final results) (P.R. 521), Appx1001-1003, and accompanying Issues and Decision Memorandum (IDM) (P.R. 515), Appx1005-1039.   To determine normal value, the statute directs Commerce to value factors of production (FOPs) with the "best available information" from a market economy country or countries, as Commerce considers appropriate.  *See* IDM at 17, Appx1021 (citing 19 U.S.C. § 1677b(c)(1)).  In its final results, Commerce selected India, over Indonesia, as the primary surrogate country because it was at the same level of economic development as Vietnam and a significant producer of merchandise comparable to the subject merchandise based on the information available. *See id.* at 11-16, Appx1015-1020.  Commerce found that overall data considerations supported a selection of India over Indonesia. *See* IDM at Comment 2, Appx1015-1025.  Specifically, Commerce explained its practice pursuant to Policy Bulletin 04.1, stating that if more than one country satisfies the economically comparable and significant producer criteria for surrogate country selection purposes, "then the country with the best factors data is selected

as the primary surrogate country." *Id.* (citing Enforcement and

Compliance's Policy Bulletin No. 04.1, "Non-Market Economy

Surrogate Country Selection Process" (Mar. 1, 2004) (Policy

Bulletin 04.1), available at

https://enforcement.trade.gov/policy/bull04-1.html.  Commerce

explained that "a country that perfectly meets the requirements of

economic comparability and significant producer is not of much use

as a primary surrogate if crucial factor price data from that

country are inadequate or unavailable." *Id.*

     When considering what constitutes the "best available

information," Commerce considers the following several criteria,

including whether the data are contemporaneous, publicly

available, tax and duty exclusive, representative of a broad market

average, and specific to the inputs in question. *See id.* at 17,

Appx1021; *see also* 19 U.S.C. § 1677b(c)(1).  Commerce explained

that no factor is dispositive and its preference is to satisfy the

breadth of the above criteria.  IDM at 17, Appx1021.  Thus, even

though Commerce explained its practice of selecting India as its

primary surrogate country from those countries at the "same" level

of economic development and that are significant producers of comparable merchandise, *id.* at Comment 2, Appx1015-1025, Commerce also explained why the Indian surrogate value data (for fingerlings, fish feed, whole live fish, by-products, and financial ratios) are preferable under each criterion and, as a whole, further support a selection of India as the primary surrogate country. *See id.* at 16-21, Appx1020-1025.

II.    **The Court's First Remand Order And Commerce's First Remand Results**

On April 25, 2022, the Court sustained in part Commerce's final results and remanded in part, among other issues, Commerce's primary surrogate country selection. *Catfish Farmers of America, et al. v. United States*, Slip Op. 22-38, Court Nos. 20-00104 and 20-00105, 2022 WL 1375140, at *11-24 (Ct. Int'l Trade Apr. 25, 2022). The Court remanded for Commerce to reconsider whether Indonesia is also economically comparable to Vietnam, and whether the Indian FOP data are the best available information as compared to the competing Indonesian data submitted by CFA. *Id.* at *18. Additionally, on the issue of NTSF Seafoods Joint Stock Co.'s (NTSF) FOPs reporting, the Court

5

directed Commerce to address contradictory reports and studies on the record regarding NTSF's whole-live-fish-to-fillet ratio, and to consider whether Commerce's analysis had properly accounted for the cost to produce by-products. *Id.* at *21-22 & n.23. Similarly, the Court held that Commerce's determination regarding NTSF's reported moisture content was not supported by substantial evidence because Commerce had "failed to address both the record evidence contrary to its decision and the record evidence potentially supportive of its decision." *Id.* at *22-23.

Specifically, on the issue of the primary surrogate country selection, the Court ordered Commerce to explain: (a) whether Indonesia is economically comparable to Vietnam using the same World Bank gross national income (GNI) data that Commerce had used to identify India and the five other countries on the Surrogate Country List, and whether Commerce had improperly focused its analysis on a set of countries at the "same" level of economic development as Vietnam; (b) whether the Indian FOP data are the best available information compared to Indonesian data that CFA had submitted; (c) why Commerce treated the Indian data as

6

superior to the Indonesian data; (d) Commerce's finding that the Indian surrogate values for whole fish, fingerlings, and fish feed represented broad market averages that constituted the best available information; and (e) Commerce's decision to use non-contemporaneous 2006 Indian data to value labor inputs. *Id.* at *11-18.

On remand, Commerce continued to select India as the primary surrogate country from its list of countries that it considered to be at the "same" level of economic development as Vietnam. Final Results of Remand Redetermination Pursuant to Court Remand, ECF No. 75 (Aug. 23, 2022) (First Remand Results) at 8-18, 38-48, Appx17421-17431, Appx17451-17461. Commerce explained that its selection of India was consistent with administrative practice and Court precedent relating to its sequential surrogate country selection practice, but it was also warranted by the fact that India's GNI was far more proximate to that of Vietnam than that of Indonesia. *Id.* (citing *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1171-75 (Ct. Int'l Trade 2017)).

Further, with respect to Commerce's reliance on India, Commerce explained that the Indian surrogate value (SV) sources were preferable on balance. *See id.* at 18-19, Appx17431-17432. Commerce stated that the Indian data source – the *Fishing Chimes* publication – represented a broad market average for key inputs, including whole live fish, fingerlings, and fish feed, because the data were sourced from a survey of major fish-producing districts within the state of Andhra Pradesh, which was the predominant location of pangasius production in India. *Id.* at 18-27, 51-56, Appx17431-17440, Appx17464-17469.  Additionally, Commerce explained that the record contained an article from *Undercurrent News,* which corroborated pricing information for fish feed in India, as reported in *Fishing Chimes*. *Id.* at 24-25, 53-54, Appx17437-17438, Appx17466-17467.  Commerce explained that its reliance on the 2006 Indian labor data was appropriate in light of Commerce's practice to rely on a single country for SVs, to the extent possible. *Id.* at 55-56, Appx17468-17469.

In addressing certain reports that CFA had offered to rebut NTSF's reporting of its own whole live fish-to-fillets ratio,

8

Commerce explained that it had previously verified NTSF's

consumption figures, and that the figures NTSF had reported were

within the ranges of yield tests in verification reports from earlier

administrative proceedings that were part of the record. *Id.* at 7-8,

23-26, Appx17420-17421, Appx17436-17439. Furthermore,

Commerce analyzed various inconsistencies on the record and

determined that the record, as a whole, did not support that CFA's

allegation that NTSF had misreported its moisture content. *Id.* at

29-33, 57-66, Appx17442-17446, Appx17471-17479. After the

Court requested supplemental briefing regarding potential double

counting in NTSF's reporting of certain by-products, ECF. No. 96,

Commerce realized that it made a misstatement relating to a small

portion of NTSF's by-product claim, and requested a voluntary

remand to provide further explanation. ECF. No. 100.

III.   <u>The Court's Second Remand Order</u>

In *CFA II*, the Court sustained Commerce's findings

regarding NTSF's reported moisture content and the

appropriateness of the fish feed sources Commerce relied upon in

the final results. 2024 WL 775181, at *3, *4-5.

The Court, however, remanded several SV issues. First, the Court remanded Commerce's selection of India as the primary surrogate country, directing Commerce to address whether, in accordance with section 19 U.S.C. § 1677b(c)(1), Indonesia is economically comparable to Vietnam and, if so, the relative merits of the Indonesian data vis-à-vis Indian data in terms of the countries' respective viability as a potential surrogate country. *Id.* at *1-2. Second, the Court directed Commerce to further explain how the Indian *Fishing Chimes* publication represents a broad market average for whole live fish and fingerlings, given that Commerce did not show how the *Fishing Chimes* data compare to India's overall pangasius production. *Id.* at *3. Third, the Court remanded for further explanation, Commerce's reliance on non-contemporaneous labor data, in light of Policy Bulletin 04.1 requiring the use of contemporaneous data when possible. *Id.* at *4. Fourth, the Court instructed Commerce to explain why the studies proffered by CFA are unconvincing or insufficient with respect to NTSF's reporting of the consumption rate for a main input, *i.e.*, whole live fish. *Id.* Finally, the Court granted

Commerce's voluntary remand request to allow it "to re-evaluate whether potential double counting with NTSF's FOPs reporting is present." *Id.*

## IV. Commerce's Second Remand Results[3]

On remand, Commerce explained that it considered both Indonesia and India, "within very broad parameters," to satisfy the statutory standard of being at a "comparable" level of economic development.[4]  Second Remand Results at 10, Appx17545.  After Commerce found India and Indonesia to be comparable, it nonetheless again found that the Indian data are superior to the Indonesian data and are the best available information for valuing FOPs.  *Id.* at 11, Appx17546.  For example, Commerce explained that the Indian data, via the *Fishing Chimes* publication, satisfy each of its surrogate value selection criteria for the inputs that account for more than a majority of normal value –

---

[3]  To avoid repetition, we address the specific factual issues in the argument section, below.

[4]  Commerce's determination is supported by substantial evidence and uncontested by the parties.  *See* Second Remand Results at 10-11, Appx17545-17546; *see generally* CFA Cmnts.

fish feed, fingerlings, and whole live fish. *Id.* at 10-21, 35-42, Appx17545-17556, Appx17570-17577. Moreover, Commerce thoroughly explained how the *Fishing Chimes* data complied with its practice regarding determining the representativeness of a broad market average. *Id.* at 13-17, Appx17548-17552. For the same inputs, Commerce explained that the Indonesian data are less desirable in terms of specificity of the input and contemporaneity with the period of review, among other concerns about the general reliability of the data. *Id.* at 12-13, 17-18, Appx17547-17548, Appx17552-17553. In terms of surrogate financial ratios, Commerce explained that neither the Indian nor Indonesian financial statements offered a clear advantage; ultimately, Commerce explained that its concerns about the Indonesian statements do not outweigh any potential advantages, which warrant its selection. *Id.* at 18, Appx17553. Commerce also explained that, even though the Indonesian labor data is contemporaneous with the period of review, there is nothing on the record which rendered the Indian labor data to be unreliable, before or after being inflated to reflect the period of review. *Id.* at

20, Appx17555.  Finally, Commerce elaborated on its use of
Indonesian data for other by-products and minor inputs, whereas
the Indian data was less specific or unavailable.  *Id.* at 20-21,
Appx17555-17556.

For NTSF's reporting of its ratio of whole live fish to fillets,
Commerce explained that the third-party reports that CFA had
placed on the record did not have substantive probative value, nor
did they undermine the yield tests that Commerce had
corroborated from verification reports from prior administrative
reviews.  *Id.* at 22-26, Appx17557-17561.  Regarding any potential
double counting in NTSF's by-product reporting, Commerce
determined that double counting of the by-product offset was not
taking place.  *Id.* at 27-29, Appx17562-17564.  Indeed, in its
comments on the draft remand results, CFA did not contest
Commerce's finding that India and Indonesia are economically
comparable and did not present any arguments relating to the
consumption rate and by-product issues.  *Id.* at 30, Appx17565; *see
also* CFA Comments on Draft Results of Redetermination (Apr. 22,
2024) (CFA Remand Comments) (Remand P.R. 5), at 5, 24-25,

13

Appx17513, Appx17532-17533.  At bottom, Commerce continued to

find that the Indian surrogate values on the record were preferable

to the Indonesian sources and were the best available information

on the record for valuing FOPs, pursuant to 19 U.S.C. §

1677b(c)(1).  *See* Second Remand Results at 35-48, Appx17570-

17583.

ARGUMENT

I.    <u>Standard of Review</u>

In remand proceedings, the Court will sustain Commerce's

determinations if they are "in accordance with the remand order," and

are "supported by substantial evidence, and are otherwise in accordance

with law."  *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349,

1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

II.   <u>Commerce's Second Remand Results Comply With The Second
Remand Order And Are Supported By Substantial Evidence</u>

Consistent with *CFA II*, Commerce's second remand results

provide additional explanation and address record evidence regarding:

(1) the relative merits of the Indonesian data vis-à-vis Indian data in

terms of the countries' respective viability as a potential surrogate

country, (2) the *Fishing Chimes* data's representativeness of broad

14

market average for whole live fish and fingerlings, and (3) Commerce's

reliance on non-contemporaneous labor data from India, the primary

surrogate country.  No party contests Commerce's determinations in the

second remand results that Indonesia is at a comparable level of

economic development as Vietnam, or NTSF's reporting of the ratio of

whole live fish to fillets and potential double counting with regard to

NTSF's FOPs.  In sum, substantial evidence supports Commerce's

determination that the Indian data continue to be preferable to the

Indonesian data.  The Court should reject CFA's various meritless

arguments, as we explain below.

> A.    Substantial Evidence Supports Commerce's Findings
>        Regarding "Broad Market Average" For Whole, Live Fish
>        And Fingerlings

Substantial evidence supports Commerce's determination that the

data from the *Fishing Chimes* publication represented a broad market

average for whole live fish and fingerlings, because the data were

sourced from a survey of major fish-producing districts within the state

of Andhra Pradesh, which was home to a vast majority of pangasius

production in India during the period of review.  *See* Second Remand

Results at 13, Appx17548.  CFA, however, seeks to impose restrictions

on Commerce's interpretation of "broad market average." CFA Cmnts.

at 23-25.  Specifically, CFA argues that only sources that meet CFA's

proposed geographical and volume reporting requirements can satisfy

Commerce's requirements for "broad market average."  *Id.*  The Court

should reject these unprecedented and unsupported restrictions on

what constitutes a broad market average.

    As Commerce explained in the second remand results, neither the

statute nor its regulations define the term "broad market average."  *See*

Second Remands Results at 15 n.76, Appx17550.  Commerce explained

that it interprets the term on a spectrum, *id.* at 16, Appx17551, as

"broader than a single data point (such as an offer for sale or a

transaction-specific price) and are generally reflective of market

conditions on a larger scale."  *Id.* at 15 n.76, Appx17550.  Commerce

also explained that it is not problematic, nor surprising, if it finds that

surrogate values are reflective of market conditions on a larger scale,

even if those data sources reflect only a subset of an economy.  *Id.* at 15-

16, Appx17550-17551; *see also Hangzhou Yingqing Material Co. v.

United States*, 195 F. Supp. 3d 1299, 1311 (Ct. Int'l Trade 2016)

(affirming Commerce's finding that surrogate values from the most

16

industrial city in Thailand reflect a broad market average); *Certain Steel Threaded Rod from the People's Republic of China*, 79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014) (final results admin. review), and accompanying IDM at Comment 3 ("{Commerce} finds that the {brokerage and handling} cost in Doing Business: Thailand 2014 is based on the experience of multiple survey contributors located in the largest city in Thailand, which means that this cost represents a broad-market average.").  In this case, consistent with its prior determinations, Commerce determined that the data sourced from a survey of major fish-producing districts within the state of Andhra Pradesh, which was home to a vast majority of pangasius production in India during the period of review, represented a "broad market" average.  *See* Second Remand Results at 13, Appx17548.  Indeed, Commerce does not impose a bright line rule that only country-wide data can satisfy its broad market average requirement, because "such an interpretation would not only be overly restrictive, it would also be virtually impossible to achieve."  *Id.* at 15 n.76, Appx17550.

CFA argues to the contrary that Commerce has a preference to rely on country-wide data to represent a broad market average.  CFA

Cmnts. at 24 (citing *Fresh Garlic Producers Ass'n v. United States*, 83 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2015); *Ad Hoc Shrimp Trade Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010)).  There are two problems with this argument.  First, because neither the statute nor regulations require country-wide data to satisfy Commerce's broad market average criterion, Commerce selected a data source from the state of Andhra Pradesh that accounted for a vast majority of pangasius production in India during the period of review.  *See* Second Remand Results at 13, Appx17548.  Second, Commerce did not disagree with CFA's assertion about its preference to use national level data, if *all things are equal*.  *Id.* at 39 n.188, Appx17574.  As explained further below, Commerce's weighing of the evidence about the other surrogate value criteria (*i.e.*, specificity, contemporaneity, *etc.*), do not render the Indian and Indonesian data sources equal.  In other words, CFA's continued mere disagreement with Commerce's findings, regarding what constitutes a broad market average, does not invalidate nor undermine Commerce's explanation of its practice, as applied to the facts of this proceeding.  *Cf. Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere

disagreement" with Commerce's weighing of evidence insufficient basis
for challenge).

        1.   <u>Whole, Live Fish</u>

Commerce first explained that *Fishing Chimes's* survey of Andhra
Pradesh is significant because it covered anywhere between 58 and 80
percent of the Indian production that occurred, in that state alone,
during the period of review. *See* Second Remand Results at 14,
Appx17549 (citing NTSF Aug. 27, 2019 SV Submission at Exh. 2, page
35, Appx13786). The 108 data sets from 54 farmers in 46 of the over
300 villages in the two largest pangasius producing districts in Andhra
Pradesh (*i.e.*, West Godavari and Krishna) satisfied Commerce's "broad
market average." *Id.* at 14-16, Appx17549-17551. Commerce explained
that it found this data to constitute many data points in the largest
pangasius producing state in India, thus providing representative
values regarding the market conditions in India. *Id.* at 14, Appx17549;
*see also* NTSF Sept. 10, 2019 SV Submission at Exh. 2, Appx96708-
96712. As we explained above, even without the surveyed information
from outside of Andhra Pradhesh (subset of an economy), Commerce
would still find these survey data to be a "broad market average"

19

because "the survey relied on a large number of data points from the state that accounted for a clear majority of India's production."  Second Remand Results at 14, Appx17549.  And even if the survey relied on 254 villages outside of the two-largest producing pangasius districts in Andhra Pradhesh, Commerce determined that that information did not "undermine{} the validity of the study," because "if the crop datasets were from the two major producing areas within the primary producing state, but the researchers *also* did field visits outside of these areas, that would, similarly, serve to buttress the broadly representative nature of the data."  *Id.*; *see also Hangzhou*, 195 F. Supp. 3d at 1311. Commerce also found that data collection methods used in *Fishing Chimes,* including the "cross verification" of prices from "farm-gate" and use of "statistical methods" to collect and analyze pricing data, further supported Commerce's findings regarding the reliability and representativeness of the *Fishing Chimes* data and their reflection of market conditions for pangasius production in India.  *See* Second Remand Results at 12, 15, Appx17547, Appx17550.

CFA seeks to undermine Commerce's reliance on *Fishing Chimes* by arguing that the report does not indicate certain volume or

percentage requirements (*i.e.*, percentage of pangasius volume produced by each farm or volume of fingerlings/feed purchased by each farm), CFA Cmnts. at 11.  CFA, importantly, cites no authority in which Commerce has required certain volume or percentage requirements in order for a survey to represent a broad market average; rather, such a restriction is *not* Commerce's practice.  *See* Second Remand Results at 37-42, Appx17572-17577.  Undeterred, CFA argues that the lack of farm-specific data, regarding whole-live fish production or fingerlings and feed consumption, within the Krishna and West Godavari districts, or within Andhra Pradesh as a whole, reduces the reliability of the *Fishing Chimes* data.  CFA Cmnts. at 11.  Specifically, CFA questions the number of months for which the *Fishing Chimes* publication provides harvest data for whole live fish, and what volume was gleaned from each month.[5]  *Id.* at 12.

    As Commerce explained, however, the representativeness and reliability of the *Fishing Chimes* data do not hinge on the survey information for each specific farmer from a particular month, but,

---

[5]  It is rather ironic that CFA criticizes the *Fishing Chimes* data set for purportedly not representing a broad market average and in the same breath faults the data set for not being sufficiently farm-specific.

rather, on the substantial volume of production of whole live fish covered by this source in India's largest pangasius producing region. *See* Second Remand Results at 13, 37, Appx17548, Appx17572. To wit, Commerce was puzzled because "it is unclear why such farm-specific information is necessary; the relevant fact here is that the estimated aggregate production volume covered by the survey is substantial." *Id.* at 37, Appx17572. The fact that the volume of whole live fish reflects India's largest producing region is further buttressed by Commerce's practice that a subset of a country's economy, Second Remand Results at 36, Appx17571, can still provide a basis for a finding that a particular source for surrogate values reflects a broad market average. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 75 Fed. Reg. 12,726 (Dep't of Commerce Mar. 17, 2010) (final results admin. review), and accompanying IDM at Comment 1.A; *Certain Steel Threaded Rod from the People's Republic of China*, 79 Fed. Reg. 71,743 (Dep't of Commerce Dec. 3, 2014) (final results admin. review), and accompanying IDM at Comment 3.

CFA, however, also argues that the survey never consisted of more than 11 farms providing data for a single month. *See* CFA Cmnts. at

12.  However, this observation merely reflects the existing market conditions in the industry, as Commerce explained in the second remand results, because farms do not seed/harvest fish in unison, so the level of distribution, across a two-year survey, was irrelevant.  *See* Second Remand Results at 36, Appx17571.

In other words, CFA has failed to show that its preferred surrogate values for whole live fish are the one and only reasonable surrogate selection on the record, not simply that the Indonesian data may have constituted another possible reasonable choice.  *See JMC Steel Corp. v. United States*, 24 F. Supp. 3d 1290, 1313 (Ct. Int'l Trade 2014) ("it is not the Court's place to re-weigh the evidence or to suggest that another alternative was the only appropriate choice"); *Globe Metallurgical, Inc. v. United States*, 865 F. Supp. 2d 1269, 1276 (Ct. Int'l Trade 2012) (substantial evidence review "contemplates {that} more than one reasonable outcome is possible on a given administrative record").  The Court should reject CFA's attempt to have the Court re-weigh the evidence when Commerce's explanation is supported by substantial evidence.  *See* Second Remand Results at 12-17, Appx17547-17552.

2.    Fingerlings

Turning to fingerlings and consistent with whole, live fish,

Commerce explained that *Fishing Chimes's* surveys of major fish

producing regions withing the state of Andhra Pradesh, the largest

(over a majority) pangasius producing region in India, was also

representative for fingerlings.  *See* Second Remand Results at 18,

Appx17553.  *Fishing Chimes* relied on responses from numerous

farmers and the data were corroborated by field visits and comparisons

to other data sources.  *Id.*  For example, Commerce found that the

nurseries in two locales supplied fingerlings to 94.5 percent and 96

percent of the pangasius farms in 2017 and 2018, respectively.  *See* IDM

at 19, Appx1023 (citing NTSF Aug. 27, 2019 Submission, at Exhs. SV-2

and SV-3, Appx13750-13815, Appx13817-13834).

However, CFA first argues that the fingerling production

referenced in *Fishing Chimes* took place outside of Andhra Pradesh and

appears to be disconnected from the majority of fingerlings

production/pricing within India, and even within Andra Pradesh.  *See*

CFA Cmnts. at 13-14.  This point is not relevant.  As Commerce

explained, the prices paid for fingerlings in *Fishing Chimes* reflect the

purchase prices in the largest producing region in India. *See* Second Remand Results at 42 n.204, Appx17577. Therefore, this fingerling pricing information does represent the actual experience of pangasius producers in Andhra Pradesh, which is the largest producing region in India. *See Hangzhou*, 195 F. Supp. 3d at 1311. Importantly, while CFA criticizes the *Fishing Chimes* data for purportedly including districts outside of Andhra Pradesh (which, if true, would make the data set an even broader market average), the Indonesian data do not even discuss the number of districts or provinces at all, regarding where its fingerling data were sourced. *See* Second Remand Results at 42, Appx17577 (citing CFA Sept. 10, 2019 SV Submission at Exhibit 2, Appx14233, and NTSF Aug. 27, 2019 SV Submission at Exhs. 2-3, Appx Appx13750-13815, Appx13817-13834).

Second, CFA criticizes the lack of volume reported for the "small subset of observations" for fingerlings, and that *Fishing Chimes* did not provide data for certain months of the period of review or the number of surveyed farms that provided the data for purchases of each size, the applicable volume, and the monthly pricing. *See* CFA Cmnts. at 14. Again, Commerce explained that it did not find these assertions to

undermine its findings regarding broad market average, because the Indonesian data does not pass the standards that CFA seeks to propose on the Indian data because it has *no volume data.* Second Remand Results at 36-37, Appx17571-17572. The Indonesian fingerling data also suffer from their failure to provide any indication about how the prices were determined and that the data are from a small number of sources. *Id.* at 37, 42, Appx17572, Appx17577. Thus, substantial evidence supports Commerce's determination that the Indian fingerling data represent a broad market average. *See JMC Steel Corp.*, 24 F. Supp. 3d at 1313.

B.    Substantial Evidence Supports Commerce's Determination That Indian Surrogate Values Are The Best Available Information

Substantial evidence supports Commerce's explanation for why the Indian FOP data are the best available information on the record, compared to the Indonesian data offered by CFA. *CFA II*, 2024 WL 775181, at *2. Specifically, the Court remanded for Commerce "evaluate the Indian data on its relative merits vis-à-vis Indonesian data." *Id.* On remand, Commerce explained why the Indian data, on balance, continue to be preferrable in satisfying its surrogate value

criteria.  *See* Second Remand Results at 11-26, 35-48, Appx17546-17561, Appx17570-17583.  Commensurate with Commerce's determination that the Indian data reflect a broad market average for the major inputs, Commerce also found that Indian data are the best available information for each factor of production (FOP) input, as explained below.

1.    <u>Legal Standard For Best Available Information</u>

Commerce's practice when selecting the best available information to value FOPs is to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and free of any taxes or duties.  *See, e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1331 (Fed. Cir. 2020).  When Commerce provides a reasoned basis for finding that the chosen data satisfy its criteria and constitute better data than alternatives, courts are "reluctant to substitute {their} own evidentiary evaluation for Commerce's{.}" *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (citation and quotation marks omitted).  Indeed, the Court should only consider whether Commerce's selection was reasonable in light of

27

information available on the record, rather than evaluating directly

whether the information that Commerce used was the best available.

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341

(Fed. Cir. 2011) (citing *Goldlink Indus. Co. v. United States*, 431 F. Supp.

2d 1323, 1327 (Ct. Int'l Trade 2006) ("This court's duty is "not to evaluate

whether the information Commerce used was the best available, but

rather whether a reasonable mind could conclude that Commerce chose

the best available information.")).

> 2.    Indian Data Are The Best Available Information For Whole Live Fish

As explained above, Commerce relied on Indian data, from the

*Fishing Chimes* publication, as its source for valuing the main inputs,

including whole live fish.  *See* Second Remand Results at 12, Appx17547

(citing IDM at 16-21, Appx1020-1025).  In addition to reflecting a broad

market average, Commerce explained that it found this Indian data

source to be publicly available, contemporaneous, tax- and duty-

exclusive, and specific to the inputs, including the particular species of

pangasius in question.  *See id.* (citing IDM at 18-20, Appx1022-1024).

Commerce also explained that the record contained an Indonesian data

source, that is, the 2017 production data from the Indonesian Ministry of

Marine Affairs and Fisheries' *One Data* website.  *Id.* (citing IDM at 19, Appx1023).   Regardless, as Commerce explained in the second remand results, although the Indonesian data met some of its surrogate value selection criteria, the Indonesian data are not species-specific and are only partially contemporaneous with the period of review, unlike the Indian data.  *See id.* at 12-13, Appx17547-17548 (citing CFA Pre-Preliminary SV Submission (Sept. 10, 2019), Appx14200-15501, IDM at Comment 2.C, Appx1020-1025); *see also* NTSF Aug. 27, 2019 SV Submission at Exh. SV-2, Appx13750-13815, and SV-3 (Table 6 "Comparison of Farm gate Prices and No. of Farms Harvested" 2017-2018), Appx13817-13834.  In other words, the Indonesian data collection were not conducted at the species level, unlike the Indian data.  Second Remand Results at 13 n.67, Appx17548.

However, CFA contends that Commerce's concerns regarding the inclusion of other species in the Indonesian data are uncompelling.  *See* CFA Cmnts. at 27-29.  Specifically, it points to statements from the individuals within the Indonesian Ministry of Marine Affairs and Fisheries, which highlight that *Pangasius hypophthalmus* is the predominant species represented in the Indonesian data, and that other

record sources support a finding that pangasius production represents over 90 percent of Indonesian catfish production. *Id.*

But Commerce did not find this evidence to be probative. *See* Second Remand Results at 38-39, Appx17573-17574. Specifically, the Director of Aquaculture from the Indonesian Ministry of Marine Affairs and Fisheries statement admitted that it did not have the necessary data to determine the "dominant species." *Id.* at 38, Appx17573 (citing CFA Dec. 14, 2018 Surrogate Country Comments at Exhibit I-3H, Appx4736-4758). Additionally, although CFA offered an academic's affidavit to support its argument regarding the percentage of patin siam reflected by the proffered Indonesian data source, Commerce observed that no supporting evidence or data were included to support the statements regarding percentages by species in the affidavit. *Id.* at 38-39, Appx17573-17574 (citing CFA Dec. 14, 2018 Surrogate Country Comments at Exhibit I-3H (containing a letter from an academic, Dr. Ir. Agus Oman Sudrajat), Appx4919-4942). Thus, as Commerce explained, this information did not provide a basis to alleviate Commerce's concern about the inclusion of multiple species in the Indonesian data. *See* Second Remant Results at 39, Appx17574.

Finally, CFA argues that even if the Court finds that Commerce reasonably found that the Indonesian data are not "perfectly species-specific," CFA argues that its proffered Indonesian data are still usable. *See* CFA Cmnts. at 29. CFA's contentions, however, again amount to a request to reweigh the evidence and select the inferior quality Indonesian data, which the Court should decline to do. *See JMC Steel Corp.*, 24 F. Supp. 3d at 1313.

### 3. Indian Data Are The Best Available Information For Fingerlings

Substantial evidence supports Commerce's explanation that the Indian data, sourced from the publication *Fishing Chimes*, satisfies each of Commerce's surrogate value selection criteria. *See* Second Remand Results at 4, Appx17539 (citing IDM at Comment 2, Appx1015-1025). In the second remand results, Commerce further explained its analysis regarding the shortcomings of Indonesian fingerling data, specifically, that they are not size-specific and species-specific. *See id.* at 4, 40-41, Appx17539, Appx17575-17576 (citing CFA Sept. 10, 2019 SV Submission at Exhibit 2, Appx14233). As Commerce explained, NTSF only consumed fingerlings 5.7 inches or greater, *id.* at 4, Appx17539 (citing NTSF Resp. to Section D Suppl. Questionnaire (Feb. 11, 2019), at

31

Attachment I, Appx7118-7119).  But *none* of the Indonesian fingerlings represented this size (or any fingerlings greater than four inches), nor did the Indonesian source – the Director of Hatchery under the Director General of Aquaculture under the Ministry of Marine Affairs and Fisheries of Indonesia – have any data for the size of those fingerlings consumed by NTSF.  *See id.* at 41, Appx17576.  Finally, Commerce explained that the Director of Hatchery data included species of pangasius, other than those processed by NTSF.  *See id.* (CFA Sept. 10, 2019 SV Submission at Exhibit 2, Appx14233, and NTSF Aug. 27, 2019 SV Submission at Exhibits 2-3, Appx13750-13815, Appx13817-13834).

CFA argues that even if the Indonesian data are not "perfectly input-specific," the Indonesian source should be preferred based on Commerce's preference for surrogate value sourcing methodology.  *See* CFA Cmts. at 30-31.  CFA again erroneously invites the Court to reweigh the evidence and select inferior data, while failing to show that Commerce's explanation is unreasonable.  *See* Second Remand Results at 40-41, Appx17575-17576; *JMC*, 24 F. Supp. 2d at 1313.

4. Indian Data Are The Best Available Information For Fish Feed

The Court already sustained Commerce's explanation regarding its reliance on Indian data for fish feed, *CFA II*, 2024 WL 775181, at *3, and the Court should reject CFA's challenges to this SV input. *See* CFA Cmnts. at 14-17. In any event, Commerce explained that the proffered Indian fish feed data satisfy the SV criteria and are preferred over the Indonesian data to further indicate why India is preferred as its primary surrogate country in complying with the Remand Order. *See* Second Remand Results at 17, 37-40, Appx17552, Appx17572-17575; *see also* First Remand Results at 53-54, Appx17466-17467; IDM at 19, Appx1023.

Alternatively, should the Court entertain CFA's challenges to Commerce's SV determination for fish feed, substantial evidence supports Commerce's determination that the Indonesian data consist of fish feed price quotes supported by sworn affidavits specifying their manner of collection, obtained only for the purposes of this review. *See* Second Remand Results at 17, 40, Appx17552, Appx17575 (citing CFA Sept. 10, 2019 SV Submission at Exh. 5, Appx14451-14452; CFA Submission of Proposed Factor Values Feb. 25, 2019 at Exhibit SV I-3B, Appx08405-08407). CFA's proffered price quotes/lists are not publicly

availability, and Commerce has a practice of not using price sources that are generated for the purposes of a proceeding. *See id.* at 17, Appx17552; *see also Certain Polyethylene Terephthalate Resin from the People's Republic of China*, 81 Fed. Reg. 13,331 (Dep't of Commerce Mar. 14, 2016) (final LTFV determ.), and accompanying IDM at Comment 2 ("Our general practice is not to use price quotes to value factors of production. {Commerce} often does not know the conditions under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes. Without access to all of the information on how the price quotes were obtained (including any negotiations or agreed-upon adjustments), it is impossible to confirm that quotes reflect a typical broad market average cost."); *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,992 (Dep't of Commerce Dec. 24, 2012) (final LTFV determ.), and accompanying IDM at 12.  CFA's argument that the Indonesian data are more preferable because they are from three Indonesian provinces, instead of two districts within one state in India, does not undermine Commerce's concern that these data sources are from price quotes/affidavits, obtained only for purposes of this proceeding.  *See* Second Remand Results at 17, 40, Appx17552,

Appx17575.  CFA's remaining arguments about fish feed are meritless,

especially considering that the Court already sustained Commerce's

determination with respect to fish feed.  *See id.*; *CFA II*, 2024 WL

775181, at *3.

     5.    The Indian Financial Statements Are The Best
             Available Information For Financial Ratios

CFA further challenges Commerce's reliance on Indian financial

statements, claiming that Commerce has not yet adequately explained

its conclusion that that the Indonesian data are not more advantageous.

CFA Cmnts. at 35-41.  To the contrary, substantial evidence supports

Commerce's determination that the Indian financial statements are the

best available information.  *See* Second Remand Results at 18-19, 43-45,

Appx17553-17554, Appx17578-17580.

For example, Commerce explained that the record contains an

unqualified and contemporaneous Indian financial statement from a

profitable company that produces/processes comparable merchandise,

called Mulpuri Aqua Processors Private Limited (Mulpuri).  *See* IDM at

20, Appx1022; Second Remand Results at 18, 43, Appx17553,

Appx17578; NTSF Feb. 25, 2019 SV Submission at Ex. SV-13,

Appx10972-11020.  The record also contained contemporaneous

financial statements of the Indonesian companies, PT Dharma

Samudera Fishing Industries Tbk (Dharma) and PT Japfa Comfeed

Indonesia Tbk (Japfa). *See* Second Remand Results at 18, 43,

Appx17553, Appx17578.

Commerce compared the Indian and Indonesian financial data

and preferred relying on the Indian financial data. Specifically,

Commerce explained that although the single Indian financial

statement has certain shortcomings (*i.e.,* contemporaneity, yet still

covers eight months of the period of review), *see* IDM at 21, Appx1025,

Second Remand Results at 45, Appx17580, the potential advantages of

the two Indonesian financial statements do not overcome their

disadvantages. Second Remand Results at 19, 43-45, Appx17554,

Appx17578-17580. Specifically, Commerce found that the financial

statements of Dharma were accompanied by an unqualified auditor's

opinion noting the company's ability to continue operating as a going

concern, and that Japfa's sales of "Aquaculture" comprised of a

relatively small percentage of the company's total sales. *Id.*

First, CFA argues that Commerce's practice is to utilize multiple

statements to calculate financial ratios, when possible. CFA Cmts. at

41 (citing *NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020)).  Although this may be true in certain administrative reviews, Commerce explained that the disadvantages of the Indonesian financial statements do not overcome the potential advantage of averaging financial statements.  Second Remand Results at 18-19, Appx17553-17554.

For example, even considering Dharma's profitability, this did not negate the auditor's statement questioning Dharma's ability to continue as a going concern, despite the management's belief that the company would continue to grow, nor is it something that Commerce should have ignored.  *See id.* at 44, Appx17579 (citing CFA Sept. 10, 2019 SV Submission at Exh. 7, Appx14456-15181).  In plain speak, Dharma's financial statements were "red flagged" because an auditor's opinion note questioned the company's ability to continue as a going concern.  *See id.* at 22, 50, Appx17557, Appx17585.  Such notes are important because they are indicative of the financial health of the company, whose financial statements are being relied upon.  *Id.* at 44, Appx17479; *see also Certain Hardwood Plywood Products from the People's Republic of China*, 85 Fed. Reg. 77,157 (Dep't of Commerce

Dec. 1, 2020) (final results of admin. review), and accompanying IDM at Comment 3 (observing that certain "events or conditions indicate that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern."). Thus, while the factual circumstances that would cause an auditor to raise concerns about a company's ability to continue operating as a going concern vary from case to case, it is reasonable for Commerce to weigh the going concern against the financial statement for the applicable company. Second Remand Results at 43-44, Appx17578-17579.

However, CFA argues that Dharma was more profitable than Mulpuri in 2017 and 2018, even with the auditor's note questioning the company's ability to operate in the future as a going concern. CFA Cmnts. at 37-38. CFA also cites administrative reviews where Commerce used financial statements of companies where those companies at issue had current liabilities exceeding their current assets, which it claims to not be the case for Dharma. *Id.* This argument, however, does not undermine the auditor's opinion regarding Dharma's ability (or perhaps, inability) to continue as a going concern. At a minimum, Commerce explained even if "we do not find that {this}

observation{} render{s} the statements automatically unusable, {it is}

relevant to our determination that the Indonesian statements are not

preferable to the Indian statement."  Second Remand Results at 19,

Appx17554.

Turning to the other Indonesian financial statement, CFA argues

that Commerce's rejection of Japfa's financial statement, "smacks of

arbitrary treatment" because Commerce had previously used Japfa's

financial statements.  *See* CFA Cmnts. at 39-41.  To the extent that

CFA argues that once Commerce has used a financial statement in one

proceeding, that same company's statement must continue to be

selected by the agency, the Court should reject this argument.  "{E}ach

administrative review is a separate exercise of Commerce's authority

that allows for different conclusions based on different facts in the

record." *Jiaxing Bro. Fastener, Co., Ltd. v. United States*, 822 F.3d

1289, 1299 (Fed. Cir. 2016).  Specifically, in the administrative reviews

cited by CFA, Commerce's surrogate country selection was not at issue

and the facts on the record did not involve the same universe of

competing financial statements, so Commerce was never in a position to

compare financial statements from its non-primary surrogate country.

39

*See* Second Remand Results at 45 n.214, Appx17580; CFA Cmnts. at 40-41.  Furthermore, Commerce never said that the Japfa statement is unusable; rather, Commerce explained that the shortcomings of each financial statement on the record do not provide a factual basis which warrants undermining Commerce's selection of its primary surrogate country.  *See* Second Remand Results at 44-45, Appx17579-17580.

Ultimately, although CFA is unsatisfied with Commerce's weighing of the evidence, this Court cannot reweigh the evidence, *JMC*, 24 F. Supp. ed at 1313, and substantial evidence supports Commerce's determination that the Indian financial statements are the best available information on the record to calculate the surrogate financial ratios.  Second Remand Results at 23-23, 48-50, Appx17558-17559, Appx17583-17585.

C.   Substantial Evidence Supports Commerce's Reliance on Indian Labor Data As The Best Available Information

As Commerce explained in the second remand results, it continued to rely on an Indian source to value labor on remand, while also acknowledging some of its shortcomings:  specifically that the Indian data are not contemporaneous, and that Commerce was required to inflate the figures to reflect the period of review.  *See* Second Remand

Results at 4, 45, Appx17539, Appx17580.

To begin with, Commerce explained how it favors selecting SVs from a single country to the extent possible, pursuant to 19 C.F.R. § 351.408(c)(2). *Id.* at 4, Appx17539. Consistent with its practice and court-sustained methodology, Commerce will "resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable," and there is nothing on the record to suggest that the Indian values are anomalous. *Id.* at 4, 45, Appx17539, Appx17580; *see also Jiaxing II*, 822 F.3d at 1293-96, 1298, 1302. As we explained above, Commerce stated that it found the India data to be preferrable overall and because the India labor data are still usable, it relied on such information to reflect the wages during the period of review. Second Remand Results at 20-21, Appx17555-17556 (citing *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1284 (Ct. Int'l Trade 2020) (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) (recognizing that Commerce has discretion in SV selection and may select non-contemporaneous data)). Furthermore, Commerce explained that, according to its practice under its regulatory preference, Commerce

41

tries to "use as much data as possible from the primary surrogate country."  Second Remand Results at 46, Appx17581 (citing *Jiaxing*, 822 F.3d at 1294 & n.3).  Commerce also properly considered the shortcoming in the Indian data (*i.e.*, the data predated the period of review), and took reasonable steps to mitigate it by adjusting the figures for inflation to reflect the period of review.  *See id.* at 4, 45, Appx17539, Appx17580.  Indeed, Commerce noted that there was "nothing on the record to suggest that the Indian values are anomalous," once adjusted.  *Id.* at 20, Appx17555.

Before the agency, CFA argued that "the agency is required to use the best available information, not merely data that is usable."  CFA Remand Comments (Remand P.R. 5) at 19, Appx17527.  Although this statement is generally true, CFA's proposed blanket rule is inconsistent with Commerce's practice.  *See* Second Remand Results at 46-47, Appx17581-17582.  Specifically, Commerce explained that CFA's proposed approach would lead Commerce to search for the best data among a wide swathe of countries for each FOP, regardless of the primary surrogate country chosen for the best available data "on an *aggregate* basis."  *Id.* at 46, Appx17581.  CFA's proposed approach is

42

also inconsistent with Commerce's Court-sustained methodology and could otherwise introduce distortions into the calculations of normal value. *Id.* Finally, Commerce explained that a 17 percent difference between the Indonesian and inflated Indian data did not render the Indian data somehow aberrational, unviable, or unusable. *Id.* at 47-48, Appx17582-17583.

Undeterred and against this backdrop, CFA argues that Commerce's analysis is insufficient, in light of Commerce's acknowledgement of the lack of contemporaneity of the Indian data, and that Commerce does not adequately explain its reliance on the Indian labor data. CFA Cmnts at 33-35.

This Court has held otherwise. First, although Commerce prefers to value FOPs with contemporaneous surrogate values, Commerce has previously selected primary surrogate country labor values even when there are other values on the record that may have been more contemporaneous. *See Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1350-51 (Ct. Int'l Trade 2019) ("Commerce was therefore justified in using the South African labor data despite its lack of contemporaneity because the other factors

favored the South African data as a whole over the Bulgarian data");

*Heze Huayi Chemical Co., Ltd. v. United States,* Ct. No. 17-32, 2018

WL 2328183, at *8 (Ct. Int'l Trade May 22, 2018) ("Commerce was able

to adjust the labor value for Mexico through its normal method of

inflating the value for labor . . . to account properly for inflation or

changes in the labor rate over this time period").  Furthermore, CFA

does not address Commerce's concern about introducing distortions

from relying on labor values from a non-primary surrogate.  *See* Second

Remand Results at 45, Appx17580.  This Court has sustained and

acknowledged Commerce's practice of valuing FOPs from its "primary

surrogate country" as a way "to minimize distortion."  *List Indus. v.*

*United States*, 641 F. Supp. 3d 1400, 1413 (Ct. Int'l Trade 2023) (citing

*Tri Union Frozen Prods., Inc. v. United States*, 227 F. Supp. 3d 1387,

1400 (Ct. Int'l Trade 2017)); *see also Carbon Activated Tianjin Co. v.*

*United States,* 547 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2021)

(discussing Commerce's preference to value all factors of production in a

single surrogate country).

Finally, CFA argues that it is not clear that the Indian labor data

were not industry-specific, but the Court did not remand that issue, and

CFA does not cite *any* record evidence demonstrating that the Indian labor data are not specific. CFA Cmnts. at 32. Thus, although CFA asks the Court to prioritize contemporaneity over other factors, CFA Cmnts at 31-35, substantial evidence supports Commerce's preference to use data from the primary surrogate country. *See* Second Remand Results at 20, 45-47, Appx17555, Appx17580-17582; 19 C.F.R. § 351.408(c)(2).

  D. Commerce Complied With The Court's Order Regarding The NTSF Issues

   In *CFA II,* the Court directed Commerce to address record evidence that reportedly undermined NTSF's reported yield ratio and granted Commerce's voluntary remand request to re-evaluate whether potential double counting with NTSF's FOPs reporting is present. 2024 WL 775181, at *4. No party contests Commerce's second remand results, and the second remand results are supported by substantial evidence.

   For example, Commerce explained why CFA's proffered third-party reports were insufficient compared to Commerce's verification of NTSF's own reported ratio of whole live fish to fillets. *See* Second Remand Results at 22-26, Appx17557-17561.

The authors generally did not provide the type of fillet and level of trimming, all of which affect the yield. *Id*. Commerce, thus, "afford{ed} these documents significantly less weight than Commerce's own, observed findings." *Id*. at 26, Appx17561. In contrast, Commerce explained that the verification reports were much more reliable because the "information in these reports includes details on the starting whole fish volume and the resultant raw fillet weights that Commerce directly observed." *Id*.

Likewise, with respect to by-product reporting and potential double-counting, Commerce explained that CFA was incorrect that double-counting had occurred. *Id*. at 28-29, Appx17563-17564. In other words, substantial evidence supports Commerce's determination that NTSF's by-product offset does not include frozen broken meat. *See id*.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's second remand results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy
Assistant Attorney
General

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

OF COUNSEL:
K. GARRETT KAYS                      /s/ Kara M. Westercamp
Of Counsel                           KARA M. WESTERCAMP
Office of the Chief Counsel          Senior Trial Counsel
  for Trade Enforcement & Compliance U.S. Department of Justice
U.S. Department of Commerce          Civil Division
Kenneth.Kays@trade.gov               Commercial Litigation Branch
                                     P.O. Box 480
                                     Ben Franklin Station
                                     Washington D.C. 20044
                                     Tel: (202) 305-7571
                                     Fax: (202) 514-8640

October 4, 2024                      Attorneys for Defendant

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard

Chambers Procedures of this Court, that this brief contains 8,303

words, excluding the table of contents, table of authorities, any

addendum containing statutes, rules or regulations, any certificates of

counsel, and counsel's signature, as calculated by the word processing

system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>
KARA M. WESTERCAMP
Senior Trial Counsel

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
|                                              )
CATFISH FARMERS OF AMERICA,                    )
*et al.*,                                      )
                                               )
      Plaintiffs,  )
                                               )  Consol.
    v.                       )  Court No. 20-00105
                                               )
UNITED STATES,                                 )
                                               )
      Defendant,    )
                                               )
      and           )
                                               )
NTSF SEAFOODS JOINT STOCK CO.,                 )
                                               )
      Defendant-Intervenor.  )
_____)

## ORDER

Upon consideration of plaintiffs' comments regarding the United States Department of Commerce's (Commerce) second remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that Commerce's second remand redetermination are sustained.

Dated: _____                      _____

         New York, New York                                  Judge